1  JAMES R. SUTTON, State Bar No. 135930
   BRADLEY W. HERTZ, State Bar No. 138564
2  THE SUTTON LAW FIRM, PC
   150 Post Street, Suite 405
3  San Francisco, CA 94108
   Tel: 415/732-7700
4  Fax: 415/732-7701
   jsutton@campaignlawyers.com
5  bhertz@campaignlawyers.com

6
   QUENTIN L. KOPP, State Bar No. 25070
7  380 West Portal Ave.
   San Francisco, CA 94127
8  Tel: 415/681-5555
   Fax: 415/242-8838
9  quentinlkopp@gmail.com

10 Attorneys for Plaintiffs
   THE COMMON SENSE PARTY,
11 TOM CAMPBELL, DEBBIE BENREY
   and MICHAEL TURNIPSEED
12

13             **THE UNITED STATES DISTRICT COURT**
14
             **FOR THE EASTERN DISTRICT OF CALIFORNIA**
15

16 THE COMMON SENSE PARTY;        )   Case No. _____
17 TOM CAMPBELL, in his            )
   capacity as the official representative of )  **VERIFIED COMPLAINT FOR**
18 the Common Sense Party and as a )  **DECLARATORY AND INJUNCTIVE**
   registered voter in the Common Sense )  **RELIEF; EXHIBITS**
19 Party; and DEBBIE BENREY and    )
   MICHAEL TURNIPSEED, as registered )  (FIRST AND FOURTEENTH
20 voters in the Common Sense Party, )  AMENDMENTS TO THE UNITED
                                    )   STATES CONSTITUTION;
21             Plaintiffs,          )   42 U.S.C. SECTION 1983)
                                    )
22                                  )
          v.                        )
23                                  )
   ALEX PADILLA, in his official capacity )
24 as Secretary of State of California; and )
   DOES 1-20,                       )
25                                  )
             Defendants.            )
26                                  )
   _____ )
27

28
             VERIFIED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF
                                   1

1   This action arises out of California state law governing the ability of new political

2   parties to access the ballot.  Present circumstances caused by the COVID-19 pandemic

3   render the applicable state statute unduly burdensome and unconstitutional. This state

4   statute currently violates the United States Constitution and thus raises a federal question,

5   warranting review by a federal court.

6   This is an action to declare unconstitutional, enjoin and/or modify California's

7   voter registration requirements for new political parties seeking to qualify for the

8   November 2020 Presidential election ballot, as codified in California Elections Code

9   ("EC") section 5151(c), which outlines the registration requirements for general elections.

10   While these requirements are constitutional under normal circumstances, the current

11   public health emergency, and the Governor's executive orders issued in response to the

12   emergency, make the requirements impossible to attain – in effect, serving as an absolute

13   block to the November 2020 ballot.

14   Plaintiffs THE COMMON SENSE PARTY, TOM CAMPBELL, in his capacity as

15   officially designated representative of the Common Sense Party and as a registered voter

16   in the Common Sense Party, and DEBBIE BENREY and MICHAEL TURNIPSEED,

17   both of whom are voters registered in the Common Sense Party ("Plaintiffs"), by this

18   Complaint, allege as follows:

19   **INTRODUCTION**

20   1.   Plaintiffs seek this Court's protection from EC section 5151(c), which

21   requires a political organization seeking to become a state-recognized political party to

22   gather registrations of California voters equal to .33 percent of the total number of

23   registered voters in California.

24   2.   EC section 5151(c) applies only to new political parties seeking

25   qualification and not to other already established political parties.

26   3.   EC section 5151(c) requires new political parties to secure over

27

28

VERIFIED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

2

1   68,000 voter registrations in order to qualify for the November 2020 election ballot.  The

2   deadline for submitting registrations to qualify a new political party for the November

3   2020 election ballot is July 3, 2020.  (EC section 5151(c)(1) [123 days before the general

4   election].)

5          4.    The voter registration threshold for qualifying new political parties used to be

6   1 percent of all votes cast in the last gubernatorial election.  In 2014, the approval of 2013

7   California Assembly Bill No. 2351 lowered the registration requirement to the current .33

8   percent.  (Exhibit ("Exh.") 1, a true and correct copy of which is attached hereto and

9   incorporated herein by this reference.)

10         5.    The aforementioned threshold was lowered in recognition of the many

11  benefits which smaller political parties bring to the electoral process and democratic

12  government and as an attempt to alleviate the various challenges which smaller parties

13  face when trying to attain and maintain their political party qualification status.  (2013 CA

14  AB 2351 (NS); CA B. An., AB 2351 Sen., 8/21/2014 [stating that, "Historically,

15  alternative parties have promoted many reforms, such as social security, that are now part

16  of our social fabric."]; Exhs. 2 and 3, true and correct copies of which are attached hereto

17  and incorporated herein by this reference.)

18         6.    The devastating nature of the COVID-19 pandemic prompted Governor

19  Newsom to issue a series of executive orders, beginning in mid-March 2020 with

20  Executive Order No. N-33-20, mandating the closures of certain businesses and that

21  people shelter in place, effectively bringing the State of California to a standstill.  (See

22  https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-

23  COVID-19-HEALTH-ORDER.pdf; Exh. 4, a true and correct copy of which is attached

24  hereto and incorporated herein by this reference.)

25         7.    Upon information and belief, these executive orders, and the social distancing

26  rules they contain, make in-person solicitation of voter registrations and petition

27  signatures impossible. As of today's date, there is no set date for the termination of these

28  social distancing rules.

8. The social distancing rules substantially hinder Plaintiffs' ability to obtain the requisite number of voter registrations in order to qualify the Common Sense Party for the November 2020 Presidential election ballot because, upon information and belief, in-person registration gathering is by far the most effective way to engage with voters about changing their party affiliation, and the only cost-effective way to obtain voter registrations.

9. Plaintiffs' right to form a political party, appear on the ballot and vote for candidates of their choice is fiercely protected under the First Amendment of the United States Constitution, as part of freedom of association, freedom to petition the government for redress of grievances, and freedom of speech. (See, e.g., Williams v. Rhodes (1968) 393 U.S. 23, 30 [ballot access laws "place burdens on two different, although overlapping, kinds of rights – the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to case their votes effectively."].)

10. Imposing a substantial burden upon access to the ballot for a party-in-formation must be justified by a compelling state interest, or the State will have violated the First Amendment and Fourteenth Amendment rights of the party-in-formation and its voters not to have their liberty deprived without due process; this burden also implicates 42 U.S.C. section 1983.

11. The current state of affairs under the COVID-19 pandemic and its detrimental effect on the ability to obtain voter registrations render EC section 5151(c) unconstitutional.

12. Plaintiffs seek declaratory relief declaring that, in light of current circumstances, the voter registration requirements for qualification of parties-in-formation are unconstitutional. Plaintiffs further seek injunctive relief to enjoin and prevent the enforcement of the voter registration requirements for qualification of new political parties in the upcoming November 2020 election on the grounds that: (1) they violate the

First Amendment to the United States Constitution; and (2) they violate due process under the Fourteenth Amendment to the United States Constitution.

## JURISDICTION AND VENUE

13.   This lawsuit alleges violations of Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. section 1983. Accordingly, this Court has "federal question" jurisdiction over Plaintiffs' claims by virtue of 28 U.S.C. sections 1331 and 1343, as well as under this Court's original jurisdiction, under which the Court can entertain an action to redress a deprivation of rights guaranteed by the United States Constitution.  This Court further has supplemental jurisdiction over state law claims under 28 U.S.C. section 1367(a).  Declaratory and injunctive relief are authorized by 28 U.S.C. sections 2201 and 2202.  (See also Fed. Rule of Civil Proc. 65.)

14.   The named Defendant is a public official within the State of California and performs official duties within this District.  Accordingly, this Court has personal jurisdiction over the named Defendant.  Venue is proper within the Eastern District of California under 28 U.S.C. section 1391(b) because a substantial part of the events, omissions and circumstances giving rise to Plaintiffs' claims occurred or will occur in the Eastern District.

## PARTIES

15.   Plaintiff THE COMMON SENSE PARTY is a political organization in the process of forming a political party in California in connection with the November 3, 2020 election.

16.   Plaintiff TOM CAMPBELL ("Campbell") is the officially designated representative of the Common Sense Party and is a registered voter with the Common Sense Party residing in Orange County, California.  (See https://elections.cdn.sos.ca.gov/ror/15day-presprim-2020/non-qual-chairs.pdf; Exh. 5, a true and correct copy of which is attached hereto and incorporated herein by this reference.)

17.   Plaintiff DEBBIE BENREY is a voter registered with the Common Sense Party residing in San Diego County, California.

18.   Plaintiff MICHAEL TURNISPEED is a voter registered with the Common Sense Party residing in Kern County, California.

19.   Defendant ALEX PADILLA, in his official capacity as the Secretary of State of California, is empowered by state law to enforce and administer California election laws, including the new political party voter registration requirements being challenged in this lawsuit.  Defendant is being sued in his official capacity for declaratory and injunctive relief under 42 U.S.C. section 1983 and 28 U.S.C. section 2201, in addition to attorney's fees and costs under 42 U.S.C. section 1988(b).

20.   Plaintiffs are unaware of the true names and capacities of Defendants DOES 1 through 20, and sue such Defendants by fictitious names.  Plaintiffs are informed and believe, and based upon such information and belief, allege that each of the fictitiously named Defendants is in some manner responsible for the actions described in this Verified Complaint.  When the true identities and capacities of these Defendants have been determined, Plaintiffs will seek leave to amend this Verified Complaint to insert such identities and capacities as appropriate.

**GENERAL ALLEGATIONS**

21.   Plaintiffs' right to form a political party and participate in the November 2020 election is a fundamental right protected by the First Amendment.  A law that imposes a substantial and disproportionate burden on this right must be narrowly tailored and backed by a compelling state interest; otherwise the State will have violated both Plaintiffs' First Amendment right to freedom of speech and association, and Fourteenth Amendment right to not have their liberties deprived without due process.

22.   Plaintiffs believe that the upcoming election for President is one of the most important elections in United States history and wish to qualify the Common Sense Party for the November 2020 election ballot so that the Party may participate in the election,

1  show its support for a Presidential and Vice-Presidential candidate, and be permitted to

2  exercise all other rights granted to political parties under California law, including the

3  ability to make contributions to candidates of its choosing.  (See EC section 5150.)

4      23.  The number of voter registrations required to be recognized as an official

5  political party in California, given the current circumstances and the social distancing

6  rules now in effect under state law, imposes a substantial burden upon Plaintiffs' right to

7  qualify the Common Sense Party as an official political party.

8      24.  Using the most recently available official information about voter

9  registrations in the State (as of February 18, 2020), EC section 5151(c) requires the

10  Common Sense Party to obtain 68,180 registrations in order to qualify for the November

11  2020 ballot.  The deadline to obtain these voter registrations is July 3, 2020. (See

12  https://www.sos.ca.gov/elections/political-parties/political-party-qualification/; Exh. 6, a

13  true and correct copy of which is attached hereto and incorporated herein by this

14  reference.)

15      25.  Plaintiffs implemented a plan, beginning on or about Labor Day weekend

16  2019, to collect the required number of registrations in the Common Sense Party and had

17  been gathering registrations by use of in-person solicitors.  The in-person registration

18  gathering process was terminated on or about March 8, 2020 out of a growing concern for

19  public safety because of the COVID-19 pandemic.

20      26.  On March 19, 2020, Governor Newsom issued an executive order ordering

21  all individuals living in California to stay home, except to carry out activities deemed

22  essential.  (See https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-

23  EO-N-33-20-COVID-19-HEALTH-ORDER.pdf; Exh. 4.)

24      27.  As of February 18, 2020, the Common Sense Party had obtained 10,859

25  registrants.  (See https://elections.cdn.sos.ca.gov/ror/15-day-presprim-2020/nonqual.pdf;

26  Exh. 7, a true and correct copy of which is attached hereto and incorporated herein by this

27  reference.)

28

28.   Plaintiffs are informed and believe that, as of March 8, 2020, the Common Sense Party had obtained 19,038 registrants.  The next official reporting of Common Sense Party registrants is scheduled to  be released by the Secretary of State's office in August 2020; this updated information will reflect the total number of registrants in the Common Sense Party as of July 3, 2020.

29.   Plaintiffs are informed and believe that they would have obtained more than 68,180 registrations by the July 3, 2020 deadline had the in-person voter registration gathering efforts been allowed to continue at a reasonable pace.

30.   As of February 18, 2020, there were five other political organizations attempting to qualify as a political party for the November 2020 election; these other parties-in-formation had only obtained between 2 and 232 registrants each as of this date, far fewer than had been obtained by the Common Sense Party.  (See https://elections.cdn.sos.ca.gov/ror/15-day-presprim-2020/nonqual.pdf; Exh. 7, a true and correct copy of which is attached hereto and incorporated herein by this reference.)

**Effect of Governor's Health Orders on Obtaining Voter Registrations**

31.   The statewide social distancing rules promulgated by Governor Newsom make in-person solicitation of voter registrations impossible and unlawful.

32.   Upon information and belief, even when social distancing rules are eventually relaxed, it is likely that social behavior will make in-person solicitation of voter registrations practically ineffective at least up until July 3, 2020, the statutory deadline for qualifying a new political party for the November 2020 election ballot.

33.   Upon information and belief, even had Governor Newsom's executive order expired as of today's date, too much time would already have been lost during the shelter-in-place order for Plaintiffs to obtain the registrants required to qualify for the November 2020 ballot.

**Methods of Gathering Voter Registrations**

34.   Methods of convincing voters to register with a new political party other than

in-person solicitation, including through e-mail or social media, are not practical alternatives to in-person voter registration solicitation.

35.   Under California law, a party-in-formation can only provide voter registration forms to potential members through in-person solicitation.  (EC section 2158(b)(4) ["If distribution of voter registration cards pursuant to this subdivision is undertaken by mailing cards to persons who have not requested the cards, the person mailing the cards shall enclose a cover letter or other notice with each card instructing the recipients to disregard the cards if they are currently registered voters."].)  The Secretary of State enforces this prohibition against voter registration efforts made through electronic as well as traditional mail.

36.   Any electronic or on-line method of seeking a change in registration would therefore require asking the potential re-registrant to obtain her or his own re-registration form, which, upon information and belief, is far less effective and more expensive than being able to give the voter registration form directly to the voter.

37.  A party-in-formation cannot ascertain when a voter has completed the registration process through electronic or on-line means, because that step has to be taken directly with a County Registrar of Voters or the Secretary of State's office.  Hence, it is impossible for a party-in-formation to contract with a signature-gathering firm to utilize electronic or on-line methods, with compensation determined on the basis of actual registrations achieved.  By contrast, a party-in-formation is able to contract with a signature-gathering firm, as the Common Sense Party did, on the basis of physical registration cards completed and signed by voters, because the voter registration cards are sent in to the Registrar of Voters in the applicable county by the signature-gathering firm itself.

38.   In addition, upon information and belief, electronic and on-line methods for soliciting voter registrations are vastly more expensive than in-person registration solicitation.  The Common Sense Party tested on-line versus in-person registration in September 2019 and found the average cost of attempting to obtain one on-line

registration would be between $20 and $100 per registrant, with no guarantee that a voter actually completed the process with the Secretary of State, compared to $10 per registrant for in-person registrations, and a guarantee that the registration obtained through the in-person method was properly submitted to the County Registrar of Voters.  This price differential increased even more during the solicitation period conducted by the Common Sense Party after the test period, when the cost per registrant obtained through in-person solicitation was between only $3 and $7.

39.   When United States district courts in the Northern District of Illinois and the Eastern District of Michigan were confronted with this same burden on ballot access because of the COVID-19 health crisis, they ordered both the use of electronic registration (which had not otherwise been permitted) and the lowering of the required number of voter signatures.  (See below.)  Hence, allowing electronic means alone was not held to be a sufficient remedy to this current burden on ballot access.  These court cases support lowering the number of required registrations under EC section 5151(c), even though California currently allows electronic methods of voter registration.

40.     Further, in ordering Illinois and Michigan to allow electronic signatures, the United States district courts were not presented with the restriction found in California law which makes it illegal to mail (traditionally or by e-mail) a registration form to an already registered voter.

### Cases in Other States

41.   The U.S. District Court for the Northern District of Illinois has just recently held that a state's interest in requiring some minimum showing of support before granting ballot access to a political party can be met with a modified requisite number of signatures, taking into account the extreme social-distancing rules of the extraordinary present health crisis.  (Libertarian Party of Illinois v. Pritzker, No. 20-CV-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020); Exh. 8, a true and correct copy of which is attached hereto and incorporated herein by this reference.)

42.   The order issued by the U. S. District Court for the Northern District of Illinois drastically reduces the number of signatures needed to qualify a new political party for the ballot to only 10 percent of its original statutory requirement.  The number of required signatures needed for a new party to qualify for the ballot in Illinois is typically 25,000, which is far less than the 68,180 registrations currently needed in California. The federal court, in recognition of the extraordinary present circumstances, nevertheless reduced the 25,000 number to <u>only 2,500 signatures</u>.  (<u>Libertarian Party of Illinois,</u> 2020 WL 1951687; Exh. 8.)

43.   Similarly, the U.S. District Court for the Eastern District of Michigan and the Supreme Judicial Court of Massachusetts have held that a state's interest in requiring some minimum showing of support before granting ballot access to a candidate for public office can be met with a modified requisite number of signatures, taking into account the social-distancing rules of the present health crisis.  (<u>Esshaki v. Whitmer</u>, No. 2:20-CV-10831-TGB, 2020 WL 1910154 (E.D. Mich. Apr. 20, 2020); <u>Goldstein v. Sec'y of Commonwealth</u>, No. SJC-12931, 2020 WL 1903931(Mass. Apr. 17, 2020); Exhs. 9 and 10, true and correct copies of which are attached hereto and incorporated herein by this reference.)

44.   The State of New York has also reached a similar conclusion by executive order. (N.Y. Exec. Order No. 202.2; Exh. 11, a true and correct copy of which is attached hereto and incorporated herein by this reference.)

45.   The State of Vermont has suspended candidate petition signature requirements <u>entirely</u> for both the August 2020 primary and the November 2020 general election, in response to the COVID-19 pandemic and corresponding social distancing rules. (Vt. Gen. Assemb., H.681, Act 92 (2020); Exh. 12, a true and correct copy of which is attached hereto and incorporated herein by this reference.)

46.   The states mentioned above changed or suspended their signature requirements at an earlier date when the duration of the social-distancing rules was still uncertain and re-opening seemed possible in a shorter period of time.  At today's later

1  date, when social-distancing rules applicable to obtaining voter registrations appear likely

2  to be kept in place in California up until and including the July 3, 2020 deadline for new

3  party qualification, any requirement for signatures that does not take into account the fact

4  that in-person registration gathering has effectively been shut down for the rest of the

5  2020 qualification period imposes an unconstitutional burden on Plaintiffs' First and

6  Fourteenth Amendment rights.

7      47.   The burden upon the State of California to demonstrate that it needs to adhere

8  to its current registration requirements is an extremely high one, given that many other

9  states, with the same interest in ensuring a reasonable showing of support for a new

10  political party or for a candidate before granting ballot access, have reduced the number

11  of signatures required to qualify for the ballot by very large amounts or have eliminated

12  signature requirements entirely.

13  **Voter Registration Requirements Codified in EC section 5151(c) are Unduly**

14  **Burdensome in Light of Current Pandemic**

15      48.   Although the State of California has a legitimate interest in requiring proof of

16  voter interest in a new party, that interest cannot be vindicated by a requirement that

17  effectively prevents a new party from qualifying for the ballot.  Under the present health

18  circumstances and statewide order prohibiting the kind of conduct required for in-person

19  registration solicitation, the State's requirement of 68,180 voter registrations by July 3,

20  2020 unreasonably burdens Plaintiffs' First Amendment rights of association, assembly,

21  petition and speech.

22      49.   In light of the social-distancing order in California, the minimum requirement

23  of registrants for a new political party to qualify for the ballot has made access to the

24  ballot "merely theoretical," which the United States Supreme Court has explicitly said is

25  not acceptable. (American Party of Texas v. White (1974), 415 U.S. 767, 783 ["what is

26  demanded may not be so excessive or impractical as to be in reality a mere device to

27  always, or almost always, exclude parties with significant support from the ballot.  The

28

Constitution requires that access to the electorate be real, not 'merely theoretical.'"]

50.   The highest court in Massachusetts, while discussing the interaction of the COVID-19 pandemic and state-mandated signature requirements, recognized that, "statutory requirements that in ordinary times impose only modest burdens . . . may significantly interfere with the fundamental right to run for political office in a time of pandemic." (Goldstein, supra, 2020 WL 1903931; Exh. 10.)

51.   Statutes impacting fundamental rights which may have previously withstood Constitutional scrutiny may now fail to withstand the same level of scrutiny given the COVID-19 pandemic and current social distancing rules, as is the case with Elections Code section 5151(c).

52.   The Plaintiffs have done all that can reasonably be expected of them to demonstrate that there is significant popular support for the Common Sense Party in the current emergency conditions.  To insist upon more registrations unreasonably curtails Plaintiffs' First and Fourteenth Amendment rights.

## FIRST CAUSE OF ACTION
### DECLARATORY RELIEF THAT EC SECTION 5151(C) IS UNCONSTITUTIONAL AS APPLIED TO PLAINTIFFS

53.   Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 52 as if fully set forth herein.

54.   Plaintiffs believe that EC section 5151(c), as applied to Plaintiffs' ability to qualify for the November 2020 Presidential election, is unconstitutional.

55.   Plaintiffs believe that Defendant will take the position that EC section 5151(c), as applied to Plaintiffs' ability to qualify for the November presidential election, is not unconstitutional.

56.   Accordingly, there exists a case or controversy as between Plaintiffs and Defendant as to the current constitutionality of EC section 5151(c), as applied to Plaintiffs, and it is appropriate for the Court to adjudicate this issue on an expedited basis.

57.   Based on the foregoing, this Court should declare that EC section 5151(c) is

1  unconstitutional as applied to Plaintiffs.

2  ## SECOND CAUSE OF ACTION

3  ### INJUNCTIVE RELIEF TO PREVENT
   ### VIOLATIONS OF THE FIRST AMENDMENT TO
4  ### THE U.S. CONSTITUTION (42 U.S.C. section 1983)

5      58.   Plaintiffs hereby reallege and incorporate by reference the allegations

6  contained in paragraphs 1 through 52 as if fully set forth herein.

7      59.   Under present circumstances, California's ballot access requirements for new

8  political parties violate the rights guaranteed to Plaintiffs by the First Amendment to the

9  United States Constitution, as enforced through 42 U.S.C. section 1983. The .33 percent

10 registration threshold imposed by EC section 5151(c), in conjunction with the social

11 distancing rules promulgated by the Governor's COVID-19 executive orders, place an

12 undue burden on Plaintiffs' ability to obtain the required number of voter registrations to

13 appear on the November 2020 ballot.

14     60.   Given current circumstances relating to the COVID-19 pandemic and the

15 inability to gather registrations in-person, the .33 percent registration threshold is

16 unreasonable, burdensome, and not narrowly tailored to meet any compelling or

17 legitimate state interest.

18     61.   A real and actual controversy exists between the parties.

19     62.   Plaintiffs have no other adequate remedy at law besides this action for

20 declaratory and injunctive relief.

21     63.   Upon information and belief, Defendant, acting under color of state law, will

22 enforce the challenged law against Plaintiffs, in violation of their First Amendment rights.

23     64.   As a direct and proximate result of the violations complained of herein,

24 Plaintiffs have suffered and will suffer irreparable harm, which necessitates and justifies

25 injunctive relief.

