1  JAMES R. SUTTON, State Bar No. 135930
   BRADLEY W. HERTZ, State Bar No. 138564
2  THE SUTTON LAW FIRM, PC
   150 Post Street, Suite 405
3  San Francisco, CA 94108
   Tel: 415/732-7700
4  Fax: 415/732-7701
   jsutton@campaignlawyers.com
5  bhertz@campaignlawyers.com

6  QUENTIN L. KOPP, State Bar No. 25070
   380 West Portal Ave.
7  San Francisco, CA 94127
   Tel: 415/681-5555
8  Fax: 415/242-8838
   quentinlkopp@gmail.com
9
   Attorneys for Plaintiffs
10 THE COMMON SENSE PARTY,
   TOM CAMPBELL, DEBBIE BENREY,
11 and MICHAEL TURNIPSEED

12

13            THE UNITED STATES DISTRICT COURT

14         FOR THE EASTERN DISTRICT OF CALIFORNIA

15

16 THE COMMON SENSE PARTY;          )   Case No. 2:20-CV-01091-MCE-CKD
   TOM CAMPBELL, in his            )
17 capacity as official representative of the )
   Common Sense Party and as a registered )
18 voter in the Common Sense Party; and )   **PLAINTIFFS' MOTION FOR**
   DEBBIE BENREY and MICHAEL       )   **TEMPORARY RESTRAINING**
19 TURNIPSEED, as registered voters )   **ORDER AND/OR PRELIMINARY**
   in the Common Sense Party,      )   **INJUNCTION**
20                                  )
             Plaintiffs,            )
21                                  )
        v.                          )   Judge Morrison C. England, Jr.
22                                  )   Magistrate Judge Edmund F. Brennan
   ALEX PADILLA, in his official capacity )
23 as Secretary of State of California; and )
   DOES 1-20,                      )
24                                  )
             Defendants.           )
25 _____)

26

27

28

## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65(a) and 65(b), and in light of the public health crisis caused by the COVID-19 pandemic, Plaintiffs THE COMMON SENSE PARTY, TOM CAMPBELL, DEBBIE BENREY, and MICHAEL TURNIPSEED ("Plaintiffs"), respectfully move for a temporary restraining order and/or preliminary injunction against Defendant ALEX PADILLA in his official capacity as the Secretary of State of California, ordering him to refrain from enforcing the registration requirements for new political party qualification, as outlined in California Elections Code ("EC") section 5151(c). More specifically, Plaintiffs request that the Court enjoin Defendant from enforcing EC section 5151(c) as applied to Plaintiffs for qualification of the Common Sense Party for the upcoming November 3, 2020 presidential election. Further, Plaintiffs request that the court enter an order requiring the Secretary of State to register the Common Sense Party as an official political party in California without the need for the Common Sense Party to obtain more voter registrations than those already submitted to County Registrars of Voters and the Secretary of State pursuant to EC section 5151(c).

Without the issuance of a temporary restraining order or preliminary injunction, Plaintiffs will suffer irreparable injury because the Common Sense Party will not be permitted to appear on the November presidential election ballot, show its support for a Presidential and Vice-Presidential candidate, and exercise all other rights granted to political parties under California law, including the ability to make contributions to candidates of its choosing. The balance of equities tips in favor of Plaintiffs because Defendant's enforcement of EC section 5151(c)'s ballot access and registration requirements for new political parties seeking qualification, given the present situation with regard to COVID-19, is not narrowly tailored to serve any compelling or legitimate State interest.

In support of this motion, Plaintiffs submit a Memorandum of Points and Authorities (demonstrating that Plaintiffs are likely to succeed on the merits with respect

to the current unconstitutionality of EC section 5151(c) given the unique circumstances caused by COVID-19); a Declaration from Tom Campbell (confirming the irreparable harm that will occur to Plaintiffs if enforcement of EC section 5151(c) is not enjoined); a Declaration from Chad Peace (concluding that the only way for Plaintiffs to try to qualify for the November 2020 presidential ballot would be through in-person registration gathering efforts); a Declaration from Bobby G. Glaser (stating that, due to COVID-19, it will be impossible for Plaintiffs to collect the requisite number of registrations by the deadline prescribed by statute); and a Declaration from James R. Sutton (detailing notice of this motion to Defendant, as required by Local Rule 231 governing temporary restraining orders and preliminary injunctions).

Dated: June __, 2020                     Respectfully Submitted:


By: _____
James R. Sutton
The Sutton Law Firm, PC
Attorneys for Plaintiffs
THE COMMON SENSE PARTY,
TOM CAMPBELL, DEBBIE BENREY,
and MICHAEL TURNIPSEED

JAMES R. SUTTON, State Bar No. 135930
BRADLEY W. HERTZ, State Bar No. 138564
THE SUTTON LAW FIRM, PC
150 Post Street, Suite 405
San Francisco, CA 94108
Tel: 415/732-7700
Fax: 415/732-7701
jsutton@campaignlawyers.com
bhertz@campaignlawyers.com

QUENTIN L. KOPP, State Bar No. 25070
380 West Portal Ave.
San Francisco, CA 94127
Tel: 415/681-5555
Fax: 415/242-8838
quentinlkopp@gmail.com

Attorneys for Plaintiffs
THE COMMON SENSE PARTY,
TOM CAMPBELL, DEBBIE BENREY,
and MICHAEL TURNIPSEED

# THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| THE COMMON SENSE PARTY;<br>TOM CAMPBELL, in his<br>capacity as official representative of the<br>Common Sense Party and as a registered<br>voter in the Common Sense Party; and<br>DEBBIE BENREY and MICHAEL<br>TURNIPSEED, as registered voters<br>in the Common Sense Party,<br><br>    Plaintiffs,<br><br>  v.<br><br>ALEX PADILLA, in his official capacity<br>as Secretary of State of California; and<br>DOES 1-20,<br><br>    Defendants. | Case No. 2:20-CV-01091-MCE-CKD<br><br>**MEMORANDUM OF POINTS AND<br>AUTHORITIES IN SUPPORT OF<br>MOTION FOR TEMPORARY<br>RESTRAINING ORDER AND/OR<br>PRELIMINARY INJUNCTION;<br>DECLARATION OF TOM<br>CAMPBELL; DECLARATION OF<br>CHAD PEACE; DECLARATION OF<br>BOBBY G GLASER; DECLARATION<br>OF JAMES R. SUTTON; EXHIBITS**<br><br>Judge Morrison C. England, Jr.<br>Magistrate Judge Edmund F. Brennan |

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT.................................................................2

LEGAL BACKGROUND..........................................................................................................2

FACTUAL BACKGROUND......................................................................................................3

LEGAL ARGUMENT...............................................................................................................4

I.      PETITIONERS ARE ENTITLED TO RELIEF IN
THE FORM OF A TEMPORARY RESTRAINING
ORDER AND/OR A PRELIMINARY INJUNCTION........................................................5

      A.      Plaintiffs Have a High Likelihood of Success
on the Merits.........................................................................................5

            1.      Plaintiffs are Entitled to Relief Because the State
of California Has Failed to Provide any Meaningful Alternative
Procedures for Them to Participate as an Officially-Recognized
Political Party in the Upcoming Election.....................................................6

            2      California's Statutory Scheme Regarding New Party
Ballot Qualification, Including Voter Registration Requirements and
Corresponding Deadlines, Cannot Withstand Constitutional Scrutiny
Given COVID-19 and Present Circumstances............................................7

      B.      Plaintiffs Will Suffer Immediate and Irreparable Harm
if Not Granted Injunctive Relief..............................................................9

      C.      The Balance of the Equities Weighs Strongly in Plaintiffs' Favor.......................10

      D.      The Requested Relief is in the Public Interest........................................11

      E.      Similar Ballot Access Cases in Other States..........................................12

      F.      No Security is Required in this Case....................................................13

CONCLUSION........................................................................................................14

1

2

# TABLE OF AUTHORITIES

<u>Page(s)</u>

3

<u>CASES:</u>

4

<u>American Party of Texas v. White</u>......................................................................6,7
(1974) 415 U.S. 767

5

<u>Anderson v. Celebrezze</u>..................................................................................8, 11
(1983) 460 U.S. 780

6

7

<u>Bryant v. Matvieshen</u>..........................................................................................5
(E.D. Cal. 2012) 904 F. Supp.2d 1034

8

<u>Buckley v. Am. Constitutional Law Found., Inc.</u>....................................................7
(1999) 525 U.S. 182

9

10

<u>Burdick v. Takushi</u>.............................................................................................8
(1992) 504 U.S. 428

11

<u>CTIA - The Wireless Ass'n v. City of Berkeley, California</u>.....................................10
(9th Cir. 2019) 928 F.3d 832

12

13

<u>Ebel v. City of Corona</u>........................................................................................9
(9th Cir. 1983) 698 F.2d 390

14

<u>Elrod v. Burns</u>...............................................................................................9-10
(1976) 427 U.S. 347

15

16

<u>Esshaki v. Whitmer</u>...........................................................................................13
(E.D. Mich. 2020) No. 2:20-CV-10831-TGB, 2020 WL 1910154

17

<u>Firearms Policy Coal. Second Amendment Def. Comm. v. Harris</u>..........................10
(E.D. Cal. 2016) 192 F. Supp. 3d 1120

18

19

<u>Goldstein v. Sec'y of Commonwealth</u>..................................................................13
(Mass. 2020) No. SJC-12931, 2020 WL 1903931

20

<u>Illinois State Bd. Of Elections v. Socialist Workers Party</u>.....................................11
(1979) 440 U.S. 173

21

22

<u>Jenness v. Fortson</u>..............................................................................................7
(1971) 403 U.S. 431

23

<u>Johnson v. Couturier</u>........................................................................................13
(9th Cir. 2009) 572 F.3d 1067

24

25

<u>Klein v. City of San Clemente</u>.......................................................................10,12
(9th Cir. 2009) 584 F.3d 1196

26

27

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

28

Libertarian Party of Illinois v. Pritzker......................................................13
    (N.D. Ill. 2020) No. 20-CV-2112, 2020 WL 1951687

Nat'l Ass'n of Wheat Growers v. Zeise.....................................................12
    (E.D. Cal. 2018) 309 F. Supp. 3d 842

Pest Comm. v. Miller.................................................................................7
    (9th Cir. 2010) 626 F.3d 1097

Williams v. Rhodes................................................................6,11,12
    (1968) 393 U.S. 23

Winter v. Nat. Res. Def. Council, Inc...........................................5
    (2008) 555 U.S. 7

**STATUTES:**

Cal. Elec. Code.............................................................................3
    §5005........................................................................................passim
    §5151(c)....................................................................................passim

Cal. Gov. Code.............................................................................3
    §§85301-85303

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

1  **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

2

3  Plaintiffs THE COMMON SENSE PARTY, TOM CAMPBELL, DEBBIE

4  BENREY and MICHAEL TURNIPSEED ("Plaintiffs") respectfully submit this

5  Memorandum of Points and Authorities in support of their motion for temporary

6  restraining order and/or preliminary injunction.

7  **INTRODUCTION AND SUMMARY OF ARGUMENT**

8  This action arises out of California state law, specifically California Elections

9  Code ("EC") section 5151(c), which governs the ability of new political parties to access

10  the ballot.  Present circumstances caused by the COVID-19 pandemic render EC section

11  5151(c) unduly burdensome and unconstitutional, as it is impossible to satisfy the voter

12  registration requirements set forth in the statute.  Due to the impossible nature of the

13  statutory voter registration requirements, Plaintiffs urgently need and are entitled to the

14  relief requested herein.  A temporary restraining order and/or a preliminary injunction is

15  needed in order to protect Plaintiffs' speech, voting, and associational rights, as

16  guaranteed to them under the First and Fourteenth Amendments.  In the absence of the

17  requested relief, Plaintiffs will suffer irreparable harm because the Common Sense Party

18  will be excluded from participating as a recognized political party in the November 2020

19  election.

20  **LEGAL BACKGROUND**

21  Plaintiffs seek this Court's protection from EC section 5151(c), which

22  requires a political organization seeking to become a state-recognized political party to

23  gather registrations of California voters equal to .33 percent of the total number of

24  registered voters in California.  Based on the current number of registered voters in

25  California, EC section 5151(c) requires new political parties to secure 68,180 voter

26

27

28

1  registrations in order to qualify for the November 2020 election ballot.[1]  The deadline for

2  submitting these registrations to the Secretary of State in order to qualify as a new

3  political party for the November 2020 election ballot is July 3, 2020.

4       Once officially recognized, a new political party in California qualified under EC

5  section 5151 has the right to designate its candidates for President and Vice President,

6  even without having participated in the primary election.  (EC section 5005(b).)  Unless

7  relief is granted in this case, the members of the Common Sense Party will be deprived of

8  the fundamental right to place a candidate for President and Vice President on the

9  California ballot this November.  An officially-recognized party may also raise campaign

10  funds in largest increments than other political organizations, and may spend money to

11  support candidates for state office in unlimited amounts.  (Cal. Govt. Code sections

12  85301 - 85303; Sutton Dec., Exh. 6.)  Unless relief is granted in this case, the Common

13  Sense Party will be deprived of this constitutional right enjoyed by the other recognized

14  parties in California.

15                    **FACTUAL BACKGROUND**

16       The Common Sense Party is a "party-in-formation" seeking to qualify as a political

17  party for the November 2020 California election.[2]  The Common Sense Party

18

---

19       [1]The law also allows a political organization to qualify for the ballot by gathering
signatures on a petition, though this alternative method would be even more impacted by the
20  COVID-19 crisis.  This method requires a political organization to gather signatures equal
to 10 percent of all votes cast in the last gubernatorial election by the 135th day before the
21  election. (EC section 5151(d).)  This number is currently 1,246,424 and the deadline for the
November 2020 election would be June 21, 2020.  Since 1968, only one of the seven minor
22  political parties which has qualified for a California ballot used the petition signature
method; the other six all relied on the voter registration method. (Declaration of James R.
23  Sutton ("Sutton Dec."), ¶ 6, Exh. 5.)

24       [2]The Common Sense party is a new political party seeking qualification and
"resolve[s] to elevate the interests of Californians above partisan politics."  The party
25  supports policies that promote the public welfare, encourage innovation, and enable
Californians to achieve their highest success. The party "pledge[s] to promote candidates for
26  local and state offices at all levels who embrace these principles and who are strong in their
commitment to fight for them" and "will support qualified "common sense" candidates who
27  are No Party Preference, and who are from the Democratic, Republican and Common Sense

28

1  implemented a plan in September 2019, far in advance of the July 3, 2020 deadline, to

2  collect the required number of registrations, and had been gathering registrations

3  primarily by using in-person solicitors.  (Campbell Dec., ¶¶ 3 & 6; Peace and Glaser

4  Decs. generally.)  There were many aspects of the registration-gathering plan, including

5  running a pilot program to test various means of registering voters, soliciting bids from

6  social media companies to drive traffic to the Party's website, engaging a professional

7  petition circulation firm to assist in obtaining registrations, etc., and the Party had every

8  reason to believe that it would reach its goal within this 10-month period.  (Campbell

9  Dec., ¶ 3).  Plaintiffs had been diligently adhering to their registration-gathering plan up

10  until early March, when the COVID-19 crisis hit. (Campbell Dec., ¶ 6; Peace and Glaser

11  Decs. generally.)

12       The in-person registration-gathering process was suspended on or about March 8,

13  2020 out of a growing concern for public safety because of the COVID-19 pandemic.

14  (Campbell Dec., ¶ 6.)  As of that date, the Common Sense Party had obtained a total of

15  19,038 registrants, or approximately 30 percent of the required number.  (Campbell Dec.,

16  ¶ 7.)  Had the Common Sense Party had been able to continue its efforts to secure voter

17  registrations at a similar pace to its efforts up until March 8th, 2020, it would have in all

18  likelihood been able to obtain more than 68,180 new voter registrations by July 3, 2020.

19  (Declaration of Bobby G. Glaser ("Glaser Dec."), ¶ 13; Campbell Dec., ¶ 9.)

20       The devastating nature of the COVID-19 pandemic prompted Governor Newsom

21  to issue a series of executive orders, beginning with a Declaration of Emergency on

22  March 4, 2020 and continuing with, among other, Executive Order No. N-33-20 on

23  March 19, 2020; these executive orders mandated the closures of most businesses and

24  required people to shelter-in-place in their homes, effectively shutting down the State.

25  (Sutton Dec., Exh. 1.)  These executive orders, and the social distancing rules they

26

27  Parties." (Declaration of Tom Campbell ("Campbell Dec."); Exh. 1.)

28

contain, make in-person solicitation of voter registrations impossible and unlawful, because in-person registration solicitation necessarily requires a registration solicitor to be in close proximity to a potential registrant. (Glaser Dec., ¶ 8.) Importantly, the executive orders do <u>not</u> include exceptions for this kind of political activity. Thus, EC section 5151(c) and the COVID-19 social distancing rules substantially hinder Plaintiffs' ability to obtain the requisite number of voter registrations to qualify the Common Sense Party for the November 2020 Presidential election ballot.

## LEGAL ARGUMENT

### I.   Plaintiffs are Entitled to Relief in the Form of a Temporary Restraining Order and/or a Preliminary Injunction.

To obtain a preliminary injunction or a temporary restraining order, Plaintiffs must show that: (1) they are likely to succeed on the merits of the case; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities weighs in their favor; and (4) the preliminary relief sought is in the public interest. (<u>Bryant v. Matvieshen</u> (E.D. Cal. 2012) 904 F. Supp.2d 1034, 1042; <u>Winter v. Nat. Res. Def. Council, Inc.</u> (2008) 555 U.S. 7, 20.) "[T]he substantive standard for granting a temporary restraining order is the same as the standard for entering a preliminary injunction." (<u>Bryant</u>, supra, 904 F.Supp.2d at 1042.) As demonstrated below, Plaintiffs satisfy the four criteria required in order to be granted a temporary restraining order and/or a preliminary injunction.

### A.   Plaintiffs Have a High Likelihood of Success on the Merits.

The extraordinary and unprecedented circumstances caused by the COVID-19 pandemic have rendered EC section 5151(c) unconstitutional as applied to Plaintiffs. COVID-19, and the statewide shelter-in-place orders issued in response, have made all in-person voter registration collection efforts futile and unlawful. Therefore, the Common Sense Party has <u>no effective way by which to gather the required number of voter registrations by the July 3, 2020 statutory deadline</u>. (See Declaration of Chad Peace

("Peace Dec.") and Glaser Dec. generally.)  This <u>absolute barrier</u> to new political party qualification and ballot access entitles Plaintiffs to the relief requested.  In addition, in light of the current public health crisis, California's voter registration requirements for new parties seeking to qualify for the ballot cannot withstand the applicable level of constitutional scrutiny – strict scrutiny – which is the highest and most stringent standard of judicial review.

        1.     **<u>Plaintiffs are Entitled to Relief Because the State Has Failed to Provide any Meaningful Alternative Procedures for Them to Participate as an Officially-Recognized Political Party in the Upcoming Election.</u>**

Currently, there is no meaningful way by which the Common Sense Party can participate as an officially-recognized party in the November 2020 election.  To do so, it would have to qualify by registering more than 68,000  A <u>complete</u> barrier to the ballot, as is the case here, is of course the biggest possible burden on ballot access and is, therefore, constitutionally impermissible.

Courts have previously held that state laws that put too heavy of a burden on ballot access are unconstitutional.  For instance, in <u>Williams v. Rhodes</u> (1968) 393 U.S. 23, 25, the Supreme Court held that a state ballot access law governing new parties was unconstitutional as it made it "virtually impossible for any party to qualify on the ballot except the Republican and Democratic Parties."  In a similar vein, EC section 5151(c), under the current circumstances, makes it "virtually impossible" for any party to qualify for the ballot, apart from those political parties that are already established and officially recognized by the State.

California is constitutionally required to provide new parties with a <u>viable</u> procedure by which to qualify for and access the ballot.  (<u>American Party of Texas v. White</u> (1974) 415 U.S. 767, 783.)  If the requirements are impossible to attain, as the requirements prescribed by EC section 5151(c) currently are – given the COVID-19 public health crisis – the law might as well simply contain a prohibition on new parties.  In light

of the social-distancing laws in California, the minimum requirement of registrants for a new political party to qualify as an officially-recognized party has made access to this status "merely theoretical," which the United States Supreme Court has explicitly said is not acceptable.  In discussing ballot access laws governing minor political parties, the Supreme Court stated:

> [W]hat is demanded may not be so excessive or impractical as to be in reality a mere device to always, or almost always, exclude parties with significant support from the ballot.  The Constitution requires that access to the electorate be real, not 'merely theoretical.

(Id.) It is therefore unconstitutional for a state to restrict access to the ballot in a way that absolutely prevents new parties from participating in an election, which is exactly what is happening here.

### 2. California's Statutory Scheme Regarding New Party Ballot Qualification, Including Voter Registration Requirements and Corresponding Deadlines, Cannot Withstand Constitutional Scrutiny Given COVID-19 and Present Circumstances.

Given current circumstances, EC section 5151(c) is unconstitutional because it imposes a severe burden on Plaintiffs' First Amendment rights of political speech and association and is not narrowly drawn to advance a state interest of compelling importance, as required by the applicable strict scrutiny analysis.  (See Pest Comm. v. Miller (9th Cir. 2010) 626 F.3d 1097, 1107; Buckley v. Am. Constitutional Law Found., Inc. (1999) 525 U.S. 182, 207 [stating that "When a state's election law directly regulates core political speech, we have always subjected the challenged restriction to strict scrutiny and required that the legislation be narrowly tailored to serve a compelling governmental interest."])

While the state has a legitimate interest in making certain that a political party has some electoral support before granting it official status (see, e.g., Jenness v. Fortson (1971) 403 U.S. 431 [the state has an interest in "requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot"]), the various requirements outlined in EC section 5151(c) are not

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

7

1   narrowly tailored to achieve this governmental interest given the statewide shelter-in-place

2   orders. Instead, the requirements currently serve as an <u>absolute barrier</u> to the ballot. EC

3   section 5151(c) eliminates <u>any and all</u> opportunity for the Common Sense Party to be

4   recognized as a political party in time to participate in the November 2020 California

5   election, which is clearly over-restrictive and impermissible. Furthermore, given the

6   immense magnitude of the burden on the Common Sense Party, the state's interest in

7   ensuring that there is some support for a political party before allowing it on the ballot is

8   not sufficiently compelling to justify the enforcement of EC section 5151(c). Even if the

9   state's interest in ensuring voter support for a new political party before granting ballot

10  access was compelling, the Common Sense Party has clearly made this showing by

11  gathering nearly 20,000 voter registrations to date.