26     65.   Based on the foregoing, this Court should issue an injunction to prevent

27

28

1   Defendants from enforcing EC section 5151(c) on the grounds that it violates Plaintiffs'

2   and others' First Amendment rights.

3                          **THIRD CAUSE OF ACTION**

4             **INJUNCTIVE RELIEF TO PREVENT**
    **VIOLATIONS OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT**
5         **TO THE UNITED STATES CONSTITUTION (42 U.S.C. section 1983)**

6         66.   Plaintiffs hereby reallege and incorporate by reference the allegations

7   contained in paragraphs 1 through 52 as if fully set forth herein.

8         67.   Under present circumstances, California's ballot access requirements for new

9   political parties violate the due process rights guaranteed to Plaintiffs by the Fourteenth

10  Amendment to the United States Constitution, as enforced through 42 U.S.C. section

11  1983. The .33 percent registration threshold imposed by EC section 5151(c), in

12  conjunction with the social distancing rules promulgated by the Governor's COVID-19

13  executive orders, place an undue burden on Plaintiffs' ability to obtain the required

14  number of voter registrations to appear on the November 2020 ballot and deprive them of

15  their due process rights under the Fourteenth Amendment.

16        68.   Given current circumstances due to the COVID-19 pandemic and the inability

17  to gather voter registrations in-person, the .33 percent registration threshold is

18  unreasonable, burdensome, and not narrowly tailored to meet any compelling or

19  legitimate state interest.

20        69.   A real and actual controversy exists between the parties.

21        70.   Plaintiffs have no other adequate remedy at law besides this action for

22  declaratory and injunctive relief.

23        71.   Upon information and belief, Defendant, acting under color of state law, will

24  enforce the challenged law against Plaintiffs, in violation of their Fourteenth Amendment

25  due process rights.

26        72.   As a direct and proximate result of the violations complained of herein,

27  Plaintiffs have suffered and will suffer irreparable harm, which necessitates and justifies

28  injunctive relief.

1      73.   Based on the foregoing, this Court should issue an injunction to prevent

2  Defendants from enforcing EC section 5151(c) on the grounds that it violates Plaintiffs'

3  and others' Fourteenth Amendment rights.

4                                **PRAYER FOR RELIEF**

5      WHEREFORE, Plaintiffs pray that this honorable court enter an order:

6      1.   Requiring the Secretary of State to register the Common Sense Party as an

7  official political party in California without the need for the Common Sense Party to

8  obtain more voter registrations than those already submitted to County Registrars of

9  Voters and the Secretary of State, pursuant to EC section 5151(c); and

10      2.   Imposing such other equitable relief as necessary or appropriate to preserve

11  Plaintiffs' constitutional rights.

12

13

14  Dated: May 29, 2020                Respectfully Submitted:

15

16                            By:

17                                James R. Sutton

18                                The Sutton Law Firm, PC
                                Attorneys for Plaintiffs

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Assembly Bill No. 2351

CHAPTER 903

An act to amend Sections 5100 and 5151 of the Elections Code, relating to elections.

[Approved by Governor September 30, 2014. Filed with
Secretary of State September 30, 2014.]

LEGISLATIVE COUNSEL'S DIGEST

AB 2351, Gordon. Political party qualification.

Existing law specifies the methods for a political party to qualify to participate in a primary election. Existing law provides that a party is qualified to participate in a primary election if, at the last preceding gubernatorial election, there was polled for any one of its candidates for any office voted on throughout the state, at least 2% of the entire vote of the state. Existing law also provides that a party is qualified to participate in a primary election if, on or before the 135th day before the primary election, it appears to the Secretary of State, as a result of examining and totaling the statement of voters transmitted by county elections officials, that voters equal in number to at least 1% of the entire vote of the state at the last gubernatorial election have declared an intention to affiliate with that party.

This bill would revise these provisions for a party to qualify to participate in a primary election. This bill would provide that a party is qualified if, at the last preceding gubernatorial primary election, the sum of the votes cast for all of the candidates for an office voted on throughout the state who disclosed a preference for that party on the ballot was at least 2% of the entire vote of the state for that office. Notwithstanding this provision, the bill would authorize the party to inform the Secretary of State that it declines to have the votes cast for a candidate counted towards the 2% qualification threshold. This bill would also provide that a party is qualified to participate if it appears to the Secretary of State that voters equal in number to at least 0.33% of the total number of voters registered on the 154th day before the primary election have declared their preference for that party.

If a political party did not qualify to participate in a presidential primary election, but nevertheless seeks qualification to participate in the following presidential general election, existing law specifies the methods for the party to qualify to participate in the general election. Existing law provides that a party is qualified to participate in a presidential general election if, at the last preceding gubernatorial election, there was polled for any one of its candidates for any office voted on throughout the state at least 2% of the entire vote of the state. Existing law also provides that a party is qualified to participate in a presidential general election if, on or before the 102nd

96

day before the general election, it appears to the Secretary of State, as a result of examining and totaling the statement of voters transmitted by county elections officials, that voters equal in number to at least 1% of the entire vote of the state at the last gubernatorial election have declared an intention to affiliate with that party.

This bill would revise these provisions for a party to qualify to participate in a presidential general election. This bill would provide that a party is qualified if, at the last preceding gubernatorial primary election, the sum of the votes casts for all of the candidates for an office voted on throughout the state who disclosed a preference for that party on the ballot was at least 2% of the entire vote of the state for that office. Notwithstanding this provision, the bill would authorize the party to inform the Secretary of State that it declines to have the votes cast for a candidate counted towards the 2% qualification threshold. This bill would also provide that a party is qualified to participate if it appears to the Secretary of State that voters equal in number to at least 0.33% of the total number of voters registered on the 123rd day before the presidential general election have declared their preference for that party.

This bill would incorporate additional changes to Sections 5100 and 5151 of the Elections Code, as proposed by SB 1043, to be operative only if SB 1043 and this bill are both chaptered and become effective on or before January 1, 2015, and this bill is chaptered last.

*The people of the State of California do enact as follows:*

SECTION 1.   Section 5100 of the Elections Code is amended to read:

5100.   A party is qualified to participate in a primary election under any of the following conditions:

(a) (1)   At the last preceding gubernatorial primary election, the sum of the votes cast for all of the candidates for an office voted on throughout the state who disclosed a preference for that party on the ballot was at least 2 percent of the entire vote of the state for that office.

(2)   Notwithstanding paragraph (1), a party may inform the Secretary of State that it declines to have the votes cast for any candidate who has disclosed that party as his or her party preference on the ballot counted toward the 2-percent qualification threshold. If the party wishes to have votes for any candidate not counted in support of its qualification under paragraph (1), the party shall notify the secretary in writing of that candidate's name by the seventh day prior to the gubernatorial primary election.

(b)   On or before the 135th day before a primary election, it appears to the Secretary of State, as a result of examining and totaling the statement of voters and their declared political preference transmitted to him or her by the county elections officials, that voters equal in number to at least 0.33 percent of the total number of voters registered on the 154th day before the primary election have declared their preference for that party.

(c) On or before the 135th day before a primary election, there is filed with the Secretary of State a petition signed by voters, equal in number to at least 10 percent of the entire vote of the state at the last preceding gubernatorial election, declaring that they represent a proposed party, the name of which shall be stated in the petition, which proposed party those voters desire to have participate in that primary election. This petition shall be circulated, signed, and verified, and the signatures of the voters on it shall be certified to and transmitted to the Secretary of State by the county elections officials substantially as provided for initiative petitions. Each page of the petition shall bear a caption in 18-point boldface type, which caption shall be the name of the proposed party followed by the words "Petition to participate in the primary election."

SEC. 1.5.  Section 5100 of the Elections Code is amended to read:

5100.  A party is qualified to participate in a primary election under any of the following conditions:

(a) (1)  At the last preceding gubernatorial primary election, the sum of the votes cast for all of the candidates for an office voted on throughout the state who disclosed a preference for that party on the ballot was at least 2-percent of the entire vote of the state for that office.

(2)  Notwithstanding paragraph (1), a party may inform the Secretary of State that it declines to have the votes cast for any candidate who has disclosed that party as his or her party preference on the ballot counted toward the 2 percent qualification threshold. If the party wishes to have votes for any candidate not counted in support of its qualification under paragraph (1), the party shall notify the secretary in writing of that candidate's name by the seventh day prior to the gubernatorial primary election.

(b) On or before the 135th day before a primary election, it appears to the Secretary of State, as a result of examining and totaling the statement of voters and their declared political preference transmitted to him or her by the county elections officials, that voters equal in number to at least 0.33 percent of the total number of voters registered on the 154th day before the primary election have declared their preference for that party.

(c) On or before the 135th day before a primary election, there is filed with the Secretary of State a political party qualification petition signed by voters, equal in number to at least 10 percent of the entire vote of the state at the last preceding gubernatorial election, declaring that the voters signing the petition support qualification of a proposed party, the name of which shall be stated in the petition, which proposed party those voters desire to have participate in that primary election. This petition shall be circulated, signed and verified, and the signatures of the voters on it shall be certified to and transmitted to the Secretary of State by the county elections officials substantially as provided for initiative petitions. Each page of the petition shall bear a caption in 18-point boldface type, which caption shall be the name of the proposed party followed by the words "Petition to participate in the primary election."

SEC. 2.  Section 5151 of the Elections Code is amended to read:

96

— 4 —

5151.  A party is qualified to participate in a presidential general election under any of the following conditions:

(a)  The party qualified to participate and participated in the presidential primary election preceding the presidential general election pursuant to Section 5100.

(b) (1)  At the last preceding gubernatorial primary election, the sum of the votes cast for all of the candidates for an office voted on throughout the state who disclosed a preference for that party on the ballot was at least 2 percent of the entire vote of the state for that office.

(2)  Notwithstanding paragraph (1), a party may inform the Secretary of State that it declines to have the votes cast for any candidate who has disclosed that party as his or her party preference on the ballot counted toward the 2-percent qualification threshold. If the party wishes to have votes for any candidate not counted in support of its qualification under paragraph (1), the party shall notify the secretary in writing of that candidate's name by the seventh day prior to the gubernatorial primary election.

(c)  If on or before the 102nd day before a presidential general election, it appears to the Secretary of State, as a result of examining and totaling the statement of voters and their declared political preference transmitted to him or her by the county elections officials, that voters equal in number to at least 0.33 percent of the total number of voters registered on the 123rd day before the presidential general election have declared their preference for that party.

(d)  On or before the 135th day before a presidential general election, there is filed with the Secretary of State a petition signed by voters, equal in number to at least 10 percent of the entire vote of the state at the last preceding gubernatorial election, declaring that they represent a proposed party, the name of which shall be stated in the petition, which proposed party those voters desire to have participate in that presidential general election. This petition shall be circulated, signed, and verified, and the signatures of the voters on it shall be certified to and transmitted to the Secretary of State by the county elections officials substantially as provided for initiative petitions. Each page of the petition shall bear a caption in 18-point boldface type, which caption shall be the name of the proposed party followed by the words "Petition to participate in the presidential general election."

SEC. 2.5.  Section 5151 of the Elections Code is amended to read:

5151.  A party is qualified to participate in a presidential general election under any of the following conditions:

(a)  The party qualified to participate and participated in the presidential primary election preceding the presidential general election pursuant to Section 5100.

(b) (1)  At the last preceding gubernatorial primary election, the sum of the votes cast for all of the candidates for an office voted on throughout the state who disclosed a preference for that party on the ballot was at least 2 percent of the entire vote of the state for that office.

(2)  Notwithstanding paragraph (1), a party may inform the Secretary of State that it declines to have the votes cast for any candidate who has disclosed that party as his or her party preference on the ballot counted toward the 2-percent qualification threshold. If the party wishes to have votes for any candidate not counted in support of its qualification under paragraph (1), the party shall notify the Secretary of State in writing of that candidate's name by the seventh day prior to the gubernatorial primary election.

(c)  On or before the 102nd day before a presidential general election, it appears to the Secretary of State, as a result of examining and totaling the statement of voters and their declared political preference transmitted to him or her by the county elections officials, that voters equal in number to at least 0.33 percent of the total number of voters registered on the 123rd day before the presidential general election have declared their preference for that party.

(d)  On or before the 135th day before a presidential general election, there is filed with the Secretary of State a political party qualification petition signed by voters, equal in number to at least 10 percent of the entire vote of the state at the last preceding gubernatorial election, declaring that the voters signing the petition support qualification of a proposed party, the name of which shall be stated in the petition, which proposed party those voters desire to have participate in that presidential general election. This petition shall be circulated, signed, and verified and the signatures of the voters on it shall be certified to and transmitted to the Secretary of State by the county elections officials substantially as provided for initiative petitions. Each page of the petition shall bear a caption in 18-point boldface type, which caption shall be the name of the proposed party followed by the words "Petition to participate in the presidential general election."

SEC. 3.  (a)  Section 1.5 of this bill incorporates amendments to Section 5100 of the Elections Code proposed by both this bill and Senate Bill 1043. It shall only become operative if (1) both bills are enacted and become effective on or before January 1, 2015, (2) each bill amends Section 5100 of the Elections Code, and (3) this bill is enacted after Senate Bill 1043, in which case Section 1 of this bill shall not become operative.

(b)  Section 2.5 of this bill incorporates amendments to Section 5151 of the Elections Code proposed by both this bill and Senate Bill 1043. It shall only become operative if (1) both bills are enacted and become effective on or before January 1, 2015, (2) each bill amends Section 5151 of the Elections Code, and (3) this bill is enacted after Senate Bill 1043, in which case Section 2 of this bill shall not become operative.

O

# EXHIBIT 2

2013 CA A.B. 2351 (NS)
2013 California Assembly Bill No. 2351, California 2013-2014 Regular Session

CALIFORNIA COMMITTEE REPORT

VERSION: General
August 25, 2014
Version Date August 25, 2014
Gordon.

**TEXT:**
BILL ANALYSIS

CONCURRENCE IN SENATE AMENDMENTS AB 2351 (Gordon) As Amended August 21, 2014 Majority vote

------------------------------------------------------------- |ASSEMBLY: |77-0 |(May 15, 2014) |SENATE: |34-0 |(August 25, | | | | | | |2014) | -------------------------------------------------------------

Original Committee Reference: E. & R.

SUMMARY : Revises conditions under which a political party is considered qualified to participate in a primary or presidential general election. Specifically, this bill :

1)Provides that a political party is qualified to participate in a primary or presidential general election if, at the last preceding gubernatorial primary election, the sum of the votes cast for all of the candidates for an office voted on throughout the state who disclosed a preference for that party on the ballot was at least 2% of the entire vote of the state, instead of the last preceding gubernatorial general election in which there was polled for any one of its candidates for any office voted on through the state, at least 2% of the entire vote of the state.

2)Permits a party to inform the Secretary of State (SOS) that it declines to have the votes cast for any candidate who has disclosed that party as his or her party preference on the ballot counted toward the 2% qualification threshold. Requires a party, if a party wishes to have votes for any candidate not counted in support of its qualification, to notify the SOS in writing of that candidate's name by the seventh day prior to the gubernatorial primary election.

3)Provides that a political party is qualified to participate in a primary election if, on or before the 135th day before a primary election, it appears to the SOS, as a result of examining and totaling the statement of voters and their declared political preferences transmitted to the SOS by county elections officials, that voters equal in number to at least 0.33 % of the total number of voters registered on the 154th day before the primary election have declared their preference for that party, instead of at least 1% of the entire vote of the state at the last preceding gubernatorial election have declared their intention to affiliate with that party.

4)Provides that a political party is qualified to participate in a presidential general election if, on or before the 102nd day before a presidential general election, it appears to the SOS, as a result of examining and totaling the statement of voters and their declared political preferences transmitted to the SOS by county elections officials, that voters equal in number to at least 0.33% of the total number of voters registered on the 123rd day before the presidential general election have declared their preference for that party, instead of at least

1% of the entire vote of the state at the last preceding gubernatorial election have declared their intention to affiliate with that party.

5)Makes other corresponding changes.

The Senate amendments add double-jointing language to avoid chaptering problems with SB 1043 (Torres) of the current legislative session.

AS PASSED BY THE ASSEMBLY , this bill was substantially similar to the version passed by the Senate.

FISCAL EFFECT : None. This bill is keyed non-fiscal by the Legislative Counsel.

COMMENTS : According to the author, "Proposition 14, passed by the voters in June of 2010, will eliminate a major way the smaller political parties remain qualified and therefore maintain ballot status. In response, AB 2351 would make two distinct changes to the party qualification statutes to remedy this situation and continue to provide smaller parties with a means to retain their qualified party status."

In February 2009, the Legislature approved SCA 4 (Maldonado), Resolution Chapter 2, Statutes of 2009, which was enacted by the voters as Proposition 14 on the June 2010 statewide primary election ballot. Proposition 14 implemented a top two primary election system in California for most elective state and federal offices. At primary elections, voters are able to vote for any candidate, regardless of party, and the two candidates who receive the most votes, regardless of party, advance to the general election.

The implementation of the top two primary system has had a significant impact on third parties. Only the top two candidates for most elective state and federal offices advance to the general election. Under this new process, it is challenging for a third party candidate for statewide office to advance to the general election ballot. Consequently, it has become impractical for third parties to maintain their status as qualified political parties based on the number of votes cast for their candidates for statewide office at the general election since their candidates typically will not appear on the general election ballot. In addition, as that method to maintain party qualification status goes away, parties will likely have to meet the registration test in order to maintain their qualification status.

According to the author's office, in an effort to address this problem this bill allows a political party to maintain its status if at the last preceding gubernatorial primary election, instead of the last preceding gubernatorial general election, the sum of the votes cast for all of the party's candidates for a statewide office total at least 2% of the votes for that office. In other words, this bill moves the timing of when the 2% test occurs, from the preceding gubernatorial general election to the preceding gubernatorial primary election as well as allowing the 2% threshold to be calculated based on the votes for all of the party's candidates in a particular race, not just one candidate.

Additionally, this bill changes the registration threshold for party qualification from 1% of all votes cast in the gubernatorial general election to 0.33% of all registered voters that have declared their preference for that party, regardless of the gubernatorial voter turnout. The combination of these changes will help alleviate the challenges smaller parties face when trying to maintain their political party qualification status.

The Senate amendments make technical changes to avoid chaptering problems with SB 1043. This bill, as amended in the Senate, is consistent with the Assembly actions.

Please see the policy committee analysis for a full discussion on this bill.

Analysis Prepared by : Nichole Becker / E. & R. / (916) 319-2094 FN: 0005323

2013 CA A.B. 2351 (NS)

End of Document
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 3

California Bill Analysis, A.B. 2351 Sen., 8/21/2014, California Bill Analysis, A.B. 2351...

CA B. An., A.B. 2351 Sen., 8/21/2014

California Bill Analysis, Senate Floor, 2013-2014 Regular Session, Assembly Bill 2351

August 21, 2014
California Senate
2013-2014 Regular Session

_ -- §SENATE RULES COMMITTEE § AB 2351§ §Office of Senate Floor Analyses § § §1020
N Street, Suite 524 § § §(916) 651-1520 Fax: (916) § § §327-4478 § § -- THIRD READING

Bill No: AB 2351

Author: Gordon (D)

Amended: 8/21/14

Vote: 21

SENATE ELECTIONS & CONST. AMEND. COMM. : 4-0, 6/17/14 AYES: Padilla, Hancock, Jackson, Pavley NO VOTE
RECORDED: Anderson

ASSEMBLY FLOOR : 77-0, 5/15/14 - See last page for vote

SUBJECT : Political party qualification

SOURCE : Author

DIGEST : This bill revises conditions under which a political party is considered qualified to participate in a primary or
presidential general election.

Senate Floor Amendments of 8/21/14 add double-jointing language with SB 1043 (Torres).

ANALYSIS : Existing law: 1.Provides that a political party is qualified to participate in a primary election under any of the
following conditions:
  A. If, at the last preceding gubernatorial election, there CONTINUED was polled for any one of its candidates for any office
voted on through the state, at least 2% of the entire vote of the state.
  B. If, on or before the 135th day before any primary election, it appears to the Secretary of State (SOS), as a result of
examining and totaling the statement of voters and their political affiliations transmitted to the SOS by county elections
officials, that voters equal in number to at least 1% of the entire vote of the state at the last preceding gubernatorial election
have declared their intention to affiliate with that party.
  C. If, on or before the 135th day before any primary election, there is filed with the SOS a petition signed by voters equal
in number to 10% of the entire vote of the state at the last preceding gubernatorial election, declaring that they represent a
proposed party, the name of which shall be stated in the petition, which proposed party those voters desire to have participate
in that primary election. 1.Provides that a political party is qualified to participate in a presidential general election under
any of the following conditions:
  A. The party is qualified to participate and participated in the presidential primary election preceding the presidential general
election pursuant to existing law.
  B. If, at the last preceding gubernatorial election, there was polled for any one of its candidates for any office voted on
through the state, at least 2% of the entire vote of the state.

California Bill Analysis, A.B. 2351 Sen., 8/21/2014, California Bill Analysis, A.B. 2351...

C. If, on or before the 135th day before any primary election, it appears to the SOS, as a result of examining and totaling the statement of voters and their political affiliations transmitted to the SOS by county elections officials, that voters equal in number to at least 1% of the entire vote of the state at the last preceding gubernatorial election have declared their intention to affiliate with that party. CONTINUED

D. If, on or before the 135th day before any primary election, there is filed with the SOS a petition signed by voters equal in number to 10% of the entire vote of the state at the last preceding gubernatorial election, declaring that they represent a proposed party, the name of which shall be stated in the petition, which proposed party those voters desire to have participate in that primary election. 1.Requires each political party to have its qualifications reviewed by the SOS upon the occurrence of the gubernatorial election. A party that does not meet the standards for qualification, as described above, shall be prohibited from participating in any primary or presidential general election. Requires a party that loses qualification, but seeks to regain that qualification, to file a notice with the SOS indicating that it intends to regain qualification. This bill: 1.Provides that a political party is qualified to participate in a primary or presidential general election if, at the last preceding gubernatorial primary election, the sum of the votes cast for all of the candidates for an office voted on throughout the state who disclosed a preference for that party on the ballot was at least 2% of the entire vote of the state, instead of the last preceding gubernatorial general election in which there was polled for any one of its candidates for any office voted on through the state, at least 2% of the entire vote of the state. 2.Permits a party to inform the SOS that it declines to have the votes cast for any candidate who has disclosed that party as his/her party preference on the ballot counted toward the 2% qualification threshold. Requires a party, if a party wishes to have votes for any candidate not counted in support of its qualification, to notify the SOS in writing of that candidate's name by the 7th day prior to the gubernatorial primary election. 3.Provides that a political party is qualified to participate in a primary election if, on or before the 135th day before a primary election, it appears to the SOS, as a result of examining and totaling the statement of voters and their CONTINUED declared political preferences transmitted to the SOS by county elections officials, that voters equal in number to at least 0.33% of the total number of voters registered on the 154th day before the primary election have declared their preference for that party, instead of at least 1% of the entire vote of the state at the last preceding gubernatorial election have declared their intention to affiliate with that party. 4.Provides that a presidential general election if, on or before the 102nd day before a presidential general election, it appears to the SOS, as a result of examining and totaling the statement of voters and their declared political preferences transmitted to the SOS by county elections officials, that voters equal in number to at least 0.33% of the total number of voters registered on the 123rd day before the presidential general election have declared their preference for that party, instead of at least 1% of the entire vote of the state at the last preceding gubernatorial election have declared their intention to affiliate with that party. 5.Contains double-jointing language with SB 1043 (Torres).