12      Apart from the traditional strict scrutiny inquiry, <u>Anderson v. Celebrezze</u> (1983)

13  460 U.S. 780 outlines an alternative, useful standard to employ in determining the

14  constitutionality of a state election law. In that case, the Supreme Court provided the

15  following framework to be employed by a reviewing court:

16      [F]irst consider the character and magnitude of the asserted injury to the
        rights protected by the First and Fourteenth Amendments that the plaintiff
17      seeks to vindicate. [The court] then must identify and evaluate the precise
        interests put forward by the State as justifications for the burden imposed by
18      its rule. In passing judgment, the Court must not only determine the
        legitimacy and strength of those interests, it also must consider the extent to
19      which those interests make it necessary to burden the plaintiff's rights. Only
        after weighing all these factors is the reviewing court in a position to decide
20      whether a challenged provision is unconstitutional.

21  (<u>Id.</u> at 789.) Furthermore, the Supreme Court has acknowledged that "the rigorousness of

22  our inquiry into the propriety of a state election law depends upon the extent to which a

23  challenged restriction burdens First and Fourteenth Amendment rights." (<u>Burdick v.</u>

24  <u>Takushi</u> (1992) 504 U.S. 428, 434.)

25      Applying this balancing framework to the case at hand, EC section 5151(c)

26  imposes huge burdens on Plaintiffs' First and Fourteenth Amendment rights because it is

27  an <u>absolute barrier</u> to the ballot. The high degree of severity of the burden at issue (i.e.,

28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY
    RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

the complete and categorical exclusion from the ballot) suggests that, under the <u>Anderson</u> framework, EC section 5151(c) should be declared unconstitutional as applied – it is a severe burden on rights of the Common Sense Party and its members. Furthermore, the traditional justification put forward by the government when justifying ballot access laws – the need to prove that there is some public support before allowing parties to participate in an election – is not persuasive here because the Common Sense Party has <u>already</u> made this showing, as evidenced by the large number of registrations that it was able to gather up until March 8, 2020. The State therefore can not claim that it is necessary to burden the Plaintiffs' rights by enforcing EC section 5151(c).

## B. **Plaintiffs Will Suffer Immediate and Irreparable Harm if Not Granted Injunctive Relief.**

Without the requested relief from this Court, the Common Sense Party will be deprived of its fundamental freedoms protected under the First and Fourteenth Amendments, and will be prevented from participating in the November 2020 election through no fault of its own. In addition, Common Sense Party voters will be deprived of their fundamental right to vote for candidates of their choice for President and Vice-President, also through no fault of their own. The very nature of fundamental rights make it so that their violation or impairment cannot be fully compensated for by an award of monetary damages after the fact; when one is deprived of a fundamental liberty interest, one is of course deprived of something that transcends monetary value and quantification. (See <u>Ebel v. City of Corona</u> (9th Cir. 1983) 698 F.2d 390, 393 [injury to one's fundamental right of freedom of expression constitutes irreparable harm, as it goes beyond monetary damages].)

Courts have acknowledged that "[r]estrictions on access to the ballot impinge on the fundamental right to associate for the advancement of political beliefs and the fundamental right to vote" and that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (<u>Elrod v. Burns</u>

(1976) 427 U.S. 347, 373-74; Klein v. City of San Clemente (9th Cir. 2009) 584 F.3d 1196, 1207-08 [granting preliminary injunction against anti-littering ordinance which prohibited leafleting of parked, unoccupied vehicles because it violated First Amendment rights]; CTIA - The Wireless Ass'n v. City of Berkeley (9th Cir. 2019) 928 F.3d 832, 851 [stating that a "party seeking preliminary injunctive relief in the First Amendment context can establish irreparable injury . . . by demonstrating the existence of a colorable First Amendment claim"].)  This very Court has also previously asserted that denial of First Amendment rights typically constitutes irreparable harm and that the harm is amplified where a party seeks to engage in speech of a political nature.  (Firearms Policy Coal. Second Amendment Def. Comm. v. Harris (E.D. Cal. 2016) 192 F. Supp. 3d 1120, 1128.)

The exclusion of the Common Sense Party from the upcoming ballot clearly implicates Plaintiffs' First Amendment rights, specifically their freedom of speech and freedom of association.  (Elrod, supra, 427 U.S. at 373-74.)  Furthermore, the Common Sense Party and its members are seeking to exercise their First Amendment rights in a political context, thereby exacerbating the harm if they are deprived of these rights. (Firearms Policy Coal. Second Amendment Def. Comm., supra, 192 F. Supp. 3d at 1128.) Without the issuance of a temporary restraining order and/or a preliminary injunction, Plaintiffs will suffer irreparable injury in the form of a serious deprivation of their fundamental rights.

**C.    The Balance of the Equities Weighs Strongly in Plaintiffs' Favor.**

Being denied recognition as an official political party for the upcoming election is an insurmountable burden for Plaintiffs. As mentioned previously, Defendant's enforcement of EC section 5151(c), given current circumstances caused by the COVID-19 pandemic, would make it impossible for the Common Sense Party to gather the requisite number of voter registrations by the July 3, 2020 deadline. The enforcement of EC section 5151(c) would effectively take away any chance whatsoever of the Common Sense Party being able to participate in the November 2020 election, although it has already spent an

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

immense amount of time and resources in its qualification efforts.  Furthermore, the right to form a political party is a fundamental right and a "precious freedom" fiercely protected by the First Amendment: "The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes."  (Williams v. Rhodes, supra, 393 U.S. 23, 31.)  If Defendant is permitted to enforce EC 5151(c), they will impinge on Plaintiffs's "precious freedoms."

By contrast, the Defendant will not suffer any harm if they are prevented from enforcing EC section 5151(c).  In fact, allowing the Common Sense Party to participate in the upcoming election will actually be beneficial to the State.  The Supreme Court has recognized the numerous benefits that newer political parties bring to society: "[H]istorically political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the status quo have in time made their way into the political mainstream."  (Anderson v. Celebrezze, supra, 460 U.S. 780, 794.)  So, in all likelihood, the inclusion of the Common Sense Party in the upcoming election will actually benefit, rather than harm, Defendant and the State of California.  Therefore, the balance of the equities tips strongly in Plaintiffs' favor.

**D.    The Requested Relief is in the Public Interest.**

There are several reasons why the relief requested by Plaintiffs is in the public interest. The first has to do with the importance of voter choice. By enforcing EC section 5151(c) and not allowing the Common Sense Party to appear on the November 2020 Presidential election ballot, the State of California would substantially limit the choices available to voters on election day.  The Supreme Court has said that, "by limiting the choices available to voters, the State impairs the voters' ability to express their political preferences."  (Illinois State Bd. Of Elections v. Socialist Workers Party (1979) 440 U.S. 173, 184.)  Permitting the Common Sense Party to appear on the upcoming Presidential election ballot would enable voters to cast a vote for a candidate designated by the Common Sense Party, thus expanding choices available to voters.

Second, as mentioned previously, newer political parties are often beneficial to society because they frequently bring fresh ideas to the political zeitgeist. Making it impossible for the Common Sense Party to speak out about candidates for public office and initiatives with the status of an official political party or to otherwise participate in the upcoming election "threaten[s] to reduce diversity and competition in the marketplace of ideas" in the political arena. (Anderson, supra, 460 U.S. at 794.) In this way, and in the spirit of encouraging new and different perspectives, allowing the Common Sense Party to qualify for and participate in the November 2020 California election is in the public interest.

Third, the relief requested in this case will necessarily benefit the public because it will protect the First Amendment rights of California's electors to cast their votes in an effective manner in the upcoming election and to associate with candidates and parties of their choosing. (See Williams, supra, 393 U.S. at 30 [holding that restrictions on ballot access hinder two separate and fundamental rights: the right of individuals to associate for political purposes and "the right of qualified voters . . . to cast their vote effectively"].) The 9th Circuit has consistently recognized the "'significant public interest' in upholding First Amendment and free speech principles. (Klein v. City of San Clemente, supra, 584 F.3d 1196, 1208; see also Nat'l Ass'n of Wheat Growers v. Zeise (E.D. Cal. 2018) 309 F. Supp. 3d 842, 854 [recognizing inherent public interest in protecting First Amendment rights].) For all of the above reasons, the public interest factor in the temporary restraining order/preliminary injunction analysis weighs heavily in Plaintiffs' favor.

**E.    Similar Ballot Access Cases in Other States.**

Given the current circumstances regarding COVID-19, courts in other states have recently enjoined the enforcement of various ballot access laws that impose too much of a burden on political parties and candidates seeking to appear on the ballot. For instance, the U.S. District Court for the Northern District of Illinois has just held that a state's interest in requiring some minimum showing of support before granting ballot access to a

political party can be met with a <u>modified</u> requisite number of signatures, taking into account the extreme social-distancing rules of the extraordinary present health crisis. (<u>Libertarian Party of Illinois v. Pritzker</u>, No. 20-CV-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020); Sutton Dec.; Exh. 2.) The order issued by the U. S. District Court for the Northern District of Illinois drastically reduces the number of signatures needed to qualify a new political party for the ballot to only 10 percent of its original statutory requirement. The number of required signatures needed for a new party to qualify for the ballot in Illinois is typically 25,000, which is far less than the 68,180 registrations currently needed in California. The federal court, in recognition of the extraordinary present circumstances, nevertheless reduced the 25,000 number to <u>only 2,500 signatures</u>. (<u>Id</u>.)

Similarly, the U.S. District Court for the Eastern District of Michigan and the Supreme Judicial Court of Massachusetts have held that a state's interest in requiring some minimum showing of support before granting ballot access to a candidate for public office can be met with a <u>modified</u> requisite number of signatures, taking into account the social-distancing rules of the present health crisis. (<u>Esshaki v. Whitmer</u>, No. 2:20-CV-10831-TGB, 2020 WL 1910154 (E.D. Mich. Apr. 20, 2020); <u>Goldstein v. Sec'y of Commonwealth</u>, No. SJC-12931, 2020 WL 1903931 (Mass. Apr. 17, 2020); Sutton Dec.; Exhs. 3 & 4.)

## II.  <u>No Security is Required in this Case</u>.

Under Rule 65(c) of the Federal Rules of Civil Procedure, security is not mandatory and can be dispensed with at the Court's discretion. (<u>Johnson v. Couturier</u> (9th Cir. 2009) 572 F.3d 1067, 1086 [despite seemingly mandatory wording of Rule 65(c), courts have "discretion as to the amount of security required, *if any*"].)  Since the present case does not threaten any harm, financial or otherwise, to Defendants, no security is needed. (<u>Id</u>. [if there is no "realistic likelihood of harm to the defendant from enjoining his or her conduct," court need not require bond].)

## <u>CONCLUSION</u>

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

13

1

2    Plaintiffs are at imminent risk of having their First and Fourteenth Amendment

3    rights violated. Without court intervention, the Common Sense Party will be excluded

4    from the upcoming November 2020 election.  Furthermore, Plaintiffs have established

5    that: (1) they are likely to succeed on the merits of the case; (2) they are likely to suffer

6    irreparable harm in the absence of the relief requested; (3) the balance of equities weighs

7    in their favor; and (4) the preliminary relief sought is in the public interest.

      For the foregoing reasons, Plaintiffs respectfully request that this Court: (1) enter a

8    temporary restraining order and/or a preliminary injunction against Defendant, prohibiting

9    Defendant from enforcing the relevant new political party qualification and ballot access

10   statute, EC section 5151(c) as against the Common Sense Party; and (2) grant such other

11   equitable relief as this Court deems just and proper.

12

13   Dated: June ⟨4⟩, 2020                        Respectfully Submitted:

14

15                                               By:  _____

16                                                    James R. Sutton
                                                     The Sutton Law Firm, PC
17                                                   Attorneys for Plaintiffs
                                                     THE COMMON SENSE PARTY,
18                                                   TOM CAMPBELL, DEBBIE BENREY,
                                                     and MICHAEL TURNIPSEED

19

20

21

22

23

24

25

26

27

28   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY
     RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

# DECLARATION OF TOM CAMPBELL

I, Tom Campbell, make this Declaration, pursuant to 28 U.S.C. 1746, based on my own personal knowledge, and, if called upon to testify hereto, I could and would competently do so:

1. My name is Tom Campbell and I am a Plaintiff in the present action. I am the officially designated representative of the Common Sense Party. I am a voter in the State of California, registered in the Common Sense Party. I was a U.S. Congressman for nine years, representing districts on the peninsula in the San Francisco Bay area. I was a California State Senator for two years. I was California Director of Finance. I was a law professor at Stanford for 19 years; dean of the Haas School of Business at UC Berkeley for 5 years, and dean of the Fowler School of Law at Chapman University for 5 years. I am presently a Professor of Law and a Professor of Economics at Chapman University.

2. The Common Sense Party is governed by principles and a mission, which are attached to this declaration as Exhibit 1, and is committed to supporting candidates for office, of any party, who espouse those principles and mission.

3. In September 2019, the Common Sense Party implemented a comprehensive plan to gather the required number of voter registrations in order to qualify the Common Sense Party as an officially recognized political party in California. Aspects of the plan included:

   a. Running a pilot program testing various means of registering voters.

   b. Monitoring the results of the pilot program and choosing in-person registration methods as by far the most effective method.

   c. Soliciting bids from social media companies to drive traffic to our website, and paying monthly retainers to do so to IVC Media, LLC.

   d. Engaging in a robust question-and-answer format on our website.

   e. Creating an extensive library of position papers on public policy matters of interest to Californians.

f. Sponsoring a contest, modeled after March Madness of the NCAA, to identify the most important public policy issues facing Californians.

g. Holding two widely attended in-person meetings of those interested in reforming California's election system.

h. Holding a virtual convention to nominate and choose interim officers and to approve our application to the Secretary of State to become a recognized political party.

i. Engaging the La Jolla Group in September 2019. The La Jolla Group, among other activities, gathers signatures for initiatives and voter registrations.

j. Monitoring our contract with the La Jolla Group to achieve the best results per our investment, taking account of competing demands upon signature-gatherers during autumn 2019 and spring 2020.

k. Contacting other political reform groups to learn what registration collection methods had been successful for them. We consulted with the leaders of the successful effort to qualify United We Stand as a political party in California in 1992.

l. Contacting organizations on college campuses to learn about possible registration efforts there.

m. Referencing my own political email list, and those of fellow co-founders, to solicit and obtain volunteers to encourage others to register for the Common Sense Party.

4. The Common Sense Party initially filed to qualify in time for the March 2020 primary election. When we were informed by the Secretary of State's Office that we had not met the deadline for the primary election, we re-submitted our application, to qualify in time for the November 2020 election.

5. The California Secretary of State's Office accepted our submission for the

1    November 2020 election and allowed us to count the registrations already received

2    toward the statutory requirement to qualify for the November 2020 election.

3        6.    The Common Sense Party, in conjunction with the La Jolla Group,

4    diligently followed its registration-gathering plan until March 8, 2020, when it decided

5    that, out of concern for public health and safety, in-person registration-gathering efforts

6    needed to be discontinued due to COVID-19.

7        7.    The Common Sense Party was informed by the La Jolla Group that, as of

8    March 8, 2020, the day that registration-gathering efforts were suspended, the La Jolla

9    group had collected 19,038 registrants in the Common Sense Party, which is nearly a third

10   of the total 68,180 registrations needed in order to appear on the upcoming November

11   2020 election ballot.

12       8.    Governor Newsom's social distancing orders issued on March 19, 2020, in

13   Executive Order N-33-20, in response to the COVID-19 emergency, and still in force,

14   make it practically impossible for the Common Sense Party to gather the remaining

15   registrations by the July 3, 2020 deadline prescribed by statute.

16       9.    Had the Common Sense Party been able to continue its gathering of

17   registrations as per its original plan, using in-person solicitations, the Common Sense

18   Party was likely to have met the required number of registrations by the July 3, 2020,

19   deadline.

20       10.   The party had been diligently raising funds and efficiently allocating them to

21   the in-person voter registration drive so as to meet that goal. To date, the Common Sense

22   Party has paid a total of $254,889.87 to two companies that have assisted in obtaining

23   voter registrations. The party has paid IVC Media, LLC a total of $94,889.87, with the

24   most recent payment being $27,750 on 4/7/20.  The party has also paid the La Jolla Group

25   a total of $160,000 ($50,000 on 8/30/19, another $50,000 on 9/27/19, and $60,000 on

26   11/8/19.)

27       11.   The Common Sense Party was informed by the Secretary of State's Office

28

DECLARATION OF TOM CAMPBELL                    3

1  that state law (California Elections Code section 2158(b)(4)) prohibited the Common

2  Sense Party from sending an unsolicited voter registration form by email to anyone

3  already registered to vote.

4      12.    By contrast, in-person solicitation permitted the Common Sense Party

5  (through the La Jolla Group) to place a registration form in the hands of a voter, to collect

6  that form after the voter filled it out in the presence of the signature-gatherer, and to

7  submit the form directly to the relevant County Registrar of Voters. Only in-person

8  solicitation offers these characteristics.

9      13.    Since the new party qualification registration requirements were set in law

10  before use of the internet, they must have been enacted with the concept of in-person

11  solicitation in mind. Yet Governor Newsom's Executive Order shut down in-person

12  solicitation.

13      14.    Only in-person registration can guarantee that a registration card would

14  actually be sent in to the County Registrar of Voters. Voters might or might not follow

15  through on a promise to re-register on-line; the Common Sense Party may not submit

16  such an application to re-register on behalf of a voter. Filling out a registration card in

17  person, by contrast, produces the very document that triggers re-registration, and is

18  submitted by the Common Sense Party (through the La Jolla Group) directly to the

19  various County Registrars of Voters.

20      15.    The voter registration requirements for new parties seeking ballot

21  qualification, as applied along with the Executive Order banning in-person solicitation,

22  will prevent the Common Sense Party from participating in the November 2020 election

23  as an officially recognized party in California.

24      16.    Among the rights the Common Sense Party would enjoy as an officially

25  recognized party in California, but could not otherwise, is the ability to contribute without

26  limit to a candidate for the State Legislature. One hundred California State Legislative

27  races will be decided this November. If the Common Sense Party is not recognized as an

28  official party, it can only contribute to a candidate for the Legislature by forming a

DECLARATION OF TOM CAMPBELL      4

1 political action committee ("PAC"), which carries a maximum of $7,800 on how much

2 may be contributed to a candidate for the Legislature.

3     17.    Among the rights the Common Sense Party would enjoy as an officially

4 recognized party in California, but could not otherwise, is to raise funds from individuals

5 for a "political party account for state candidates." Individuals may contribute up to

6 $38,800 to such an account, and the Common Sense Party would be permitted to use all

7 that sum from any one individual (plus funds from other individuals) to contribute

8 directly to a candidate. If the Common Sense Party were not an officially recognized

9 party, it could not solicit funds for such a "political party account for state candidates,"

10 and an individual donor would be restricted to giving no more than $4700 to a candidate

11 for the Legislature.

12     18.    The Common Sense Party intends to raise money and direct it to candidates

13 for the Legislature in the November, 2020, election, even though recipients may not be

14 members of the Common Sense Party. We intend specifically to support those candidates

15 for the Legislature who have shown an independent spirit, even if the recipient candidate

16 is a member of one of the two major parties.  If the Common Sense Party is not permitted

17 to become an officially recognized political party, its ability to engage in this protected

18 political activity will be restricted; and its ability to compete with the officially

19 recognized parties on an equal opportunity basis will be denied.

20     19.    In addition, the Common Sense Party intends to speak out on the various

21 initiatives on the ballot this November. It may choose to endorse one of the candidates

22 who have qualified for the November ballot, including candidates for President and Vice

23 President. The Common Sense Party's ability to have an impact with such endorsements

24 will be greatly enhanced by our status as an officially recognized party and greatly

25 diminished if we are not an officially recognized party.

26     20.    The Common Sense Party has the right to submit candidates for President

27

28

and Vice President on the November ballot, under California Elections Code 5005(b), once having been recognized as an official political party under Elections Code section 5151. The Common Sense Party may wish to exercise that right.

21. The aforementioned voter registration requirements, as applied in the context of what Governor Newsom's Executive Order has done to shut down in-person solicitation, will cause irreparable harm to the Common Sense Party itself, to registered voters of the party, and to the California electorate more broadly. If no relief is granted, the Common Sense Party, through no lack

3   of its own diligence, will be deprived of its right to participate

4   meaningfully in the November 2020 election, as it will not be able

5   to participate in the manner made available by California law to

6   political parties that have been officially recognized.

7      I declare under penalty of perjury under the laws of the United

8      States of America that the foregoing is true and correct.

9

10   Executed on June 4, 2020 at Temecula, California.

11

12   _Tom Campbell_

13

14   TOM CAMPBELL

DECLARATION OF TOM CAMPBELL; EXHIBIT 1

## Principles of the Common Sense Party

California inspires risk takers, visionaries, and entrepreneurs.

Our state used to take pride in our infrastructure, education, environmental preservation, health, and safety. For decades, these investments enabled mobility up the economic and social ladder for individuals and rapid growth for the State.

But an increasingly partisan environment has created bad public policy, stifling innovation, slowing infrastructure investment, jeopardizing public welfare, and compromising California's status as a leader in the world.

We resolve to elevate the interests of Californians above partisan politics so we can renew California's full promise.

## Challenges

California no longer offers equality of opportunity for individuals, especially those in the middle and working classes. That's because our "solutions" have been driven by political talking points, not sustainable policy.

- Housing supply is insufficient and prohibitively expensive.

- Water and transportation infrastructures are aging and inadequate.

- We are not good stewards of our environment, failing to protect and enhance it locally and globally.