Background In February 2009, the Legislature approved SCA 4 (Maldonado, Chapter
2) which was enacted by the voters as Proposition 14 on the June 2010 Statewide Primary Election Ballot. Proposition 14 implemented a Top Two primary election system in California for most elective state and federal offices. At primary elections, voters are able to vote for any candidate, regardless of party, and the two candidates who receive the most votes, regardless of party, advance to the general election. The implementation of the Top Two primary system has had a significant impact on third parties. Only the top two candidates for most elective state and federal offices advance to the general election. Under this new process, it is challenging for a third party candidate for statewide office to advance to the general election ballot. Consequently, it has become impractical for third parties to maintain their status as qualified political parties based on the number of votes cast for their candidates for statewide office at the general CONTINUED election since their candidates may not appear on the general election ballot. In addition, as that method to maintain party qualification status goes away, parties will likely have to meet the registration test in order to maintain their qualification status.

FISCAL EFFECT : Appropriation: No Fiscal Com.: No Local: No

SUPPORT : (Verified 8/22/14) Secretary of State California Alliance for Retired Americans Californians for Electoral Reform Coalition for Free and Open Elections Libertarian Party of California Peace & Freedom Party of California

ARGUMENTS IN SUPPORT : California Alliance for Retired Americans states that this bill "moves the vote test for parties to maintain their ballot status from the general election to the primary and takes the sum of all of the party's candidates for

Case 2:20-cv-01091-MCE-EFB  Document 1  Filed 05/29/20  Page 30 of 151

California Bill Analysis, A.B. 2351 Sen., 8/21/2014, California Bill Analysis, A.B. 2351...

a statewide office to meet this test. This move was necessary because it is now highly unlikely that smaller alternative party candidates will qualify for future general elections as a result of the new Top Two elections laws. In addition, if passed, this bill will reduce the registration test to .33% of the total registration. This is over half of the current registration test requirements. However, as the total number of registrations increase, the number of registrations needed by the parties to maintain ballot status will increase as well. Ballot access for all viable parties is fundamental to a multi-party electoral system. Historically, alternative parties have promoted many reforms, such as social security, that are now part of our social fabric."

ASSEMBLY FLOOR : 77-0, 5/15/14 AYES: Achadjian, Alejo, Allen, Ammiano, Bigelow, Bloom, Bocanegra, Bonilla, Bonta, Bradford, Brown, Buchanan, Ian Calderon, Campos, Chau, Chávez, Chesbro, Conway, Cooley, Dababneh, Dahle, Daly, Dickinson, Donnelly, Eggman, Fong, Fox, Frazier, Beth Gaines, Garcia, Gatto, Gomez, Gonzalez, Gordon, Gorell, Gray, Grove, Hagman, Hall, Harkey, Roger Hernández, CONTINUED Holden, Jones, Jones-Sawyer, Levine, Linder, Logue, Lowenthal, Maienschein, Medina, Melendez, Mullin, Muratsuchi, Nazarian, Nestande, Olsen, Pan, Patterson, Perea, John

A. Peŕez, V. Manuel Peŕez, Quirk, Quirk-Silva, Rendon, Rodriguez, Salas, Skinner, Stone, Ting, Wagner, Waldron, Weber, Wieckowski, Wilk, Williams, Yamada, Atkins NO VOTE RECORDED: Mansoor, Ridley-Thomas, Vacancy RM:e 8/22/14 Senate Floor Analyses SUPPORT/OPPOSITION: SEE ABOVE **** END **** CONTINUED

CA B. An., A.B. 2351 Sen., 8/21/2014

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 4

EXECUTIVE DEPARTMENT
STATE OF CALIFORNIA

**EXECUTIVE ORDER N-33-20**

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** in a short period of time, COVID-19 has rapidly spread throughout California, necessitating updated and more stringent guidance from federal, state, and local public health officials; and

**WHEREAS** for the preservation of public health and safety throughout the entire State of California, I find it necessary for all Californians to heed the State public health directives from the Department of Public Health.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567, 8627, and 8665 do hereby issue the following Order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1)  To preserve the public health and safety, and to ensure the healthcare delivery system is capable of serving all, and prioritizing those at the highest risk and vulnerability, all residents are directed to immediately heed the current State public health directives, which I ordered the Department of Public Health to develop for the current statewide status of COVID-19. Those directives are consistent with the March 19, 2020, Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, found at: https://covid19.ca.gov/. Those directives follow:

ORDER OF THE STATE PUBLIC HEALTH OFFICER
March 19, 2020

To protect public health, I as State Public Health Officer and Director of the California Department of Public Health order all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors, as outlined at https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19. In addition, and in consultation with the Director of the Governor's Office of Emergency Services, I may designate additional sectors as critical in order to protect the health and well-being of all Californians.

Pursuant to the authority under the Health and Safety Code 120125, 120140, 131080, 120130(c), 120135, 120145, 120175 and 120150, this order is to go into effect immediately and shall stay in effect until further notice.

The federal government has identified 16 critical infrastructure sectors whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or

destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof. I order that Californians working in these 16 critical infrastructure sectors may continue their work because of the importance of these sectors to Californians' health and well-being.

This Order is being issued to protect the public health of Californians. The California Department of Public Health looks to establish consistency across the state in order to ensure that we mitigate the impact of COVID-19. Our goal is simple, we want to bend the curve, and disrupt the spread of the virus.

The supply chain must continue, and Californians must have access to such necessities as food, prescriptions, and health care. When people need to leave their homes or places of residence, whether to obtain or perform the functions above, or to otherwise facilitate authorized necessary activities, they should at all times practice social distancing.

2) The healthcare delivery system shall prioritize services to serving those who are the sickest and shall prioritize resources, including personal protective equipment, for the providers providing direct care to them.

3) The Office of Emergency Services is directed to take necessary steps to ensure compliance with this Order.

4) This Order shall be enforceable pursuant to California law, including, but not limited to, Government Code section 8665.

    **IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

    This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

                                **IN WITNESS WHEREOF** I have
                                hereunto set my hand and caused
                                the Great Seal of the State of
                                California to be affixed this 19th day
                                of March 2020.


                                _____
                                GAVIN NEWSOM
                                Governor of California

                                ATTEST:


                                _____
                                ALEX PADILLA
                                Secretary of State

# EXHIBIT 5



ALEX PADILLA | SECRETARY OF STATE | STATE OF CALIFORNIA
ELECTIONS DIVISION
1500 11th Street, 5th Floor, Sacramento, CA 95814 | **Tel** 916.657.2166 | **Fax** 916.653.3214 | www.sos.ca.gov

---

## POLITICAL BODIES ATTEMPTING TO QUALIFY

---

### Attempting to qualify for the November 3, 2020, General Election

**Common Sense Party**
Tom Campbell
22536 Lake Forest Lane
Lake Forest, CA 92630

**Constitution Party of California**
Don Grundmann
59 Washington Street #152
Santa Clara, CA 95050

**Good Government Party**
Del Stewart
3125 Harbor Ridge Lane
San Diego, CA 92103

**The Hogwash Party**
Rich Riel
9848 Apple Tree Drive #D
San Diego, CA 92124

**K9 Party**
Robert Pendleton
3309 Camino Coronado
Carlsbad, CA 92009

**New America Political Party**
No contact information available.

# EXHIBIT 6

5/26/2020

**Alex Padilla**
**California Secretary of State**

| What can we help you with? |
|---|
| **Search** |



# Political Party Qualification

A qualified political party is entitled to participate in any primary election or presidential general election. (Elections Code § 338.) The following information is for a new political party to be entitled to participate in either the March 3, 2020, primary election or the November 3, 2020, presidential general election.

The political parties currently qualified to participate in the elections are, in alphabetical order: the American Independent Party, the Democratic Party, the Green Party, the Libertarian Party, the Peace and Freedom Party, and the Republican Party.

## Beginning the Process of Qualifying a Political Party

Whenever a group of electors desires to qualify a new political party, the group shall form a political body by carrying out the following two requirements (Elections Code § 5001):

### Hold a Caucus or Convention

The group of electors must hold a caucus or convention at which temporary officers shall be elected and a party name designated. The designated name shall not be so similar to the name of an existing party so as to mislead the voters, and shall not conflict with that of any existing political party or other political body.

### Filing Notice with Secretary of State

Following the convention, the group must file a formal notice with the Secretary of State. The notice must contain the following information:

- That the political body has organized,
- That the political body elected temporary officers,
- That the political body intends to qualify a political party pursuant to Elections Code section 5100 or 5151, but not both, and
- The names and addresses of the temporary officers of the political body.

Upon receipt of the above notice, the Secretary of State will notify county elections officials of the name of the political body, its intent to qualify as a political party, and whether it intends to qualify for the next primary election or for the next presidential general election. (Elections Code § 5002.)

A political body is entitled, upon request to the Secretary of State, to have counted toward its qualification as a political party, affidavits of registration in which voters disclosed a preference with the political body prior to the date the political body filed the above notice. This request must be made within the first 70 days after filing the notice. (Elections Code § 5003.)

## Two Methods to Qualify a Political Party

A political body may use one of two methods to qualify as a political party: voter registration or petition. (Elections Code §§ 5100, 5151.)

### Voter Registration Method - Elections Code Section 5100(b) or 5151(c)

To qualify a new political party by voter registration requires that voters equal in number to at least 0.33 percent of the total number of voters registered on the 154th day before the primary election or the 123rd day before the presidential general election complete an affidavit of registration, disclosing a preference by writing in the name of the political body intending to qualify as a political party. (Elections Code §§ 5100(b), 5151(c).)

These completed affidavits of registration must be submitted to the county elections officials <u>154 days prior to any primary election</u> (if intending to qualify to participate in the next primary election) or <u>123 days before a presidential general election</u>(if intending to qualify to participate in the next presidential general election). (Elections Code §§ 2187(c)(1), (c)(4).) The completed affidavits of registration should be submitted to the elections official in the counties of the voters' residences. They may be submitted to the Secretary of State's office, although this will result in delays to the counties' receipt of the affidavits.

- 154 days prior to the <u>March 3, 2020, primary election</u> is October 1, 2019.
- 123 days prior to the <u>November 3, 2020, presidential general election</u> is July 3, 2020.

The Secretary of State must determine, from examining and totaling the reports of registration from the counties, that the political body obtained voter registrations equal in number to at least 0.33 percent of the total number of voters registered on the 154th day before the primary election or the 123rd day before the presidential general election. (Elections Code §§ 5100(b), 5151(c).)

If a political body chooses to use the voter registration method, they can contact the Secretary of State Elections Division to obtain voter registration cards. Any request of 50 or more voter registration cards will require a representative from the political body to complete and submit a "Voter Registration Card Statement of Distribution" form to the Secretary of State. A "Voter Registration Card Statement of Distribution" form is available on the Secretary of State's website at **elections.cdn.sos.ca.gov/vrdis.pdf (https://elections.cdn.sos.ca.gov/vrdis.pdf)**. The completed form must be mailed or faxed to:

> Secretary of State
> Elections Division
> 1500 11th Street, 5th Floor
> Sacramento CA 95814
> Fax: (916) 653-3214

Information on voter registration drives is available on the Secretary of State's website at **www.sos.ca.gov/elections/additional-elections-information/publications-and-resources/guide-vr-drives//(/elections/publications-and-resources/guide-vr-drives/)**.

## Petition Method - Elections Code Section 5100(c) or 5151(d)

To qualify a new political party by petition, no later than 135 days prior to the primary election or the presidential general election, the Secretary of State must determine if a political body intending to qualify collected petition signatures of registered voters equal to 10 percent of the votes cast at the last gubernatorial election. (Elections Code §§ 5100(c), 5151(d).) The current signature requirement is <u>1,271,255</u> (10% of 12,712,542, the votes cast at the November 8, 2018, gubernatorial election).

In order for the Secretary of State to make this determination on or before the 135th day prior to the primary election or the presidential general election, the counties must have ample time to count and verify the signatures.

- 135 days prior to the <u>March 3, 2020, primary election</u> is October 20, 2019.
- 135 days prior to the <u>November 3, 2020, presidential general election</u> is June 21, 2020.

If a political body chooses the petition process, it is responsible to print and distribute petitions at its expense. The Secretary of State does not review the petition prior to its distribution. The political body may need to obtain the services of an attorney who is familiar with election law to ensure the accuracy of the petition.

The petition process to qualify a political party is similar to the initiative petition process. (Elections Code §§ 5100(c), 5151(d).) For example, the petitions must be filed with the appropriate county elections officials and may be submitted in sections; however, all the sections submitted in a single county must be filed at the same time. Information on the initiative process is available on the Secretary of State's website at **www.sos.ca.gov/ballot-measures/initiative-guide.html(/)** .

# If the Political Body Qualifies as a Political Party

A newly qualified political party must determine which existing political party's statutory provisions it will follow for the operation of its activities. The temporary officers of the newly qualified political party shall file notice of its selection with the Secretary of State not later than 30 days after the political party qualifies. (Elections Code § 5005.)

A political party newly qualified pursuant to Elections Code section 5100 must also determine which existing political party's statutory provisions it will follow for the conduct of its presidential primary election. If the newly qualified political party has not elected permanent officers, the temporary officers shall notify the Secretary of State of its selection on or before the 125th day before the presidential primary election. (Elections Code § 5006.)

The existing qualified political parties with statutes relating to their activities and the conduct of their presidential primary elections are: the Democratic Party, the Republican Party, the American Independent Party, and the Peace and Freedom Party.

**Maintaining Its Qualified Status**

Once qualified, a political party maintains its qualified status by:

Retaining registrants representing at least 1/15 of 1 percent (0.067%) of the total state registration (Elections Code §§ 5101, 5153); **and**

Having one of its statewide candidates (running for Governor, Lieutenant Governor, Secretary of State, Controller, Treasurer, Attorney General, Insurance Commissioner, or United States Senator) receive at least 2 percent of the entire vote of the state for that office at the June 5, 2018, gubernatorial primary election (Elections Code §§ 5100(a), 5151(b)); **or**

Retaining statewide registration equaling at least 0.33 percent of the total number of voters registered on the 154th day before the primary election or the 123rd day before the presidential general election. (Elections Code §§ 5100(b), 5151(c).)

## If the Political Body Fails to Qualify as a Political Party

If by the 135th day before any primary election (if intending to qualify to participate in the next primary election) or the 102nd day prior to a presidential general election (if intending to qualify to participate in the next presidential general election), a political body has not qualified as a political party, the political body shall be considered to have abandoned its attempt to qualify as a political party and shall be ineligible to participate in the following primary election or the following presidential general election. (Elections Code § 5004.)

## Note to Political Body Organizers

These web pages are intended to provide general information about the formation of political bodies and the qualification of political parties and do not have the force and effect of law, regulation, or rule. It is distributed with the understanding that the Secretary of State is not rendering legal advice and these pages are not a substitute for legal counsel for any person or group using it.

In case of conflict, the law, regulation, or rule will apply. Interested persons should obtain the most up-to-date information available because of possible changes in law or procedure since the publication of these pages.

# EXHIBIT 7

## Report of Registration as of February 18, 2020
## Registration by Political Bodies Attempting to Qualify by County

| County | Total | Common Sense Party | Constitution Party of California | Good Government Party | The Hogwash Party |
|---|---|---|---|---|---|
| Alameda | 701 | 695 | 4 | 2 | 0 |
| Alpine | 0 | 0 | 0 | 0 | 0 |
| Amador | 1 | 0 | 1 | 0 | 0 |
| Butte | 4 | 1 | 3 | 0 | 0 |
| Calaveras | 0 | 0 | 0 | 0 | 0 |
| Colusa | 0 | 0 | 0 | 0 | 0 |
| Contra Costa | 117 | 111 | 6 | 0 | 0 |
| Del Norte | 0 | 0 | 0 | 0 | 0 |
| El Dorado | 9 | 5 | 4 | 0 | 0 |
| Fresno | 217 | 210 | 7 | 0 | 0 |
| Glenn | 1 | 0 | 1 | 0 | 0 |
| Humboldt | 16 | 15 | 1 | 0 | 0 |
| Imperial | 1 | 0 | 1 | 0 | 0 |
| Inyo | 0 | 0 | 0 | 0 | 0 |
| Kern | 230 | 218 | 12 | 0 | 0 |
| Kings | 85 | 81 | 4 | 0 | 0 |
| Lake | 3 | 0 | 3 | 0 | 0 |
| Lassen | 1 | 0 | 1 | 0 | 0 |
| Los Angeles | 1,163 | 1,116 | 47 | 0 | 0 |
| Madera | 0 | 0 | 0 | 0 | 0 |
| Marin | 12 | 11 | 1 | 0 | 0 |
| Mariposa | 0 | 0 | 0 | 0 | 0 |
| Mendocino | 5 | 4 | 1 | 0 | 0 |
| Merced | 4 | 2 | 1 | 0 | 0 |
| Modoc | 1 | 0 | 1 | 0 | 0 |
| Mono | 0 | 0 | 0 | 0 | 0 |
| Monterey | 82 | 81 | 1 | 0 | 0 |
| Napa | 5 | 4 | 1 | 0 | 0 |
| Nevada | 1 | 0 | 1 | 0 | 0 |
| Orange | 359 | 359 | 0 | 0 | 0 |
| Placer | 11 | 7 | 4 | 0 | 0 |
| Plumas | 0 | 0 | 0 | 0 | 0 |
| Riverside | 366 | 361 | 5 | 0 | 0 |
| Sacramento | 92 | 86 | 6 | 0 | 0 |
| San Benito | 2 | 2 | 0 | 0 | 0 |
| San Bernardino | 1,258 | 1,230 | 22 | 0 | 0 |
| San Diego | 4,342 | 4,294 | 35 | 1 | 5 |
| San Francisco | 254 | 254 | 0 | 0 | 0 |
| San Joaquin | 45 | 42 | 3 | 0 | 0 |
| San Luis Obispo | 32 | 28 | 4 | 0 | 0 |
| San Mateo | 31 | 27 | 4 | 0 | 0 |
| Santa Barbara | 20 | 17 | 3 | 0 | 0 |
| Santa Clara | 1,336 | 1,328 | 6 | 0 | 0 |

## Report of Registration as of February 18, 2020
## Registration by Political Bodies Attempting to Qualify by County

| County | K9 Party | New America Political Party |
|---|---|---|
| Alameda | 0 | 0 |
| Alpine | 0 | 0 |
| Amador | 0 | 0 |
| Butte | 0 | 0 |
| Calaveras | 0 | 0 |
| Colusa | 0 | 0 |
| Contra Costa | 0 | 0 |
| Del Norte | 0 | 0 |
| El Dorado | 0 | 0 |
| Fresno | 0 | 0 |
| Glenn | 0 | 0 |
| Humboldt | 0 | 0 |
| Imperial | 0 | 0 |
| Inyo | 0 | 0 |
| Kern | 0 | 0 |
| Kings | 0 | 0 |
| Lake | 0 | 0 |
| Lassen | 0 | 0 |
| Los Angeles | 0 | 0 |
| Madera | 0 | 0 |
| Marin | 0 | 0 |
| Mariposa | 0 | 0 |
| Mendocino | 0 | 0 |
| Merced | 1 | 0 |
| Modoc | 0 | 0 |
| Mono | 0 | 0 |
| Monterey | 0 | 0 |
| Napa | 0 | 0 |
| Nevada | 0 | 0 |
| Orange | 0 | 0 |
| Placer | 0 | 0 |
| Plumas | 0 | 0 |
| Riverside | 0 | 0 |
| Sacramento | 0 | 0 |
| San Benito | 0 | 0 |
| San Bernardino | 6 | 0 |
| San Diego | 7 | 0 |
| San Francisco | 0 | 0 |
| San Joaquin | 0 | 0 |
| San Luis Obispo | 0 | 0 |
| San Mateo | 0 | 0 |
| Santa Barbara | 0 | 0 |
| Santa Clara | 0 | 2 |

**Report of Registration as of February 18, 2020**
**Registration by Political Bodies Attempting to Qualify by County**

| County | Total | Common Sense Party | Constitution Party of California | Good Government Party | The Hogwash Party |
|---|---|---|---|---|---|
| Santa Cruz | 12 | 8 | 4 | 0 | 0 |
| Shasta | 14 | 12 | 2 | 0 | 0 |
| Sierra | 0 | 0 | 0 | 0 | 0 |
| Siskiyou | 0 | 0 | 0 | 0 | 0 |
| Solano | 30 | 30 | 0 | 0 | 0 |
| Sonoma | 22 | 21 | 0 | 1 | 0 |
| Stanislaus | 42 | 25 | 17 | 0 | 0 |
| Sutter | 2 | 2 | 0 | 0 | 0 |
| Tehama | 10 | 8 | 2 | 0 | 0 |
| Trinity | 1 | 1 | 0 | 0 | 0 |
| Tulare | 152 | 148 | 4 | 0 | 0 |
| Tuolumne | 0 | 0 | 0 | 0 | 0 |
| Ventura | 10 | 3 | 7 | 0 | 0 |
| Yolo | 3 | 1 | 2 | 0 | 0 |
| Yuba | 11 | 11 | 0 | 0 | 0 |
| **State Total** | **11,116** | **10,859** | **232** | **4** | **5** |

## Report of Registration as of February 18, 2020
## Registration by Political Bodies Attempting to Qualify by County

| County | K9 Party | New America Political Party |
|---|---|---|
| Santa Cruz | 0 | 0 |
| Shasta | 0 | 0 |
| Sierra | 0 | 0 |
| Siskiyou | 0 | 0 |
| Solano | 0 | 0 |
| Sonoma | 0 | 0 |
| Stanislaus | 0 | 0 |
| Sutter | 0 | 0 |
| Tehama | 0 | 0 |
| Trinity | 0 | 0 |
| Tulare | 0 | 0 |
| Tuolumne | 0 | 0 |
| Ventura | 0 | 0 |
| Yolo | 0 | 0 |
| Yuba | 0 | 0 |
| **State Total** | **14** | **2** |

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LIBERTARIAN PARTY OF ILLINOIS, et al., | ) | Case No.  20-cv-2112 |
| | ) | |
| Plaintiffs, | ) | Hon. Charles R. Norgle, Sr., |
| | ) | Presiding Judge |
| and KYLE KOPITKE, | ) | |
| | ) | |
| Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| J.B. PRITZKER, et al., | ) | Hon. Rebecca R. Pallmeyer, |
| | ) | Emergency Judge |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs are the Libertarian Party of Illinois; the Illinois Green Party; and several Illinois registered voters who wish to vote for those parties' candidates in the November 2020 election, to run for state or federal office in the November 2020 election on behalf of those parties or as independents, and/or to gather signatures to ensure that their candidates of choice appear on the ballot for the November 2020 election.[1]  On April 2, 2020, Plaintiffs filed this lawsuit against Illinois Governor J.B. Pritzker and others, seeking to enjoin or modify "Illinois' in-person signature collection and witnessing requirements for independent and third-party candidates in Illinois seeking to qualify for the November 3, 2020 election," in light of the "public health emergency

---

[1]         The registered-voter Plaintiffs are David F. Black, whom the Illinois Green Party has nominated as its candidate for United States Senate; Sheldon Schafer, who is a Co-Chair of the Illinois Green Party and has full authority to act for and on behalf of it in this lawsuit; Richard Whitney, who is likewise a Co-Chair of the Illinois Green Party and has full authority to act for and on behalf of it in this lawsuit; Bennett W. Morris, who is the Chair of the Libertarian Party of Illinois and has full authority to act for and on behalf of it in this lawsuit, and whom the Libertarian Party of Illinois has nominated as its candidate for the United States House of Representatives, District 5; William Redpath, whom the Libertarian Party of Illinois has nominated as its candidate for the United States House of Representatives, District 6; Marcus Throneburg, who is an independent candidate seeking election to the Illinois State Senate, District 37; and David Gill, who is an independent candidate seeking election to the United States House of Representatives in Illinois' District 18.