- Public places, universities, state parks, and state agencies serving the public have not kept been adequately maintained or improved.

- Public K-12 education fails to provide adequate 21st century skills to too many, especially at schools in lower-income neighborhoods.

- Higher-education costs and student debt climb relentlessly.

- Millions of Californians lack access to basic healthcare.

- The complex regulatory environment and high state taxes discourage investment and entrepreneurship.

- Unfunded obligations for public pensions and overuse of general obligation bond financing burdens future generations with massive debt.

- The sum total of these problems has resulted in a flight from California of businesses and those taxpayers capable of moving, while the middle class, unable to move out of state, are squeezed by higher costs of living.

## **Mission**

We pledge to promote candidates for local and state offices at all levels who embrace these principles and who are strong in their commitment to fight for them. We will support qualified "common sense" candidates who are No Party Preference, and who are from the Democratic, Republican and Common Sense Parties.

## DECLARATION OF CHAD PEACE

I, Chad Peace, make this Declaration, pursuant to 28 U.S.C. 1746, in support of the Memorandum of Points and Authorities in support of the motion for a temporary restraining order and/or preliminary injunction filed by THE COMMON SENSE PARTY et. al. ("Plaintiffs"), based on my own personal knowledge, and, if called upon to testify hereto, I could and would competently do so:

1.      My name is Chad Peace and I am the President of IVC Media LLC, which is a consulting firm engaged in, among other enterprises, advising organizations on media strategies for public policy.

2.      Since September of 2019, IVC Media LLC has been engaged by the founders of the Common Sense Party, which is a political organization seeking to become an officially recognized political party in California.

3.      In September of 2019, IVC Media LLC conducted a pilot program to test various strategies to obtain the voter registrations required under California law for a new political party to be officially recognized. We tested email and social media outreach and compared the cost-effectiveness of those methods against traditional, in-person registration gathering.

4.      For in-person voter registration drives, the Common Sense Party has relied on the services of traditional signature-gathering firms. The signature-gathering firms actually interact directly with voters, take possession of the completed registration cards, validate the registration cards, and send them to the Registrar of Voters' office or Secretary of State's office.

5.      By contrast, electronic registration methods can not track and validate who actually registers for the Common Sense Party, because the registration process must be completed by the voter him or herself through the California Secretary of State's website. The Common Sense Party can only ascertain whether a voter visited or left the Common Sense Party website.

6.      As a result, there is no way to compensate signature-gathering or social-media-outreach firms on the basis of the number of registrations which the firm obtains,

1   whereas this is the way signature-gathering firms are compensated for obtaining physical,

2   filled-out registration cards.

3          7.     The cost of obtaining valid voter registrants to the Common Sense Party in-

4   person during the pilot program was approximately $10 per valid voter registrations.

5          8.     We assisted the Common Sense Party in working with a signature-gathering

6   firm, the La Jolla Consulting Group, after the pilot period as well.  Compensation for

7   voter registrants to the Common Sense Party gathered varied from $3 to $7 over that

8   subsequent period, plus administrative, validation, and other overhead costs.

9          9.     The cost to contact a *potential* registrant to the Common Sense Party

10  website and direct them to the California Secretary of State website, ascertained through

11  testing various target audiences and messaging strategies, ranged from approximately $20

12  to over $100 per registrant, depending on the target audience and method of acquisition.

13  The cost per actual registrant with the Secretary of State, however, was necessarily higher

14  than that because not every person who visits the Common Sense Party website can be

15  expected to have actually completed the full registration process with the Secretary of

16  State.

17         10.    For this reason, we advised the Common Sense Party that the only way to

18  attempt to qualify as a state-recognized political party by the July 3, 2020 deadline for

19  political parties to appear on the November 3, 2020 Presidential ballot in California

20  would be to proceed exclusively with an in-person registration effort.

21

22         I declare under penalty of perjury under the laws of the State of California that the

23  foregoing is true and correct.

24         Executed on May 27 , 2020 at San Diego                         , California.

25

26                                                   _____

27                                                   CHAD PEACE

28

DECLARATION OF CHAD PEACE                    2

### DECLARATION OF BOBBY G. GLASER

I, BOBBY G. GLASER, make this Declaration, pursuant to 28 U.S.C. 1746, in support of the Memorandum of Points and Authorities in support of the motion for a temporary restraining order and/or preliminary injunction, filed by THE COMMON SENSE PARTY et. al. ("Plaintiffs"), based on my own personal knowledge, and, if called upon to testify hereto, I could and would competently do so:

1.    My name is Bobby G. Glaser and my work address is 8304 Clairemont Mesa Blvd., Suite 213, San Diego, California, 92111-1315.

2.    I am the President and owner of La Jolla Group Consulting, Inc. (The La Jolla Group) located at the above address, which has been in business for over 37 years. I have been the owner of The La Jolla Group since its inception in July of 1983.

3.    The La Jolla Group is a corporation engaged in a variety of business activities relating to California state and local elections. One primary activity is the gathering of signatures from citizens on various types of political petitions, including registering citizens to vote, in California and several other states across the nation.

4.    Over the past 37 years, The La Jolla Group has been paid to register over 200,000 citizens as new voters. These registrations have been from individuals in many political parties.

5.    The La Jolla Group has, in the past, had direct contracts with the Republican, Democratic and Reform political parties.

6.    In my experience, it is very common for new political parties to retain the services of a professional signature gathering firm in order to qualify the party for the ballot. In fact, based on my experience and expertise, given the high threshold for registrations or signatures needed to qualify a political party for the ballot in California, it would be difficult if not impossible to qualify a political party for the California ballot without using a professional signature gathering firm such as The La Jolla Group.

7.    In 1992, The La Jolla Group was contracted to qualify the Reform Party in several states. The La Jolla Group qualified the Reform Party in North Carolina, New

DECLARATION OF BOBBY G. GLASER                    1

1 York, Michigan and Washington D.C., and assisted in its qualification in California.

2       8.    In order to qualify a new political party for an upcoming ballot, we

3 approach citizens to ask them to consider registering, or re-registering, in the new party.

4 The method of contact requires working in front of retail stores, where large numbers of

5 citizens congregate while entering and leaving the premises. Moreover, it is essential that

6 a person-to-person conversation about registering, and the details of the new party, be

7 conducted in close proximity to one another.

8       9.    Based on my experience and expertise in obtaining registrations and

9 signatures for ballot propositions, I am able to compare the efficacy of various methods of

10 obtaining registrations and signatures. In obtaining registrations, it is essential to provide

11 the individual with an actual voter registration form, and then for The La Jolla Group to

12 collect the completed registration card and forward it to the appropriate County Registrar

13 of Voters' office. That way, the process can be completed in one step. Any other method

14 requires the individual to go to a website and download a registration form or to complete

15 an electronic registration form; in this case, the party-in-formation does not know whether

16 the voter has decided to register or re-register with the new party, which means that these

17 other methods are vastly less effective.

18      10.    Since Labor Day weekend 2019, The La Jolla Group has been engaged by

19 the Common Sense Party, a political party-in-formation, to offer advice and to collect

20 voter registrations of California citizens in order to qualify the Common Sense Party as an

21 official party in California for the 2020 election.

22      11.    As of March 8, 2020, the effort had collected 19,038 registrations for the

23 Common Sense Party, which The La Jolla Group has validated and submitted to the

24 appropriate Registrar of Voters. The Registrars of Voters then reports these filings to the

25 Secretary of State.

26      12.    The price charged by The La Jolla Group to the Common Sense Party for

27 these registrations varied over the collection period from a low of $3 to a high of $10 per

28 registration. The price varied based on the availability of professional circulators and the

DECLARATION OF BOBBY G. GLASER       2

1  amount that such circulators were being paid by other petitions being circulated at the

2  same time.

3       13.  Based on my experience and expertise, had The La Jolla Group been able to

4  continue its efforts to secure voter registrations on behalf of the Common Sense Party at a

5  similar pace to its efforts up until March 8th, 2020, I am certain that the Common Sense

6  Party would have been able to obtain more than 68,180 new voter registrations by July 3,

7  2020.

8       14.  On or about March 8, 2020, the La Jolla Group suspended its in-person

9  registration and signature gathering operations for the safety and protection of both the

10  circulators and the citizens of California because of the COVID-19 pandemic.  The need

11  to have person-to-person conversations in close proximity in order to obtain voter

12  registrations made continuing these efforts unsafe and impossible.

13       15.  On or about March 19, 2020, Governor Newsom issued an Executive Order

14  requiring "social distancing" in California.  This Executive Order will prevent resumption

15  of in-person voter registration efforts until the last phase of re-opening has been reached.

16  The La Jolla Group does not believe that date will arrive prior to July 3, 2020.

17       16.  Even when retail stores eventually re-open, it will be very difficult to

18  convince citizens to stop and talk to circulators face-to-face, and it will be difficult to

19  convince citizens to touch, complete and sign a voter registration card provided by The La

20  Jolla Group.  It will be a challenge given the continued fear of COVID-19, the use of

21  facial masks and coverings, and the social distancing requirements.  Most citizens will

22  want to move quickly in and out of retail locations.  I believe it will be many months, if

23  not a year, before citizens are comfortable stopping and having a conversation with a

24  circulator in front of a retail location.

25       17.  It will also be difficult for The La Jolla Group to recruit circulators for the

26  foreseeable future.  Based on my experience and expertise, circulators will not work on

27  voter registration or ballot proposition petition drives unless they feel confident that they

28  can earn a certain amount of money.

DECLARATION OF BOBBY G. GLASER       3

18.     Based on my experience and expertise, even if the Common Sense Party were allowed to restart person-to-person collection of new registrations immediately, it would be virtually impossible, if not impossible, to collect the required number of new voter registrations by the July 3, 2020 deadline.

19.     For all practical purposes, obtaining in-person voter registrations will not be possible until after the July 3, 2020 deadline for a new political party seeking to qualify for the November 2020 Presidential ballot to have obtained the requisite number of registrations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 4th, 2020 at _San Diego_, California.

BOBBY G. GLASER

DECLARATION OF BOBBY G. GLASER                    4

## DECLARATION OF JAMES R. SUTTON

I, JAMES R. SUTTON, make this Declaration in support of the motion for temporary restraining order and/or preliminary injunction filed by THE COMMON SENSE PARTY et. al. ("Plaintiffs"), based on my own personal knowledge, and, if called upon to testify hereto, I could and would competently do so:

1.     I am an attorney admitted to practice law in the State of California, am the Managing Partner of the Sutton Law Firm, and am the lead counsel for Plaintiffs in this action.

2.     Attached hereto as Exhibit 1, and incorporated herein by this reference, is a true and correct copy of California Governor Gavin Newsom's Executive Order No. N-33-20, which mandated that California citizens shelter in place until further notice.  I obtained a copy of this executive order from https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf on June 4, 2020.

3.     Attached hereto as Exhibit 2, and incorporated herein by this reference, is a true and correct copy of the court order in Libertarian Party of Illinois v. Pritzker, No. 20-CV-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020), lowering signature requirements for new political party qualification in the State of Illinois by 90 percent, extending the signature gathering deadline, and permitting the submission of electronic copies of petitions in recognition of the unique circumstances caused by COVID-19.  I obtained a copy of this court order from https://cases.justia.com/federal/district-courts/illinois/ilndce/1:2020cv02112/375021/26/0.pdf?ts=1587720110 on June 4, 2020.

4.     Attached hereto as Exhibit 3, and incorporated herein by this reference, is a true and correct copy of the court order in Esshaki v. Whitmer, No. 2:20-CV-10831-TGB, 2020 WL 1910154 (E.D. Mich. Apr. 20, 2020), modifying election laws and signature gathering requirements in the State of Michigan in light of current circumstances caused by COVID-19.   I obtained a copy of this court order from

1  https://www.michigan.gov/documents/sos/23_order_granting_PI_687756_7.pdf on June

2  4, 2020.

3         5.      Attached hereto as Exhibit 4, and incorporated herein by this reference, is a

4  true and correct copy of the court order in <u>Goldstein v. Sec'y of Commonwealth</u>, No.

5  SJC-12931, 2020 WL 1903931 (Mass. Apr. 17, 2020), reducing ballot access signature

6  requirements for the upcoming primary election in the State of Massachusetts due to

7  COVID-19.  I obtained a copy of this court order from

8  https://cases.justia.com/massachusetts/supreme-court/2020-sjc-12931.pdf?ts=1587384161

9  on June 4, 2020.

10         6.      Attached hereto as Exhibit 5, and incorporated herein by this reference, is a

11  true and correct copy of "Political Party Qualification Process, Requirements and

12  History" published by the California Secretary of State's office.  I obtained a copy of this

13  document from

14  <u>https://www.sos.ca.gov/elections/prior-elections/statewide-election-results/statewide-</u>

15  <u>direct-primary-election-june-3-2014/2014-california-election-calendar/section-8-political-</u>

16  <u>party/</u> on June 4, 2020.

17         7.      Attached hereto as Exhibit 6, and incorporated herein by this reference, is a

18  true and correct copy of "Calfiornia State Contriobution Limits" published by the

19  California Fair Political Practices Commission.  I obtained a copy of this document from

20  http://www.fppc.ca.gov/content/dam/fppc/NS-Documents/TAD/Campaign%20Document

21  s/StateContributionVolunExpenditureLimites/007-Jan-2019%20State%20Contribution%2

22  0Limits%20Chart%202.pdf on June 4, 2020.

23         8.      On June 4th, 2020, at approximately 2pm, I called Steve Reyes, legal

24  counsel in the Secretary of State's office, and informed him of our intention to file a

25  motion for temporary restraining order and/or preliminary injunction.  I told him that

26  Plaintiffs were seeking to have the enforcement of California Elections Code section

27  5151(c) enjoined, as applied, given the current circumstances caused by COVID-19.  Mr.

28  Reyes indicated that the Secretary of State's office would oppose the motion and would

DECLARATION OF JAMES R. SUTTON                          2

1  not stipulate to a temporary restraining order.

2

3      I declare under penalty of perjury under the laws of the United States of America

4  that the foregoing is true and correct.

5      Executed on June ___, 2020 at _____, California.

6

7

8                                      JAMES R. SUTTON

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JAMES R. SUTTON            3

DECLARATION OF JAMES R. SUTTON; EXHIBIT 1

### EXECUTIVE DEPARTMENT
### STATE OF CALIFORNIA

#### EXECUTIVE ORDER N-33-20

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** in a short period of time, COVID-19 has rapidly spread throughout California, necessitating updated and more stringent guidance from federal, state, and local public health officials; and

**WHEREAS** for the preservation of public health and safety throughout the entire State of California, I find it necessary for all Californians to heed the State public health directives from the Department of Public Health.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567, 8627, and 8665 do hereby issue the following Order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1) To preserve the public health and safety, and to ensure the healthcare delivery system is capable of serving all, and prioritizing those at the highest risk and vulnerability, all residents are directed to immediately heed the current State public health directives, which I ordered the Department of Public Health to develop for the current statewide status of COVID-19. Those directives are consistent with the March 19, 2020, Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, found at: https://covid19.ca.gov/. Those directives follow:

ORDER OF THE STATE PUBLIC HEALTH OFFICER
March 19, 2020

To protect public health, I as State Public Health Officer and Director of the California Department of Public Health order all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors, as outlined at https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19. In addition, and in consultation with the Director of the Governor's Office of Emergency Services, I may designate additional sectors as critical in order to protect the health and well-being of all Californians.

Pursuant to the authority under the Health and Safety Code 120125, 120140, 131080, 120130(c), 120135, 120145, 120175 and 120150, this order is to go into effect immediately and shall stay in effect until further notice.

The federal government has identified 16 critical infrastructure sectors whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or

destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof. I order that Californians working in these 16 critical infrastructure sectors may continue their work because of the importance of these sectors to Californians' health and well-being.

This Order is being issued to protect the public health of Californians. The California Department of Public Health looks to establish consistency across the state in order to ensure that we mitigate the impact of COVID-19. Our goal is simple, we want to bend the curve, and disrupt the spread of the virus.

The supply chain must continue, and Californians must have access to such necessities as food, prescriptions, and health care. When people need to leave their homes or places of residence, whether to obtain or perform the functions above, or to otherwise facilitate authorized necessary activities, they should at all times practice social distancing.

2) The healthcare delivery system shall prioritize services to serving those who are the sickest and shall prioritize resources, including personal protective equipment, for the providers providing direct care to them.

3) The Office of Emergency Services is directed to take necessary steps to ensure compliance with this Order.

4) This Order shall be enforceable pursuant to California law, including, but not limited to, Government Code section 8665.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 19th day of March 2020.

GAVIN NEWSOM
Governor of California

ATTEST:

ALEX PADILLA
Secretary of State

DECLARATION OF JAMES R. SUTTON; EXHIBIT 2

Case 2:20-cv-01091-MCE-JDP   Document 5   Filed 06/04/20   Page 44 of 142   Doc. 26
Libertarian Party of Illinois et al v. Pritzker et al
Case: 1:20-cv-02112 Document #: 26 Filed: 04/23/20 Page 1 of 10 PageID #:389

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LIBERTARIAN PARTY OF ILLINOIS, et al., | ) | Case No.  20-cv-2112 |
| | ) | |
| Plaintiffs, | ) | Hon. Charles R. Norgle, Sr., Presiding Judge |
| | ) | |
| and KYLE KOPITKE, | ) | |
| | ) | |
| Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| J.B. PRITZKER, et al., | ) | |
| | ) | Hon. Rebecca R. Pallmeyer, Emergency Judge |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs are the Libertarian Party of Illinois; the Illinois Green Party; and several Illinois registered voters who wish to vote for those parties' candidates in the November 2020 election, to run for state or federal office in the November 2020 election on behalf of those parties or as independents, and/or to gather signatures to ensure that their candidates of choice appear on the ballot for the November 2020 election.[1] On April 2, 2020, Plaintiffs filed this lawsuit against Illinois Governor J.B. Pritzker and others, seeking to enjoin or modify "Illinois' in-person signature collection and witnessing requirements for independent and third-party candidates in Illinois seeking to qualify for the November 3, 2020 election," in light of the "public health emergency

---

[1]     The registered-voter Plaintiffs are David F. Black, whom the Illinois Green Party has nominated as its candidate for United States Senate; Sheldon Schafer, who is a Co-Chair of the Illinois Green Party and has full authority to act for and on behalf of it in this lawsuit; Richard Whitney, who is likewise a Co-Chair of the Illinois Green Party and has full authority to act for and on behalf of it in this lawsuit; Bennett W. Morris, who is the Chair of the Libertarian Party of Illinois and has full authority to act for and on behalf of it in this lawsuit, and whom the Libertarian Party of Illinois has nominated as its candidate for the United States House of Representatives, District 5; William Redpath, whom the Libertarian Party of Illinois has nominated as its candidate for the United States House of Representatives, District 6; Marcus Throneburg, who is an independent candidate seeking election to the Illinois State Senate, District 37; and David Gill, who is an independent candidate seeking election to the United States House of Representatives in Illinois' District 18.

caused by the novel coronavirus [COVID-19] and the Governor's emergency orders effectively shutting down the State." (Compl. [2] ¶ 1; *see also* Am. Compl. [17] ¶ 1.) The matter was assigned to the Honorable Charles R. Norgle, but because Plaintiffs have requested emergency relief, it is before this court for this motion only. On April 17, 2020, the court granted Kyle K. Kopitke's motion for leave to intervene.[2] After a round of briefing and several hearings, the court is entering a preliminary injunction order, granting Plaintiffs' motion in part and accepting Defendants' proposed alternative resolution in part.

## BACKGROUND

"Illinois classifies general-election candidates into three groups: those affiliated with an 'established' political party, those affiliated with a 'new' political party, and those running as independents." *Libertarian Party of Illinois v. Scholz*, 872 F.3d 518, 521 (7th Cir. 2017). An "established" political party is one whose candidates have received a certain threshold of votes in recent elections. *See* 10 ILCS 5/10-2. Established political parties face lower requirements for getting their candidates to appear on the ballot—especially when it comes to the collection of voter signatures. (*See, e.g.,* State of Illinois 2020 Candidates Guide, Ex. B to Defs.' Resp. to Emergency Mot., [16-2] at 25–27 (noting new party and independent candidates for state senator require substantially fewer signatures than established party candidates).) To appear on the ballot for statewide office, new party and independent candidates must collect signatures from the lesser of 25,000 voters or 1 percent of the votes cast in the most recent statewide election. 10 ILCS 5/10-2. And to appear on the ballot for a political subdivision within the state, like a legislative district, the number of signatures required is 5 percent of the voters who voted for the last election for that office. *Id.* For example, a new party candidate for the U.S. Senate would need 25,000 signatures, while a Democrat or Republican would need only 5,000 to 10,000. (State

---

[2]    Kopitke is a "native of Illinois and a current Michigan resident" who wishes to run as an independent for United States President in the 2020 election. (Emergency Am. Mot. to Intervene [7] ¶ 6.)

2

of Illinois 2020 Candidates Guide [16-2] at 22.)  State law regulates how these signatures must be collected, as well.  Specifically, all signatures have to be "wet" signatures (*i.e.*, physical signatures as opposed to electronic signatures), signed by a voter in person, and notarized. *See* 10 ILCS 5/10-4.

These signature requirements present an obvious obstacle for candidates like Plaintiffs Libertarian Party of Illinois and Illinois Green Party as well as for independent candidates like Intervenor Kyle Kopitke, but the regulatory scheme has been repeatedly upheld by federal courts. *See Libertarian Party of Illinois v. Rednour*, 108 F.3d 768, 774 (7th Cir. 1997) ("The Supreme Court has long permitted states to impose various restrictions limiting a candidate's access to the ballot."); *Nader v. Keith*, No. 04 C 4913, 2004 WL 1880011, at *6–8 (N.D. Ill. Aug. 23, 2004), *aff'd*, 385 F.3d 729 (7th Cir. 2004) (denying challenge to Illinois' petition and signature requirements). Courts have reasoned that while these laws potentially impose some burden on candidates' speech and association rights, the state has an "important interest of ensuring that a political party that is new in a particular political subdivision demonstrates a modicum of public support before it can place its candidates on an election ballot." *Libertarian Party*, 108 F.3d at 775.  And the in-person signature and notarization requirements have been upheld as well because such rules have been determined to serve the "legitimate need" of rooting out fraud. *See Tripp v. Smart*, No. 14-CV-0890-MJR-PMF, 2016 WL 4379876, at *7 (S.D. Ill. Aug. 17, 2016) (noting that Illinois has a history of "roundtabling" and "other types of circulator fraud"), *aff'd sub nom. Tripp v. Scholz*, 872 F.3d 857 (7th Cir. 2017).