Dockets.Justia.com

caused by the novel coronavirus [COVID-19] and the Governor's emergency orders effectively shutting down the State." (Compl. [2] ¶ 1; *see also* Am. Compl. [17] ¶ 1.) The matter was assigned to the Honorable Charles R. Norgle, but because Plaintiffs have requested emergency relief, it is before this court for this motion only. On April 17, 2020, the court granted Kyle K. Kopitke's motion for leave to intervene.[2] After a round of briefing and several hearings, the court is entering a preliminary injunction order, granting Plaintiffs' motion in part and accepting Defendants' proposed alternative resolution in part.

## BACKGROUND

"Illinois classifies general-election candidates into three groups: those affiliated with an 'established' political party, those affiliated with a 'new' political party, and those running as independents." *Libertarian Party of Illinois v. Scholz*, 872 F.3d 518, 521 (7th Cir. 2017). An "established" political party is one whose candidates have received a certain threshold of votes in recent elections. *See* 10 ILCS 5/10-2. Established political parties face lower requirements for getting their candidates to appear on the ballot—especially when it comes to the collection of voter signatures. (*See, e.g.,* State of Illinois 2020 Candidates Guide, Ex. B to Defs.' Resp. to Emergency Mot., [16-2] at 25–27 (noting new party and independent candidates for state senator require substantially fewer signatures than established party candidates).) To appear on the ballot for statewide office, new party and independent candidates must collect signatures from the lesser of 25,000 voters or 1 percent of the votes cast in the most recent statewide election. 10 ILCS 5/10-2. And to appear on the ballot for a political subdivision within the state, like a legislative district, the number of signatures required is 5 percent of the voters who voted for the last election for that office. *Id.* For example, a new party candidate for the U.S. Senate would need 25,000 signatures, while a Democrat or Republican would need only 5,000 to 10,000. (State

---

[2] Kopitke is a "native of Illinois and a current Michigan resident" who wishes to run as an independent for United States President in the 2020 election. (Emergency Am. Mot. to Intervene [7] ¶ 6.)

2

of Illinois 2020 Candidates Guide [16-2] at 22.)  State law regulates how these signatures must be collected, as well.  Specifically, all signatures have to be "wet" signatures (*i.e.*, physical signatures as opposed to electronic signatures), signed by a voter in person, and notarized. *See* 10 ILCS 5/10-4.

These signature requirements present an obvious obstacle for candidates like Plaintiffs Libertarian Party of Illinois and Illinois Green Party as well as for independent candidates like Intervenor Kyle Kopitke, but the regulatory scheme has been repeatedly upheld by federal courts. *See Libertarian Party of Illinois v. Rednour*, 108 F.3d 768, 774 (7th Cir. 1997) ("The Supreme Court has long permitted states to impose various restrictions limiting a candidate's access to the ballot."); *Nader v. Keith*, No. 04 C 4913, 2004 WL 1880011, at *6–8 (N.D. Ill. Aug. 23, 2004), *aff'd*, 385 F.3d 729 (7th Cir. 2004) (denying challenge to Illinois' petition and signature requirements). Courts have reasoned that while these laws potentially impose some burden on candidates' speech and association rights, the state has an "important interest of ensuring that a political party that is new in a particular political subdivision demonstrates a modicum of public support before it can place its candidates on an election ballot." *Libertarian Party*, 108 F.3d at 775.  And the in-person signature and notarization requirements have been upheld as well because such rules have been determined to serve the "legitimate need" of rooting out fraud. *See Tripp v. Smart*, No. 14-CV-0890-MJR-PMF, 2016 WL 4379876, at *7 (S.D. Ill. Aug. 17, 2016) (noting that Illinois has a history of "roundtabling" and "other types of circulator fraud"), *aff'd sub nom. Tripp v. Scholz*, 872 F.3d 857 (7th Cir. 2017).

However challenging it may be in general to satisfy the statutory signature and notarization requirement, Plaintiffs and Intervenor argue that under current circumstances, those requirements impose a burden that effectively violates their rights.  Illinois today confronts a public health emergency resulting from the spread of the novel coronavirus, COVID-19.  Beginning in mid-March, the Governor of Illinois, J.B. Pritzker, issued a series of executive orders limiting public gathering and culminating in a shelter-at-home order on March 20, which requires all individuals

to stay at home except for persons engaged in certain "essential" activities.  (Am. Compl. [17]

¶¶ 48–53.) Most public establishments have been closed, and public events have been cancelled

as well.  Practically all public gatherings of any size have been banned.  (*Id.* ¶ 53 (citing COVID-

19 Executive Order No. 8).)  The stay-at-home order will remain in place until at least April 30,

but, as Plaintiffs note, there is great uncertainty about how long it might remain in place.  (*Id.*

¶ 57–58.) The court takes notice that a further extension of many restrictions on personal contacts

is all but certain.  *See* http://www.chicagotribune.com/coronavirus/ct-coronavirus-illinois-stay-at-

home-extension-20200423-cqp6wzjj5ng7rgrfpg64ijgoua-story.html (last visited April 23, 2020).

Despite this disruption and rapid spread of a contagious and dangerous respiratory illness,

new party and independent candidates like Plaintiffs and Intervenor are, under current law, still

required to obtain thousands of wet signatures and to file their completed petitions by June 22,

2020—when the state *could* still be subject to a stay-at-home order.  *See* 10 ILCS 5/10-4.  In

essence, they must choose between complying with the governor's emergency orders intended

to prevent the spread of the coronavirus or engaging in the outreach needed to receive signatures

to appear on the ballot.  They have therefore brought this challenge to enjoin the state from

enforcing certain of these requirements in light of COVID-19.

## DISCUSSION

Plaintiffs allege that under the extraordinary circumstances unleashed by the COVID-19

pandemic, the signature requirements at issue violate their First Amendment rights, as well as

their rights under the Equal Protection Clause of the Fourteenth Amendment.  Although there is

no fundamental right to seek elected office, the Supreme Court has recognized that ballot access

laws like the ones at issue here "place burdens on two different, although overlapping, kinds of

rights—the right of individuals to associate for the advancement of political beliefs, and the right

of qualified voters, regardless of their political persuasion, to cast their votes effectively."

*Williams v. Rhodes*, 393 U.S. 23, 30 (1968); *see also, e.g., Munro v. Socialist Workers Party*, 479

U.S. 189, 193 (1986) (similar); *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983) (stating that

4

the "primary concern" with ballot access restrictions is their "tendency . . . 'to limit the field of candidates from which voters might choose'" (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)). "Both of these rights . . . rank among our most precious freedoms." *Rhodes*, 393 U.S. at 30. They are "not absolute," however. *Munro*, 479 U.S. at 193. States have an important interest in regulating elections, including an interest in "avoiding confusion, deception, and even frustration of the democratic process at the general election." *Id.* at 194 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)); *see also Navarro v. Neal*, 716 F.3d 425, 431 (7th Cir. 2013) (recognizing that "ballot access laws serve the important, interrelated goals of preventing voter confusion, blocking frivolous candidates from the ballot, and otherwise protecting the integrity of elections"). Thus, as referenced above, it is well-settled that States may require candidates to make "some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot." *Jenness*, 403 U.S. at 442; *see also, e.g., Munro*, 479 U.S. at 193–4; *Libertarian Party*, 108 F.3d at 775.

In determining whether a ballot access restriction survives constitutional scrutiny, courts apply the framework articulated in *Anderson*, 460 U.S. 780, and *Burdick v. Takushi*, 504 U.S. 428 (1992). The *Anderson-Burdick* framework directs courts to "make a practical assessment of the challenged scheme's justifications and effects." *Stone v. Bd. of Election Comm'rs for City of Chicago*, 750 F.3d 678, 681 (7th Cir. 2014). First, a court must "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789. Then, a court "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* A court "must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* The Seventh Circuit has stated that, "[p]ractically speaking, much of the action takes place at the first stage of [this] balancing inquiry." *Stone*, 750 F.3d at 681. "If the burden on the plaintiffs' constitutional rights is 'severe,' a state's regulation must be narrowly

drawn to advance a compelling state interest." *Id.* (quoting *Burdick*, 504 U.S. at 434). By contrast, "[i]f the burden is merely 'reasonable' and 'nondiscriminatory' . . . the government's legitimate regulatory interests will carry the day." *Stone*, 750 F.3d at 681 (quoting *Burdick*, 504 U.S. at 434); *see also Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006) ("Ballot access restrictions are evaluated under a flexible standard that weighs the 'character and magnitude of the asserted injury to the [protected rights] that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State . . . .'" (internal quotation marks omitted) (quoting *Burdick*, 504 U.S. at 434)).

The Seventh Circuit has "warned . . . against federal judicial micromanagement of state regulation of elections." *Stevo v. Keith*, 546 F.3d 405, 409 (7th Cir. 2008) (citing *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 954 (7th Cir. 2007)). But it has also made clear that a district court has broad equitable authority to fashion appropriate relief when an election procedure violates the Constitution:

> [T]he district court has the power to order the state to take steps to bring its election procedures into compliance with rights guaranteed by the federal Constitution, even if the order requires the state to disregard provisions of state law that otherwise might ordinarily apply to cause delay or prevent action entirely. . . . To the extent that Illinois law makes compliance with a provision of the federal Constitution difficult or impossible, it is Illinois law that must yield.

*Judge v. Quinn*, 624 F.3d 352, 355–56 (7th Cir. 2010) (quoting *Judge v. Quinn*, 387 F. App'x 629, 630 (7th Cir. 2010)). Defendants emphasize that the Seventh Circuit, on several occasions, has determined that minimum signature requirements for ballot access under the Illinois Election Code are constitutional. *See, e.g.*, *Tripp*, 872 F.3d at 859, 871–72 (law mandating "new" political party candidates for state representative to meet a 5% signature requirement, collect the signatures in a 90-day timeframe, and have each signature notarized, did not violate the First or Fourteenth Amendments); *Nader*, 385 F.3d at 731 (law requiring independent candidate to, among other things, "obtain nominating petitions signed by at least 25,000 qualified voters" and submit the petitions to the state board of elections "at least 134 days before the election" did not violate the First or Fourteenth Amendments); Defs.' Resp. to Emergency Mot. [15] at 2 (citing same).

6

As the court has noted, however, this lawsuit does not challenge the constitutionality of the ballot access restrictions in a vacuum.  Rather, Plaintiffs have requested emergency injunctive relief on the ground that the extraordinary circumstances arising from COVID-19, combined with the ballot access restrictions, violate their First and Fourteenth Amendment rights.  If the court were to side with Plaintiffs on that score, it would have the power to enjoin the unconstitutional restrictions and order appropriate relief.  *See, e.g., Judge*, 624 F.3d at 355–56; *Jones v. McGuffage*, 921 F. Supp. 2d 888, 892, 902 (N.D. Ill. 2013) (enjoining the State of Illinois from requiring "new" party and independent candidates to submit more than 3,444 valid signatures in order to be included on a special congressional election ballot, where the compliance period was only 62 days; there had been no "lead-up time in which to organize a signature drive"; and the plaintiffs faced additional obstacles, including inclement weather); *Esshaki v. Whitmer*, No. 2:20-CV-10831-TGB, 2020 WL 1910154, at *2, *12 (E.D. Mich. Apr. 20, 2020) (recognizing signature-gathering challenges arising from the COVID-19 pandemic and the State of Michigan's stay-at-home directive, ordering that certain candidates "[s]hall be qualified for inclusion on the August 4, 2020 primary election ballot if the candidate submits fifty percent of the number of valid signatures required by" a Michigan election law, and ordering Michigan's Director of Elections to "adopt and promulgate" appropriate "regulations providing for an additional optional procedure that allows the collection and submission of ballot petition signatures in digital form by electronic means such as email").

The combined effect of the restrictions on public gatherings imposed by Illinois' stay-at-home order and the usual in-person signature requirements in the Illinois Election Code is a nearly insurmountable hurdle for new party and independent candidates attempting to have their names placed on the general election ballot.  *See* Ill. Exec. Order No. 2020-10 (Mar. 20, 2020); 10 ILCS 5/10-4.  The problem is exacerbated by the circumstance by the fact that the "window" for gathering such signatures opened at nearly the same time that Governor Pritzker first imposed restrictions.  The court need not devote significant additional attention to the constitutional

7

questions presented because, after a round of briefing and several hearings and in response to the court's direction at oral argument, the parties have proposed an order that grants appropriate relief in these unprecedented circumstances.  Notably, from the outset of these proceedings, even Defendants have acknowledged that the ballot access restrictions must be relaxed, in some shape or form, to account for the havoc that COVID-19 has wreaked.  (*See* Defs.' Resp. to Emergency Mot. at 2 (recognizing "the need for some accommodations" under the circumstances).)  The court is satisfied that the parties' agreed order will ameliorate Plaintiffs' difficulty meeting the statutory signature requirement due to the COVID-19 restrictions—thereby addressing the constitutional questions raised by Plaintiffs' motion (*see* Pls.' Emergency Mot. [2] at 11–12)—while accommodating the State's legitimate interest in ensuring that only parties with a measurable modicum of public support will gain access to the 2020 general election ballot.  *See Jenness*, 403 U.S. at 442.

There is little judicial guidance regarding how to measure whether a new party or independent candidate has demonstrated a modicum of public support sufficient to warrant ballot access.  Instead of relying on standards such as the reputation or media coverage of individual candidates, *see, e.g., McCarthy v. Briscoe*, 429 U.S. 1317, 1323 (1976) (Powell, J., in chambers), Illinois, like other states, measures support through signature-gathering.  Even under normal conditions, the ultimate number of signatures a candidate must gather will vary widely because the signature requirement is, with some exceptions, based on voter turnout in the previous election.  *See Jones*, 921 F. Supp. 2d at 899.  Suspending entirely the signature requirement without requiring candidates to otherwise demonstrate historical support would, however, extend far beyond these typical variations.  *See Munro*, 479 U.S. at 197 (noting that states need not provide automatic ballot access).

The parties' agreed order, permitting ballot access for previously-qualifying new party and independent candidates, and loosening the statutory signature requirements for other new party and independent candidates, establishes a measurable standard that the State can use to

8

determine which candidates are eligible to be placed on the ballot in the unique context of this election. The court notes that in order to respect social distancing guidelines implemented in response to the COVID-19 pandemic, numerous states have likewise reduced the number of signatures required for a candidate to be placed on the ballot. *See, e.g., Esshaki v. Whitmer*, No. 2:20-CV-10831-TGB, 2020 WL 1910154, at *12 (E.D. Mich. Apr. 20, 2020) (reducing the statutory signature requirement by 50 percent); *Goldstein v. Sec'y of Commonwealth*, No. SJC-12931, 2020 WL 1903931, at *9 (Mass. Apr. 17, 2020) (same); N.Y. Exec. Order No. 202.2 (Mar. 14, 2020) (reducing the statutory signature requirement to 30 percent of normal); H. 681, 2019–2020 Gen. Assemb., Adjourned Sess. (Vt. 2020) (suspending the statutory signature requirement entirely). Reducing the required number of signatures to 10 percent accommodates the fact that Plaintiffs have not been able to rely on their usual signature-gathering methods for the 2020 general election ballot because the window for collecting signatures in Illinois was slated to begin on March 24, 2020, after the stay-at-home order took effect. *Cf. Goldstein*, 2020 WL 1903931, at *9.

Additionally, permitting candidates to submit physical or electronic copies of petitions accommodates the various practical barriers to collecting signatures at this time—due to the closure of most public places, Illinoisans may have limited access to the Internet or a printer, or may even be wary of opening mailed petitions. *See Esshaki*, 2020 WL 1910154, at *5 (explaining that a mail-based signature campaign is expensive and ultimately ineffective). Other states have similarly permitted signature collection and petition submission in both electronic and physical formats. *See, e.g.,* Fla. Emergency R. 1SER20-2 (Apr. 2, 2020); N.J. Exec. Order Nos. 105, 120 (Mar. 19, 2020, Apr. 8, 2020); Utah Exec. Order No. 2020-8 (Mar. 26, 2020). The court recognizes that the state will be burdened by extending the signature-gathering deadline, but finds this hardship outweighed by the significant difficulties that would be experienced by campaigns trying to implement a new signature-gathering process while complying with even the modified statutory requirements in such a short amount of time. In particular, the court notes that even after some

9

restrictions are lifted, until a vaccine is available, voters are likely to continue practicing social distancing and avoiding any physical hand contact with other persons or objects.

In sum, the parties' agreed order balances the State's legitimate interests in "preventing voter confusion, blocking frivolous candidates from the ballot, and otherwise protecting the integrity of" the upcoming election, *Navarro*, 716 F.3d at 431, while accommodating the significant restrictions on new party and independent candidates' ability to collect signatures in light of the unprecedented limitations on public gatherings required to reduce the spread of COVID-19.

ENTER:

Dated: April 23, 2020

REBECCA R. PALLMEYER
United States District Judge

EXHIBIT 9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

**ERIC ESSHAKI**, as candidate for
United States Congress and in his
individual capacity;
**MATT SAVICH**, as candidate for
the Forty-Seventh District Court,
Oakland County, Michigan and in
his individual capacity;
**DEANA BEARD**, as candidate for
the Third Circuit Court Judge,
Regular Term, Non-Incumbent
Position in Wayne County and in
her individual capacity.

                Plaintiffs,

     vs.

**GRETCHEN WHITMER**,
Governor of Michigan;
**JOCELYN BENSON**, Secretary of
State of Michigan; and
**JONATHAN BRATER**, Director of
the Michigan Bureau of Elections,
in their official capacities,

                Defendants.

**2:20-CV-10831-TGB**

**ORDER GRANTING MOTION
FOR PRELIMINARY
INJUNCTION**

---

In normal times, a candidate for United States Congress in Michigan's Eleventh Congressional District must collect one thousand signatures from registered voters in order to have his or her name appear

1

on the primary ballot.  Candidates typically gather these signatures door-to-door, or in high-traffic public places like outside malls, grocery stores, crowded school or community events, public rallies, or places of worship. Under Michigan's statute, the signatures are due on the fifteenth Tuesday before the August 4th primary.  This year, signatures are due on April 21, 2020.

Unfortunately, these are not normal times.  On March 10, 2020, Michigan Governor Gretchen Whitmer declared a state of emergency based on the serious threat to public safety posed by the COVID-19 or "coronavirus" pandemic.  In less than four months, since the first reported case of the disease on American soil in January,[1] this highly contagious novel virus has taken the lives of more than thirty-four thousand Americans, of whom more than two thousand were residents of the State of Michigan.[2]  In addition to causing thousands of deaths, the pandemic has upended the daily routines of hundreds of millions as they

---

[1] Michelle L. Holshue, et al., *First Case of 2019 Novel Coronavirus in the United States*, 382 New Eng. J. Med. 929 (2020).

[2] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times (Apr. 19, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last accessed Apr. 19, 2020).

sheltered at home, causing one in four small businesses to close,[3] and 22 million Americans to lose their jobs.[4]  Since March 23, 2020, pursuant to Executive Order 2020-21, the State of Michigan has been on lockdown: all nonessential in-person work has been prohibited, as have all public and private gatherings of persons not part of the same household.  Malls are closed, schools and churches have moved to social media solutions such as Zoom, and any candidate trying to canvass door-to-door to attempt to gather signatures today would be committing a misdemeanor offense.

Yet, the State insists on enforcing the signature-gathering requirements as if its Stay-at-Home Order responding to the ongoing pandemic had no impact on the rights of candidates and the people who may wish to vote for them.  The plaintiff[5] in this matter, Eric Esshaki, is running for United States Congress in Michigan's Eleventh

---

[3]  *Special Report on Coronavirus and Small Business,* U.S. Chamber of Comm. & MetLife, Apr. 3, 2020.

[4]  Heather Long, *U.S. now has 22 million unemployed, wiping out a decade of job gains*, Wash. Post (Apr. 16, 2020), https://www.washingtonpost.com/business/2020/04/16/unemployment-claims-coronavirus/?outputType=amp.

[5]  Since oral argument on April 15, 2020, the Court has granted emergency motions to intervene from two additional plaintiffs, Mr. Savich and Ms. Beard.  Both allege that their legal positions are substantively identical to Mr. Esshaki, but because of the emergency nature of these proceedings, Defendants have not yet had opportunity to respond to Mr. Savich's or Ms. Beard's allegations specifically. Accordingly, this Order focuses primarily on Mr. Esshaki's arguments, and refers to him as "Plaintiff".

Congressional District. He states that he has gathered more than seven hundred of the one thousand signatures he needs to get on the primary ballot. He contends that because of the Stay-at-Home Order, he was effectively prohibited from collecting the remaining three hundred signatures he needed in time to meet the April 21 deadline, and that consequently he will be barred from having his name appear on the primary ballot. Under these unique historical circumstances, as will be explained in detail below, the Court finds that the State's actions in the form of enforcing both the Stay-at-Home Order and the statutory ballot-access requirements, operate in tandem to impose a severe burden on Plaintiff's ability to seek elected office, in violation of his First and Fourteenth Amendment rights to freedom of speech, freedom of association, equal protection, and due process of the law. Consequently, the Motion for Preliminary Injunction will be granted.

## I.   BACKGROUND

Plaintiff Eric Esshaki is a registered nurse and practicing attorney running as a Republican candidate for United States Congress in Michigan's Eleventh Congressional District. Compl. ¶ 2, ECF No. 1, PageID.2. He filed his statement of candidacy with the Federal Election

Commission on October 31, 2019.  *Id.* ¶ 18, PageID.5.  He is required by statute to collect one thousand valid signatures from registered voters by April 21, 2020 to qualify to have his name placed on the August 4, 2020 primary ballot.  Mich. Comp. Laws §§ 168.133, 168.544f (collectively "the signature requirement").  By March 23, 2020, Esshaki's campaign had already collected approximately seven hundred signatures.  Compl. ¶ 22, ECF No. 1, PageID.6.

On March 10, 2020, Michigan's first two COVID-19 cases were announced and Governor Gretchen Whitmer declared a state of emergency.  *See* Mich. Exec. Order 2020-4 (Mar. 10, 2020) ("State of Emergency Declaration").  The State of Emergency Declaration cautioned citizens that COVID-19 "is a respiratory disease that can result in serious illness or death . . . and can easily spread from person to person."  *Id.*  By March 23, 2020, the number of diagnosed coronavirus cases in Michigan had grown to more than nine hundred and thirteen[6] and the Governor signed Executive Order 2020-21 (the "Stay-at-Home Order").  The Stay-at-Home Order suspended in-person non-essential commercial activities and directed residents to "remain at home or in their place of residence

---

[6]    *Daily    Counts*,    Michigan.gov,    https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173_99207---,00.html (last accessed Apr. 17, 2020).

to the maximum extent feasible." Mich. Exec. Order No. 2020-21 (Mar. 23, 2020). It also prohibited all "public and private gatherings of any number of people" not part of a single household and ordered that persons performing essential activities outside of their homes remain six feet apart. *Id.* The Stay-at-Home Order does not contain any exception for campaign workers. On April 9, 2020, the Governor signed a second executive order extending the Stay-at-Home Order through the end of April. *See* Mich. Exec. Order No. 2020-42 (Apr. 9, 2020). A violation of the Stay-at-Home Order is a misdemeanor criminal offense. *Id.*; Mich. Comp. Laws § 10.33.