However challenging it may be in general to satisfy the statutory signature and notarization requirement, Plaintiffs and Intervenor argue that under current circumstances, those requirements impose a burden that effectively violates their rights.  Illinois today confronts a public health emergency resulting from the spread of the novel coronavirus, COVID-19.  Beginning in mid-March, the Governor of Illinois, J.B. Pritzker, issued a series of executive orders limiting public gathering and culminating in a shelter-at-home order on March 20, which requires all individuals

3

to stay at home except for persons engaged in certain "essential" activities. (Am. Compl. [17] ¶¶ 48–53.) Most public establishments have been closed, and public events have been cancelled as well. Practically all public gatherings of any size have been banned. (*Id.* ¶ 53 (citing COVID-19 Executive Order No. 8).) The stay-at-home order will remain in place until at least April 30, but, as Plaintiffs note, there is great uncertainty about how long it might remain in place. (*Id.* ¶ 57–58.) The court takes notice that a further extension of many restrictions on personal contacts is all but certain. *See* http://www.chicagotribune.com/coronavirus/ct-coronavirus-illinois-stay-at-home-extension-20200423-cqp6wzjj5nq7rgrfpq64ijgoua-story.html (last visited April 23, 2020).

Despite this disruption and rapid spread of a contagious and dangerous respiratory illness, new party and independent candidates like Plaintiffs and Intervenor are, under current law, still required to obtain thousands of wet signatures and to file their completed petitions by June 22, 2020—when the state *could* still be subject to a stay-at-home order. *See* 10 ILCS 5/10-4. In essence, they must choose between complying with the governor's emergency orders intended to prevent the spread of the coronavirus or engaging in the outreach needed to receive signatures to appear on the ballot. They have therefore brought this challenge to enjoin the state from enforcing certain of these requirements in light of COVID-19.

## DISCUSSION

Plaintiffs allege that under the extraordinary circumstances unleashed by the COVID-19 pandemic, the signature requirements at issue violate their First Amendment rights, as well as their rights under the Equal Protection Clause of the Fourteenth Amendment. Although there is no fundamental right to seek elected office, the Supreme Court has recognized that ballot access laws like the ones at issue here "place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968); *see also, e.g., Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986) (similar); *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983) (stating that

4

the "primary concern" with ballot access restrictions is their "tendency . . . 'to limit the field of candidates from which voters might choose'" (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)). "Both of these rights . . . rank among our most precious freedoms." *Rhodes*, 393 U.S. at 30. They are "not absolute," however. *Munro*, 479 U.S. at 193. States have an important interest in regulating elections, including an interest in "avoiding confusion, deception, and even frustration of the democratic process at the general election." *Id.* at 194 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)); *see also Navarro v. Neal*, 716 F.3d 425, 431 (7th Cir. 2013) (recognizing that "ballot access laws serve the important, interrelated goals of preventing voter confusion, blocking frivolous candidates from the ballot, and otherwise protecting the integrity of elections"). Thus, as referenced above, it is well-settled that States may require candidates to make "some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot." *Jenness*, 403 U.S. at 442; *see also, e.g., Munro*, 479 U.S. at 193–4; *Libertarian Party*, 108 F.3d at 775.

In determining whether a ballot access restriction survives constitutional scrutiny, courts apply the framework articulated in *Anderson*, 460 U.S. 780, and *Burdick v. Takushi*, 504 U.S. 428 (1992). The *Anderson-Burdick* framework directs courts to "make a practical assessment of the challenged scheme's justifications and effects." *Stone v. Bd. of Election Comm'rs for City of Chicago*, 750 F.3d 678, 681 (7th Cir. 2014). First, a court must "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789. Then, a court "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* A court "must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* The Seventh Circuit has stated that, "[p]ractically speaking, much of the action takes place at the first stage of [this] balancing inquiry." *Stone*, 750 F.3d at 681. "If the burden on the plaintiffs' constitutional rights is 'severe,' a state's regulation must be narrowly

drawn to advance a compelling state interest." *Id.* (quoting *Burdick*, 504 U.S. at 434). By contrast, "[i]f the burden is merely 'reasonable' and 'nondiscriminatory' . . . the government's legitimate regulatory interests will carry the day." *Stone*, 750 F.3d at 681 (quoting *Burdick*, 504 U.S. at 434); *see also Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006) ("Ballot access restrictions are evaluated under a flexible standard that weighs the 'character and magnitude of the asserted injury to the [protected rights] that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State . . . .'" (internal quotation marks omitted) (quoting *Burdick*, 504 U.S. at 434)).

The Seventh Circuit has "warned . . . against federal judicial micromanagement of state regulation of elections." *Stevo v. Keith*, 546 F.3d 405, 409 (7th Cir. 2008) (citing *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 954 (7th Cir. 2007)). But it has also made clear that a district court has broad equitable authority to fashion appropriate relief when an election procedure violates the Constitution:

> [T]he district court has the power to order the state to take steps to bring its election procedures into compliance with rights guaranteed by the federal Constitution, even if the order requires the state to disregard provisions of state law that otherwise might ordinarily apply to cause delay or prevent action entirely. . . . To the extent that Illinois law makes compliance with a provision of the federal Constitution difficult or impossible, it is Illinois law that must yield.

*Judge v. Quinn*, 624 F.3d 352, 355–56 (7th Cir. 2010) (quoting *Judge v. Quinn*, 387 F. App'x 629, 630 (7th Cir. 2010)). Defendants emphasize that the Seventh Circuit, on several occasions, has determined that minimum signature requirements for ballot access under the Illinois Election Code are constitutional. *See, e.g.*, *Tripp*, 872 F.3d at 859, 871–72 (law mandating "new" political party candidates for state representative to meet a 5% signature requirement, collect the signatures in a 90-day timeframe, and have each signature notarized, did not violate the First or Fourteenth Amendments); *Nader*, 385 F.3d at 731 (law requiring independent candidate to, among other things, "obtain nominating petitions signed by at least 25,000 qualified voters" and submit the petitions to the state board of elections "at least 134 days before the election" did not violate the First or Fourteenth Amendments); Defs.' Resp. to Emergency Mot. [15] at 2 (citing same).

As the court has noted, however, this lawsuit does not challenge the constitutionality of the ballot access restrictions in a vacuum. Rather, Plaintiffs have requested emergency injunctive relief on the ground that the extraordinary circumstances arising from COVID-19, combined with the ballot access restrictions, violate their First and Fourteenth Amendment rights. If the court were to side with Plaintiffs on that score, it would have the power to enjoin the unconstitutional restrictions and order appropriate relief. *See, e.g., Judge*, 624 F.3d at 355–56; *Jones v. McGuffage*, 921 F. Supp. 2d 888, 892, 902 (N.D. Ill. 2013) (enjoining the State of Illinois from requiring "new" party and independent candidates to submit more than 3,444 valid signatures in order to be included on a special congressional election ballot, where the compliance period was only 62 days; there had been no "lead-up time in which to organize a signature drive"; and the plaintiffs faced additional obstacles, including inclement weather); *Esshaki v. Whitmer*, No. 2:20-CV-10831-TGB, 2020 WL 1910154, at *2, *12 (E.D. Mich. Apr. 20, 2020) (recognizing signature-gathering challenges arising from the COVID-19 pandemic and the State of Michigan's stay-at-home directive, ordering that certain candidates "[s]hall be qualified for inclusion on the August 4, 2020 primary election ballot if the candidate submits fifty percent of the number of valid signatures required by" a Michigan election law, and ordering Michigan's Director of Elections to "adopt and promulgate" appropriate "regulations providing for an additional optional procedure that allows the collection and submission of ballot petition signatures in digital form by electronic means such as email").

The combined effect of the restrictions on public gatherings imposed by Illinois' stay-at-home order and the usual in-person signature requirements in the Illinois Election Code is a nearly insurmountable hurdle for new party and independent candidates attempting to have their names placed on the general election ballot. *See* Ill. Exec. Order No. 2020-10 (Mar. 20, 2020); 10 ILCS 5/10-4. The problem is exacerbated by the circumstance by the fact that the "window" for gathering such signatures opened at nearly the same time that Governor Pritzker first imposed restrictions. The court need not devote significant additional attention to the constitutional

7

questions presented because, after a round of briefing and several hearings and in response to the court's direction at oral argument, the parties have proposed an order that grants appropriate relief in these unprecedented circumstances. Notably, from the outset of these proceedings, even Defendants have acknowledged that the ballot access restrictions must be relaxed, in some shape or form, to account for the havoc that COVID-19 has wreaked. (*See* Defs.' Resp. to Emergency Mot. at 2 (recognizing "the need for some accommodations" under the circumstances).) The court is satisfied that the parties' agreed order will ameliorate Plaintiffs' difficulty meeting the statutory signature requirement due to the COVID-19 restrictions—thereby addressing the constitutional questions raised by Plaintiffs' motion (*see* Pls.' Emergency Mot. [2] at 11–12)—while accommodating the State's legitimate interest in ensuring that only parties with a measurable modicum of public support will gain access to the 2020 general election ballot. *See Jenness*, 403 U.S. at 442.

There is little judicial guidance regarding how to measure whether a new party or independent candidate has demonstrated a modicum of public support sufficient to warrant ballot access. Instead of relying on standards such as the reputation or media coverage of individual candidates, *see, e.g., McCarthy v. Briscoe*, 429 U.S. 1317, 1323 (1976) (Powell, J., in chambers), Illinois, like other states, measures support through signature-gathering. Even under normal conditions, the ultimate number of signatures a candidate must gather will vary widely because the signature requirement is, with some exceptions, based on voter turnout in the previous election. *See Jones*, 921 F. Supp. 2d at 899. Suspending entirely the signature requirement without requiring candidates to otherwise demonstrate historical support would, however, extend far beyond these typical variations. *See Munro*, 479 U.S. at 197 (noting that states need not provide automatic ballot access).

The parties' agreed order, permitting ballot access for previously-qualifying new party and independent candidates, and loosening the statutory signature requirements for other new party and independent candidates, establishes a measurable standard that the State can use to

8

determine which candidates are eligible to be placed on the ballot in the unique context of this election. The court notes that in order to respect social distancing guidelines implemented in response to the COVID-19 pandemic, numerous states have likewise reduced the number of signatures required for a candidate to be placed on the ballot. *See, e.g., Esshaki v. Whitmer*, No. 2:20-CV-10831-TGB, 2020 WL 1910154, at \*12 (E.D. Mich. Apr. 20, 2020) (reducing the statutory signature requirement by 50 percent); *Goldstein v. Sec'y of Commonwealth*, No. SJC-12931, 2020 WL 1903931, at \*9 (Mass. Apr. 17, 2020) (same); N.Y. Exec. Order No. 202.2 (Mar. 14, 2020) (reducing the statutory signature requirement to 30 percent of normal); H. 681, 2019–2020 Gen. Assemb., Adjourned Sess. (Vt. 2020) (suspending the statutory signature requirement entirely). Reducing the required number of signatures to 10 percent accommodates the fact that Plaintiffs have not been able to rely on their usual signature-gathering methods for the 2020 general election ballot because the window for collecting signatures in Illinois was slated to begin on March 24, 2020, after the stay-at-home order took effect. *Cf. Goldstein*, 2020 WL 1903931, at \*9.

Additionally, permitting candidates to submit physical or electronic copies of petitions accommodates the various practical barriers to collecting signatures at this time—due to the closure of most public places, Illinoisans may have limited access to the Internet or a printer, or may even be wary of opening mailed petitions. *See Esshaki*, 2020 WL 1910154, at \*5 (explaining that a mail-based signature campaign is expensive and ultimately ineffective). Other states have similarly permitted signature collection and petition submission in both electronic and physical formats. *See, e.g.,* Fla. Emergency R. 1SER20-2 (Apr. 2, 2020); N.J. Exec. Order Nos. 105, 120 (Mar. 19, 2020, Apr. 8, 2020); Utah Exec. Order No. 2020-8 (Mar. 26, 2020). The court recognizes that the state will be burdened by extending the signature-gathering deadline, but finds this hardship outweighed by the significant difficulties that would be experienced by campaigns trying to implement a new signature-gathering process while complying with even the modified statutory requirements in such a short amount of time. In particular, the court notes that even after some

restrictions are lifted, until a vaccine is available, voters are likely to continue practicing social distancing and avoiding any physical hand contact with other persons or objects.

In sum, the parties' agreed order balances the State's legitimate interests in "preventing voter confusion, blocking frivolous candidates from the ballot, and otherwise protecting the integrity of" the upcoming election, *Navarro*, 716 F.3d at 431, while accommodating the significant restrictions on new party and independent candidates' ability to collect signatures in light of the unprecedented limitations on public gatherings required to reduce the spread of COVID-19.

ENTER:

Dated: April 23, 2020

_____
REBECCA R. PALLMEYER
United States District Judge

10

DECLARATION OF JAMES R. SUTTON; EXHIBIT 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **ERIC ESSHAKI**, as candidate for United States Congress and in his individual capacity;<br>**MATT SAVICH**, as candidate for the Forty-Seventh District Court, Oakland County, Michigan and in his individual capacity;<br>**DEANA BEARD**, as candidate for the Third Circuit Court Judge, Regular Term, Non-Incumbent Position in Wayne County and in her individual capacity.<br><br>Plaintiffs,<br><br>vs.<br><br>**GRETCHEN WHITMER**, Governor of Michigan;<br>**JOCELYN BENSON**, Secretary of State of Michigan; and<br>**JONATHAN BRATER**, Director of the Michigan Bureau of Elections, in their official capacities,<br><br>Defendants. | **2:20-CV-10831-TGB**<br><br><br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |

In normal times, a candidate for United States Congress in Michigan's Eleventh Congressional District must collect one thousand signatures from registered voters in order to have his or her name appear

1

on the primary ballot. Candidates typically gather these signatures door-to-door, or in high-traffic public places like outside malls, grocery stores, crowded school or community events, public rallies, or places of worship. Under Michigan's statute, the signatures are due on the fifteenth Tuesday before the August 4th primary. This year, signatures are due on April 21, 2020.

Unfortunately, these are not normal times. On March 10, 2020, Michigan Governor Gretchen Whitmer declared a state of emergency based on the serious threat to public safety posed by the COVID-19 or "coronavirus" pandemic. In less than four months, since the first reported case of the disease on American soil in January,[1] this highly contagious novel virus has taken the lives of more than thirty-four thousand Americans, of whom more than two thousand were residents of the State of Michigan.[2] In addition to causing thousands of deaths, the pandemic has upended the daily routines of hundreds of millions as they

---

[1] Michelle L. Holshue, et al., *First Case of 2019 Novel Coronavirus in the United States*, 382 New Eng. J. Med. 929 (2020).

[2] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times (Apr. 19, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last accessed Apr. 19, 2020).

sheltered at home, causing one in four small businesses to close,[3] and 22 million Americans to lose their jobs.[4] Since March 23, 2020, pursuant to Executive Order 2020-21, the State of Michigan has been on lockdown: all nonessential in-person work has been prohibited, as have all public and private gatherings of persons not part of the same household. Malls are closed, schools and churches have moved to social media solutions such as Zoom, and any candidate trying to canvass door-to-door to attempt to gather signatures today would be committing a misdemeanor offense.

Yet, the State insists on enforcing the signature-gathering requirements as if its Stay-at-Home Order responding to the ongoing pandemic had no impact on the rights of candidates and the people who may wish to vote for them. The plaintiff[5] in this matter, Eric Esshaki, is running for United States Congress in Michigan's Eleventh

---

[3] *Special Report on Coronavirus and Small Business,* U.S. Chamber of Comm. & MetLife, Apr. 3, 2020.

[4] Heather Long, *U.S. now has 22 million unemployed, wiping out a decade of job gains,* Wash. Post (Apr. 16, 2020), https://www.washingtonpost.com/business/2020/04/16/unemployment-claims-coronavirus/?outputType=amp.

[5] Since oral argument on April 15, 2020, the Court has granted emergency motions to intervene from two additional plaintiffs, Mr. Savich and Ms. Beard. Both allege that their legal positions are substantively identical to Mr. Esshaki, but because of the emergency nature of these proceedings, Defendants have not yet had opportunity to respond to Mr. Savich's or Ms. Beard's allegations specifically. Accordingly, this Order focuses primarily on Mr. Esshaki's arguments, and refers to him as "Plaintiff".

Congressional District. He states that he has gathered more than seven hundred of the one thousand signatures he needs to get on the primary ballot. He contends that because of the Stay-at-Home Order, he was effectively prohibited from collecting the remaining three hundred signatures he needed in time to meet the April 21 deadline, and that consequently he will be barred from having his name appear on the primary ballot. Under these unique historical circumstances, as will be explained in detail below, the Court finds that the State's actions in the form of enforcing both the Stay-at-Home Order and the statutory ballot-access requirements, operate in tandem to impose a severe burden on Plaintiff's ability to seek elected office, in violation of his First and Fourteenth Amendment rights to freedom of speech, freedom of association, equal protection, and due process of the law. Consequently, the Motion for Preliminary Injunction will be granted.

## I.   BACKGROUND

Plaintiff Eric Esshaki is a registered nurse and practicing attorney running as a Republican candidate for United States Congress in Michigan's Eleventh Congressional District. Compl. ¶ 2, ECF No. 1, PageID.2. He filed his statement of candidacy with the Federal Election

Commission on October 31, 2019. *Id.* ¶ 18, PageID.5. He is required by statute to collect one thousand valid signatures from registered voters by April 21, 2020 to qualify to have his name placed on the August 4, 2020 primary ballot. Mich. Comp. Laws §§ 168.133, 168.544f (collectively "the signature requirement"). By March 23, 2020, Esshaki's campaign had already collected approximately seven hundred signatures. Compl. ¶ 22, ECF No. 1, PageID.6.

On March 10, 2020, Michigan's first two COVID-19 cases were announced and Governor Gretchen Whitmer declared a state of emergency. *See* Mich. Exec. Order 2020-4 (Mar. 10, 2020) ("State of Emergency Declaration"). The State of Emergency Declaration cautioned citizens that COVID-19 "is a respiratory disease that can result in serious illness or death . . . and can easily spread from person to person." *Id.* By March 23, 2020, the number of diagnosed coronavirus cases in Michigan had grown to more than nine hundred and thirteen[6] and the Governor signed Executive Order 2020-21 (the "Stay-at-Home Order"). The Stay-at-Home Order suspended in-person non-essential commercial activities and directed residents to "remain at home or in their place of residence

---

[6]   *Daily Counts*, Michigan.gov, https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173_99207---,00.html (last accessed Apr. 17, 2020).

to the maximum extent feasible." Mich. Exec. Order No. 2020-21 (Mar. 23, 2020). It also prohibited all "public and private gatherings of any number of people" not part of a single household and ordered that persons performing essential activities outside of their homes remain six feet apart. *Id.* The Stay-at-Home Order does not contain any exception for campaign workers. On April 9, 2020, the Governor signed a second executive order extending the Stay-at-Home Order through the end of April. *See* Mich. Exec. Order No. 2020-42 (Apr. 9, 2020). A violation of the Stay-at-Home Order is a misdemeanor criminal offense. *Id.*; Mich. Comp. Laws § 10.33.

Plaintiff and the numerous candidates who have expressed an interest in the outcome of this case[7] maintain that the Stay-at-Home Order has for all practical purposes denied them the opportunity to

---

[7] The Court has received a number of amicus curiae briefs and motions to intervene from other candidates who, like Plaintiff, say they have been unable to gather signatures because of the Stay-at-Home Order. They include: Mr. Daniel Finley, a judicial candidate for Michigan's Twenty-Second Circuit (ECF No. 13), Mr. Matt Savich, a judicial candidate for Michigan's Forty-Seventh District Court (ECF No. 11), Ms. Deana Beard, a judicial candidate for Michigan's Third Circuit Court (ECF No. 17), and Mr. Kyle Kopitke, an independent presidential candidate (ECF No. 18). In addition, the American Civil Liberties Union filed an amicus curiae brief in support of Plaintiff (ECF No. 15), and Ms. Whittney Williams, a competitor of Mr. Esshaki also seeking to run as the Republican candidate for United States Congress in Michigan's Eleventh Congressional District, filed an amicus curiae brief opposing relief for Plaintiff (ECF No. 21). The Court also received correspondence from Mr. Bob Carr, a Republican candidate for U.S. Senate, who provided a list of candidates that he appeared to be citing as similarly situated, but provided no evidentiary support for his claim. By separate order, the Court will grant these pending motions to intervene and file amicus briefs, with the exception of the motion of proposed Plaintiff Kopitke, because the relief he seeks differs significantly from that of the other candidates.

collect the signatures that they needed during the timeframe between March 23 and April 21. Mot. for Prelim. Inj., ECF No. 2, PageID.50. Plaintiff contends that the combination of the State's strict enforcement of statutory signature gathering requirements with the Governor's Stay-at-Home Order has placed a severe burden on his ability to run for elected office—in violation of the freedom of speech, freedom of association, equal protection, and due process rights guaranteed to him by the First and Fourteenth Amendments. Compl. ¶ 46, ECF No. 1, PageID.11. Plaintiff argues that the burden placed on him by the State's actions is unconstitutional because the State has neither a compelling interest in enforcing the signature requirement, nor has it narrowly tailored its ballot access requirements to effectuate any compelling interest it may have. ECF No. 2, PageID.55.

Defendants contend that enforcement of the signature requirement in light of the Governor's Stay-at-Home Order has only moderately burdened Plaintiff's ability to run for elective office. Defs. Resp., ECF No. 6, PageID.112. Defendants argue that Plaintiff entered the race relatively late, that he was not diligently collecting signatures before the Stay-at-Home Order was issued, that he should have "doubled down" on

his signature-collection efforts during the period between the March 10th State of Emergency Declaration and the March 23rd Stay-at-Home Order, that he could have collected signatures by mail, and that even if he fails to get on the ballot, he can always run as a write-in candidate. *Id.* at PageID.110-12.