Plaintiff and the numerous candidates who have expressed an interest in the outcome of this case[7] maintain that the Stay-at-Home Order has for all practical purposes denied them the opportunity to

---

[7] The Court has received a number of amicus curiae briefs and motions to intervene from other candidates who, like Plaintiff, say they have been unable to gather signatures because of the Stay-at-Home Order. They include: Mr. Daniel Finley, a judicial candidate for Michigan's Twenty-Second Circuit (ECF No. 13), Mr. Matt Savich, a judicial candidate for Michigan's Forty-Seventh District Court (ECF No. 11), Ms. Deana Beard, a judicial candidate for Michigan's Third Circuit Court (ECF No. 17), and Mr. Kyle Kopitke, an independent presidential candidate (ECF No. 18). In addition, the American Civil Liberties Union filed an amicus curiae brief in support of Plaintiff (ECF No. 15), and Ms. Whittney Williams, a competitor of Mr. Esshaki also seeking to run as the Republican candidate for United States Congress in Michigan's Eleventh Congressional District, filed an amicus curiae brief opposing relief for Plaintiff (ECF No. 21). The Court also received correspondence from Mr. Bob Carr, a Republican candidate for U.S. Senate, who provided a list of candidates that he appeared to be citing as similarly situated, but provided no evidentiary support for his claim. By separate order, the Court will grant these pending motions to intervene and file amicus briefs, with the exception of the motion of proposed Plaintiff Kopitke, because the relief he seeks differs significantly from that of the other candidates.

6

collect the signatures that they needed during the timeframe between March 23 and April 21. Mot. for Prelim. Inj., ECF No. 2, PageID.50. Plaintiff contends that the combination of the State's strict enforcement of statutory signature gathering requirements with the Governor's Stay-at-Home Order has placed a severe burden on his ability to run for elected office—in violation of the freedom of speech, freedom of association, equal protection, and due process rights guaranteed to him by the First and Fourteenth Amendments. Compl. ¶ 46, ECF No. 1, PageID.11. Plaintiff argues that the burden placed on him by the State's actions is unconstitutional because the State has neither a compelling interest in enforcing the signature requirement, nor has it narrowly tailored its ballot access requirements to effectuate any compelling interest it may have. ECF No. 2, PageID.55.

Defendants contend that enforcement of the signature requirement in light of the Governor's Stay-at-Home Order has only moderately burdened Plaintiff's ability to run for elective office. Defs. Resp., ECF No. 6, PageID.112. Defendants argue that Plaintiff entered the race relatively late, that he was not diligently collecting signatures before the Stay-at-Home Order was issued, that he should have "doubled down" on

7

his signature-collection efforts during the period between the March 10th State of Emergency Declaration and the March 23rd Stay-at-Home Order, that he could have collected signatures by mail, and that even if he fails to get on the ballot, he can always run as a write-in candidate. *Id.* at PageID.110-12.

Defendants assert that any burden placed on Plaintiff's ability to run for elective office by the enforcement of the State's signature requirements must be weighed against the State's substantial interest in ensuring that candidates have a significant modicum of support before their names are printed on the ballot. *Id.* at PageID.113. Defendants argue that a threshold showing of support through signature gathering helps protect the integrity of the electoral process by limiting the number of candidates on the ballot and avoiding voter confusion. *Id.* Defendants further assert that the State has an interest in maintaining April 21, 2020 as the filing deadline because that date "ensur[es] that the Secretary of State and her staff have sufficient time to canvass petitions, provide a challenge period, and meet the ballot certification deadline, which triggers final preparations for ballot printing by the counties." *Id.* at PageID.115.

The Court heard oral argument on this motion on April 15, 2020, utilizing the social media platform Zoom. At the hearing, both parties referenced proposed remedies that each had submitted to the Court *in camera*. Plaintiff seeks an order reducing the required number of signatures by forty percent, so that candidates would only need to collect sixty percent of the required number. Defendants proposed postponing the filing date to May 8, 2020, and offering candidates an approved method to collect signatures by e-mail, and submit them using the Internet, but they opposed any reduction in the required number of signatures. The Court will consider these proposed remedies together with the relevant facts and applicable law in reaching its decision.

## II.   LEGAL STANDARD

### a. Preliminary Injunction

The Court must consider four factors when ruling on a motion for a preliminary injunction: (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm absent the injunction; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is

advanced by the issuance of the injunction. *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012). No one factor is dispositive; rather the court must balance all four factors. *In re De Lorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). A preliminary injunction is an extraordinary remedy that will only be granted if Plaintiff shows that circumstances clearly demand it. *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

## III.  DISCUSSION

### a. Likelihood of Success on the Merits

Under Michigan election law, candidates for certain elective offices must comply with statutory signature gathering requirements enumerated in Section 168.544f. Mich. Comp. Laws § 168.544f. The number of signatures required depends on the population of the district and whether or not that candidate is running as a member of a party. Mich. Comp. Laws § 168.544f. Congressional candidates are also governed by Section 168.133, which sets the April 21, 2020 filing deadline. Mich. Comp. Laws § 168.133. Substantially similar statutes set April 21, 2020 as the petition filing date for other offices. *See, e.g.,* Mich. Comp. Laws § 168.93 (U.S. Senator); Mich. Comp. Laws § 168.93

(judge of Circuit Court); Mich. Comp. Laws § 168.467b (judge of District Court).

While there is no fundamental right to run for elective office, the Supreme Court has recognized that ballot access laws such as Sections 168.133 and 168.544f "place burdens on two different, although overlapping, kinds of rights – the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968). Ballot access restrictions affect candidates and individual voters alike because absent recourse to state-wide proposals or referenda, "voters can assert their preferences only through candidates or parties or both." *Lubin v. Panish*, 415 U.S. 709, 716 (1974). "By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). As the Supreme Court explained in the seminal ballot access case of *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983), "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws

that affect candidates always have at least some theoretical correlative effect on voters." (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)).

When considering the constitutionality of ballot access laws, courts apply the framework established in *Anderson*, 460 U.S. at 780 as later refined in *Burdick v. Takushi*, 504 U.S. 428 (1992). Under the *Anderson-Burdick* framework, courts first look at the "character and magnitude of the asserted injury" to the plaintiff's constitutional rights. *Anderson*, 460 U.S. at 789. "When a state promulgates a regulation which imposes a 'severe' burden on individuals' rights, that regulation will only be upheld if it is 'narrowly drawn to advance a state interest of compelling importance'" *Lawrence v. Blackwell*, 430 F.3d 368, 373 (6th Cir. 2005) (quoting *Burdick*, 504 U.S. at 434). The analysis requiring that a state law be narrowly tailored to accomplish a compelling state interest is known as the "strict scrutiny" test. If regulations enacted do not seriously burden a plaintiff's rights, a state's important regulatory interests will typically be enough to justify "reasonable, nondiscriminatory restrictions." *Anderson*, 460 U.S. at 788. Regulations falling somewhere in between—"i.e., regulations that impose a more-than-minimal but less-than-severe burden—require a 'flexible' analysis,

'weighing the burden on the plaintiffs against the [s]tate's asserted interest and chosen means of pursuing it.'" *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016) (quoting *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 546 (6th Cir. 2014)). This level of review is called "intermediate scrutiny."

### i. Severity of the burden on Plaintiff

In this case, Plaintiff is challenging neither the constitutionality of the State's ballot access laws nor the Governor's Stay-at-Home Order in isolation. Rather, Plaintiff seeks relief because the two regulations, taken together, have prevented him from collecting enough signatures before the April 21, 2020 deadline to get his name on the primary ballot. *See Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 586 (6th Cir. 2006) ("Our inquiry is not whether each law individually creates an impermissible burden but rather whether the combined effect of the applicable election regulations creates an unconstitutional burden on First Amendment rights."); *Graveline v. Johnson*, 336 F. Supp. 3d 801, 810 (E.D. Mich. 2018) (considering "the 'combined effect' of the challenged regulations, rather than each statute's requirement by itself"). Plaintiff argues that the burden put on him by the two regulations is severe,

necessitating a strict scrutiny analysis. ECF No. 1, PageID.11. Defendants contend that the burden is moderate, necessitating a "flexible" weighing of the burdens analysis, or "intermediate scrutiny." ECF No. 6, PageID.110.

Defendants proffer four separate reasons why the burden on Plaintiff is not severe. Upon close examination, none is convincing. First, Defendants argue that Plaintiff has not been diligent in collecting signatures because, at the time the March 23rd Stay-at-Home Order was issued, he had only collected seven hundred of the one thousand he is required to obtain. ECF No. 6, PageID.110. Defendants offer little evidence to support this assessment. The State refers to information available on its website showing a list of those candidates who have successfully met the current filing requirements.[8] But the relevant question pertains to those candidates who have declared their intentions to qualify for the ballot, but have not yet met the filing requirements at the time the Stay-at-Home Order went into effect. The State could have conducted a survey to determine where those candidates were in the signature collection process as of the date of the shut-down, but no such

---

[8] *2020 Michigan Candidate Listing,* Mich. Sec'y of State, https://miboecfr.nictusa.com/election/candlist/2020PRI_CANDLIST.html (last accessed Apr. 19, 2020).

information has been proffered. It is not enough to merely assert that a candidate's successful collection of seventy percent of the requisite signatures with twenty-nine days left to go is somehow evidence of dilatory behavior. Moreover, during oral argument on this matter, Plaintiff indicated that he had campaign events planned for late March and April that had to be canceled after the Stay-at-Home Order was issued. Other candidates as well have submitted testimony that they likewise had planned to ramp up signature collection efforts in March and April, when warmer spring weather would accommodate outdoor activities and be more conducive to large social gatherings and door-to-door canvassing. *See* Bannister Decl. ¶ 10, ECF No. 15-2, PageID.273-74; Amicus Br. of Daniel P. Finley, ECF No. 13, PageID.212; Deana Beard Mtn. for Joinder, ECF No. 17, PageID.296; *see also Jones v. McGuffage*, 921 F. Supp. 2d 888, 897 (N.D. Ill. 2013) (noting that burden on candidates increased when signature gathering period for special election was truncated by one-third and limited to "December and January—months during which weather in the Chicago area is particularly inclement and in which there are a dearth of large scale, outdoor, public events during which signature drives are most successful").

15

Second, Defendants contend that the Governor's March 10, 2020 State of Emergency Declaration "should have acted as a wake-up call to Plaintiff and his staff to double-down on signature collection efforts" before the March 23, 2020 Stay-at-Home Order.  ECF No. 6, PageID.111. This argument both defies good sense and flies in the face of all other guidance that the State was offering to citizens at the time.  The Governor's State of Emergency Declaration cautioned citizens that COVID-19 "is a respiratory disease that can result in serious illness or death . . . and can easily spread from person to person."  Mich. Exec. Order 2020-4 (Mar. 10, 2020).  The next day, the State issued a press release urging citizens to "[r]educe in-person gatherings and activities," "consider tele-work[ing]" and limit interactions with vulnerable populations.[9]  Instead of "doubling down" on door-to-door signature collection efforts between March 10th and March 23rd—increasing the risk that Plaintiff and his supporters could possibly be exposed to the COVID-19 virus by engaging in repeated close-contact with potential

---

[9] *State Recommends Community Mitigation Strategies to help slow the transmission of COVID-19 in Michigan*, Michigan.gov (Mar. 11, 2020), https://www.michigan.gov/coronavirus/0,9753,7-406-98158-521463--,00.html.

16

petition signers or unknowingly transmit it to others—prudence at that time counseled in favor of doing just the opposite.

Third, Defendants argue that Plaintiff could have utilized a mail-based campaign to collect the remaining three hundred signatures he needed during the month-long shutdown. ECF No. 6, PageID.111. Plaintiff counters that a mail campaign is both prohibitively expensive and of unproven efficacy. ECF No. 10, PageID.159. He also says that he tried it. Plaintiff states that on April 2, 2020, he sent one thousand petitions by mail at a cost of $1.75 each. ECF No. 10, PageID.159. And by April 14, 2020, the mail campaign had garnered a total of fifteen additional signatures—which, given the cost of the mailing, meant the equivalent of paying approximately $115 per signature. *Id.* At that rate, Plaintiff estimates that it would have cost him an additional $34,500 to gather the remaining three hundred signatures he needed. *See id.* Indeed, if Plaintiff wanted to collect four hundred signatures in order to ensure a safety margin in the event any signatures were later found to be invalid, such a mailing would cost $45,000. *Id*; *see also* Deana Beard Mtn. for Joinder, ECF No. 17, PageID.296 (judicial candidate who estimates that a mail-only campaign for remaining signatures would cost

17

her $216,450).  A $34,500 expense is a significant financial burden for any congressional campaign.  Further, the unforeseen nature of such an expense here surely magnifies its burden: no candidate, at the time they initially declared for office, could have anticipated that at the end of March, just when in-person signature collecting might be expected to be ramping up, there would arise the sudden need to switch to a mail-only signature campaign.  While Plaintiff is not entitled to free access to the ballot, the financial burden imposed by an unforeseen but suddenly required mail-only signature campaign is far more than an incidental campaign expense or reasonable regulatory requirement.  For any candidate other than those with unusually robust financial means, such a last-minute requirement could be prohibitive.  *Compare Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 577 (6th Cir. 2016) ("the incidental costs of gathering signatures on petitions do not come close to exclusion from the ballot, and thus do not impose a severe burden on ballot access") *with Lubin*, 415 U.S. at 718 (holding that a $701.60 filing fee is an unconstitutional burden on indigent candidate with no alternative mechanism to get his name on the ballot).

Furthermore, though the Court finds that a mail-only campaign for the remaining signatures would impose more than an incidental cost on Plaintiff and candidates like him, in the context of the COVID-19 pandemic, the efficacy of a mail-based campaign is unproven and questionable at best.   Conducting an effective mail campaign in the current environment presents a significant hurdle.   Such a mail-only signature gathering campaign assumes both a fully operational postal service and a public willing to walk to the mailbox, open physical envelopes, sign a petition, and deposit the envelope back into a mailbox or make a trip to the Post Office.   Today, sadly, ample reasons exist to question the plausibility of each of those assumptions.   For one, the United States Postal Service has itself been affected by the COVID-19 virus: As of April 7, 2020, more than 386 postal workers have tested positive for the virus nationwide and mail delays have been confirmed in Southeast Michigan.[10]   Media reports extensively discuss the risks of contracting COVID-19 from mail, suggesting, at least anecdotally, that

---

[10] Justin P. Hicks, *Michigan mail delivery slows as coronavirus hits postal service workers*, Mlive (Apr. 7, 2020),       https://www.mlive.com/public-interest/2020/04/michigan-mail-delivery-slows-as-coronavirus-hits-postal-service-workers.html.

the issue may be of widespread public concern or even fear.[11] Getting voters to return signatures by mail in normal times is difficult.[12] In these unprecedented circumstances, the efficacy of a mail-only signature gathering campaign is simply an unknown.   Forcing candidates—through little fault of their own—to rely on the mails as their only means of obtaining signatures presents a formidable obstacle of unknown dimension.

Fourth, Defendants contend that even if Plaintiff fails to gather sufficient signatures to have his name placed on the August ballot, he remains free to mount a write-in campaign, and like any write-in candidate, he would have that method of access to the ballot, which should be considered adequate.   ECF No. 6, PageID.112.   But this argument has already been rejected both by the Supreme Court and by a court in this district.   *Lubin*, 415 U.S. 719 n.5 ("The realities of the electoral process . . . strongly suggest that 'access' via write-in votes falls

---

[11] *See, e.g.*, Nicola Twilley, *You've Got Mail. Will You Get the Coronavirus?*, N.Y. Times (Mar. 24, 2020), https://www.nytimes.com/2020/03/24/health/coronavirus-mail-packages.html.

[12] *See* Daniel Hays Lowenstein & Robert M. Stern, *The First Amendment and Paid Initiative Petition Circulators: A Dissenting View and A Proposal*, 17 Hastings Const. L.Q. 175, 206 (1989) ("Recipients are not likely to sign and return the petitions . . . . Whereas the course of least resistance in a shopping mall may be to sign when asked, signing and returning a petition by mail takes significantly more effort than throwing away the solicitation letter.").

far short of access in terms of having the name of the candidate on the ballot."); *Anderson*, 460 U.S. at 799 n.26 ("We have previously noted that [a write-in] opportunity is not an adequate substitute for having the candidate's name appear on the printed ballot."); *Graveline*, 336 F. Supp. 3d at 811 (Roberts, J.) (same).

The reality on the ground for Plaintiff and other candidates is that state action has pulled the rug out from under their ability to collect signatures. Since March 23, 2020, traditional door-to-door signature collecting has become a misdemeanor offense; malls, churches and schools and other public venues where signatures might be gathered have been shuttered, and even the ability to rely on the mail to gather signatures is uncertain—if not prohibitively expensive. Absent relief, Plaintiff's lack of a viable, alternative means to procure the signatures he needs means that he faces virtual exclusion from the ballot. After considering Defendants' arguments, this Court has little trouble concluding that the unprecedented—though understandably necessary— restrictions imposed on daily life by the Stay-at-Home Order, when combined with the ballot access requirements of Sections 168.133 and 168.544f, have created a severe burden on Plaintiff's exercise of his free

speech and free association rights under the First Amendment, as well as his due process and equal protection rights under the Fourteenth Amendment[13]—as expressed in his effort to place his name on the ballot for elective office. *See Libertarian Party of Ky.*, 835 F.3d at 574 ("The hallmark of a severe burden is exclusion or virtual exclusion from the ballot."). Accordingly, a strict scrutiny analysis is appropriate here. *See, e.g., Faulkner v. Va. Dep't. of Elections*, CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020) (applying strict scrutiny to candidate's ballot access claim in light of state's COVID-19 restrictions).

### *ii. Defendants' interest in enforcing signature requirements in light of the Stay-at-Home Order*

Because the State's signature requirements, operating in conjunction with the Stay-at-Home Order, have imposed a severe burden on the First and Fourteenth Amendment rights of Plaintiff and other candidates in his position, such measures can be constitutionally justified only if they are "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434.

---

[13] Although Plaintiffs nominally invoke equal protection, due process, and the First Amendment, the specific interests they raise and the nature of their arguments involve First Amendment principles more closely than the equal protection rights of minor party or independent candidates. Accordingly, this Court, like the parties, will view the case mainly as implicating First Amendment rights.

Defendants argue that the State has two separate interests in enforcing Sections 168.133 and 168.544f. First, the State has a substantial interest in ensuring that candidates have a significant modicum of support before their names are printed on the ballot. ECF No. 6, PageID.113. Second, the State has an interest in maintaining the filing deadline of April 21, 2020 because that date "ensur[es] that the Secretary of State and her staff have sufficient time to canvass petitions, provide a challenge period, and meet the ballot certification deadline, which triggers final preparations for ballot printing by the counties." *Id.* at PageID.115.

The Supreme Court has recognized that states have "an important interest in ensuring that candidates demonstrate a 'significant modicum of support,' before gaining access to the ballot, primarily in order to avoid voter confusion, ballot overcrowding, and frivolous candidacies." *Libertarian Party of Ky.*, 835 F.3d at 577 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)). Along with enforcing specific deadlines, both regulations are part and parcel of the State's generalized interest in the orderly administration of elections. *Mays v. LaRose*, 951 F.3d 775, 787 (6th Cir. 2020).

Notably, Defendants do not explicitly contend in their brief that either of the State's proffered interests in strict enforcement of the signature requirements rise to the level of a *compelling* state interest. *See* ECF No. 6, PageID.113-16. Rather, they see them as *important* government interests in the context of today's pandemic that would pass the flexible intermediate scrutiny analysis. At oral argument, however, the State asserted that its interests were compelling, and the Supreme Court has found that ensuring that a candidate has a modicum of support before inclusion on the ballot can be a compelling state interest in other contexts. *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986) . Significantly though, with respect to Section 168.133's April 21, 2020 deadline, the State conceded at oral argument that the signature-gathering due date could be moved back to May 8, 2020 without significant impairment of the State's interests. Clearly any interest in maintaining April 21, 2020 as the signature due date is not, in fact, compelling.

But even assuming the State has a compelling interest in the need to ensure a modicum of support through the enforcement of the signature requirement, the regulatory means to accomplish that compelling

interest are not narrowly tailored to the context of the COVID-19 pandemic—as it would need to be to survive a strict scrutiny analysis. This is because under typical conditions, Plaintiff's ability to obtain one thousand signatures from registered voters would be a valid indication that he has earned the "modicum of support" the Michigan Legislature deemed sufficient to appear on the ballot. When setting the requirement at one thousand signatures, the Michigan Legislature intended that candidates be allowed until April 21, 2020—under normal, non-pandemic conditions—to gather one thousand signatures using all of the traditionally effective means to do so. The March 23, 2020 Stay-at-Home Order, for reasons already discussed, effectively halted signature-gathering by traditional means, reducing the available time prescribed by the Michigan Legislature to gather one thousand signatures by twenty-nine days. Thus, a state action narrowly tailored to accomplish the same compelling state interest would correspondingly reduce the signature requirement to account for the lost twenty-nine days. Or, to state it differently, even assuming the State generally has a compelling interest in ensuring candidates have a modicum of support before allowing inclusion on the ballot, here the State has not shown it has a

compelling interest in enforcing *the specific numerical requirements* set forth in Section 168.544f in the context of the pandemic conditions and the upcoming August primary.

The State has thus failed to show that its enforcement of the signature requirements in conjunction with the Stay-at-Home Order is both justified by a compelling state interest and narrowly tailored to accomplish that interest in a manner that has the least restrictive impact on Plaintiff's constitutional rights. It therefore fails to pass a strict scrutiny analysis. Consequently, Plaintiff has established a likelihood of prevailing on the merits of his First and Fourteenth Amendment claims.

### b. Likelihood That Plaintiff Will Suffer Irreparable Harm Absent Injunctive Relief

The Court next considers whether Plaintiff will suffer irreparable harm in the absence of injunctive relief. *Bays*, 668 F.3d at 818-19. "To demonstrate irreparable harm, the plaintiffs must show that . . . they will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).

In reviewing the record, the Court concludes that Plaintiff will suffer irreparable harm absent relief. Ballot access cases such as this

implicate First Amendment rights, and when such fundamental rights are violated—as when a candidate is unconstitutionally deprived of access to the ballot—irreparable harm can be presumed. *See Libertarian Party of Ohio*, 751 F.3d at 412 ("[I]t is well-settled that loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)).

### c. Probability of Harm to Others and Consideration of the Interests of the Public

The remaining factors, "harm to the opposing party and weighing the public interest . . . merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Defendants contend that the State and its citizens will be harmed in two ways if the Court issues an injunction. First, the State and the people will be deprived of the full and proper enforcement of laws enacted by the Michigan Legislature. Second, an injunction lowering the signature requirement would allegedly result in the disparate treatment of similarly situated candidates. ECF No. 6, PageID.118-19. On the first point, the State is correct that the Supreme Court has consistently recognized that states have a strong interest in seeing their laws effectuated. *See New Motor*

*Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). As to the second point regarding disparate treatment, it is the case that other candidates, including some running against Plaintiff for the Republican nomination in Michigan's Eleventh Congressional District, have already obtained enough signatures to appear on the August ballot. *See* Amicus Br. of Whittney Williams, ECF No. 21. If the Court were to grant Plaintiff's request to lower the minimum number of signatures required to appear on the August primary ballot, it would be permitting candidates to appear on the ballot who had gathered fewer signatures than those like Williams who have successfully met the threshold before April 21st. In considering the State's position, the Court agrees that the first point is well taken and that the State will likely suffer injury from not having its ballot access requirements enforced as written if an injunction issues. The question is balancing the significance of this harm against the deprivation of constitutional rights, as well as other public harms, that enforcement of those requirements would cause.