Defendants assert that any burden placed on Plaintiff's ability to run for elective office by the enforcement of the State's signature requirements must be weighed against the State's substantial interest in ensuring that candidates have a significant modicum of support before their names are printed on the ballot. *Id.* at PageID.113. Defendants argue that a threshold showing of support through signature gathering helps protect the integrity of the electoral process by limiting the number of candidates on the ballot and avoiding voter confusion. *Id.* Defendants further assert that the State has an interest in maintaining April 21, 2020 as the filing deadline because that date "ensur[es] that the Secretary of State and her staff have sufficient time to canvass petitions, provide a challenge period, and meet the ballot certification deadline, which triggers final preparations for ballot printing by the counties." *Id.* at PageID.115.

8

The Court heard oral argument on this motion on April 15, 2020, utilizing the social media platform Zoom. At the hearing, both parties referenced proposed remedies that each had submitted to the Court *in camera*. Plaintiff seeks an order reducing the required number of signatures by forty percent, so that candidates would only need to collect sixty percent of the required number. Defendants proposed postponing the filing date to May 8, 2020, and offering candidates an approved method to collect signatures by e-mail, and submit them using the Internet, but they opposed any reduction in the required number of signatures. The Court will consider these proposed remedies together with the relevant facts and applicable law in reaching its decision.

## II.    LEGAL STANDARD

### a. Preliminary Injunction

The Court must consider four factors when ruling on a motion for a preliminary injunction: (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm absent the injunction; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is

advanced by the issuance of the injunction. *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012). No one factor is dispositive; rather the court must balance all four factors. *In re De Lorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). A preliminary injunction is an extraordinary remedy that will only be granted if Plaintiff shows that circumstances clearly demand it. *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

## III. DISCUSSION

### a. Likelihood of Success on the Merits

Under Michigan election law, candidates for certain elective offices must comply with statutory signature gathering requirements enumerated in Section 168.544f. Mich. Comp. Laws § 168.544f. The number of signatures required depends on the population of the district and whether or not that candidate is running as a member of a party. Mich. Comp. Laws § 168.544f. Congressional candidates are also governed by Section 168.133, which sets the April 21, 2020 filing deadline. Mich. Comp. Laws § 168.133. Substantially similar statutes set April 21, 2020 as the petition filing date for other offices. *See, e.g.*, Mich. Comp. Laws § 168.93 (U.S. Senator); Mich. Comp. Laws § 168.93

(judge of Circuit Court); Mich. Comp. Laws § 168.467b (judge of District Court).

While there is no fundamental right to run for elective office, the Supreme Court has recognized that ballot access laws such as Sections 168.133 and 168.544f "place burdens on two different, although overlapping, kinds of rights – the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968). Ballot access restrictions affect candidates and individual voters alike because absent recourse to state-wide proposals or referenda, "voters can assert their preferences only through candidates or parties or both." *Lubin v. Panish*, 415 U.S. 709, 716 (1974). "By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). As the Supreme Court explained in the seminal ballot access case of *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983), "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws

11

that affect candidates always have at least some theoretical correlative effect on voters." (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)).

When considering the constitutionality of ballot access laws, courts apply the framework established in *Anderson*, 460 U.S. at 780 as later refined in *Burdick v. Takushi*, 504 U.S. 428 (1992). Under the *Anderson-Burdick* framework, courts first look at the "character and magnitude of the asserted injury" to the plaintiff's constitutional rights. *Anderson*, 460 U.S. at 789. "When a state promulgates a regulation which imposes a 'severe' burden on individuals' rights, that regulation will only be upheld if it is 'narrowly drawn to advance a state interest of compelling importance'" *Lawrence v. Blackwell*, 430 F.3d 368, 373 (6th Cir. 2005) (quoting *Burdick*, 504 U.S. at 434). The analysis requiring that a state law be narrowly tailored to accomplish a compelling state interest is known as the "strict scrutiny" test. If regulations enacted do not seriously burden a plaintiff's rights, a state's important regulatory interests will typically be enough to justify "reasonable, nondiscriminatory restrictions." *Anderson*, 460 U.S. at 788. Regulations falling somewhere in between—"i.e., regulations that impose a more-than-minimal but less-than-severe burden—require a 'flexible' analysis,

'weighing the burden on the plaintiffs against the [s]tate's asserted interest and chosen means of pursuing it.'" *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016) (quoting *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 546 (6th Cir. 2014)). This level of review is called "intermediate scrutiny."

### i. Severity of the burden on Plaintiff

In this case, Plaintiff is challenging neither the constitutionality of the State's ballot access laws nor the Governor's Stay-at-Home Order in isolation. Rather, Plaintiff seeks relief because the two regulations, taken together, have prevented him from collecting enough signatures before the April 21, 2020 deadline to get his name on the primary ballot. *See Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 586 (6th Cir. 2006) ("Our inquiry is not whether each law individually creates an impermissible burden but rather whether the combined effect of the applicable election regulations creates an unconstitutional burden on First Amendment rights."); *Graveline v. Johnson*, 336 F. Supp. 3d 801, 810 (E.D. Mich. 2018) (considering "the 'combined effect' of the challenged regulations, rather than each statute's requirement by itself"). Plaintiff argues that the burden put on him by the two regulations is severe,

necessitating a strict scrutiny analysis. ECF No. 1, PageID.11. Defendants contend that the burden is moderate, necessitating a "flexible" weighing of the burdens analysis, or "intermediate scrutiny." ECF No. 6, PageID.110.

Defendants proffer four separate reasons why the burden on Plaintiff is not severe. Upon close examination, none is convincing. First, Defendants argue that Plaintiff has not been diligent in collecting signatures because, at the time the March 23rd Stay-at-Home Order was issued, he had only collected seven hundred of the one thousand he is required to obtain. ECF No. 6, PageID.110. Defendants offer little evidence to support this assessment. The State refers to information available on its website showing a list of those candidates who have successfully met the current filing requirements.[8] But the relevant question pertains to those candidates who have declared their intentions to qualify for the ballot, but have not yet met the filing requirements at the time the Stay-at-Home Order went into effect. The State could have conducted a survey to determine where those candidates were in the signature collection process as of the date of the shut-down, but no such

---

[8] *2020 Michigan Candidate Listing*, Mich. Sec'y of State, https://miboecfr.nictusa.com/election/candlist/2020PRI_CANDLIST.html (last accessed Apr. 19, 2020).

information has been proffered. It is not enough to merely assert that a candidate's successful collection of seventy percent of the requisite signatures with twenty-nine days left to go is somehow evidence of dilatory behavior. Moreover, during oral argument on this matter, Plaintiff indicated that he had campaign events planned for late March and April that had to be canceled after the Stay-at-Home Order was issued. Other candidates as well have submitted testimony that they likewise had planned to ramp up signature collection efforts in March and April, when warmer spring weather would accommodate outdoor activities and be more conducive to large social gatherings and door-to-door canvassing. *See* Bannister Decl. ¶ 10, ECF No. 15-2, PageID.273-74; Amicus Br. of Daniel P. Finley, ECF No. 13, PageID.212; Deana Beard Mtn. for Joinder, ECF No. 17, PageID.296; *see also Jones v. McGuffage*, 921 F. Supp. 2d 888, 897 (N.D. Ill. 2013) (noting that burden on candidates increased when signature gathering period for special election was truncated by one-third and limited to "December and January—months during which weather in the Chicago area is particularly inclement and in which there are a dearth of large scale, outdoor, public events during which signature drives are most successful").

Second, Defendants contend that the Governor's March 10, 2020 State of Emergency Declaration "should have acted as a wake-up call to Plaintiff and his staff to double-down on signature collection efforts" before the March 23, 2020 Stay-at-Home Order. ECF No. 6, PageID.111. This argument both defies good sense and flies in the face of all other guidance that the State was offering to citizens at the time. The Governor's State of Emergency Declaration cautioned citizens that COVID-19 "is a respiratory disease that can result in serious illness or death . . . and can easily spread from person to person." Mich. Exec. Order 2020-4 (Mar. 10, 2020). The next day, the State issued a press release urging citizens to "[r]educe in-person gatherings and activities," "consider tele-work[ing]" and limit interactions with vulnerable populations.[9] Instead of "doubling down" on door-to-door signature collection efforts between March 10th and March 23rd—increasing the risk that Plaintiff and his supporters could possibly be exposed to the COVID-19 virus by engaging in repeated close-contact with potential

---

[9] *State Recommends Community Mitigation Strategies to help slow the transmission of COVID-19 in Michigan*, Michigan.gov (Mar. 11, 2020), https://www.michigan.gov/coronavirus/0,9753,7-406-98158-521400--,00.html.

16

petition signers or unknowingly transmit it to others—prudence at that time counseled in favor of doing just the opposite.

Third, Defendants argue that Plaintiff could have utilized a mail-based campaign to collect the remaining three hundred signatures he needed during the month-long shutdown. ECF No. 6, PageID.111. Plaintiff counters that a mail campaign is both prohibitively expensive and of unproven efficacy. ECF No. 10, PageID.159. He also says that he tried it. Plaintiff states that on April 2, 2020, he sent one thousand petitions by mail at a cost of $1.75 each. ECF No. 10, PageID.159. And by April 14, 2020, the mail campaign had garnered a total of fifteen additional signatures—which, given the cost of the mailing, meant the equivalent of paying approximately $115 per signature. *Id.* At that rate, Plaintiff estimates that it would have cost him an additional $34,500 to gather the remaining three hundred signatures he needed. *See id.* Indeed, if Plaintiff wanted to collect four hundred signatures in order to ensure a safety margin in the event any signatures were later found to be invalid, such a mailing would cost $45,000. *Id; see also* Deana Beard Mtn. for Joinder, ECF No. 17, PageID.296 (judicial candidate who estimates that a mail-only campaign for remaining signatures would cost

her $216,450).  A $34,500 expense is a significant financial burden for any congressional campaign.  Further, the unforeseen nature of such an expense here surely magnifies its burden: no candidate, at the time they initially declared for office, could have anticipated that at the end of March, just when in-person signature collecting might be expected to be ramping up, there would arise the sudden need to switch to a mail-only signature campaign.  While Plaintiff is not entitled to free access to the ballot, the financial burden imposed by an unforeseen but suddenly required mail-only signature campaign is far more than an incidental campaign expense or reasonable regulatory requirement.  For any candidate other than those with unusually robust financial means, such a last minute requirement could be prohibitive.  *Compare Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 577 (6th Cir. 2016) ("the incidental cost of gathering signatures on petitions do not come close to exclusion from the ballot, and thus do not impose a severe burden on ballot access") *with Lubin*, 415 U.S. at 718 (holding that a $701.60 filing fee is an unconstitutional burden on indigent candidate with no alternative mechanism to get his name on the ballot).

Furthermore, though the Court finds that a mail-only campaign for the remaining signatures would impose more than an incidental cost on Plaintiff and candidates like him, in the context of the COVID-19 pandemic, the efficacy of a mail-based campaign is unproven and questionable at best. Conducting an effective mail campaign in the current environment presents a significant hurdle. Such a mail-only signature gathering campaign assumes both a fully operational postal service and a public willing to walk to the mailbox, open physical envelopes, sign a petition, and deposit the envelope back into a mailbox or make a trip to the Post Office. Today, sadly, ample reasons exist to question the plausibility of each of those assumptions. For one, the United States Postal Service has itself been affected by the COVID-19 virus. As of April 7, 2020, more than 386 postal workers have tested positive for the virus nationwide and mail delays have been confirmed in Southeast Michigan.[10] Media reports extensively discuss the risks of contracting COVID-19 from mail, suggesting, at least anecdotally, that

---

[10] Justin P. Hicks, *Michigan mail delivery slows as coronavirus hits postal service workers*, Mlive (Apr. 7, 2020), https://www.mlive.com/public-interest/2020/04/michigan-mail-delivery-slows-as-coronavirus-hits-postal-service-workers.html.

the issue may be of widespread public concern or even fear.[11] Getting voters to return signatures by mail in normal times is difficult.[12] In these unprecedented circumstances, the efficacy of a mail-only signature gathering campaign is simply an unknown.   Forcing candidates—through little fault of their own—to rely on the mails as their only means of obtaining signatures presents a formidable obstacle of unknown dimension.

Fourth, Defendants contend that even if Plaintiff fails to gather sufficient signatures to have his name placed on the August ballot, he remains free to mount a write-in campaign, and like any write-in candidate, he would have that method of access to the ballot, which should be considered adequate.   ECF No. 6, PageID.112.   But this argument has already been rejected both by the Supreme Court and by a court in this district.  *Lubin*, 415 U.S. 719 n.5 ("The realities of the electoral process . . . strongly suggest that 'access' via write-in votes falls

---

[11] *See, e.g.,* Nicola Twilley, *You've Got Mail. Will You Get the Coronavirus?*, N.Y. Times (Mar. 24, 2020), https://www.nytimes.com/2020/03/24/health/coronavirus-mail-packages.html.

[12] *See* Daniel Hays Lowenstein & Robert M. Stern, *The First Amendment and Paid Initiative Petition Circulators: A Dissenting View and A Proposal*, 17 Hastings Const. L.Q. 175, 206 (1989) ("Recipients are not likely to sign and return the petitions . . . . Whereas the course of least resistance in a shopping mall may be to sign when asked, signing and returning a petition by mail takes significantly more effort than throwing away the solicitation letter.").

far short of access in terms of having the name of the candidate on the ballot."); *Anderson*, 460 U.S. at 799 n.26 ("We have previously noted that [a write-in] opportunity is not an adequate substitute for having the candidate's name appear on the printed ballot."); *Graveline*, 336 F. Supp. 3d at 811 (Roberts, J.) (same).

The reality on the ground for Plaintiff and other candidates is that state action has pulled the rug out from under their ability to collect signatures. Since March 23, 2020, traditional door-to-door signature collecting has become a misdemeanor offense; malls, churches and schools and other public venues where signatures might be gathered have been shuttered, and even the ability to rely on the mail to gather signatures is uncertain—if not prohibitively expensive. Absent relief, Plaintiff's lack of a viable, alternative means to procure the signatures he needs means that he faces virtual exclusion from the ballot. After considering Defendants' arguments, this Court has little trouble concluding that the unprecedented—though understandably necessary—restrictions imposed on daily life by the Stay-at-Home Order, when combined with the ballot access requirements of Sections 168.133 and 168.544f, have created a severe burden on Plaintiff's exercise of his free

speech and free association rights under the First Amendment, as well as his due process and equal protection rights under the Fourteenth Amendment[13]—as expressed in his effort to place his name on the ballot for elective office. *See Libertarian Party of Ky.*, 835 F.3d at 574 ("The hallmark of a severe burden is exclusion or virtual exclusion from the ballot."). Accordingly, a strict scrutiny analysis is appropriate here. *See, e.g., Faulkner v. Va. Dep't. of Elections*, CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020) (applying strict scrutiny to candidate's ballot access claim in light of state's COVID-19 restrictions).

### ii. *Defendants' interest in enforcing signature requirements in light of the Stay-at-Home Order*

Because the State's signature requirements, operating in conjunction with the Stay-at-Home Order, have imposed a severe burden on the First and Fourteenth Amendment rights of Plaintiff and other candidates in his position, such measures can be constitutionally justified only if they are "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434.

---

[13] Although Plaintiffs nominally invoke equal protection, due process, and the First Amendment, the specific interests they raise and the nature of their arguments involve First Amendment principles more closely than the equal protection rights of minor party or independent candidates. Accordingly, this Court, like the parties, will view the case mainly as implicating First Amendment rights.

Defendants argue that the State has two separate interests in enforcing Sections 168.133 and 168.544f. First, the State has a substantial interest in ensuring that candidates have a significant modicum of support before their names are printed on the ballot. ECF No. 6, PageID.113. Second, the State has an interest in maintaining the filing deadline of April 21, 2020 because that date "ensur[es] that the Secretary of State and her staff have sufficient time to canvass petitions, provide a challenge period, and meet the ballot certification deadline, which triggers final preparations for ballot printing by the counties." *Id.* at PageID.115.

The Supreme Court has recognized that states have "an important interest in ensuring that candidates demonstrate a 'significant modicum of support,' before gaining access to the ballot, primarily in order to avoid voter confusion, ballot overcrowding, and frivolous candidacies." *Libertarian Party of Ky.*, 835 F.3d at 577 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)). Along with enforcing specific deadlines, both regulations are part and parcel of the State's generalized interest in the orderly administration of elections. *Mays v. LaRose*, 951 F.3d 775, 787 (6th Cir. 2020).

Notably, Defendants do not explicitly contend in their brief that either of the State's proffered interests in strict enforcement of the signature requirements rise to the level of a *compelling* state interest. *See* ECF No. 6, PageID.113-16. Rather, they see them as *important* government interests in the context of today's pandemic that would pass the flexible intermediate scrutiny analysis. At oral argument, however, the State asserted that its interests were compelling, and the Supreme Court has found that ensuring that a candidate has a modicum of support before inclusion on the ballot can be a compelling state interest in other contexts. *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986). Significantly though, with respect to Section 168.133's April 21, 2020 deadline, the State conceded at oral argument that the signature-gathering due date could be moved back to May 8, 2020 without significant impairment of the State's interests. Clearly any interest in maintaining April 21, 2020 as the signature due date is not, in fact, compelling.

But even assuming the State has a compelling interest in the need to ensure a modicum of support through the enforcement of the signature requirement, the regulatory means to accomplish that compelling

interest are not narrowly tailored to the context of the COVID-19 pandemic—as it would need to be to survive a strict scrutiny analysis. This is because under typical conditions, Plaintiff's ability to obtain one thousand signatures from registered voters would be a valid indication that he has earned the "modicum of support" the Michigan Legislature deemed sufficient to appear on the ballot. When setting the requirement at one thousand signatures, the Michigan Legislature intended that candidates be allowed until April 21, 2020—under normal, non-pandemic conditions—to gather one thousand signatures using all of the traditionally effective means to do so. The March 23, 2020 Stay-at-Home Order, for reasons already discussed, effectively halted signature-gathering by traditional means, reducing the available time prescribed by the Michigan Legislature to gather one thousand signatures by twenty-nine days. Thus, a state action narrowly tailored to accomplish the same compelling state interest would correspondingly reduce the signature requirement to account for the lost twenty-nine days. Or, to state it differently, even assuming the State generally has a compelling interest in ensuring candidates have a modicum of support before allowing inclusion on the ballot, here the State has not shown it has a

compelling interest in enforcing *the specific numerical requirements* set forth in Section 168.544f in the context of the pandemic conditions and the upcoming August primary.

The State has thus failed to show that its enforcement of the signature requirements in conjunction with the Stay-at-Home Order is both justified by a compelling state interest and narrowly tailored to accomplish that interest in a manner that has the least restrictive impact on Plaintiff's constitutional rights. It therefore fails to pass a strict scrutiny analysis. Consequently, Plaintiff has established a likelihood of prevailing on the merits of his First and Fourteenth Amendment claims.

### b. Likelihood That Plaintiff Will Suffer Irreparable Harm Absent Injunctive Relief

The Court next considers whether Plaintiff will suffer irreparable harm in the absence of injunctive relief. *Bays*, 668 F.3d at 818-19. "To demonstrate irreparable harm, the plaintiffs must show that . . . they will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).

In reviewing the record, the Court concludes that Plaintiff will suffer irreparable harm absent relief. Ballot access cases such as this

26

implicate First Amendment rights, and when such fundamental rights are violated—as when a candidate is unconstitutionally deprived of access to the ballot—irreparable harm can be presumed. *See Libertarian Party of Ohio*, 751 F.3d at 412 ("[I]t is well-settled that loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitute irreparable injury.") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)).

### Probability of Harm to Others and Consideration of the Interests of the Public

The remaining factors, "harm to the opposing party and weighing the public interest . . . merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Defendants contend that the State and its citizens will be harmed in two ways if the Court issues an injunction. First, the State and the people will be deprived of the full and proper enforcement of laws enacted by the Michigan Legislature. Second, an injunction lowering the signature requirement would allegedly result in the disparate treatment of similarly situated candidates. ECF No. 6, PageID.118-19. On the first point, the State is correct that the Supreme Court has consistently recognized that states have a strong interest in seeing their laws effectuated. *See New Motor*

*Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). As to the second point regarding disparate treatment, it is the case that other candidates, including some running against Plaintiff for the Republican nomination in Michigan's Eleventh Congressional District, have already obtained enough signatures to appear on the August ballot. *See* Amicus Br. of Whittney Williams, ECF No. 21. If the Court were to grant Plaintiff's request to lower the minimum number of signatures required to appear on the August primary ballot, it would be permitting candidates to appear on the ballot who had gathered fewer signatures than those like Williams who have successfully met the threshold before April 21st. In considering the State's position, the Court agrees that the first point is well taken and that the State will likely suffer injury from not having its ballot access requirements enforced as written if an injunction issues. The question is balancing the significance of this harm against the deprivation of constitutional rights, as well as other public harms, that enforcement of those requirements would cause.

28

As to the second harm identified by the State, the alleged disparate treatment of candidates, this point is not well founded. Without any injunctive relief, the combination of the Stay-at-Home Order and the signature requirements operates to cause disparate treatment of those candidates who were fortunate enough to have met their signature requirement early as compared with those who were planning—and needing to use—the last twenty-nine days that they had assumed would be available to gather signatures. One group benefits while the other loses. Similarly, if injunctive relief were to lower the number of required signatures, one could argue that the early birds who might have gained an advantage from the Stay-at-Home Order's exclusion of their more procrastinating competitors would be "harmed" while the other candidates would be benefitted. Both the status quo and the remedy sought by Plaintiff would arguably cause a form of disparate impact on candidates. Consequently, the Court will not give weight to this second form of harm raised by the State.

The Court must weigh the State's proffered harm of not being able to enforce its ballot access requirements against the harm to the Plaintiff and the public harms that would result from the lack of any injunction.