As to the second harm identified by the State, the alleged disparate treatment of candidates, this point is not well founded. Without any injunctive relief, the combination of the Stay-at-Home Order and the signature requirements operates to cause disparate treatment of those candidates who were fortunate enough to have met their signature requirement early as compared with those who were planning—and needing to use—the last twenty-nine days that they had assumed would be available to gather signatures. One group benefits while the other loses. Similarly, if injunctive relief were to lower the number of required signatures, one could argue that the early birds who might have gained an advantage from the Stay-at-Home Order's exclusion of their more procrastinating competitors would be "harmed" while the other candidates would be benefitted. Both the status quo and the remedy sought by Plaintiff would arguably cause a form of disparate impact on candidates. Consequently, the Court will not give weight to this second form of harm raised by the State.

The Court must weigh the State's proffered harm of not being able to enforce its ballot access requirements against the harm to the Plaintiff and the public harms that would result from the lack of any injunction.

The Court finds that the balance weighs in favor of an injunction. First, in the absence of an injunction, Plaintiff and other candidates in his position were left with no choice but to have violated the Stay-at-Home Order in order to collect the signatures they need. Indeed, some candidates have already admitted to having done so. *See* Bannister Decl. ¶ 36, ECF No. 15-2, PageID.278. The broader public interest is not served by preserving the current signature-gathering scheme at the cost of encouraging more candidates and their supporters to risk their health and criminal penalties to gather signatures.

Second, while Defendants accurately point out that voters do not have an "absolute right to vote for a candidate of [their] choice," it is also the case that a candidate's ability to appear on the ballot "affects the First Amendment rights of voters." *Blackwell*, 462 F.3d at 588; *see also Ill. State Bd. of Elections*, 440 U.S. at 184 ("By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences."). Here, if a candidate should fail to obtain enough signatures because she had relied on the somewhat standard and eminently reasonable assumption that she would be able to ramp up signature collecting in the spring, Michigan voters may lose the ability to

vote for a candidate who, absent the pandemic, would have easily been included on the ballot. This would cause injury to the First Amendment rights of an innumerable number of Michigan voters.

Finally, were the Court to redress Plaintiff's injury by granting his request to lower the number of signatures required to qualify for the August primary ballot, the uniform nature of the relief would have some benefits both for candidates who had already met the current threshold as well as those who had collected a lesser number of signatures. For example, because Ms. Williams has already obtained one thousand signatures, any signatures she gathered in excess of a lower minimum would provide her, and any other candidates in her position, with a larger margin of signatures, should any of the gathered signatures later be deemed invalid.

### d. Remedy

Since the advent of the coronavirus, and the unfurling of its deadly pall across America, the governments of the several states have searched for solutions to protect their citizens' health, while at the same time

preserving fundamental democratic processes and liberties.[14]   In New York, Governor Andrew Cuomo, confronted with the same issue that is before this Court, reduced the number of petition signatures candidates would be required to obtain to thirty percent of the statutory requirement.   N.Y. Exec. Order No. 202.2 (Mar. 14, 2020).   Vermont suspended its signature requirement entirely.   H. 681, 2019-2020 Gen. Assemb., Adjourned Sess. (Vt. 2020).   At least three states have attempted to address the difficulty candidates face obtaining in-person signatures by allowing for electronically submitted signatures.   FL. Emergency R. 1SER20-2 (Apr. 2, 2020); N.J. Exec. Order No. 105 (Mar. 19, 2020); Utah Exec. Order No. 2020-8 (Mar. 26, 2020).

In responding to the public health risks that in-person voting presents, many states have taken actions designed to ensure adequate conditions for public participation.   At least sixteen states and one territory—Alaska, Connecticut, Delaware, Georgia, Hawaii, Indiana, Kentucky, Louisiana, Maryland, New Jersey, New York, Ohio,

---

[14] For an extensive review of the numerous examples of state initiatives aimed at protecting democratic processes in the wake of the COVID-19 pandemic, see *Changes to election dates, procedures, and administration in response to the coronavirus (COVID-19) pandemic, 2020*, Ballotpedia, https://ballotpedia.org/Changes_to_election_dates,_procedures,_and_administration_in_response_to_the_coronavirus_(COVID-19)_pandemic,_2020 (last accessed Apr. 19, 2020).

Pennsylvania, Rhode Island, West Virginia, Wyoming and Puerto Rico—have either rescheduled their presidential primaries or adopted voting by mail procedures with extended deadlines.[15]  In total, more than half of the states have already postponed at least one election.[16]  It may be that others will follow suit.

In Michigan, while extraordinary and well-coordinated efforts have been adopted to protect the public health, fewer efforts have focused on the challenges the virus has raised for the fair and effective functioning of elections.[17]  Based on the record before the Court, for the reasons explained above, Plaintiff has established that he is likely to succeed on the merits of his claim and that he will suffer irreparable harm absent an injunction.  The Court also finds that on balance, the public interest would be served by the issuance of an injunction, and that the benefits to

---

[15] Nick Corasaniti & Stephanie Saul, *16 States Have Postponed Their Primaries Because of Coronavirus. Here's a List*, N.Y. Times (Apr. 17, 2020),   https://www.nytimes.com/article/2020-campaign-primary-calendar-coronavirus.html.

[16] *See* footnote 14, *supra*.

[17] Some measures have been taken, for example, the Michigan Secretary of State announced that absentee ballots would be sent to all voters in preparation for the May 5, 2020 elections.  Mich. Sec'y of State, *Secretary of State to mail absent voter ballot applications to all May 5 voters* (Mar. 23, 2020) https://www.michigan.gov/sos/0,4670,7-127-93094-522761--,00.html?link_id=34&can_id=3ce03c3d77033bbeb4c4bf7ba04c984c&source=email-morning-digest-comeback-bid-by-former-attorney-general-highlights-utahs-quirky-ballot-access-rules&email_referrer=email_759189&email_subject=morning-digest-comeback-bid-by-former-attorney-general-highlights-utahs-quirky-ballot-access-rules.

the public and Plaintiff outweigh the injuries the State is likely to incur. Accordingly, Plaintiff is entitled to the extraordinary remedy of injunctive relief.

Plaintiff seeks relief from the application of the State's signature requirements—specifically Sections 168.133 and 168.544f—because of the severe burdens the State's Stay-at-Home Order has placed on his ability to gather signatures. *See* Mich. Comp. Laws §§ 168.133, 168.544f. Injunctive relief in the context of a forthcoming election is an equitable—and unusual—remedy, but it is not unprecedented. In fact, at least one state court has already entered a preliminary injunction reducing a state statutory signature requirement because of the burdens put on candidates by the COVID-19 pandemic. *Faulkner v. Va. Dep't. of Elections*, CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020) (granting preliminary injunction and reducing candidate signature gathering requirements because of state's COVID-19 restrictions). This Court agrees with the *Faulkner* court and finds that it is appropriate to enjoin Defendants from rigid application of those particular statutes, as well as any others that are substantively identical in causing the same kind of irreparable harm to similarly situated individuals. At the same time, the Court also finds

34

that the State is legitimately concerned that a lowering of ballot access standards could result in "laundry list" ballots crowded with names that "discourage voter participation and confuse and frustrate those who do participate." *Lubin*, 415 U.S., at 715; *see also Briscoe*, 429 U.S. at 1322–23. Accordingly, the Court will balance the interests of both parties in fashioning a remedy.

The Court considers the proposed remedies suggested by the parties, together with the facts and applicable law, and finds that a three-pronged remedy is necessary to address the nature of the harm while simultaneously respecting the interest of the State. First, the signature requirements must be lowered to account for the fact that the State's action reduced the available time to gather signatures. Second, as the State has conceded that it could still meet its election planning obligations if the due date for signatures were extended until May 8, the Court will order that extension. Finally, to enhance the available means for gathering signatures, the State will be ordered to implement a method that would permit signatures to be gathered through the use of electronic mail. In doing so, the State is directed to design a system that is as "user-friendly" as possible to maximize its efficacy. For example, such

procedures should allow for the use of a digital copy of a real signature whether created by scanner or by a digital photograph, assuming that the signature is appropriately witnessed, such as through digital means as described in Executive Order 2020-41.

As stated, because the Court gives weight to the State's competing interests, the Court will not completely enjoin the enforcement of the signature requirements contained in Sections 168.133 and 168.544f. The Court will instead order the State to lower the minimum number of signatures required for candidates to be included on the August primary ballot and continue to accept signatures until May 8, 2020. This form of relief is also not without precedent. *See Faulkner v. Va. Dep't. of Elections*, CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020) (reducing signature requirement sixty-five percent in light of COVID-19 restrictions); *see also Graveline*, 336 F. Supp. 3d at 817 (granting preliminary injunction and reducing signature requirement for attorney general candidate from 30,000 signatures to 5,000) *aff'd Graveline v. Johnson*, 747 F. App'x 408, 416 (6th Cir. 2018); *Jones v. McGuffage*, 921 F. Supp. 2d 888, 899 (N.D. Ill. 2013) (granting preliminary injunction and reducing candidate signature gathering requirements because upholding statutory signature

gathering requirements in context of truncated special election limited to Chicago winter would place unconstitutional burden on candidates).

The Court notes that a number of other candidates have sought to participate in this action because the outcome of this case will affect their access to the August primary ballot.[18] In a separate order, the Court will permit some of the proposed plaintiffs to join this lawsuit, but because the State did not directly address the specifics of their factual claims, they are not thoroughly discussed here. As to the question of how much the signature requirement should be reduced, Plaintiff, who has already obtained seventy percent of the signatures that he is required to obtain, is asking the Court to reduce the number of signatures required to sixty percent of the minimum number required pursuant to Section 168.544f. ECF No. 10, PageID.165. Even such a reduction, however, would still present a significant hurdle for otherwise viable candidates, including those whose signature requirements are lower than Plaintiff's. For example, candidates for certain city council positions subject to the April 21, 2020 deadline need only procure one hundred signatures. *See* Bannister Decl. ¶ 5, ECF No. 15-2, PageID.273. Such a candidate may

---

[18] *See* footnote seven, *supra*.

37

be able to easily collect one hundred signatures in as little as one week using traditional collection means like going door-to-door or canvassing at community centers. *Id.* ¶ 10. These candidates may have relied, reasonably and in good faith, on the ability to collect the vast majority of the signatures they needed in late March or early April, when rising temperatures would bring more people outside and facilitate signature gathering. *See, e.g., Jones*, 921 F. Supp. 2d at 897. While any such line-drawing inevitably involves some degree of arbitrariness, common sense suggests that a reasonably diligent candidate should be expected to have reached the half-way point in gathering signatures when there is only one month to go. Consequently, a reduction in the requirement by fifty percent will be ordered. This reduction, combined with an extension of the signature-gathering deadline until May 8, 2020, and the adoption of an acceptable email-based method for collecting signatures, will be sufficient in these unusual circumstances to ensure both sufficient access to the ballot for those who seek it, and accommodation of the State's interest in ensuring candidates have a modicum of support before inclusion on the ballot.

## IV.  CONCLUSION

Accordingly, for all the reasons set out above, **IT IS HEREBY ORDERED**:

- That all candidates:

  - (i) who filed a statement of organization under the Federal Election Campaign Act of 1971, 52 U.S.C. §§ 30101 *et seq.*, or established a candidate committee under the Michigan Campaign Finance Law, Mich. Comp. Laws, §§ 169.201 *et seq.*, before March 10, 2020; and

  - (ii) who are required by a relevant section of the Michigan Election Law, Mich. Comp. Laws, §§ 168.1 *et seq.*, to file a nominating petition by April 21, 2020, for the purpose of appearing on the August 4, 2020, primary election ballot; and

  - (iii) who do not have the option under Michigan Election Law to appear on the August 4, 2020, primary election ballot through the payment of a filing fee in lieu of filing a nominating petition;

- Shall be qualified for inclusion on the August 4, 2020 primary election ballot if the candidate submits fifty percent of the number

of valid signatures required by Mich. Comp. Laws § 168.544f with the appropriate filing official as provided by Michigan Election Law by 5:00 p.m. on May 8, 2020.  No other filing deadline is extended under this Order.

- Furthermore, the Director of Elections shall within 72 hours of the date of this Order adopt and promulgate, according to the specifications it determines to be appropriate and efficient, regulations providing for an additional optional procedure that allows the collection and submission of ballot petition signatures in digital form by electronic means such as email;

- Finally, the Director of Elections shall take all reasonable and necessary steps to communicate the terms of this injunction to county, township, and city clerks in this State who act as filing officials for offices for which nominating petitions are due as described in this Order.

**IT IS SO ORDERED.**

DATED this 20th day of April, 2020.

BY THE COURT:
/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

40

# EXHIBIT 10

NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12931

ROBERT GOLDSTEIN[1] & others[2]  vs.  SECRETARY OF THE COMMONWEALTH.


Suffolk.      April 16, 2020. - April 17, 2020.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
& Kafker, JJ.


Elections, Ballot, Validity of nomination papers.  Secretary of
    the Commonwealth.  Constitutional Law, Elections.


    Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on April 8, 2020.

    The case was reported by Cypher, J.


    Robert G. Jones for the plaintiffs.
    Anne Sterman, Assistant Attorney General, for the
defendant.
    Thomas O. Bean & James D. Henderson, for Ranked Choice
Voting 2020 Committee, amicus curiae, submitted a brief.


    GANTS, C.J.  On April 8, 2020, the plaintiffs, each of whom

seeks to be a candidate for elective office in the primary

---

    [1] On behalf of himself and others similarly situated.

    [2] Kevin O'Connor and Melissa Bower Smith, on behalf of
themselves and others similarly situated.

2

election scheduled for September 1, 2020, brought an emergency petition in the county court, seeking relief under G. L. c. 214, § 1, and G. L. c. 231A, § 1.  They requested a declaration that, in light of the emergency circumstances arising from the COVID-19 pandemic, the signature requirements in G. L. c. 53, §§ 7 and 44 (minimum signature requirements), to be listed on the ballot for a party's nomination pose an "unconstitutionally severe burden on the fundamental rights" of all Massachusetts would-be candidates.  They seek, by means of this declaration, to eliminate the minimum signature requirements for the September 1 primary election.  In the alternative, they asked for various forms of equitable relief, such as substantially reducing the number of required signatures of certified voters, extending the applicable filing deadlines, and permitting electronic signatures, as a means of remedying the constitutional violation.  A single justice of this court reserved and reported this petition to the full court.

The plaintiffs do not contend that the minimum signature requirements in §§ 7 and 44 are facially unconstitutional; that is, they do not contend that these requirements unduly burden the constitutional right of a candidate to seek elective office in ordinary times.  Rather, they contend that these requirements, when applied in these extraordinary times of a declared state of emergency arising from the COVID-19 pandemic,

create an undue burden on a prospective candidate's constitutional right to seek elective office.

The Secretary of the Commonwealth (Secretary) agrees that, "as a practical matter, application of the signature requirements in the context of the current public health crisis imposes a greater than usual burden on [the plaintiffs], triggering heightened scrutiny." The Secretary also agrees that, in this time of pandemic, the justification for the current signature requirements cannot survive this scrutiny, and that this court must craft a remedy for this constitutional violation. We also agree, and fashion equitable relief intended to substantially diminish that burden, while respecting the legislative purpose for imposing minimum signature requirements.

In short, for all candidates seeking to appear on the State primary ballot on September 1, we order three forms of relief. First, we order that the number of required signatures be reduced by fifty percent (50%). Second, we extend the deadlines for candidates running for State district and county offices to submit their nomination papers to local election officials for certification and for the filing of certified nomination papers with the Secretary to May 5, 2020, and June 2, 2020, respectively, which are the current due dates for party candidates running for Federal and Statewide offices. Third, subject to the restrictions outlined later in this opinion, we

order the Secretary to allow the submission and filing of nomination papers with electronic rather than wet-ink original signatures ("wet" signatures).  We emphasize that the declaration we make and the equitable relief we provide is limited to the primary election in these extraordinary circumstances, which is the sole subject of the case before us, and does not affect the minimum signature requirements for the general election this year or for the primary elections in any other year.[3]

Background.  1.  Ballot access.  This year, 2020, is an election year in Massachusetts for certain Federal,[4] State,[5] and county offices.[6]  The State primary election, in which candidates

---

[3] We acknowledge the amicus letter submitted by the Ranked Choice Voting 2020 Committee.

[4] Federal offices include electors of President and Vice-President, United States senator (the seat currently held by Senator Edward Markey), and United States representative (all nine districts).  See Secretary of the Commonwealth, A Candidate's Guide to the 2020 State Election, at 5 (rev. Feb. 2020) (2020 Candidate's Guide).

[5] Statewide offices include executive councilor (all eight districts), State senator (all forty districts), and State representative (all 160 districts).  See 2020 Candidate's Guide, supra.

[6] County offices include the register of probate (Barnstable, Bristol, Dukes, Norfolk, and Plymouth Counties only), county commissioner (same), county treasurer (Bristol, Dukes, Norfolk, and Plymouth Counties only), council of government executive committee (Franklin County only), and sheriff (Norfolk County only).  See 2020 Candidate's Guide, supra.

affiliated with the various political parties (Democratic, Green-Rainbow, Libertarian, and Republican) are nominated to run for the offices at issue, is currently scheduled for September 1, 2020.  See Secretary of the Commonwealth, A Candidate's Guide to the 2020 State Election, at 5 (rev. Feb. 2020) (2020 Candidate's Guide).  The general election, in which the party nominees will compete against one another as well as against any nonparty candidates for the offices on the ballot, is scheduled for November 3, 2020.  See id.

The three plaintiffs aspire to appear on the State primary election ballot in September in an effort to secure their respective party's nominations for three different Federal and State offices.  Robert Goldstein seeks to be the Democratic Party's nominee for the office of United States representative for the Eighth Congressional District in Massachusetts.  Kevin O'Connor seeks the Republican Party's nomination for the office of United States senator.  Melissa Bower Smith aspires to be the Democratic Party's nominee for the office of State representative for the Fourth Norfolk District.

a.  Minimum signature requirements.  To appear on the ballot, candidates like the plaintiffs are required by statute to, among other things, submit nomination papers containing a

minimum number of certified voter signatures.[7]  See G. L. c. 53,
§ 44.  The number of certified signatures required differs
depending on the office the candidate is seeking.  Id.  For
example, a candidate like O'Connor, seeking election as a United
States senator, must secure 10,000 certified voter signatures.
Id.  A candidate like Goldstein, seeking election as a
representative to the United States Congress, requires 2,000.
Id.  And a candidate seeking election as a State representative,
like Smith, must obtain 150.  Id.[8]

    b.  Certified signatures.  To qualify as "certified," a
signature must be of a voter registered in the geographic area
corresponding to the office for which the candidate is seeking
nomination.  See G. L. c. 53, § 7.  In addition, if the
candidate is seeking the nomination of a particular political

---

[7] Candidates for Federal and Statewide offices who are not
affiliated with a party also must satisfy certain minimum
signature requirements to appear on the general election ballot
in November.  The deadlines for the submission and filing of
their nomination papers, however, do not expire until July 28
and August 25, 2020.  See 2020 Candidate's Guide, supra at 6-9.
Federal and Statewide nonparty candidates, therefore, are not
similarly situated to the plaintiffs.  Nor has anyone appeared
in this action and challenged the signature requirements and
deadlines for nonparty candidates for Federal or Statewide
offices.  Therefore, we do not address the constitutionality of
those requirements and deadlines.

[8] The number of certified voter signatures required for the
other offices at issue in the upcoming State primary election
are as follows:  Executive councilor, 1,000; State senator, 300;
Barnstable and Franklin County offices, 500; and all other
county offices, 1,000.  See G. L. c. 53, § 44.

party, as is the case with the plaintiffs, the voter must be registered with the same party or as "unenrolled," meaning registered to vote, but with no party affiliation.[9]  See G. L. c. 53, § 37; 2020 Candidate's Guide, <u>supra</u> at 13.  Accordingly, for a candidate like O'Connor, seeking the Republican Party nomination for United States senator, a Statewide office, signatures may be secured from voters registered anywhere in Massachusetts as either Republicans or unenrolled.  For a candidate like Goldstein or Smith, seeking the Democratic Party nomination to represent a specific district in Massachusetts, the signatures must be from voters registered in that district as either Democrats or unenrolled.

    c.  <u>Nomination papers</u>.  The process for obtaining and certifying the required number of signatures commences when the Secretary prepares the nomination papers and furnishes them to candidates.  See G. L. c. 53, § 47.  This year, the nomination papers were furnished on February 11, 2020.[10]  Before obtaining any signatures, candidates must fill in the top of the nomination papers with certain information, including their

---

    [9] Unenrolled voters are commonly referred to as "Independents."  See 2020 Candidate's Guide, <u>supra</u> at 4.

    [10] The Secretary is required to furnish the nomination papers on or before the fifteenth Tuesday preceding the deadline established in G. L. c. 53, § 48, for filing certified nomination papers.  See G. L. c. 53, § 47.

name, address, and party affiliation (if any), and the office they are pursuing. See G. L. c. 53, § 8. The candidates, or others working on their behalf, must then gather voter signatures on the nomination papers or on "exact copies" of such forms. See G. L. c. 53, § 17. Voters are required to sign the nomination papers "in person as registered or substantially as registered" (emphasis added). G. L. c. 53, § 7. The Secretary interprets this combination of requirements, that the voter sign "in person" on the original nomination papers or on "exact copies" thereof, to mean that the signatures eventually submitted and filed must be original handwritten or "wet" signatures. However, "any voter who is prevented by physical disability from writing may authorize some person to write his or her name and residence in his or her presence." Id. Voters also must indicate the address where they are currently registered on the nomination papers. Id.

d. Certification and filing deadlines. The statutorily driven timeline that follows the receipt of the nomination papers from the Secretary has two major deadlines, which can differ depending on the office a candidate is pursuing. The first is the deadline by which the candidate must submit the nomination papers to local election officials for certification. At least twenty-eight days before the deadline for the submission of the certified nomination papers to the Secretary,

the candidates must submit their nomination papers to local election officials in each city and town where the individuals who signed the papers are registered to vote.[11]  See G. L. c. 53, §§ 7, 46.  For a candidate like Smith, pursuing a seat as a State representative, this deadline falls on or before April 28, 2020.  For candidates like O'Connor and Goldstein, seeking Federal offices, this deadline falls on or before May 5, 2020.

Applying regulations promulgated by the Secretary, see 950 Code Mass. Regs. § 55.03(1) (2004),[12] local election officials then review each signature on the nomination papers.  See G. L. c. 53, §§ 7, 46.  Signatures can be disallowed for a variety of reasons, including that the voter is not registered at the address provided, the voter's name as signed does not match the voter's name as registered, the voter's signature or address is illegible, the voter is enrolled in the wrong party, or the voter's signature already appeared on the candidate's nominating papers.  See 950 Code Mass. Regs. § 55.03(1).  Due to the potential for the disallowance of numerous signatures, prudent candidates collect more signatures than are required, see 2020 Candidate's Guide, supra at 16 (encouraging candidates to do

---

[11] "Each nomination paper should contain signatures of registered voters from only ONE city or town."  2020 Candidate's Guide, supra at 16.

[12] The regulations were promulgated by the Secretary pursuant to authority granted in G. L. c. 53, § 7.

just that), and local election officials are required to certify two-fifths more signatures than are required to make the ballot, G. L. c. 53, § 7.  Local election officials are required to complete the certification process no later than the seventh day before the deadline for the submission of the papers to the Secretary.  G. L. c. 53, §§ 7, 46.  There then follows a short period for candidates to seek a review of disallowed signatures. See G. L. c. 55B, § 6.