The Court finds that the balance weighs in favor of an injunction. First, in the absence of an injunction, Plaintiff and other candidates in his position were left with no choice but to have violated the Stay-at-Home Order in order to collect the signatures they need. Indeed, some candidates have already admitted to having done so. *See* Bannister Decl. ¶ 36, ECF No. 15-2, PageID.278. The broader public interest is not served by preserving the current signature-gathering scheme at the cost of encouraging more candidates and their supporters to risk their health and criminal penalties to gather signatures.

Second, while Defendants accurately point out that voters do not have an "absolute right to vote for a candidate of [their] choice," it is also the case that a candidate's ability to appear on the ballot "affects the First Amendment rights of voters." *Blackwell*, 462 F.3d at 588; *see also Ill. State Bd. of Elections*, 440 U.S. at 184 ("By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences."). Here, if a candidate should fail to obtain enough signatures because she had relied on the somewhat standard and eminently reasonable assumption that she would be able to ramp up signature collecting in the spring, Michigan voters may lose the ability to

vote for a candidate who, absent the pandemic, would have easily been included on the ballot. This would cause injury to the First Amendment rights of an innumerable number of Michigan voters.

Finally, were the Court to redress Plaintiff's injury by granting his request to lower the number of signatures required to qualify for the August primary ballot, the uniform nature of the relief would have some benefits both for candidates who had already met the current threshold as well as those who had collected a lesser number of signatures. For example, because Ms. Williams has already obtained one thousand signatures, any signatures she gathered in excess of a lower minimum would provide her, and any other candidates in her position, with a larger margin of signatures, should any of the gathered signatures later be deemed invalid.

### d. Remedy

Since the advent of the coronavirus, and the unfurling of its deadly pall across America, the governments of the several states have searched for solutions to protect their citizens' health, while at the same time

preserving fundamental democratic processes and liberties.[14]  In New York, Governor Andrew Cuomo, confronted with the same issue that is before this Court, reduced the number of petition signatures candidates would be required to obtain to thirty percent of the statutory requirement.  N.Y. Exec. Order No. 202.2 (Mar. 14, 2020).  Vermont suspended its signature requirement entirely.  H. 681, 2019-2020 Gen. Assemb., Adjourned Sess. (Vt. 2020).  At least three states have attempted to address the difficulty candidates face obtaining in-person signatures by allowing for electronically submitted signatures.  FL. Emergency R. 1SER20-2 (Apr. 2, 2020); N.J. Exec. Order No. 105 (Mar. 19, 2020); Utah Exec. Order No. 2020-8 (Mar. 26, 2020).

In responding to the public health risks that in-person voting presents, many states have taken actions designed to ensure adequate conditions for public participation.  At least sixteen states and one territory—Alaska, Connecticut, Delaware, Georgia, Hawaii, Indiana, Kentucky, Louisiana, Maryland, New Jersey, New York, Ohio,

---

[14] For an extensive review of the numerous examples of state initiatives aimed at protecting democratic processes in the wake of the COVID-19 pandemic, see *Changes to election dates, procedures, and administration in response to the coronavirus (COVID-19) pandemic, 2020*, Ballotpedia, https://ballotpedia.org/Changes_to_election_dates,_procedures,_and_administration_in_response_to_the_coronavirus_(COVID-19)_pandemic,_2020 (last accessed Apr. 19, 2020).

Pennsylvania, Rhode Island, West Virginia, Wyoming and Puerto Rico—
have either rescheduled their presidential primaries or adopted voting by
mail procedures with extended deadlines.[15]  In total, more than half of
the states have already postponed at least one election.[16]  It may be that
others will follow suit.

In Michigan, while extraordinary and well-coordinated efforts have
been adopted to protect the public health, fewer efforts have focused on
the challenges the virus has raised for the fair and effective functioning
of elections.[17]  Based on the record before the Court, for the reasons
explained above, Plaintiff has established that he is likely to succeed on
the merits of his claim and that he will suffer irreparable harm absent
an injunction.  The Court also finds that on balance, the public interest
would be served by the issuance of an injunction, and that the benefits to

---

[15] Nick Corasaniti & Stephanie Saul, *16 States Have Postponed Their Primaries Because of Coronavirus. Here's a List*, N.Y. Times (Apr. 17, 2020), https://www.nytimes.com/article/2020-campaign-primary-calendar-coronavirus.html.

[16] *See* footnote 14, *supra*.

[17] Some measures have been taken, for example, the Michigan Secretary of State announced that absentee ballots would be sent to all voters in preparation for the May 5, 2020 elections. Mich. Sec'y of State, *Secretary of State to mail absent voter ballot applications to all May 5 voters* (Mar. 23, 2020) https://www.michigan.gov/sos/0,4670,7-127-93094-522761--,00.html?link_id=34&can_id=3ce03c3d77033bbeb4c4bf7ba04c984c&source=email-morning-digest-comeback-bid-by-former-attorney-general-highlights-utahs-quirky-ballot-access-rules&email_referrer=email_759189&email_subject=morning-digest-comeback-bid-by-former-attorney-general-highlights-utahs-quirky-ballot-access-rules.

the public and Plaintiff outweigh the injuries the State is likely to incur. Accordingly, Plaintiff is entitled to the extraordinary remedy of injunctive relief.

Plaintiff seeks relief from the application of the State's signature requirements—specifically Sections 168.133 and 168.544f—because of the severe burdens the State's Stay-at-Home Order has placed on his ability to gather signatures. *See* Mich. Comp. Laws §§ 168.133, 168.544f. Injunctive relief in the context of a forthcoming election is an equitable—and unusual—remedy, but it is not unprecedented. In fact, at least one state court has already entered a preliminary injunction reducing a state statutory signature requirement because of the burdens put on candidates by the COVID-19 pandemic. *Faulkner v. Va. Dep't. of Elections*, CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020) (granting preliminary injunction and reducing candidate signature gathering requirements because of state's COVID-19 restrictions). This Court agrees with the *Faulkner* court and finds that it is appropriate to enjoin Defendants from rigid application of those particular statutes, as well as any others that are substantively identical in causing the same kind of irreparable harm to similarly situated individuals. At the same time, the Court also finds

34

that the State is legitimately concerned that a lowering of ballot access standards could result in "laundry list" ballots crowded with names that "discourage voter participation and confuse and frustrate those who do participate." *Lubin*, 415 U.S., at 715; *see also Briscoe*, 429 U.S. at 1322–23. Accordingly, the Court will balance the interests of both parties in fashioning a remedy.

The Court considers the proposed remedies suggested by the parties, together with the facts and applicable law, and finds that a three-pronged remedy is necessary to address the nature of the harm while simultaneously respecting the interest of the State. First, the signature requirements must be lowered to account for the fact that the State's action reduced the available time to gather signatures. Second, as the State has conceded that it could still meet its election planning obligations if the due date for signatures were extended until May 8, the Court will order that extension. Finally, to enhance the available means for gathering signatures, the State will be ordered to implement a method that would permit signatures to be gathered through the use of electronic mail. In doing so, the State is directed to design a system that is as "user-friendly" as possible to maximize its efficacy. For example, such

procedures should allow for the use of a digital copy of a real signature whether created by scanner or by a digital photograph, assuming that the signature is appropriately witnessed, such as through digital means as described in Executive Order 2020-41.

As stated, because the Court gives weight to the State's competing interests, the Court will not completely enjoin the enforcement of the signature requirements contained in Sections 168.133 and 168.544f. The Court will instead order the State to lower the minimum number of signatures required for candidates to be included on the August primary ballot and continue to accept signatures until May 8, 2020. This form of relief is also not without precedent. *See Faulkner v. Va. Dep't. of Elections*, CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020) (reducing signature requirement sixty-five percent in light of COVID-19 restrictions); *see also Graveline*, 336 F. Supp. 3d at 817 (granting preliminary injunction and reducing signature requirement for attorney general candidate from 30,000 signatures to 5,000) *aff'd Graveline v. Johnson*, 747 F. App'x 408, 416 (6th Cir. 2018); *Jones v. McGuffage*, 921 F. Supp. 2d 888, 899 (N.D. Ill. 2013) (granting preliminary injunction and reducing candidate signature gathering requirements because upholding statutory signature

gathering requirements in context of truncated special election limited to Chicago winter would place unconstitutional burden on candidates).

The Court notes that a number of other candidates have sought to participate in this action because the outcome of this case will affect their access to the August primary ballot.[18] In a separate order, the Court will permit some of the proposed plaintiffs to join this lawsuit, but because the State did not directly address the specifics of their factual claims, they are not thoroughly discussed here. As to the question of how much the signature requirement should be reduced, Plaintiff, who has already obtained seventy percent of the signatures that he is required to obtain, is asking the Court to reduce the number of signatures required to sixty percent of the minimum number required pursuant to Section 168.544f. ECF No. 10, PageID.165. Even such a reduction, however, would still present a significant hurdle for otherwise viable candidates, including those whose signature requirements are lower than Plaintiff's. For example, candidates for certain city council positions subject to the April 21, 2020 deadline need only procure one hundred signatures. *See* Bannister Decl. ¶ 5, ECF No. 15-2, PageID.273. Such a candidate may

---

[18] *See* footnote seven, *supra.*

be able to easily collect one hundred signatures in as little as one week using traditional collection means like going door-to-door or canvassing at community centers. *Id.* ¶ 10. These candidates may have relied, reasonably and in good faith, on the ability to collect the vast majority of the signatures they needed in late March or early April, when rising temperatures would bring more people outside and facilitate signature gathering. *See, e.g., Jones*, 921 F. Supp. 2d at 897. While any such line-drawing inevitably involves some degree of arbitrariness, common sense suggests that a reasonably diligent candidate should be expected to have reached the half-way point in gathering signatures when there is only one month to go. Consequently, a reduction in the requirement by fifty percent will be ordered. This reduction, combined with an extension of the signature-gathering deadline until May 8, 2020, and the adoption of an acceptable email-based method for collecting signatures, will be sufficient in these unusual circumstances to ensure both sufficient access to the ballot for those who seek it, and accommodation of the State's interest in ensuring candidates have a modicum of support before inclusion on the ballot.

## IV.  CONCLUSION

Accordingly, for all the reasons set out above, **IT IS HEREBY ORDERED:**

- That all candidates:

    o (i) who filed a statement of organization under the Federal Election Campaign Act of 1971, 52 U.S.C. §§ 30101 *et seq.*, or established a candidate committee under the Michigan Campaign Finance Law, Mich. Comp. Laws, §§ 169.201 *et seq.*, before March 10, 2020; and

    o (ii) who are required by a relevant section of the Michigan Election Law, Mich. Comp. Laws, §§ 168.1 *et seq.*, to file a nominating petition by April 21, 2020, for the purpose of appearing on the August 4, 2020, primary election ballot; and

    o (iii) who do not have the option under Michigan Election Law to appear on the August 4, 2020, primary election ballot through the payment of a filing fee in lieu of filing a nominating petition;

- Shall be qualified for inclusion on the August 4, 2020 primary election ballot if the candidate submits fifty percent of the number

of valid signatures required by Mich. Comp. Laws § 168.544f with the appropriate filing official as provided by Michigan Election Law by 5:00 p.m. on May 8, 2020. No other filing deadline is extended under this Order.

- Furthermore, the Director of Elections shall within 72 hours of the date of this Order adopt and promulgate, according to the specifications it determines to be appropriate and efficient, regulations providing for an additional optional procedure that allows the collection and submission of ballot petition signatures in digital form by electronic means such as email;

- Finally, the Director of Elections shall take all reasonable and necessary steps to communicate the terms of this injunction to county, township, and city clerks in this State who act as filing officials for offices for which nominating petitions are due as described in this Order.

**IT IS** SO ORDERED.

DATED this 8th day of April, 2020.

BY THE COURT:
/s/Terrence G. Berg_____
TERRENCE G. BERG
United States District Judge

40

DECLARATION OF JAMES R. SUTTON; EXHIBIT 4

NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12931

ROBERT GOLDSTEIN[1] & others[2] vs. SECRETARY OF THE COMMONWEALTH.


        Suffolk.      April 16, 2020. - April 17, 2020.

    Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
                    & Kafker, JJ.


Elections, Ballot, Validity of nomination papers.  Secretary of
    the Commonwealth.  Constitutional Law, Elections.



        Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on April 8, 2020.

        The case was reported by Cypher, J.


        Robert G. Jones for the plaintiffs.
        Anne Sterman, Assistant Attorney General, for the
defendant.
        Thomas O. Bean & James D. Henderson, for Ranked Choice
Voting 2020 Committee, amicus curiae, submitted a brief.


        GANTS, C.J.  On April 8, 2020, the plaintiffs, each of whom

seeks to be a candidate for elective office in the primary

_____

        [1] On behalf of himself and others similarly situated.

        [2] Kevin O'Connor and Melissa Bower Smith, on behalf of
themselves and others similarly situated.

election scheduled for September 1, 2020, brought an emergency petition in the county court, seeking relief under G. L. c. 214, § 1, and G. L. c. 231A, § 1. They requested a declaration that, in light of the emergency circumstances arising from the COVID-19 pandemic, the signature requirements in G. L. c. 53, §§ 7 and 44 (minimum signature requirements), to be listed on the ballot for a party's nomination pose an "unconstitutionally severe burden on the fundamental rights" of all Massachusetts would-be candidates. They seek, by means of this declaration, to eliminate the minimum signature requirements for the September 1 primary election. In the alternative, they asked for various forms of equitable relief, such as substantially reducing the number of required signatures of certified voters, extending the applicable filing deadlines, and permitting electronic signatures, as a means of remedying the constitutional violation. A single justice of this court reserved and reported this petition to the full court.

The plaintiffs do not contend that the minimum signature requirements in §§ 7 and 44 are facially unconstitutional; that is, they do not contend that these requirements unduly burden the constitutional right of a candidate to seek elective office in ordinary times. Rather, they contend that these requirements, when applied in these extraordinary times of a declared state of emergency arising from the COVID-19 pandemic,

create an undue burden on a prospective candidate's constitutional right to seek elective office.

The Secretary of the Commonwealth (Secretary) agrees that, "as a practical matter, application of the signature requirements in the context of the current public health crisis imposes a greater than usual burden on [the plaintiffs], triggering heightened scrutiny." The Secretary also agrees that, in this time of pandemic, the justification for the current signature requirements cannot survive this scrutiny, and that this court must craft a remedy for this constitutional violation. We also agree, and fashion equitable relief intended to substantially diminish that burden, while respecting the legislative purpose for imposing minimum signature requirements.

In short, for all candidates seeking to appear on the State primary ballot on September 1, we order three forms of relief. First, we order that the number of required signatures be reduced by fifty percent (50%). Second, we extend the deadlines for candidates running for State district and county offices to submit their nomination papers to local election officials for certification and for the filing of certified nomination papers with the Secretary to May 5, 2020, and June 2, 2020, respectively, which are the current due dates for party candidates running for Federal and Statewide offices. Third, subject to the restrictions outlined later in this opinion, we

order the Secretary to allow the submission and filing of nomination papers with electronic rather than wet-ink original signatures ("wet" signatures).  We emphasize that the declaration we make and the equitable relief we provide is limited to the primary election in these extraordinary circumstances, which is the sole subject of the case before us, and does not affect the minimum signature requirements for the general election this year or for the primary elections in any other year.[3]

Background.  1.  Ballot access.  This year, 2020, is an election year in Massachusetts for certain Federal,[4] State,[5] and county offices.[6]  The State primary election, in which candidates

---

[3] We acknowledge the amicus letter submitted by the Ranked Choice Voting 2020 Committee.

[4] Federal offices include electors of President and Vice-President, United States senator (the seat currently held by Senator Edward Markey), and United States representative (all nine districts).  See Secretary of the Commonwealth, A Candidate's Guide to the 2020 State Election, at 5 (rev. Feb. 2020) (2020 Candidate's Guide).

[5] Statewide offices include executive councilor (all eight districts), State senator (all forty districts), and State representative (all 160 districts).  See 2020 Candidate's Guide, supra.

[6] County offices include the register of probate (Barnstable, Bristol, Dukes, Norfolk, and Plymouth Counties only), county commissioner (same), county treasurer (Bristol, Dukes, Norfolk, and Plymouth Counties only), council of government executive committee (Franklin County only), and sheriff (Norfolk County only).  See 2020 Candidate's Guide, supra.

affiliated with the various political parties (Democratic, Green-Rainbow, Libertarian, and Republican) are nominated to run for the offices at issue, is currently scheduled for September 1, 2020.  See Secretary of the Commonwealth, A Candidate's Guide to the 2020 State Election, at 5 (rev. Feb. 2020) (2020 Candidate's Guide).  The general election, in which the party nominees will compete against one another as well as against any nonparty candidates for the offices on the ballot, is scheduled for November 3, 2020.  See id.

The three plaintiffs aspire to appear on the State primary election ballot in September in an effort to secure their respective party's nominations for three different Federal and State offices.  Robert Goldstein seeks to be the Democratic Party's nominee for the office of United States representative for the Eighth Congressional District in Massachusetts.  Kevin O'Connor seeks the Republican Party's nomination for the office of United States senator.  Melissa Bower Smith aspires to be the Democratic Party's nominee for the office of State representative for the Fourth Norfolk District.

a.  <u>Minimum signature requirements</u>.  To appear on the ballot, candidates like the plaintiffs are required by statute to, among other things, submit nomination papers containing a

minimum number of certified voter signatures.[7]  See G. L. c. 53, § 44.  The number of certified signatures required differs depending on the office the candidate is seeking.  <u>Id</u>.  For example, a candidate like O'Connor, seeking election as a United States senator, must secure 10,000 certified voter signatures. <u>Id</u>.  A candidate like Goldstein, seeking election as a representative to the United States Congress, requires 2,000. <u>Id</u>.  And a candidate seeking election as a State representative, like Smith, must obtain 150.  <u>Id</u>.[8]

    b.  <u>Certified signatures</u>.  To qualify as "certified," a signature must be of a voter registered in the geographic area corresponding to the office for which the candidate is seeking nomination.  See G. L. c. 53, § 7.  In addition, if the candidate is seeking the nomination of a particular political

---

[7] Candidates for Federal and Statewide offices who are not affiliated with a party also must satisfy certain minimum signature requirements to appear on the general election ballot in November.  The deadlines for the submission and filing of their nomination papers, however, do not expire until July 28 and August 25, 2020.  See 2020 Candidate's Guide, <u>supra</u> at 6-9. Federal and Statewide nonparty candidates, therefore, are not similarly situated to the plaintiffs.  Nor has anyone appeared in this action and challenged the signature requirements and deadlines for nonparty candidates for Federal or Statewide offices.  Therefore, we do not address the constitutionality of those requirements and deadlines.

[8] The number of certified voter signatures required for the other offices at issue in the upcoming State primary election are as follows:  Executive councilor, 1,000; State senator, 300; Barnstable and Franklin County offices, 500; and all other county offices, 1,000.  See G. L. c. 53, § 44.

party, as is the case with the plaintiffs, the voter must be registered with the same party or as "unenrolled," meaning registered to vote, but with no party affiliation.[9]  See G. L. c. 53, § 37; 2020 Candidate's Guide, supra at 13.  Accordingly, for a candidate like O'Connor, seeking the Republican Party nomination for United States senator, a Statewide office, signatures may be secured from voters registered anywhere in Massachusetts as either Republicans or unenrolled.  For a candidate like Goldstein or Smith, seeking the Democratic Party nomination to represent a specific district in Massachusetts, the signatures must be from voters registered in that district as either Democrats or unenrolled.

  c.  Nomination papers.  The process for obtaining and certifying the required number of signatures commences when the Secretary prepares the nomination papers and furnishes them to candidates.  See G. L. c. 53, § 47.  This year, the nomination papers were furnished on February 11, 2020.[10]  Before obtaining any signatures, candidates must fill in the top of the nomination papers with certain information, including their

---

[9] Unenrolled voters are commonly referred to as "Independents."  See 2020 Candidate's Guide, supra at 4.

[10] The Secretary is required to furnish the nomination papers on or before the fifteenth Tuesday preceding the deadline established in G. L. c. 53, § 48, for filing certified nomination papers.  See G. L. c. 53, § 47.

name, address, and party affiliation (if any), and the office they are pursuing. See G. L. c. 53, § 8. The candidates, or others working on their behalf, must then gather voter signatures on the nomination papers or on "exact copies" of such forms. See G. L. c. 53, § 17. Voters are required to sign the nomination papers "in person as registered or substantially as registered" (emphasis added). G. L. c. 53, § 7. The Secretary interprets this combination of requirements, that the voter sign "in person" on the original nomination papers or on "exact copies" thereof, to mean that the signatures eventually submitted and filed must be original handwritten or "wet" signatures. However, "any voter who is prevented by physical disability from writing may authorize some person to write his or her name and residence in his or her presence." Id. Voters also must indicate the address where they are currently registered on the nomination papers. Id.

    d.  Certification and filing deadlines. The statutorily driven timeline that follows the receipt of the nomination papers from the Secretary has two major deadlines, which can differ depending on the office a candidate is pursuing. The first is the deadline by which the candidate must submit the nomination papers to local election officials for certification. At least twenty-eight days before the deadline for the submission of the certified nomination papers to the Secretary,

the candidates must submit their nomination papers to local election officials in each city and town where the individuals who signed the papers are registered to vote.[11] See G. L. c. 53, §§ 7, 46. For a candidate like Smith, pursuing a seat as a State representative, this deadline falls on or before April 28, 2020. For candidates like O'Connor and Goldstein, seeking Federal offices, this deadline falls on or before May 5, 2020.

Applying regulations promulgated by the Secretary, see 950 Code Mass. Regs. § 55.03(1) (2004),[12] local election officials then review each signature on the nomination papers. See G. L. c. 53, §§ 7, 46. Signatures can be disallowed for a variety of reasons, including that the voter is not registered at the address provided, the voter's name as signed does not match the voter's name as registered, the voter's signature or address is illegible, the voter is enrolled in the wrong party, or the voter's signature already appeared on the candidate's nominating papers. See 950 Code Mass. Regs. § 55.03(1). Due to the potential for the disallowance of numerous signatures, prudent candidates collect more signatures than are required, see 2020 Candidate's Guide, supra at 16 (encouraging candidates to do

---

[11] "Each nomination paper should contain signatures of registered voters from only ONE city or town." 2020 Candidate's Guide, supra at 16.