The second major deadline, from which the first is calculated, is the date by which nomination papers certified by local election officials must then be filed with the Secretary. For candidates seeking election to State district and county offices, this deadline is on or before the last Tuesday in May of an election year, which, this year, means on or before May 26, 2020.  See G. L. c. 53, §§ 10, 48.  This is the deadline by which Smith, seeking election as a State representative, must file her certified nomination papers with the Secretary. Meanwhile, for candidates who are seeking election to Federal or Statewide offices, as are O'Connor and Goldstein, the deadline is on or before the first Tuesday in June, which, in this election year, is on or before June 2, 2020.  See G. L. c. 53, § 48.

e.  <u>Objection process</u>.  Registered voters from the district in which a candidate seeks nomination have three days from the

filing deadlines with the Secretary to file objections to nomination papers with the State Ballot Law Commission (SBLC). See G. L. c. 55B, § 5.  The SBLC then has twenty-one days from the closure of the objection periods to render a decision on any objections.  See G. L. c. 55B, § 10.  Given the aforementioned filing deadlines with the Secretary, therefore, objections to nomination papers would have to be decided by the SBLC on or before June 19 and 26, 2020, as applicable.

    f.  <u>Preparation of ballots</u>.  For any election in which a Federal office is at issue, Federal law mandates that ballots must be transmitted to military and overseas voters no later than forty-five days in advance of the election.  See 52 U.S.C. § 20302(a)(8)(A).  For the upcoming September 1 primary election, this means that local election officials must transmit the ballots to military and overseas voters by July 18.  In turn, this means the Secretary's office may have as little as eighteen days from the June 26 SBLC decision deadline to the July 14 date when ballots must be in the hands of local election officials to prepare, proofread, and finalize the 2,200 different ballot styles required for the different jurisdictions in the Commonwealth.  According to the Secretary's office, this timeline is already tight, since the process usually takes three weeks to complete.

2.  COVID-19 pandemic.  On March 10, 2020, the Governor
declared a state of emergency throughout the Commonwealth in
response to the spread of COVID-19, where he invoked his
statutory authority to "from time to time issue recommendations,
directives, and orders as circumstances may require."  See
Executive Order No. 591.  The following day, the World Health
Organization declared COVID-19 to be a global pandemic.  On
March 15, 2020, the Governor issued orders closing all public
and private elementary and secondary schools, prohibiting public
and private gatherings of more than twenty-five people, and
prohibiting the on-premises consumption of food and drink at
restaurants, bars, and other food establishments.  Then, on
March 23, 2020, he issued another executive order, further
limiting public and private gatherings to no more than ten
people and requiring all nonessential businesses to close their
physical workplaces and facilities.  See COVID-19 Order No. 13.
See also COVID-19 Order No. 21.  At his direction, the
Department of Public Health (DPH) issued a "Stay-at-Home
Advisory" the following day, declaring that it was "critically
important" for everybody to "[o]nly leave home for essential
errands such as going to the grocery store or pharmacy," and
that, when people do leave home, to "practice social distancing
by staying [six] feet away from others."  DPH Public Health
Advisory:  Stay-at-Home Advisory (Mar. 24, 2020).  On April 10,

DPH issued another advisory recommending that people wear face coverings or masks when social distancing is not possible.  See DPH Advisory Regarding Face Coverings and Cloth Masks (Apr. 10, 2020).  All of these restrictions on everyday life, which will remain in effect until at least May 4, 2020, have been imposed in an effort to mitigate the spread of the virus, which can occur at an alarming rate.  Even with these restrictions in place, as of April 16, 2020, there have been 32,141 confirmed cases of COVID-19 in Massachusetts, resulting in 1,245 deaths. See Department of Public Health, Coronavirus Disease 2019 (COVID-19) Cases in MA, as of April 16, 2020, https://mass.gov /doc/covid-19-cases-in-massachusetts-as-of-april-16-2020 /download [https://perma.cc/FR75-PDFY].

With the onset of the pandemic and the imposition of restrictions that followed, the plaintiffs and other candidates could not safely and reasonably gather voter signatures in the usual ways, namely, going to places where large numbers of potential registered voters are likely to be, such as town centers, malls, grocery stores, or political meetings.  In the face of this predicament, the plaintiffs and other candidates wrote to the Secretary, seeking relief from the minimum signature requirements.  The Secretary, however, maintained that he lacked the authority to act, and that only the Governor and

Legislature could provide such relief.[13]  The Governor and
numerous legislators have expressed their willingness to
consider a legislative "fix" to the predicament, but bills that
were introduced in the Legislature that would reduce the number
of required signatures for those offices requiring 1,000 or more
signatures by fifty percent, see 2020 Senate Doc. No. 2632, or
by two-thirds for all offices, see 2020 House Doc. No. 4981.
The Senate has engrossed its bill, but, as of the time this
opinion was submitted, neither legislative "fix" had been
enacted.

    Discussion.  The right to seek elected office, like the
related right to vote, is a fundamental constitutional right in
Massachusetts.  Article 9 of the Massachusetts Declaration of
Rights provides, with impressive brevity and clarity, that
"[a]ll elections ought to be free; and all the inhabitants of
this commonwealth, having such qualifications as they shall
establish by their frame of government, have an equal right to
elect officers, and to be elected, for public employments."

_____

    [13] The Secretary issued an advisory recommending, among
other things, that candidates and volunteers "take appropriate
precautions as they continue to gather signatures.  If you are
interacting with voters, be sure to have hand sanitizer or
disinfectant wipes available and wash your hands frequently.  If
possible, consider providing signers with fresh pens and sheets
of paper."  See Secretary of the Commonwealth, COVID-19
Elections Updates, https://www.sec.state.ma.us/ele/covid-
19/covid-19.htm [https://perma.cc/ZM2J-GBY8].

Over the ensuing 240 years since the adoption of our Declaration of Rights in 1780, art. 9 has served to protect the "fundamental" and "intertwine[d]" rights of candidates to gain access to the ballot and of voters to cast their ballots as they see fit.  See Libertarian Ass'n of Mass. v. Secretary of the Commonwealth, 462 Mass. 538, 560 (2012) (LAM).

As with many fundamental rights, the "court has sustained statutes which reasonably regulate elections and access to a place on the ballot."  Opinion of the Justices, 368 Mass. 819, 821-822 (1975).  See Opinion of the Justices, 413 Mass. 1201, 1209 (1992), quoting Opinion of the Justices, 375 Mass. 795, 811 (1978) ("the right to be elected, preserved in art. 9, is not absolute but 'is subject to legislation reasonably necessary to achieve legitimate public objectives'").  In fact, the court has previously considered the same minimum signature requirements at issue here and concluded that they withstood constitutional scrutiny.  LAM, 462 Mass. at 567.  In that case, the plaintiff Libertarian party sought to transfer the certified voter signatures obtained by one candidate to another candidate in order to qualify the latter to be on the general election ballot.  See id. at 545-546.  The present case comes before the court under an entirely different set of facts and circumstances.  The framework through which we analyze it, however, remains the same.

When we evaluate the constitutionality of a restriction on access to the ballot, we apply a "sliding scale approach, . . . through which [we] weigh the character and magnitude of the burden the State's rule imposes on the plaintiffs' rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary" (quotations, citations, and alterations omitted).  Id. at 560.  "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest.  Lesser burdens . . . trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions" (quotations and citations omitted).  Id.  More recently, recognizing that the Massachusetts Declaration of Rights may be more protective of voting rights than the Federal Constitution, we have declared that we do not use the phrase "severe burden," which arises from Federal constitutional jurisprudence, in determining whether strict scrutiny applies but instead apply strict scrutiny to a voting requirement that "significantly interfere[s]" with the fundamental right to vote. See Chelsea Collaborative, Inc. v. Secretary of the Commonwealth, 480 Mass. 27, 35, 36 n.21, 40 (2018).  We need not decide here whether the Massachusetts Constitution provides greater protections for the art. 9 rights at issue, because it

is undisputed that, under the circumstances arising from this
pandemic, we should apply strict scrutiny to the minimum
signature requirements regardless of whether we apply a "severe
burden" or "significant interference" formulation.

In ordinary times, the minimum signature requirements to
appear on the ballot in Massachusetts only impose "modest
burdens" on prospective candidates for public office, so "there
need be only a rational basis undergirding the regulation in
order for it to pass constitutional muster" (citation omitted).
LAM, 462 Mass. at 567. And in ordinary times the rational basis
threshold is "easily" met, as the "State's interest in ensuring
that a candidate makes a preliminary showing of a substantial
measure of support before appearing on the ballot is legitimate"
(quotation, citation, and alteration omitted). Id. Minimum
signature requirements ensure "that the candidates who appear on
the . . . ballot have demonstrable support among the voting
public." Barr v. Galvin, 626 F. 3d 99, 111 (1st Cir. 2010),
cert. denied, 565 U.S. 929 (2011). In doing so, they "safeguard
the integrity of elections by avoiding overloaded ballots and
frivolous candidacies, which diminish victory margins,
contribute to the cost of conducting elections, confuse and
frustrate voters, increase the need for burdensome runoffs, and
may ultimately discourage voter participation in the electoral

process." <u>Libertarian Party of Me</u>. v. <u>Diamond</u>, 992 F.2d 365,
371 (1st Cir.), cert. denied, 510 U.S. 917 (1993).

But, as we have recognized, statutory requirements that
were once considered constitutionally permissible may later be
found to interfere significantly with a fundamental right as
societal conditions and technology change. See <u>Chelsea</u>
<u>Collaborative, Inc</u>., 480 Mass. at 37, citing <u>Goodridge</u> v.
<u>Department of Pub. Health</u>, 440 Mass. 309, 341 n.33 (2003). And
similarly, statutory requirements that in ordinary times impose
only modest burdens on prospective candidates for public office
may significantly interfere with the fundamental right to run
for political office in a time of pandemic.

We need not dwell long on how dramatically conditions have
changed in Massachusetts since the Governor first announced a
state of emergency arising from the COVID-19 pandemic on March
10. All who presently live in the Commonwealth have seen it
(and lived it), and, for additional details, posterity can look
to our recent decision in <u>Committee for Pub. Counsel Servs</u>. v.
<u>Chief Justice of the Trial Court</u>, 484 Mass. 431, 433-434 (2020).
Suffice it to say that, during the state of emergency, the
traditional venues for signature collection are unavailable:
few people are walking on public streets in town centers; malls
are closed, as are all but essential businesses; restaurants
provide only take-out food or delivery; public meetings, if held

at all, are conducted virtually; and the vast majority of people
are remaining at home.  See Glovsky v. Roche Bros. Supermkts.,
Inc., 469 Mass. 752, 762 (2014) (recognizing candidates'
constitutional right to solicit nominating signatures outside
entrance to supermarket); Batchelder v. Allied Stores Int'l,
Inc., 388 Mass. 83, 92 (1983) ("a person needing signatures for
ballot access requires personal contact with voters").

When people do encounter each other, they do so only by
maintaining a "social distance" of at least six feet, and
attempt to keep such encounters as brief as possible.  Because
it has been shown that one can carry and spread the COVID-19
virus without any apparent symptoms, every encounter with
another person, especially a stranger, poses a risk of
infection.  Because it is not altogether clear how long the
COVID-19 virus may "survive" on various surfaces and objects,
people are reluctant to touch any pen or piece of paper that has
been touched by another, at least unless they quickly can wash
or sanitize their hands.  Accordingly, if a candidate seeks to
obtain signatures on nomination papers in the traditional ways,
he or she reasonably may fear that doing so might risk the
health and safety not only of the person requesting the
signature but also of the persons who are signing, of the
families with whom they live, and potentially of their entire
community.

In short, as the Secretary rightly and readily acknowledges, the minimum signature requirements, which may only impose a modest burden on candidates in ordinary times, now impose a severe burden on, or significant interference with, a candidate's right to gain access to the September 1 primary ballot, and the government has not advanced a compelling interest for why those same requirements should still apply under the present circumstances.  See LAM, 462 Mass. at 560. Indeed, it concedes that there is none.  The minimum signature requirements, therefore, in this time of pandemic are unconstitutional as applied to the plaintiffs, and other similarly situated candidates.

If the Legislature had enacted a law on March 23 imposing harsh new requirements that made it substantially more difficult for candidates to obtain the required signatures to get on the September 1 primary ballot, we no doubt would declare the law unconstitutional.  The Legislature, of course, did not do this, but it is fair to say that the pandemic did.  To be sure, "wet" signatures can still be obtained, but the ability to do so safely has been greatly diminished or been made significantly more laborious.  No fair-minded person can dispute that the fundamental right to run for elective office has been unconstitutionally burdened or interfered with by the need to

obtain the required "wet" signatures in the midst of this pandemic.  See LAM, 462 Mass. at 560.

The burdens imposed by the statutory minimum signature requirements are not inevitable.  There are alternatives that could preserve the legislative purpose that a candidate demonstrate a certain level of support in order to win a place on the ballot and yet protect the public from the health risks associated with obtaining "wet" signatures.

As a general matter, the principle of separation of powers set forth in art. 30 of the Massachusetts Declaration of Rights prevents the "judiciary [from] substituting its notions of correct policy for that of a popularly elected Legislature" (citation omitted).  Commonwealth v. Leno, 415 Mass. 835, 841 (1993).  But where fundamental constitutional rights are violated, and where the Legislature fails to remedy the constitutional deficiencies after having had the opportunity to do so, and where an aggrieved litigant files suit seeking remedial relief for the constitutional violation, the judiciary must provide such a remedy.  See Cepulonis v. Secretary of the Commonwealth, 389 Mass. 930, 938 (1983), citing Reynolds v. Sims, 377 U.S. 533, 586 (1964).  Here, where the filing deadline for nomination papers fast approaches, and the Legislature has yet to take decisive action, we have little choice but to provide equitable relief, pursuant to G. L. c. 214, § 1, to

protect the constitutional rights of the plaintiffs and those
similarly situated.  See Commonwealth v. United Food Corp., 374
Mass. 765, 781 (1978) ("In order to avoid the unconstitutional
aspects of the statute, and to achieve the basic legislative
purpose, we conclude that the judge must have discretion to
fashion the judgment in this case . . .").  "It is a well
settled principle that, in fashioning appropriate relief, the
issuance and scope of equitable relief rests within the sound
discretion" of the court.  Johnson v. Martignetti, 374 Mass.
784, 794 (1978), citing Martin v. Murphy, 216 Mass. 466, 468
(1914).  We recognize, though, that where these extraordinary
circumstances require us to make policy judgments that, in
ordinary times would be best left to the Legislature, our remedy
must be "no more intrusive than it ought reasonably be to ensure
the accomplishment of the legally justified result."  Perez v.
Boston Hous. Auth., 379 Mass. 703, 730 (1980).[14]

---

[14] The action we take here is by no means unprecedented.
Other States, addressing the potential for voter
disenfranchisement in the face of natural disasters, have
similarly provided narrowly tailored equitable relief to protect
the constitutional rights of voters.  See, e.g., Florida
Democratic Party v. Scott, 215 F. Supp. 3d 1250, 1257-1259 (N.D.
Fla. 2016) (ordering Statewide extension of voter registration
deadline in response to Hurricane Matthew); Georgia Coalition
for the People's Agenda, Inc. v. Deal, 214 F. Supp. 3d 1344,
1345-1346 (S.D. Ga. 2016) (ordering extension of voter
registration deadline for one county in response to Hurricane
Matthew).  In addition, at least one court has declared minimum
signature requirements to be unconstitutional in light of the
pandemic and, as a result, reduced the numbers.  See Omari

The plaintiffs have requested various alternative forms of relief.  Before we discuss the relief that is granted, we take a moment to address the requests for relief that we do not believe are justified.

The plaintiffs first request that we not only declare the minimum signature requirements unconstitutional as applied to them and similarly situated candidates during this primary election, but also declare the minimum signature requirements void.  In effect, the plaintiffs seek to avoid the minimum signature requirements altogether and proceed directly to the September 1 primary ballot.  We decline to order this remedy; the justification for the current statutorily prescribed signature requirements is outweighed by the burden those requirements impose under the present conditions, but there is still merit to having some signature requirements.  Even in the midst of the pandemic, the State has a legitimate interest in ensuring that a candidate makes a preliminary showing of support among the electorate before appearing on the ballot.  In addition, the pandemic has not completely deprived candidates of the ability to gather signatures.  Between February 11, 2020, when the nomination papers were first made available, and March

---

Faulkner for Va. vs. Virginia Dep't of Elections, CL2000-1456, Cir. Ct. of Richmond (Mar. 25, 2020) (order reducing signature requirement for candidates seeking to be Republican Party nominees for United States Senate from 10,000 to 3,000).

23, 2020, when the first significant restrictions were imposed
in response to the pandemic, candidates had forty-one days in
which to gather signatures without any constraint.  Since March
23, the process has become unconstitutionally burdensome, but
not impossible.  And the remedies we provide in this decision
will permit additional signatures to be safely obtained.  It
would not be equitable, therefore, to declare the minimum
signature requirements void altogether.

Given the looming deadlines, the plaintiffs also request,
in the alternative, that we extend the deadlines for submitting
nomination papers to local election officials and for filing the
certified nomination papers with the Secretary.  The Secretary,
however, maintains that an extension beyond May 5 for
submissions to local election officials and May 26 for filing
with the Secretary is not workable, given the time needed for
the SBLC to deal with any objections to the nomination papers,
for the Secretary's office to prepare the 2,200 different styles
of ballots required for the different jurisdictions in the
Commonwealth, and for local election officials to then transmit
the ballots by July 18 to military and overseas voters, as
required by Federal law.  The plaintiffs have not disputed the
Secretary's timeline or his analysis of the problems that would
arise from a greater extension, and we defer to his experienced
judgment in this regard.  Therefore, we will extend the

deadlines only for candidates running for State district and county offices, and extend their deadlines only to match the deadlines that apply to party candidates running for Federal and Statewide offices:  from April 28 to May 5 to submit nomination papers to local election officials for certification, and from May 26 to June 2 to file the certified nomination papers with the Secretary.

The plaintiffs have further requested, as alternative relief, that we "substantially" reduce the number of signatures required to get on the primary election ballot.  The Secretary agrees, but suggests that the reductions should only apply to offices for which 1,000 or more certified voter signatures are currently required.  This would preclude any reduction of the required minimum signatures for candidates for State senator and representative, who currently must secure 300 and 150 signatures, respectively, and for offices in certain counties (e.g., Barnstable County register of probate and Barnstable County commissioner), who currently need to obtain 500 signatures.  We agree that, in light of the prevailing circumstances, the most equitable alternative is to reduce the number of signatures required.  We do not agree, however, that it would be equitable to do so only for some candidates and not others.

Presumably, the number of signatures required for each office was established to reflect a balance between the number of people represented by the elected office and the burden involved in obtaining the signatures.  Hence, a Statewide office such as United States senator warrants burdening a candidate with a requirement of gathering 10,000 signatures, while an office representing fewer people, such as a State senator, warrants a signature requirement of 300.  It seems only just that the same rationale should apply when it comes to reducing the minimum numbers in response to the pandemic, and that the same percentage decrease should apply to all offices.  To hold otherwise would alter the relative ratio of the minimum requirements chosen by the Legislature.  For instance, a primary candidate for the State Senate must gather only three per cent of the signatures that a primary candidate for the United States Senate must gather; that ratio should not be altered by the remedy we devise.

In determining the percentage of the across-the-board reduction, the Secretary has suggested a reduction of fifty percent (50%), the same amount that has been proposed in one of the bills currently pending in the Legislature.[15]  We agree with

---

[15] We note that both the Secretary and 2020 Senate Doc. No. 2632 would limit this fifty percent (50%) reduction to offices requiring 1,000 or more signatures.

that suggested percentage decrease.  Fifty percent (50%) has a
rational connection to the underlying constitutional violation.
As noted supra, the candidates had forty-one days after the date
when nomination papers were first made available (February 11)
to gather signatures without any significant restrictions
related to the pandemic.  That all changed on March 23, when the
Governor issued the order limiting public and private gatherings
to no more than ten people, requiring all nonessential
businesses to close their physical workplaces and facilities,
and directing DPH to issue the Stay-at-Home Advisory, urging
people to leave home only for essential errands and to practice
social distancing when they did.  Forty-one days is almost
exactly fifty percent (50%) of the time between February 11 and
May 5, which is now the deadline by which all primary candidates
have to collect signatures and submit them to local election
officials.  Even if candidates were slow to start, it was
significantly challenging, but not impossible, to gather
signatures after March 23, and as discussed infra, candidates
will now have some opportunity to obtain electronic signatures
through May 5, so it should not be unfairly burdensome for a
serious candidate to obtain one-half of the required signatures.
The number of certified registered voter signatures required to
get on the September 1 primary ballot, therefore, is reduced by
fifty percent (50%) for all candidates.

Finally, the plaintiffs also request that we order State officials to explore "less stringent strategies" for the collection and submission of signatures, such as through the electronic collection of signatures.  They note that a few States have implemented the use of electronic signatures and submissions for purposes of securing access to the ballot, including at least two that did so in response to the current pandemic.[16]  In the order reserving and reporting this case to the full court, the parties were asked to address the logistics of, and potential problems with, collecting and verifying electronic signatures.  Their submissions have convinced us that there are too many issues and unanswered questions to allow us confidently to impose a remedy that would transform a nomination system that required "wet" signatures into one that permitted a broad range of electronic signatures, including a printed name. To name just a few, there are the inherent time constraints discussed supra; there are potential logistical, legal, and cyber-security related concerns; and, of course, there is the

---

[16] Arizona already had adopted an electronic candidate nominating system called "E-qual," which allows voters to show support for candidates "from the comfort of [their] home[s] or anywhere [I]nternet access is available."  See https://apps .azsos.gov/equal [https://perma.cc/2HDB-YHSF].  New Jersey and Florida, meanwhile, have taken some action in this regard in response to the pandemic.  See New Jersey Governor, Executive Order No. 105 (Mar. 19, 2020); Florida Secretary of State, Emergency Rule No. 1SER20-2 (Apr. 3, 2020).

fact that local and State governments are already operating under severe constraints, and often with skeletal staffing, due to the pandemic.

The Secretary, however, has suggested one modest means to include electronic signature collection among our equitable remedies, which the plaintiffs find attractive, as do we. Specifically, the Secretary proposes that we order that candidates seeking to be on the ballot for the September 1 primary election be allowed to scan and post or otherwise distribute their nomination papers online.  Voters may then download the image of the nomination papers and either apply an electronic signature with a computer mouse or stylus, or print out a hard copy and sign it by hand.  The signed nomination paper can then be returned to the candidate, or a person working on the candidate's behalf, either in electronic form (by transmitting the "native" electronic document or a scanned paper document) or in paper form (by hand or mail).  The candidates will still have to submit the nomination papers to local election officials in hard copy paper format, but the proposed process will alleviate the need for, and the risk associated with, obtaining "wet" signatures.  The Secretary is ordered forthwith to provide clear guidance to prospective candidates as to how this electronic signature collection process may be

accomplished effectively, although candidates need not await that guidance to get started.

    Conclusion.  For the reasons stated, the plaintiffs' application for declaratory relief is allowed to the extent that we declare, in the limited context of the current pandemic, that the minimum signature requirements in G. L. c. 53, §§ 7 and 44, for candidates in the September 1, 2020, primary election are unconstitutional.  As a remedy for this constitutional violation, we order that (1) the number of required signatures be reduced by fifty percent (50%) for all offices; (2) the deadlines for candidates running for State district and county offices to submit their nomination papers to local election officials for certification and for the filing of certified nomination papers with the Secretary be extended to May 5, 2020, and June 2, 2020, respectively, which are the current due dates for party candidates running for Federal and Statewide offices; and (3) subject to the restrictions outlined in this decision, the Secretary shall allow the submission and filing of nomination papers with electronic rather than "wet" signatures.