[12] The regulations were promulgated by the Secretary pursuant to authority granted in G. L. c. 53, § 7.

just that), and local election officials are required to certify two-fifths more signatures than are required to make the ballot, G. L. c. 53, § 7.  Local election officials are required to complete the certification process no later than the seventh day before the deadline for the submission of the papers to the Secretary.  G. L. c. 53, §§ 7, 46.  There then follows a short period for candidates to seek a review of disallowed signatures. See G. L. c. 55B, § 6.

The second major deadline, from which the first is calculated, is the date by which nomination papers certified by local election officials must then be filed with the Secretary. For candidates seeking election to State district and county offices, this deadline is on or before the last Tuesday in May of an election year, which, this year, means on or before May 26, 2020.  See G. L. c. 53, §§ 10, 48.  This is the deadline by which Smith, seeking election as a State representative, must file her certified nomination papers with the Secretary. Meanwhile, for candidates who are seeking election to Federal or Statewide offices, as are O'Connor and Goldstein, the deadline is on or before the first Tuesday in June, which, in this election year, is on or before June 2, 2020.  See G. L. c. 53, § 48.

    e.  <u>Objection process</u>.  Registered voters from the district in which a candidate seeks nomination have three days from the

filing deadlines with the Secretary to file objections to nomination papers with the State Ballot Law Commission (SBLC). See G. L. c. 55B, § 5. The SBLC then has twenty-one days from the closure of the objection periods to render a decision on any objections. See G. L. c. 55B, § 10. Given the aforementioned filing deadlines with the Secretary, therefore, objections to nomination papers would have to be decided by the SBLC on or before June 19 and 26, 2020, as applicable.

f. <u>Preparation of ballots</u>. For any election in which a Federal office is at issue, Federal law mandates that ballots must be transmitted to military and overseas voters no later than forty-five days in advance of the election. See 52 U.S.C. § 20302(a)(8)(A). For the upcoming September 1 primary election, this means that local election officials must transmit the ballots to military and overseas voters by July 18. In turn, this means the Secretary's office may have as little as eighteen days from the June 26 SBLC decision deadline to the July 14 date when ballots must be in the hands of local election officials to prepare, proofread, and finalize the 2,200 different ballot styles required for the different jurisdictions in the Commonwealth. According to the Secretary's office, this timeline is already tight, since the process usually takes three weeks to complete.

2.  <u>COVID-19 pandemic</u>.  On March 10, 2020, the Governor declared a state of emergency throughout the Commonwealth in response to the spread of COVID-19, where he invoked his statutory authority to "from time to time issue recommendations, directives, and orders as circumstances may require."  See Executive Order No. 591.  The following day, the World Health Organization declared COVID-19 to be a global pandemic.  On March 15, 2020, the Governor issued orders closing all public and private elementary and secondary schools, prohibiting public and private gatherings of more than twenty-five people, and prohibiting the on-premises consumption of food and drink at restaurants, bars, and other food establishments.  Then, on March 23, 2020, he issued another executive order, further limiting public and private gatherings to no more than ten people and requiring all nonessential businesses to close their physical workplaces and facilities.  See COVID-19 Order No. 13.  See also COVID-19 Order No. 21.  At his direction, the Department of Public Health (DPH) issued a "Stay-at-Home Advisory" the following day, declaring that it was "critically important" for everybody to "[o]nly leave home for essential errands such as going to the grocery store or pharmacy," and that, when people do leave home, to "practice social distancing by staying [six] feet away from others."  DPH Public Health Advisory:  Stay-at-Home Advisory (Mar. 24, 2020).  On April 10,

DPH issued another advisory recommending that people wear face coverings or masks when social distancing is not possible.  See DPH Advisory Regarding Face Coverings and Cloth Masks (Apr. 10, 2020).  All of these restrictions on everyday life, which will remain in effect until at least May 4, 2020, have been imposed in an effort to mitigate the spread of the virus, which can occur at an alarming rate.  Even with these restrictions in place, as of April 16, 2020, there have been 32,141 confirmed cases of COVID-19 in Massachusetts, resulting in 1,245 deaths. See Department of Public Health, Coronavirus Disease 2019 (COVID-19) Cases in MA, as of April 16, 2020, https://mass.gov /doc/covid-19-cases-in-massachusetts-as-of-april-16-2020 /download [https://perma.cc/FR75-PDFY].

With the onset of the pandemic and the imposition of restrictions that followed, the plaintiffs and other candidates could not safely and reasonably gather voter signatures in the usual ways, namely, going to places where large numbers of potential registered voters are likely to be, such as town centers, malls, grocery stores, or political meetings.  In the face of this predicament, the plaintiffs and other candidates wrote to the Secretary, seeking relief from the minimum signature requirements.  The Secretary, however, maintained that he lacked the authority to act, and that only the Governor and

Legislature could provide such relief.[13]  The Governor and
numerous legislators have expressed their willingness to
consider a legislative "fix" to the predicament, but bills that
were introduced in the Legislature that would reduce the number
of required signatures for those offices requiring 1,000 or more
signatures by fifty percent, see 2020 Senate Doc. No. 2632, or
by two-thirds for all offices, see 2020 House Doc. No. 4981.
The Senate has engrossed its bill, but, as of the time this
opinion was submitted, neither legislative "fix" had been
enacted.

Discussion.  The right to seek elected office, like the
related right to vote, is a fundamental constitutional right in
Massachusetts.  Article 9 of the Massachusetts Declaration of
Rights provides, with impressive brevity and clarity, that
"[a]ll elections ought to be free; and all the inhabitants of
this commonwealth, having such qualifications as they shall
establish by their frame of government, have an equal right to
elect officers, and to be elected, for public employments."

---

[13] The Secretary issued an advisory recommending, among
other things, that candidates and volunteers "take appropriate
precautions as they continue to gather signatures.  If you are
interacting with voters, be sure to have hand sanitizer or
disinfectant wipes available and wash your hands frequently.  If
possible, consider providing signers with fresh pens and sheets
of paper."  See Secretary of the Commonwealth, COVID-19
Elections Updates, https://www.sec.state.ma.us/ele/covid-
19/covid-19.htm [https://perma.cc/ZM2J-GBY8].

Over the ensuing 240 years since the adoption of our Declaration of Rights in 1780, art. 9 has served to protect the "fundamental" and "intertwine[d]" rights of candidates to gain access to the ballot and of voters to cast their ballots as they see fit. See Libertarian Ass'n of Mass. v. Secretary of the Commonwealth, 462 Mass. 538, 560 (2012) (LAM).

As with many fundamental rights, the "court has sustained statutes which reasonably regulate elections and access to a place on the ballot." Opinion of the Justices, 368 Mass. 819, 821-822 (1975). See Opinion of the Justices, 413 Mass. 1201, 1209 (1992), quoting Opinion of the Justices, 375 Mass. 795, 811 (1978) ("the right to be elected, preserved in art. 9, is not absolute but 'is subject to legislation reasonably necessary to achieve legitimate public objectives'"). In fact, the court has previously considered the same minimum signature requirements at issue here and concluded that they withstood constitutional scrutiny. LAM, 462 Mass. at 567. In that case, the plaintiff Libertarian party sought to transfer the certified voter signatures obtained by one candidate to another candidate in order to qualify the latter to be on the general election ballot. See id. at 545-546. The present case comes before the court under an entirely different set of facts and circumstances. The framework through which we analyze it, however, remains the same.

When we evaluate the constitutionality of a restriction on
access to the ballot, we apply a "sliding scale approach, . . .
through which [we] weigh the character and magnitude of the
burden the State's rule imposes on the plaintiffs' rights
against the interests the State contends justify that burden,
and consider the extent to which the State's concerns make the
burden necessary" (quotations, citations, and alterations
omitted).  Id. at 560.  "Regulations imposing severe burdens on
plaintiffs' rights must be narrowly tailored and advance a
compelling state interest.  Lesser burdens . . . trigger less
exacting review, and a State's important regulatory interests
will usually be enough to justify reasonable, nondiscriminatory
restrictions" (quotations and citations omitted).  Id.  More
recently, recognizing that the Massachusetts Declaration of
Rights may be more protective of voting rights than the Federal
Constitution, we have declared that we do not use the phrase
"severe burden," which arises from Federal constitutional
jurisprudence, in determining whether strict scrutiny applies
but instead apply strict scrutiny to a voting requirement that
"significantly interfere[s]" with the fundamental right to vote.
See Chelsea Collaborative, Inc. v. Secretary of the
Commonwealth, 480 Mass. 27, 35, 36 n.21, 40 (2018).  We need not
decide here whether the Massachusetts Constitution provides
greater protections for the art. 9 rights at issue, because it

is undisputed that, under the circumstances arising from this
pandemic, we should apply strict scrutiny to the minimum
signature requirements regardless of whether we apply a "severe
burden" or "significant interference" formulation.

In ordinary times, the minimum signature requirements to
appear on the ballot in Massachusetts only impose "modest
burdens" on prospective candidates for public office, so "there
need be only a rational basis undergirding the regulation in
order for it to pass constitutional muster" (citation omitted).
LAM, 462 Mass. at 567.  And in ordinary times the rational basis
threshold is "easily" met, as the "State's interest in ensuring
that a candidate makes a preliminary showing of a substantial
measure of support before appearing on the ballot is legitimate"
(quotation, citation, and alteration omitted).  Id.  Minimum
signature requirements ensure "that the candidates who appear on
the . . . ballot have demonstrable support among the voting
public." Barr v. Galvin, 626 F. 3d 99, 111 (1st Cir. 2010),
cert. denied, 565 U.S. 929 (2011).  In doing so, they "safeguard
the integrity of elections by avoiding overloaded ballots and
frivolous candidacies, which diminish victory margins,
contribute to the cost of conducting elections, confuse and
frustrate voters, increase the need for burdensome runoffs, and
may ultimately discourage voter participation in the electoral

process." <u>Libertarian Party of Me</u>. v. <u>Diamond</u>, 992 F.2d 365,
371 (1st Cir.), cert. denied, 510 U.S. 917 (1993).

But, as we have recognized, statutory requirements that
were once considered constitutionally permissible may later be
found to interfere significantly with a fundamental right as
societal conditions and technology change.  See <u>Chelsea</u>
<u>Collaborative, Inc</u>., 480 Mass. at 37, citing <u>Goodridge</u> v.
<u>Department of Pub. Health</u>, 440 Mass. 309, 341 n.33 (2003).  And
similarly, statutory requirements that in ordinary times impose
only modest burdens on prospective candidates for public office
may significantly interfere with the fundamental right to run
for political office in a time of pandemic.

We need not dwell long on how dramatically conditions have
changed in Massachusetts since the Governor first announced a
state of emergency arising from the COVID-19 pandemic on March
10.  All who presently live in the Commonwealth have seen it
(and lived it), and, for additional details, posterity can look
to our recent decision in <u>Committee for Pub. Counsel Servs</u>. v.
<u>Chief Justice of the Trial Court</u>, 484 Mass. 431, 433-434 (2020).
Suffice it to say that, during the state of emergency, the
traditional venues for signature collection are unavailable:
few people are walking on public streets in town centers; malls
are closed, as are all but essential businesses; restaurants
provide only take-out food or delivery; public meetings, if held

at all, are conducted virtually; and the vast majority of people are remaining at home.  See Glovsky v. Roche Bros. Supermkts., Inc., 469 Mass. 752, 762 (2014) (recognizing candidates' constitutional right to solicit nominating signatures outside entrance to supermarket); Batchelder v. Allied Stores Int'l, Inc., 388 Mass. 83, 92 (1983) ("a person needing signatures for ballot access requires personal contact with voters").

When people do encounter each other, they do so only by maintaining a "social distance" of at least six feet, and attempt to keep such encounters as brief as possible.  Because it has been shown that one can carry and spread the COVID-19 virus without any apparent symptoms, every encounter with another person, especially a stranger, poses a risk of infection.  Because it is not altogether clear how long the COVID-19 virus may "survive" on various surfaces and objects, people are reluctant to touch any pen or piece of paper that has been touched by another, at least unless they quickly can wash or sanitize their hands.  Accordingly, if a candidate seeks to obtain signatures on nomination papers in the traditional ways, he or she reasonably may fear that doing so might risk the health and safety not only of the person requesting the signature but also of the persons who are signing, of the families with whom they live, and potentially of their entire community.

In short, as the Secretary rightly and readily acknowledges, the minimum signature requirements, which may only impose a modest burden on candidates in ordinary times, now impose a severe burden on, or significant interference with, a candidate's right to gain access to the September 1 primary ballot, and the government has not advanced a compelling interest for why those same requirements should still apply under the present circumstances.  See LAM, 462 Mass. at 560. Indeed, it concedes that there is none.  The minimum signature requirements, therefore, in this time of pandemic are unconstitutional as applied to the plaintiffs, and other similarly situated candidates.

If the Legislature had enacted a law on March 23 imposing harsh new requirements that made it substantially more difficult for candidates to obtain the required signatures to get on the September 1 primary ballot, we no doubt would declare the law unconstitutional.  The Legislature, of course, did not do this, but it is fair to say that the pandemic did.  To be sure, "wet" signatures can still be obtained, but the ability to do so safely has been greatly diminished or been made significantly more laborious.  No fair-minded person can dispute that the fundamental right to run for elective office has been unconstitutionally burdened or interfered with by the need to

obtain the required "wet" signatures in the midst of this pandemic. See LAM, 462 Mass. at 560.

The burdens imposed by the statutory minimum signature requirements are not inevitable. There are alternatives that could preserve the legislative purpose that a candidate demonstrate a certain level of support in order to win a place on the ballot and yet protect the public from the health risks associated with obtaining "wet" signatures.

As a general matter, the principle of separation of powers set forth in art. 30 of the Massachusetts Declaration of Rights prevents the "judiciary [from] substituting its notions of correct policy for that of a popularly elected Legislature" (citation omitted). Commonwealth v. Leno, 415 Mass. 835, 841 (1993). But where fundamental constitutional rights are violated, and where the Legislature fails to remedy the constitutional deficiencies after having had the opportunity to do so, and where an aggrieved litigant files suit seeking remedial relief for the constitutional violation, the judiciary must provide such a remedy. See Cepulonis v. Secretary of the Commonwealth, 389 Mass. 930, 938 (1983), citing Reynolds v. Sims, 377 U.S. 533, 586 (1964). Here, where the filing deadline for nomination papers fast approaches, and the Legislature has yet to take decisive action, we have little choice but to provide equitable relief, pursuant to G. L. c. 214, § 1, to

protect the constitutional rights of the plaintiffs and those similarly situated. See Commonwealth v. United Food Corp., 374 Mass. 765, 781 (1978) ("In order to avoid the unconstitutional aspects of the statute, and to achieve the basic legislative purpose, we conclude that the judge must have discretion to fashion the judgment in this case . . ."). "It is a well settled principle that, in fashioning appropriate relief, the issuance and scope of equitable relief rests within the sound discretion" of the court. Johnson v. Martignetti, 374 Mass. 784, 794 (1978), citing Martin v. Murphy, 216 Mass. 466, 468 (1914). We recognize, though, that where these extraordinary circumstances require us to make policy judgments that, in ordinary times would be best left to the Legislature, our remedy must be "no more intrusive than it ought reasonably be to ensure the accomplishment of the legally justified result." Perez v. Boston Hous. Auth., 379 Mass. 703, 730 (1980).[14]

_____

[14] The action we take here is by no means unprecedented. Other States, addressing the potential for voter disenfranchisement in the face of natural disasters, have similarly provided narrowly tailored equitable relief to protect the constitutional rights of voters. See, e.g., Florida Democratic Party v. Scott, 215 F. Supp. 3d 1250, 1257-1259 (N.D. Fla. 2016) (ordering Statewide extension of voter registration deadline in response to Hurricane Matthew); Georgia Coalition for the People's Agenda, Inc. v. Deal, 214 F. Supp. 3d 1344, 1345-1346 (S.D. Ga. 2016) (ordering extension of voter registration deadline for one county in response to Hurricane Matthew). In addition, at least one court has declared minimum signature requirements to be unconstitutional in light of the pandemic and, as a result, reduced the numbers. See Omari

The plaintiffs have requested various alternative forms of relief.  Before we discuss the relief that is granted, we take a moment to address the requests for relief that we do not believe are justified.

The plaintiffs first request that we not only declare the minimum signature requirements unconstitutional as applied to them and similarly situated candidates during this primary election, but also declare the minimum signature requirements void.  In effect, the plaintiffs seek to avoid the minimum signature requirements altogether and proceed directly to the September 1 primary ballot.  We decline to order this remedy; the justification for the current statutorily prescribed signature requirements is outweighed by the burden those requirements impose under the present conditions, but there is still merit to having some signature requirements.  Even in the midst of the pandemic, the State has a legitimate interest in ensuring that a candidate makes a preliminary showing of support among the electorate before appearing on the ballot.  In addition, the pandemic has not completely deprived candidates of the ability to gather signatures.  Between February 11, 2020, when the nomination papers were first made available, and March

---

Faulkner for Va. vs. Virginia Dep't of Elections, CL2000-1456, Cir. Ct. of Richmond (Mar. 25, 2020) (order reducing signature requirement for candidates seeking to be Republican Party nominees for United States Senate from 10,000 to 3,000).

23, 2020, when the first significant restrictions were imposed in response to the pandemic, candidates had forty-one days in which to gather signatures without any constraint. Since March 23, the process has become unconstitutionally burdensome, but not impossible. And the remedies we provide in this decision will permit additional signatures to be safely obtained. It would not be equitable, therefore, to declare the minimum signature requirements void altogether.

Given the looming deadlines, the plaintiffs also request, in the alternative, that we extend the deadlines for submitting nomination papers to local election officials and for filing the certified nomination papers with the Secretary. The Secretary, however, maintains that an extension beyond May 5 for submissions to local election officials and May 26 for filing with the Secretary is not workable, given the time needed for the SBLC to deal with any objections to the nomination papers, for the Secretary's office to prepare the 2,200 different styles of ballots required for the different jurisdictions in the Commonwealth, and for local election officials to then transmit the ballots by July 18 to military and overseas voters, as required by Federal law. The plaintiffs have not disputed the Secretary's timeline or his analysis of the problems that would arise from a greater extension, and we defer to his experienced judgment in this regard. Therefore, we will extend the

deadlines only for candidates running for State district and county offices, and extend their deadlines only to match the deadlines that apply to party candidates running for Federal and Statewide offices: from April 28 to May 5 to submit nomination papers to local election officials for certification, and from May 26 to June 2 to file the certified nomination papers with the Secretary.

The plaintiffs have further requested, as alternative relief, that we "substantially" reduce the number of signatures required to get on the primary election ballot. The Secretary agrees, but suggests that the reductions should only apply to offices for which 1,000 or more certified voter signatures are currently required. This would preclude any reduction of the required minimum signatures for candidates for State senator and representative, who currently must secure 300 and 150 signatures, respectively, and for offices in certain counties (e.g., Barnstable County register of probate and Barnstable County commissioner), who currently need to obtain 500 signatures. We agree that, in light of the prevailing circumstances, the most equitable alternative is to reduce the number of signatures required. We do not agree, however, that it would be equitable to do so only for some candidates and not others.

Presumably, the number of signatures required for each office was established to reflect a balance between the number of people represented by the elected office and the burden involved in obtaining the signatures. Hence, a Statewide office such as United States senator warrants burdening a candidate with a requirement of gathering 10,000 signatures, while an office representing fewer people, such as a State senator, warrants a signature requirement of 300. It seems only just that the same rationale should apply when it comes to reducing the minimum numbers in response to the pandemic, and that the same percentage decrease should apply to all offices. To hold otherwise would alter the relative ratio of the minimum requirements chosen by the Legislature. For instance, a primary candidate for the State Senate must gather only three per cent of the signatures that a primary candidate for the United States Senate must gather; that ratio should not be altered by the remedy we devise.

In determining the percentage of the across-the-board reduction, the Secretary has suggested a reduction of fifty percent (50%), the same amount that has been proposed in one of the bills currently pending in the Legislature.[15] We agree with

---

[15] We note that both the Secretary and 2020 Senate Doc. No. 2632 would limit this fifty percent (50%) reduction to offices requiring 1,000 or more signatures.

that suggested percentage decrease.  Fifty percent (50%) has a rational connection to the underlying constitutional violation. As noted _supra_, the candidates had forty-one days after the date when nomination papers were first made available (February 11) to gather signatures without any significant restrictions related to the pandemic.  That all changed on March 23, when the Governor issued the order limiting public and private gatherings to no more than ten people, requiring all nonessential businesses to close their physical workplaces and facilities, and directing DPH to issue the Stay-at-Home Advisory, urging people to leave home only for essential errands and to practice social distancing when they did.  Forty-one days is almost exactly fifty percent (50%) of the time between February 11 and May 5, which is now the deadline by which all primary candidates have to collect signatures and submit them to local election officials.  Even if candidates were slow to start, it was significantly challenging, but not impossible, to gather signatures after March 23, and as discussed _infra_, candidates will now have some opportunity to obtain electronic signatures through May 5, so it should not be unfairly burdensome for a serious candidate to obtain one-half of the required signatures. The number of certified registered voter signatures required to get on the September 1 primary ballot, therefore, is reduced by fifty percent (50%) for all candidates.

Finally, the plaintiffs also request that we order State officials to explore "less stringent strategies" for the collection and submission of signatures, such as through the electronic collection of signatures. They note that a few States have implemented the use of electronic signatures and submissions for purposes of securing access to the ballot, including at least two that did so in response to the current pandemic.[16] In the order reserving and reporting this case to the full court, the parties were asked to address the logistics of, and potential problems with, collecting and verifying electronic signatures. Their submissions have convinced us that there are too many issues and unanswered questions to allow us confidently to impose a remedy that would transform a nomination system that required "wet" signatures into one that permitted a broad range of electronic signatures, including a printed name. To name just a few, there are the inherent time constraints discussed supra; there are potential logistical, legal, and cyber-security related concerns; and, of course, there is the

---

[16] Arizona already had adopted an electronic candidate nominating system called "E-qual," which allows voters to show support for candidates "from the comfort of [their] home[s] or anywhere [I]nternet access is available." See https://apps.azsos.gov/equal [https://perma.cc/2HDB-YHSF]. New Jersey and Florida, meanwhile, have taken some action in this regard in response to the pandemic. See New Jersey Governor, Executive Order No. 105 (Mar. 19, 2020); Florida Secretary of State, Emergency Rule No. 1SER20-2 (Apr. 3, 2020).

fact that local and State governments are already operating under severe constraints, and often with skeletal staffing, due to the pandemic.