So ordered.

KAFKER, J. (concurring).  Given the pressing need for immediate action during the pandemic, and the technological limitations in our existing electoral infrastructure identified by the Secretary of the Commonwealth (Secretary), I concur in the court's multifaceted remedy.  I write separately, however, to express concern that those responsible for our electoral process have concluded that they are unable to solve the problem of in-person signatures with the more straightforward and targeted solution of electronic filing of signatures, and therefore have required the court to temporarily rewrite the election laws.  Those responsible for our elections must have the technological tools to respond to the pandemic that confronts us, which has fundamentally changed the world as we know it.  Leaving these electoral problems for the courts to solve should be a last resort.

When we declare an act unconstitutional, we must do so in the least intrusive and most judicious manner possible.  See Duracraft Corp. v. Holmes Prods. Corp., 427 Mass. 156, 167 (1998) ("We must construe statutory provisions, when possible, to avoid unconstitutionality, . . . and to preserve as much of the legislative intent as is possible in a fair application of constitutional principles").  Even as these extraordinary circumstances require us to fashion judicial remedies for such constitutional violations, we must do our utmost to avoid making

policy decisions that are the responsibilities of other branches

of government.  See Commonwealth v. Leno, 415 Mass. 835, 841

(1993) (recognizing "the undesirability of the judiciary

substituting its notions of correct policy for that of a

popularly elected Legislature" [quotations and citation

omitted]).  Our duty is to do the minimum of what is necessary

to conform those statutes to the Massachusetts Constitution, and

not to rewrite those statutes more extensively.  See id.  See

also Aptheker v. Secretary of State, 378 U.S. 500, 515 (1964)

("Although this Court will often strain to construe legislation

so as to save it against constitutional attack, it must not and

will not carry this to the point of perverting the purpose of

a statute or judicially rewriting it" [quotation, citation, and

alteration omitted]).

The fundamental issue here is the statutory requirement

that nomination signatures be obtained "in person."  See G. L.

c. 53, § 7.  As the court highlights, and as we have previously

stated, the State has a legitimate interest in ensuring that

candidates have a "substantial measure of support" before they

may appear on the ballot.  See Libertarian Ass'n of Mass. v.

Secretary of the Commonwealth, 462 Mass. 538, 567 (2012),

quoting Barr v. Galvin, 626 F.3d 99, 111 (1st Cir. 2010), cert.

denied, 565 U.S. 929 (2011).  Otherwise, the ballot would be

overcrowded and confusing.  See id. at 567 & n.29.  Moreover,

the requirement that candidates obtain a minimum number of signatures in order to qualify for the ballot is reasonably related to this interest.  See id.  Rather, it is the in-person aspect of the signature requirement that renders it unduly burdensome in light of the current pandemic and quarantine, as this requirement presents public safety risks for both the campaign and individual signatories.  An in-person signature simply cannot be obtained without endangering the health of those collecting the signatures and those signing their names.

The least intrusive remedy to this constitutional deficiency would be one that carves out the in-person requirement and replaces it with its nearest equivalent: electronic signatures.  This solution should be technologically feasible and relatively straightforward in the midst of a pandemic:  use electronic nomination papers that can be electronically signed by voters and electronically submitted to local election officials.

Electronic signatures are the norm in the private sector and many areas of government.  Even before automatic voter registration took effect, the Secretary maintained an online portal that allowed citizens to complete an online affidavit using an image of their electronic signature from the registry of motor vehicles to register to vote.  See G. L. c. 51, § 33A. The Legislature has also already laid the groundwork for the

verification of registered voters' electronic signatures.  The
Legislature has expressly determined that, as a general matter,
"[a] record or signature may not be denied legal effect or
enforceability solely because it is in electronic form," and,
"[i]f a law requires a signature, an electronic signature
satisfies the law."  G. L. c. 110G, § 7 (a), (d).  The
Legislature and the Secretary have also facilitated certain
business filings by allowing both electronic signatures and
electronic submissions.  See G. L. c. 156D, §§ 1.40 et seq.
(including electronic signatures in definition of "sign" or
"signature" for purposes of incorporation); 950 Code Mass. Regs.
§ 113.06(4) (2006) (requiring "original" signature on corporate
filings unless documents are submitted "by authorized electronic
or facsimile transmission").  If this trend toward acknowledging
electronic signatures is acceptable for the registration of
voters and the creation of businesses, it should also be
sufficient to meet ballot signature requirements.

One would think that, had electronic signatures been
expeditiously approved for use on nomination papers by the
Legislature and the Secretary, nothing more would be necessary
to remedy the unconstitutional burden here.  In an age dominated
by social media sites like Facebook and Twitter, and one that
requires sophisticated digital political campaigning, it is
difficult to imagine that a viable legislative candidate for the

State house or State senate would be unable to electronically
alert and engage the 150 or 300 followers that the candidate
needs to obtain electronic signatures to appear on the ballot.
Those seeking Statewide office should also be able to satisfy
their reasonable signature requirements if a readily accessible
electronic signature process were adopted.  Indeed, this would
presumably be the norm if the technical capacities of our
election infrastructure were anywhere near as sophisticated and
adaptable as those of the private sector and other areas of
government.

Unfortunately, according to the Secretary, election
officials lack the technological capacity at this time to
readily accept electronic signatures for ballot nominations.
The Secretary contends that there are significant limitations on
the capacity of local and State election officials to receive
and verify such electronic signatures for the purposes of
satisfying the signature requirements, even when those
requirements involve a manageable numbers of signatures, ranging
from 150 to 10,000, plus the additional number of signatures
necessary to create a margin of error for the candidates.
Specifically, the Secretary contends that individual
municipalities may not be able to open large e-mail attachments
containing voter signatures, and may be unable to access online
file storage sites due to cybersecurity concerns.  Why this

remains so difficult in the modern era is somewhat inexplicable.
Why a simple e-mail attestation that includes the name, address,
and party registration of the voter is insufficient is also not
obvious.  The process for verifying even "wet" signatures
appears to consist primarily, if not completely, of a comparison
of the name, address, and voter registration on the "wet"
signature with the name, address, and voter registration on
record.  See 950 Code Mass. Regs. § 55.03(1) (2004).  Why a
simple e-mail is more suspect than a "wet" signature remains
unclear.

Nevertheless, because of the current technological limits
on our election capabilities and the procedural requirements of
the current process, candidates will be forced to continue to
submit their nomination papers in hard copy form.  According to
the Secretary, we are limited to the following process for
allowing electronic signatures.  First, candidates will be
permitted to electronically post or distribute their nomination
papers.  Then, voters must download the papers and either
electronically sign, or print and physically sign, the document
and return it to the candidate in electronic or paper form.  The
candidate will then be tasked with producing all voter
signatures in hard copy paper format, and physically submitting
his or her nomination papers to local officials for
certification.  At minimum, this awkward, multistep process will

require candidates or campaign volunteers to risk exposure to the virus by venturing out, either to the post office or a local official's physical office, in order to deliver the nomination papers to election officials.

Allowing voters to submit their signatures electronically as part of this cumbersome process, by itself, is not enough to fix the problem.  Indeed, the parties agree that this stilted approach to electronic signatures is not enough.  Rather, given the apparent lack of technological capacity to readily accept and verify electronic signatures in a more straightforward manner -- even in the midst of a global pandemic -- this court is instead forced to impose alternative remedies, such as reducing the statutorily prescribed signature threshold and extending the time limits for gathering signatures.

Unfortunately, these alternative remedies raise other constitutional issues.  When we start to alter the numbers of signatures required to qualify for the ballot, we begin to stray into territory reserved for the Legislature.  See Kenniston v. Dep't of Youth Servs., 453 Mass. 179, 189 (2009).  While reducing the signature threshold by fifty percent may be a sound Solomonic solution, and roughly corresponds to the amount of time candidates have lost, this appears to be more of a policy choice best left to the Legislature, which can act with great

dispatch when it chooses to do so.[1]  Nonetheless, in the instant case, at this last minute in the signature gathering process, and in the absence of legislative action, this court is forced to impose these alternative remedies itself to conform the election laws to constitutional requirements during the pending emergency.  These remedies also appear to be the least intrusive ones available, in light of the deficient technological capabilities identified by the Secretary and the imminent approaching deadlines for submitting nomination papers.

In this "high tech" era, and in the midst of a global pandemic that severely restricts close personal contact, the failure to be able to solve manageable technological problems on the eve of an election is confounding and distressing.  At a time when we need to be fundamentally rethinking what must be done in person and what can instead be done electronically, our electoral process seems dangerously unequipped to adapt to a new paradigm.

The COVID-19 pandemic has dramatically changed our current reality, not only in the Commonwealth, but across the globe, and not simply for a month or two.  Despite the significant negative

---

[1] We recognize that elected officials are presently operating under the same quarantine restrictions as the rest of the Commonwealth.  This makes the enactment of major substantive changes more difficult to accomplish, particularly where such changes require collaborative efforts among significant numbers of people.

effects of this lockdown, health officials have urged the
importance of maintaining quarantine efforts for the foreseeable
future. Tozzi and Bloomberg, "Social distancing until 2022? It
may be necessary, according to Harvard coronavirus researchers,"
Fortune (Apr. 14, 2020) https://fortune.com/2020/04/14
/social-distancing-until-2022-coronavirus-end-date-spread-covid-
19-harvard-researchers/ [https://perma.cc/HQJ5-4257]. It
remains to be seen when the current measures will no longer be
necessary. The Governor has indicated that the existing
lockdown will remain in place until at least May 4, 2020. See
COVID-19 Order No. 21. Even to the extent that the spread of
the virus slows in the coming months, there are indications it
may again surge in the fall. See Tozzi and Bloomberg, supra.
In any event, it is clear that the effects of COVID-19 will be
felt for years to come, and that we must adapt to face the long-
term logistical challenges that this new reality poses to our
society, particularly for in-person interactions.

Other States have adapted their election machinery to
address the electronic signature problem. As the court
observes, ante at note 16, Arizona has adopted a centralized
system for allowing voters to electronically sign candidates'
nomination papers, called "E-Qual." See
https://apps.azsos.gov/equal/ [https://perma.cc/2HDB-YHSF]. The
E-Qual website prompts voters to provide select personal

information, which is then used to access their voter
registration record.  See <u>id</u>.  Once their voter registration
record has been identified, voters may electronically sign a
candidate's nominating petition.  See <u>id</u>.  As the website
boasts, this system allows voters to show their "support for a
candidate from the comfort of [their] home[s] or anywhere
[I]nternet access is available."  See <u>id</u>.

Despite the apparent lack of technological solutions
available for purposes of the current election cycle, it would
appear that the Commonwealth has the means to ameliorate this
issue going forward, though not in time to address the issue
before the court.  As explained by the amicus, the Commonwealth
is already expanding its acceptance of electronic signatures in
other areas of election administration.  Pursuant to legislation
passed in 2018, the Commonwealth began implementing an automatic
voter registration process on January 1, 2020.  See G. L. c. 51,
§ 42G½; St. 2018, c. 205, § 4.  As a part of this process,
automatic voter registration agencies, such as the registry of
motor vehicles,[2] must transmit a voter's electronic signature to
the Secretary, who transmits the same to the board of registrars

---

[2] An "automatic voter registration agency" is defined as "a
location at a state agency where an eligible citizen may
register to vote."  G. L. c. 51, § 42G½ (<u>a</u>), (<u>b</u>).

or election commission of the city or town where the voter resides.  G. L. c. 51, § 42G½ (e).

Municipal registrars therefore already have at least a growing database of electronic signatures of voters registered in the Commonwealth.  It follows, then, that they should have the capability to compare electronic signatures submitted for a candidate's nomination papers with electronic signatures submitted by automatic voter registration agencies.  See G. L. c. 51, § 42G½; 950 Code Mass. Regs. § 55.03(1)(b).  They should therefore be able to scale up to wider use of electronic signatures in the near future.  That future, however, is apparently not now.  For that reason, I am forced to concur.

In sum, while I agree with the court that the technological limitations described by the Secretary prevent us from replacing the in-person requirement with electronic signatures alone in the short time before the signatures are due, and require the multifaceted remedy the court proposes, I feel compelled to emphasize that those responsible for our election process must have the necessary tools to quickly adapt to the current pandemic and the future crises to follow.  Absent such technological adaptability, our elections will be imperiled and our election laws may themselves have to be rewritten in the midst of a crisis, as was done here.  That is an invitation to conflict and confusion that must be avoided.

# EXHIBIT 11



No. 202.2

### EXECUTIVE ORDER

**Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency**

**WHEREAS,** on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

**WHEREAS,** both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue; and

**NOW, THEREFORE,** I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 13, 2020 the following:

**Suspension of laws and regulations:**

- Section 8-400 of the Election Law is temporarily suspended and otherwise altered to provide that due to the prevalence and community spread of COVID-19, temporary illness for the purpose of this section shall include the potential for contraction of the COVID-19 virus for any election held on or before April 1, 2020;

- Solely for any election held on or before April 1, 2020, Section 8-400 of the Election Law is hereby further modified to allow for electronic application, with no requirement for in-person signature or appearance to be able to access an absentee ballot; and deadlines to apply for such ballot are hereby modified to no later than March 23, 2020 and such ballots once voted shall be postmarked no later than March 24, 2020 or may be delivered in person to any board of elections; and

- Article 6 of the Election Law is modified to the extent necessary to reduce required number of signatures on petitions pursuant to Section 6-136 of such law to 1.5% of the enrolled voters required, or 30% of the stated threshold, whichever is less. Further such provisions are modified to require that gathering of signatures shall be suspended effective Tuesday, March 17, 2020 at 5 p.m.

**IN ADDITION,** by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through April 13, 2020:

Any school district which is closing pursuant to a local state of emergency declared as a result of the COVID-19 virus shall be required to first consult with local department of health and also exhaust any available time including snow days and vacation days. Additionally, the State Education Department shall promulgate guidance for districts to ensure access to meals for students in need, critical educational supports for students and distance learning options.



G I V E N   under my hand and the Privy Seal of the

State in the City of Albany the

fourteenth day of March in the year

two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

# EXHIBIT 12

No. 92
2020

**No. 92.  An act relating to government operations in response to the COVID-19 outbreak.**

(H.681)

It is hereby enacted by the General Assembly of the State of Vermont:

* * * Elections * * *

Sec. 1.  LEGISLATIVE INTENT; PROTECTION OF CITIZENS AND OF

ELECTIONS

It is the intent of the General Assembly that, if the coronavirus disease 2019

(COVID-19) pandemic continues its expected spread in the State of Vermont,

the citizens of Vermont should be able to protect their health, safety, and

welfare while also continuing to exercise their right to participate in elections

in order to maintain our democratic institutions.  Accordingly, this act sets

forth temporary elections provisions in response to COVID-19.

Sec. 2.  ELECTIONS IN THE YEAR 2020; SUSPENSION OF PRIMARY

PETITION, STATEMENT OF NOMINATION, AND LOCAL

ELECTION VOTER SIGNATURE REQUIREMENTS

(a)  Notwithstanding 17 V.S.A. § 2354, 2355, 2402(b), 2681(b), or any

other provision of law to the contrary, a person shall not be required to collect

voter signatures in order to have the person's name placed on any ballot in the

year 2020, including on any local election ballot.  Accordingly, a person shall

not be required to file a primary petition as a major party candidate for the

primary, a statement of nomination as an independent candidate for the general

No. 92
2020

election, or a petition as a candidate for a local election, as those contain the

voter signatures.

   (b)  In the year 2020:

      (1)  Notwithstanding the start date for filing primary petitions for major

party candidates set forth in 17 V.S.A. § 2356(a), consent of candidate forms

for those candidates shall be filed not earlier than the second Thursday after the

first Monday in May.

      (2)  Notwithstanding the start date for filing statements of nomination for

independent candidates for President or Vice President of the United States set

forth in 17 V.S.A. § 2402(d)(1)(A), consent of candidate forms for those

candidates shall be filed not earlier than Saturday, July 18, 2020.

      (3)  Notwithstanding the start date for filing statements of nomination for

any other independent candidates except for justice of the peace set forth in

17 V.S.A. § 2402(d)(1)(C), consent of candidate forms for those candidates

shall be filed not earlier than Thursday, July 23, 2020.

   (c)  All other requirements relating to nominations and candidate

qualifications shall continue to apply.

Sec. 3.  ELECTIONS IN THE YEAR 2020; SECRETARY OF STATE;

            GOVERNOR; TEMPORARY ELECTIONS PROCEDURES

   (a)  In the year 2020, the Secretary of State is authorized, in consultation

and agreement with the Governor, to order or permit, as applicable, appropriate

elections procedures for the purpose of protecting the health, safety, and

No. 92
2020

welfare of voters, elections workers, and candidates in carrying out elections,

including:

(1)  requiring mail balloting by requiring town clerks to send ballots by

mail to all registered voters;

(2)  creating early or mail ballot collection stations;

(3)  permitting municipal clerks to process and begin counting ballots in

a 30-day window preceding the day of an election;

(4)  permitting drive-up, car window collection of ballots by election

officials;

(5)  extending the time for municipal clerks to process and count ballots;

and

(6)  extending voting hours on the day of an election.

(b)  For any temporary elections procedure the Secretary of State orders or

permits under this section, the Secretary shall adopt any necessary

corresponding procedures that ensure the public can monitor polling places and

the counting of votes.

Sec. 4.  2020 LOCAL ELECTIONS BY AUSTRALIAN BALLOT

(a)  Notwithstanding the provisions of 17 V.S.A. § 2680(a) that require the

voters of a municipality to vote to apply the provisions of the Australian ballot

system to the annual or special meeting of the municipality, in the year 2020,

any municipality may apply the Australian ballot system to any or all of its

municipal elections held in the year 2020 by vote of its legislative body.

No. 92
2020

(b)  The Secretary of State may waive statutory deadlines or other statutory provisions, or provisions set forth in a school district's articles of agreement, related to a municipal election as necessary in order for a municipality to apply the Australian ballot system to its meeting in the year 2020.  This waiver authority applies to statutory provisions set forth in a municipal charter or provisions set forth in a school district's articles of agreement if the waiver is requested by that municipality.

* * * Open Meeting Law * * *

Sec. 5.  LEGISLATIVE INTENT; COVID-19 RESPONSE AND OPEN
         MEETINGS

It is the intent of the General Assembly that during the continued spread of coronavirus disease 2019 (COVID-19) in the State of Vermont public bodies should organize and hold open meetings in a manner that will protect the health and welfare of the public while providing access to the operations of government.  Public bodies should meet electronically and provide the public with electronic access to meetings in lieu of a designated physical location. Accordingly, this act sets forth temporary Open Meeting Law procedures in response to COVID-19.

No. 92
2020

Sec. 6.  OPEN MEETING LAW; TEMPORARY SUSPENSION OF

DESIGNATED PHYSICAL MEETING LOCATION

REQUIREMENTS

(a)  Notwithstanding 1 V.S.A. § 312(a), during a declared state of

emergency under 20 V.S.A. chapter 1 due to COVID-19:

(1)  a quorum or more of the members of a public body may attend a

regular, special, or emergency meeting by electronic or other means without

being physically present at a designated meeting location;

(2)  the public body shall not be required to designate a physical meeting

location where the public may attend; and

(3)  the members and staff of the public body shall not be required to be

physically present at a designated meeting location.

(b)  When the public body meets electronically under subsection (a) of this

section, the public body shall use technology that permits the attendance of the

public through electronic or other means.  The public body shall allow the

public to access the meeting by telephone whenever feasible.  The public body

shall post information on how the public may access meetings electronically

and shall include this information in the published agenda for each meeting.

Unless unusual circumstances make it impossible for them to do so, the

legislative body of each municipality and each school board shall record its

meetings held pursuant to this section.

No. 92
2020

(c)  In the event of a staffing shortage during a declared state of emergency under 20 V.S.A. chapter 1 due to COVID-19, a public body may extend the time limit for the posting of minutes prescribed in 1 V.S.A. § 312(b)(2) to not more than 10 days from the date of the meeting.

Sec. 7.  DEPARTMENT OF FISH AND WILDLIFE; FISH AND WILDLIFE

BOARD; MEETING REQUIREMENTS IN THE YEAR 2020

In the year 2020, the Department of Fish and Wildlife and the Fish and Wildlife Board shall not be required to hold the number of regional meetings as required by 10 V.S.A. §§ 4081(f) (deer) and 4082(b) and (c) (migratory bird and moose), but shall be required to hold not less than five meetings by electronic means to ensure adequate public involvement.

* * * Deadlines for Municipal Corporations and

Other Political Subdivisions * * *

Sec. 8.  EXTENSION OF DEADLINES APPLICABLE TO MUNICIPAL

CORPORATIONS AND REGIONAL PLANNING COMMISSIONS;

CONTINUED VALIDITY OF LICENSES AND PLANS

(a)  During a declared state of emergency under 20 V.S.A. chapter 1 due to COVID-19, the Governor may authorize State agencies to extend any deadline applicable to municipal corporations or regional planning commissions.  A deadline established by statute shall not be extended to more than 90 days after the date that the declared state of emergency ends.  Any expiring license, permit, program, or plan issued to a municipal corporation or regional planning

commission that is due to a State agency for renewal or review shall remain

valid for 90 days after the date that the declared state of emergency ends.

(b)  During a declared state of emergency under 20 V.S.A. chapter 1 due to

COVID-19, a municipal corporation shall be permitted to extend any deadline

applicable to municipal corporations, provided that the deadline does not relate

to a State license, permit, program, or plan subject to subsection (a) of this

section.  A municipal corporation may extend or waive deadlines applicable to

licenses, permits, programs, or plans issued by a municipal corporation.  Any

expiring license, permit, program, or plan issued by a municipal corporation

that is due to the municipal corporation for renewal or review shall remain

valid for 90 days after the date that the declared state of emergency ends.

Sec. 9.  TEMPORARY MORATORIUM ON DISCONNECTIONS FROM

PUBLIC DRINKING WATER AND WASTEWATER SYSTEMS

(a)  Notwithstanding 24 V.S.A. chapter 129, a municipality shall be

prohibited from disconnecting a person from water or sewer services during a

declared state of emergency under 20 V.S.A. chapter 1 due to COVID-19.

(b)  Notwithstanding any provision of law to the contrary, a person who is

permitted as a public water system pursuant to 10 V.S.A. chapter 56 and who

provides another person water as a part of the operation of that public water

system shall be prohibited from disconnecting any person from the public

water system during a declared state of emergency under 20 V.S.A. chapter 1

due to COVID-19.

No. 92
2020

(c)  Notwithstanding any provision of law to the contrary, a company engaged in the collecting, sale, and distribution of water for domestic, industrial, business, or fire protection purposes that is regulated by the Public Utility Commission under 30 V.S.A. § 203(3) shall be prohibited from disconnecting any person from services during a declared state of emergency under 20 V.S.A. chapter 1 due to COVID-19.

(d)  A violation of subsection (a) or (b) of this section may be enforced by the Agency of Natural Resources pursuant to 10 V.S.A. chapter 201.  A violation of subsection (c) of this section may be enforced by the Public Utility Commission under 30 V.S.A. § 30.

* * * Effective Date * * *

Sec. 10.  EFFECTIVE DATE

This act shall take effect on passage.

Date Governor signed bill:  March 30, 2020

I, Tom Campbell, acting under the authority of the Plaintiff, the Common Sense Party, and on my own behalf as Plaintiff, verify under the penalty of perjury under the laws of the United States of America that the foregoing Verified Complaint for Declaratory and Injunctive Relief is true and correct.

Executed on May 29, 2020

*Tom Campbell*

Tom Campbell