The Secretary, however, has suggested one modest means to include electronic signature collection among our equitable remedies, which the plaintiffs find attractive, as do we. Specifically, the Secretary proposes that we order that candidates seeking to be on the ballot for the September 1 primary election be allowed to scan and post or otherwise distribute their nomination papers online. Voters may then download the image of the nomination papers and either apply an electronic signature with a computer mouse or stylus, or print out a hard copy and sign it by hand. The signed nomination paper can then be returned to the candidate, or a person working on the candidate's behalf, either in electronic form (by transmitting the "native" electronic document or a scanned paper document) or in paper form (by hand or mail). The candidates will still have to submit the nomination papers to local election officials in hard copy paper format, but the proposed process will alleviate the need for, and the risk associated with, obtaining "wet" signatures. The Secretary is ordered forthwith to provide clear guidance to prospective candidates as to how this electronic signature collection process may be

accomplished effectively, although candidates need not await that guidance to get started.

Conclusion.  For the reasons stated, the plaintiffs' application for declaratory relief is allowed to the extent that we declare, in the limited context of the current pandemic, that the minimum signature requirements in G. L. c. 53, §§ 7 and 44, for candidates in the September 1, 2020, primary election are unconstitutional.  As a remedy for this constitutional violation, we order that (1) the number of required signatures be reduced by fifty percent (50%) for all offices; (2) the deadlines for candidates running for State district and county offices to submit their nomination papers to local election officials for certification and for the filing of certified nomination papers with the Secretary be extended to May 5, 2020, and June 2, 2020, respectively, which are the current due dates for party candidates running for Federal and Statewide offices; and (3) subject to the restrictions outlined in this decision, the Secretary shall allow the submission and filing of nomination papers with electronic rather than "wet" signatures.

So ordered.

KAFKER, J. (concurring).  Given the pressing need for immediate action during the pandemic, and the technological limitations in our existing electoral infrastructure identified by the Secretary of the Commonwealth (Secretary), I concur in the court's multifaceted remedy.  I write separately, however, to express concern that those responsible for our electoral process have concluded that they are unable to solve the problem of in-person signatures with the more straightforward and targeted solution of electronic filing of signatures, and therefore have required the court to temporarily rewrite the election laws.  Those responsible for our elections must have the technological tools to respond to the pandemic that confronts us, which has fundamentally changed the world as we know it.  Leaving these electoral problems for the courts to solve should be a last resort.

When we declare an act unconstitutional, we must do so in the least intrusive and most judicious manner possible.  See Duracraft Corp. v. Holmes Prods. Corp., 427 Mass. 156, 167 (1998) ("We must construe statutory provisions, when possible, to avoid unconstitutionality, . . . and to preserve as much of the legislative intent as is possible in a fair application of constitutional principles").  Even as these extraordinary circumstances require us to fashion judicial remedies for such constitutional violations, we must do our utmost to avoid making

policy decisions that are the responsibilities of other branches of government.  See Commonwealth v. Leno, 415 Mass. 835, 841 (1993) (recognizing "the undesirability of the judiciary substituting its notions of correct policy for that of a popularly elected Legislature" [quotations and citation omitted]).  Our duty is to do the minimum of what is necessary to conform those statutes to the Massachusetts Constitution, and not to rewrite those statutes more extensively.  See id.  See also Aptheker v. Secretary of State, 378 U.S. 500, 515 (1964) ("Although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute or judicially rewriting it" [quotation, citation, and alteration omitted]).

The fundamental issue here is the statutory requirement that nomination signatures be obtained "in person."  See G. L. c. 53, § 7.  As the court highlights, and as we have previously stated, the State has a legitimate interest in ensuring that candidates have a "substantial measure of support" before they may appear on the ballot.  See Libertarian Ass'n of Mass. v. Secretary of the Commonwealth, 462 Mass. 538, 567 (2012), quoting Barr v. Galvin, 626 F.3d 99, 111 (1st Cir. 2010), cert. denied, 565 U.S. 929 (2011).  Otherwise, the ballot would be overcrowded and confusing.  See id. at 567 & n.29.  Moreover,

the requirement that candidates obtain a minimum number of signatures in order to qualify for the ballot is reasonably related to this interest.  See id.  Rather, it is the in-person aspect of the signature requirement that renders it unduly burdensome in light of the current pandemic and quarantine, as this requirement presents public safety risks for both the campaign and individual signatories.  An in-person signature simply cannot be obtained without endangering the health of those collecting the signatures and those signing their names.

The least intrusive remedy to this constitutional deficiency would be one that carves out the in-person requirement and replaces it with its nearest equivalent: electronic signatures.  This solution should be technologically feasible and relatively straightforward in the midst of a pandemic:  use electronic nomination papers that can be electronically signed by voters and electronically submitted to local election officials.

Electronic signatures are the norm in the private sector and many areas of government.  Even before automatic voter registration took effect, the Secretary maintained an online portal that allowed citizens to complete an online affidavit using an image of their electronic signature from the registry of motor vehicles to register to vote.  See G. L. c. 51, § 33A. The Legislature has also already laid the groundwork for the

4

verification of registered voters' electronic signatures. The
Legislature has expressly determined that, as a general matter,
"[a] record or signature may not be denied legal effect or
enforceability solely because it is in electronic form," and,
"[i]f a law requires a signature, an electronic signature
satisfies the law." G. L. c. 110G, § 7 (a), (d). The
Legislature and the Secretary have also facilitated certain
business filings by allowing both electronic signatures and
electronic submissions. See G. L. c. 156D, §§ 1.40 et seq.
(including electronic signatures in definition of "sign" or
"signature" for purposes of incorporation); 950 Code Mass. Regs.
§ 113.06(4) (2006) (requiring "original" signature on corporate
filings unless documents are submitted "by authorized electronic
or facsimile transmission"). If this trend toward acknowledging
electronic signatures is acceptable for the registration of
voters and the creation of businesses, it should also be
sufficient to meet ballot signature requirements.

One would think that, had electronic signatures been
expeditiously approved for use on nomination papers by the
Legislature and the Secretary, nothing more would be necessary
to remedy the unconstitutional burden here. In an age dominated
by social media sites like Facebook and Twitter, and one that
requires sophisticated digital political campaigning, it is
difficult to imagine that a viable legislative candidate for the

State house or State senate would be unable to electronically
alert and engage the 150 or 300 followers that the candidate
needs to obtain electronic signatures to appear on the ballot.
Those seeking Statewide office should also be able to satisfy
their reasonable signature requirements if a readily accessible
electronic signature process were adopted.  Indeed, this would
presumably be the norm if the technical capacities of our
election infrastructure were anywhere near as sophisticated and
adaptable as those of the private sector and other areas of
government.

Unfortunately, according to the Secretary, election
officials lack the technological capacity at this time to
readily accept electronic signatures for ballot nominations.
The Secretary contends that there are significant limitations on
the capacity of local and State election officials to receive
and verify such electronic signatures for the purposes of
satisfying the signature requirements, even when those
requirements involve a manageable numbers of signatures, ranging
from 150 to 10,000, plus the additional number of signatures
necessary to create a margin of error for the candidates.
Specifically, the Secretary contends that individual
municipalities may not be able to open large e-mail attachments
containing voter signatures, and may be unable to access online
file storage sites due to cybersecurity concerns.  Why this

remains so difficult in the modern era is somewhat inexplicable. Why a simple e-mail attestation that includes the name, address, and party registration of the voter is insufficient is also not obvious. The process for verifying even "wet" signatures appears to consist primarily, if not completely, of a comparison of the name, address, and voter registration on the "wet" signature with the name, address, and voter registration on record. See 950 Code Mass. Regs. § 55.03(1) (2004). Why a simple e-mail is more suspect than a "wet" signature remains unclear.

Nevertheless, because of the current technological limits on our election capabilities and the procedural requirements of the current process, candidates will be forced to continue to submit their nomination papers in hard copy form. According to the Secretary, we are limited to the following process for allowing electronic signatures. First, candidates will be permitted to electronically post or distribute their nomination papers. Then, voters must download the papers and either electronically sign, or print and physically sign, the document and return it to the candidate in electronic or paper form. The candidate will then be tasked with producing all voter signatures in hard copy paper format, and physically submitting his or her nomination papers to local officials for certification. At minimum, this awkward, multistep process will

require candidates or campaign volunteers to risk exposure to the virus by venturing out, either to the post office or a local official's physical office, in order to deliver the nomination papers to election officials.

Allowing voters to submit their signatures electronically as part of this cumbersome process, by itself, is not enough to fix the problem. Indeed, the parties agree that this stilted approach to electronic signatures is not enough. Rather, given the apparent lack of technological capacity to readily accept and verify electronic signatures in a more straightforward manner -- even in the midst of a global pandemic -- this court is instead forced to impose alternative remedies, such as reducing the statutorily prescribed signature threshold and extending the time limits for gathering signatures.

Unfortunately, these alternative remedies raise other constitutional issues. When we start to alter the numbers of signatures required to qualify for the ballot, we begin to stray into territory reserved for the Legislature. See Kenniston v. Dep't of Youth Servs., 453 Mass. 179, 189 (2009). While reducing the signature threshold by fifty percent may be a sound Solomonic solution, and roughly corresponds to the amount of time candidates have lost, this appears to be more of a policy choice best left to the Legislature, which can act with great

dispatch when it chooses to do so.[1] Nonetheless, in the instant case, at this last minute in the signature gathering process, and in the absence of legislative action, this court is forced to impose these alternative remedies itself to conform the election laws to constitutional requirements during the pending emergency. These remedies also appear to be the least intrusive ones available, in light of the deficient technological capabilities identified by the Secretary and the imminent approaching deadlines for submitting nomination papers.

In this "high tech" era, and in the midst of a global pandemic that severely restricts close personal contact, the failure to be able to solve manageable technological problems on the eve of an election is confounding and distressing. At a time when we need to be fundamentally rethinking what must be done in person and what can instead be done electronically, our electoral process seems dangerously unequipped to adapt to a new paradigm.

The COVID-19 pandemic has dramatically changed our current reality, not only in the Commonwealth, but across the globe, and not simply for a month or two. Despite the significant negative

---

[1] We recognize that elected officials are presently operating under the same quarantine restrictions as the rest of the Commonwealth. This makes the enactment of major substantive changes more difficult to accomplish, particularly where such changes require collaborative efforts among significant numbers of people.

effects of this lockdown, health officials have urged the importance of maintaining quarantine efforts for the foreseeable future. Tozzi and Bloomberg, "Social distancing until 2022? It may be necessary, according to Harvard coronavirus researchers," Fortune (Apr. 14, 2020) https://fortune.com/2020/04/14 /social-distancing-until-2022-coronavirus-end-date-spread-covid- 19-harvard-researchers/ [https://perma.cc/HQJ5-4257]. It remains to be seen when the current measures will no longer be necessary. The Governor has indicated that the existing lockdown will remain in place until at least May 4, 2020. See COVID-19 Order No. 21. Even to the extent that the spread of the virus slows in the coming months, there are indications it may again surge in the fall. See Tozzi and Bloomberg, supra. In any event, it is clear that the effects of COVID-19 will be felt for years to come, and that we must adapt to face the long- term logistical challenges that this new reality poses to our society, particularly for in-person interactions.

Other States have adapted their election machinery to address the electronic signature problem. As the court observes, ante at note 16, Arizona has adopted a centralized system for allowing voters to electronically sign candidates' nomination papers, called "E-Qual." See https://apps.azsos.gov/equal/ [https://perma.cc/2HDB-YHSF]. The E-Qual website prompts voters to provide select personal

information, which is then used to access their voter
registration record.  See id.  Once their voter registration
record has been identified, voters may electronically sign a
candidate's nominating petition.  See id.  As the website
boasts, this system allows voters to show their "support for a
candidate from the comfort of [their] home[s] or anywhere
[I]nternet access is available."  See id.

Despite the apparent lack of technological solutions
available for purposes of the current election cycle, it would
appear that the Commonwealth has the means to ameliorate this
issue going forward, though not in time to address the issue
before the court.  As explained by the amicus, the Commonwealth
is already expanding its acceptance of electronic signatures in
other areas of election administration.  Pursuant to legislation
passed in 2018, the Commonwealth began implementing an automatic
voter registration process on January 1, 2020.  See G. L. c. 51,
§ 42G½; St. 2018, c. 205, § 4.  As a part of this process,
automatic voter registration agencies, such as the registry of
motor vehicles,[2] must transmit a voter's electronic signature to
the Secretary, who transmits the same to the board of registrars

---

[2] An "automatic voter registration agency" is defined as "a
location at a state agency where an eligible citizen may
register to vote."  G. L. c. 51, § 42G½ (a), (b).

or election commission of the city or town where the voter resides.  G. L. c. 51, § 42G½ (e).

Municipal registrars therefore already have at least a growing database of electronic signatures of voters registered in the Commonwealth.  It follows, then, that they should have the capability to compare electronic signatures submitted for a candidate's nomination papers with electronic signatures submitted by automatic voter registration agencies.  See G. L. c. 51, § 42G½; 950 Code Mass. Regs. § 55.03(1)(b).  They should therefore be able to scale up to wider use of electronic signatures in the near future.  That future, however, is apparently not now.  For that reason, I am forced to concur.

In sum, while I agree with the court that the technological limitations described by the Secretary prevent us from replacing the in-person requirement with electronic signatures alone in the short time before the signatures are due, and require the multifaceted remedy the court proposes, I feel compelled to emphasize that those responsible for our election process must have the necessary tools to quickly adapt to the current pandemic and the future crises to follow.  Absent such technological adaptability, our elections will be imperiled and our election laws may themselves have to be rewritten in the midst of a crisis, as was done here.  That is an invitation to conflict and confusion that must be avoided.

DECLARATION OF JAMES R. SUTTON; EXHIBIT 5

**Alex Padilla**
**California Secretary of State**

| What can we help you with? |
| --- |
| **Search** |



# Section 8: Political Party

**Print Version  (PDF) (https://elections.cdn.sos.ca.gov/statewide-elections/2014-primary/section-8-political-party.pdf)**

## Political Party Qualification Process, Requirements, and History

The method by which political parties gain, and retain, qualified status in California is prescribed in Elections Code sections 5000-5200.[1]

In order to achieve initial qualified status, thereby allowing a political party to participate in the next primary election or the next presidential general election, a proposed political party must:

1. Hold a caucus or convention to elect temporary officers and designate a party name;     § 5001(a)
2. File a formal notice with the Secretary of State, declaring that the political body has organized, elected temporary officers, and declared an intent to qualify as a political party pursuant to either Elections Code section 5100 or 5151. This notice must include the names and addresses of the temporary officers of the political body;     § 5001(b) and
3. Use one of two methods to qualify as a political party: voter registration or petition.     §§ 5100, 5151

Voter Registration

Qualifying a new political party by voter registration requires that 103,004 (1% of 10,300,392 votes cast at the last gubernatorial election) eligible persons complete an affidavit of registration, on which they have disclosed a preference for the political body intending to qualify as a political party, by writing in the name of the political body.     §§ 5100(b), 5151(c)

These completed affidavits of registration must be submitted to the county elections officials 154 days prior to a primary election (if intending to qualify to participate in the next primary election) or 123 days before a presidential general election (if intending to qualify to participate in the next presidential general election). The completed affidavits of registration should be submitted to the elections official in the counties of the voters' residences. Affidavits may be submitted to the Secretary of State's office; however, this will result in a delay in the receipt of the affidavits by counties. The 154th day prior to the June 3, 2014, Primary Election is December 31, 2013.     § 2187(d)(1) & (d)(4)

No later than 135 days prior to any primary election and no later than 102 days prior to a presidential general election, the Secretary of State must determine, from examining and totaling the reports of registration from the counties, that the political body obtained voter registrations equal in number to 1% of the votes cast at the last gubernatorial election. The 135th day prior to the June 3, 2014, Primary Election is January 19, 2014.     §§ 5100(b), 5151(c)

Petition

To qualify a new political party by petition, no later than 135 days prior to the primary election or the presidential general election, the Secretary of State must determine if a political body intending to qualify collected 1,030,040 (10% of 10,300,392 votes cast at the last gubernatorial election) petition signatures of registered voters.     §§ 5100(c), 5151(d)

In order for the Secretary of State to make this determination on or before the 135th day prior to the primary election or the presidential general election, the counties must have ample time to count and verify the signatures. The 135th day prior to the June 3, 2014, Primary Election is January 19, 2014.

§ 2187(d)(1) & (d)(4)

Once qualified, a political party maintains its qualified status by:

1. Retaining registrants representing at least 1/15 of 1% (.00067%) of the total state registration; and    §§ 5101, 5153

2. Having one of its statewide candidates (running for Governor, Lieutenant Governor, Secretary of State, Controller, Treasurer, Attorney General, Insurance Commissioner, or United States Senator) receive at least 2% of the entire vote of the state for that office at the last gubernatorial election;    §§ 5100(a), 5151(b)
or
Retaining statewide registration equaling at least 1% of the total votes cast at the last gubernatorial election.

§§ 5100(b), 5151(c)

There are currently **seven** qualified political parties in California: Democratic, Republican, American Independent, Americans Elect, Green, Libertarian, and Peace and Freedom. In addition to the Democratic and Republican parties, which have participated in state primary elections since 1910, seven other parties have qualified since 1967. In 1968, both the American Independent Party and the Peace and Freedom Party qualified by the voter registration method; however, in 1998, the Peace and Freedom Party failed to meet the requirement that one of its candidates receive 2% of the vote for the particular office and therefore lost its qualified status. The Libertarian Party achieved the requisite number of registrants in 1980; the Green Party reached the required number in 1992. In 1995, the Natural Law and the Reform parties garnered the requisite number of registered voters. In 2003, the Peace and Freedom Party regained its qualified status and the Reform Party failed to meet the requirements to retain its qualified status. The Natural Law Party lost its qualified status in 2006. In 2011, the Americans Elect Party qualified using the petition method.

Since the statewide party nomination process began in 1910, 19 parties have qualified to participate in primary elections, including:

Democratic 1910-present[2]

Republican 1910-present[2]

Independence League 1910[2]

Prohibition 1910-1962[2]

Socialist 1910-1938[2]

Progressive (Bull Moose) 1912-1918[2]

Liberty 1932-1934

Commonwealth 1934-1938

Communist 1934-1944

Progressive 1934-1938

Townsend 1938-1942

Independent Progressive 1948-1954

American Independent 1968-present

Peace and Freedom 1968-1998; 2003-present

Libertarian 1980-present

Green 1992-present

Natural Law 1995-2006

Reform 1995-2002

Americans Elect 2011-present

Prior to 1910, many parties either conducted conventions or held primary elections to select their candidates for the statewide general election.

For additional information regarding qualifying a political party, please visit the Secretary of State's website at **www.sos.ca.gov/elections/political-parties/political-party-qualification.htm (/elections/political-parties/political-party-qualification/)**.

1. Assembly Bill (AB) 1419 amends and adds various Election Code sections addressing political party qualification. AB 1419 becomes effective January 1, 2014. ↑
2. Active before 1910 ↑

DECLARATION OF JAMES R. SUTTON; EXHIBIT 6

# California Fair Political Practices Commission
# California State Contribution Limits
(Effective January 1, 2019 - December 31, 2020)

Candidates seeking a state office and committees that make contributions to state candidates are subject to contribution limits from a single source. (Sections 85301 - 85303.)  Contributions from affiliated entities are aggregated for purposes of the limits. (Regulation 18215.1.)  The chart below shows the current limits per contributor for state offices.  The primary, general, special, and special run-off elections are considered separate elections.  Contribution limits to candidates apply to each election.  Contribution limits to officeholder and other committees apply on a calendar year basis.  Contact your city or county about contribution limits for local offices.

## Contribution Limits to State Candidates Per Election

| Candidate or Officeholder | Contributor Sources | | |
| --- | --- | --- | --- |
| | Person (individual, business entity, committee/PAC) | Small Contributor Committee (see definition on page 2) | Political Party |
| Senate and Assembly | $4,700 | $9,300 | No Limit |
| CalPERS/CalSTRS | $4,700 | $9,300 | No Limit |
| Lt. Governor, Secretary of State, Attorney General, Treasurer, Controller, Supt. of Public Instruction, Insurance Commissioner, and Board of Equalization | $7,800 | $15,500 | No Limit |
| Governor | $31,000 | $31,000 | No Limit |

## Contributions to Other State Committees Per Calendar Year

| Committee | Contributor Sources |
| --- | --- |
| | Person (individual, business entity, committee/PAC) |
| Committee (Not Political Party) that Contributes to State Candidates (PAC) | $7,800 |
| Political Party Account for State Candidates | $38,800 |
| Small Contributor Committee | $200 |
| Committee Account NOT for State Candidates (Ballot Measure, PAC, Political Party) | No Limit* |

*State committees (including political parties and PACs) may receive contributions in excess of the limits identified above as long as the contributions are NOT used for state candidate contributions.  (Regulation 18534.)

## Contributions to State Officeholder Committees Per Calendar Year

| Committee | Contributor Sources | |
| --- | --- | --- |
| | Any Source (Person, Small Contributor Committee or Political Party) | Aggregate From All Sources |
| Senate and Assembly | $3,900 | $64,400 |
| CalPERS/CalSTRS | $3,900 | $64,400 |
| Lt. Governor, Secretary of State, Attorney General, Treasurer, Controller, Supt. of Public Instruction, Insurance Commissioner, and Board of Equalization | $6,400 | $128,700 |
| Governor | $25,700 | $257,500 |

*www.fppc.ca.gov*
*FPPC Advice: advice@fppc.ca.gov (1.866.275.3772 )*
*FPPC EAED • 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 • Page 1 of 2*