1   XAVIER BECERRA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   MILAD DALJU
    Deputy Attorney General
4   PETER H. CHANG
    Deputy Attorney General
5   State Bar No. 241467
      455 Golden Gate Avenue, Suite 11000
6     San Francisco, CA  94102-7004
      Telephone:  (415) 510-3776
7     Fax:  (415) 703-1234
      E-mail:  Peter.Chang@doj.ca.gov
8   *Attorneys for Defendant Secretary of State*

9

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE EASTERN DISTRICT OF CALIFORNIA

12                    SACRAMENTO DIVISION

13

14  THE COMMON SENSE PARTY; et al.,

                                      Case No. 2:20-cv-01091-MCE-CKD
15                         Plaintiffs,

16          v.                        **DEFENDANT'S OPPOSITION TO
                                      PLAINTIFFS' MOTION FOR A
17                                    TEMPORARY RESTRAINING ORDER
    ALEX PADILLA,                     AND/OR PRELIMINARY INJUNCTION**

18                         Defendant. Hearing Date: June 25, 2020
                                      Hearing Time: 2:00 p.m.
19
                                      Judge: Hon. Morrison C. England, Jr.
20

21

22

23

24

25

26

27

28

                              0

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................................. 1

Background ............................................................................................................... 2

    I.      California's Party-Qualification System .................................................... 2

          A.     Political Parties Must Qualify to Appear on the Ballot ................. 2

          B.     Party Qualification by Voter Registration and Methods of Gathering Voter Registration ..................................................... 3

    II.     The COVID-19 Pandemic and California's Swift Response ...................... 5

          A.     The State Orders and Their Effect on Election Activities.............. 5

          B.     The Governor's Roadmap to Reopen California ........................... 7

    III.    The CSP's Attempts to Qualify as a Political Party and the Present Action ......... 8

Legal Standard ......................................................................................................... 9

Argument ............................................................................................................... 10

    I.      Plaintiffs Fail to Satisfy the Equitable Factors for a Temporary Restraining Order or Preliminary Injunction ............................................ 10

          A.     Plaintiffs Have Failed to Demonstrate a Likelihood of Success on the Merits of Their Claims ............................................ 11

               1.     Section 5151(c) Does Not Impose a Severe Burden on Plaintiffs' First Amendment Rights ............................ 12

                    a.     Plaintiffs Have and Have Had Numerous Means to Campaign and Gather Voter Registration Unaffected by the Pandemic ............... 12

                    b.     Courts in Other Jurisdictions Have Denied Preliminary Relief to Enjoin Ballot Access Measures During the Pandemic ................. 14

                    c.     Plaintiffs Have Failed to Show Diligence in Seeking Qualification .................................. 17

               2.     The State's Compelling Interest in Establishing Minimum Qualifications for Political Parties to Appear on the Ballot Is Undiminished by the Pandemic .................... 18

          B.     Equitable Factors Weigh Heavily Against Issuance of a Temporary Restraining Order ............................................. 19

Conclusion ............................................................................................................. 21

1

## TABLE OF AUTHORITIES

2

Page

3

CASES

4

*Abbott v. Perez*
5
    138 S. Ct. 2305 (2018) ........................................................................................20

6
*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011)............................................................................10

7

8
*Am. Party of Texas v. White*
    415 U.S. 767 (1974)............................................................................................19

9
*Arizonans for Fair Elections v. Hobbs*
    No. CV-20-00658-PHX-DWL, 2020 WL 1905747 (D. Ariz. Apr. 17, 2020)....................15, 16
10

11
*Burdick v. Takushi*
    504 U.S. 428 (1992)............................................................................................11

12
*Chamness v. Bowen*
13
    722 F.3d 1110 (9th Cir. 2013).............................................................................12

14
*Drakes Bay Oyster Co. v. Jewell*
    747 F.3d 1073 (9th Cir. 2014).............................................................................19
15

16
*Dudum v. Arntz*
    640 F.3d 1098 (9th Cir. 2011).............................................................................12

17
*Engquist v. Or. Dept. of Agric.*
18
    478 F.3d 985 (9th Cir. 2007)...............................................................................18

19
*Esshaki v. Whitmer*
    No. 2:20-cv-10831, 2020 WL 1910154 (E.D. Mich. Apr. 20, 2020) ................................16, 17
20

21
*Garcia v. Google*
    786 F.3d 733 (9th Cir. 2015) (en banc)...............................................................11

22
*Givens v. Newsom*
    No. 2:20-cv-00852-JAM-CKD, 2020 WL 2307224 (E.D. Cal. May 8, 2020) ........................10
23

24
*Goldstein v. Secretary of Commonwealth*
    142 N.E.3d 560 (2020).........................................................................................16
25

26
*Jenness v. Fortson*
    403 U.S. 431 (1971)................................................................................14, 18, 19

27
*Libertarian Party of Illinois v. Pritzker*
28
    No. 20-CV-2112, 2020 WL 1951687, at *1 (N.D. Ill. Apr. 23, 2020) ................................15, 16

1

**TABLE OF AUTHORITIES**

2

Page

3   *Mazurek v. Armstrong*
4        520 U.S. 968 (1997) ........................................................................................10

5   *Munaf v. Geren*
        553 U.S. 674 (2008) ..........................................................................................9
6
    *Munro v. Socialist Workers Party*
7        479 U.S. 189 (1986) ................................................................................. *passim*

8   Murray *v. Cuomo*
        No. 1:20-CV-03571-MKV, 2020 WL 2521449 (S.D.N.Y. May 18, 2020) ...........................15
9
    *Public Integrity Alliance v. City of Tucson*
10       836 F.3d 1019 (9th Cir. 2016) (en banc)........................................................11, 12

11  *Reno Air Racing Ass'n, Inc. v. McCord*
        452 F.3d 1126 (9th Cir. 2006) ........................................................................9
12
    *Saddiq v. Trinity Servs. Grp.*
13       No. 13-01671-PHX-ROS (MHB), 2015 WL 13684701 (D. Ariz. Nov. 3, 2015) ...................11
14
    *Stanley v. Univ. of So. Cal.*
15       13 F.3d 1313 (9th Cir. 1994) .....................................................................10, 11

16  *Storer v. Brown*
        415 U.S. 724 (1974) ......................................................................................12
17
    *Tanner Motor Livery, Ltd. v. Avis, Inc.*
18       316 F.2d 804 (9th Cir. 1963) ..........................................................................10

19  *Thompson v. Dewine*
20       959 F.3d 804 (6th Cir. 2020)...........................................................14, 17, 18, 21

21  *Timmons v. Twin Cities Area New Party*,
        520 U.S. 351 (1997) ......................................................................................18
22
    *Winter v. Nat. Res. Def. Council, Inc.*
23       555 U.S. 7 (2008) ...................................................................................10, 19

24

25

26

27

28

**TABLE OF AUTHORITIES**

**Page**

**STATUTES**

California Elections Code

    § 338 ........................................................................................................................2

    § 2138 ......................................................................................................................4

    § 2139 ......................................................................................................................4

    § 2158(b)(4) .....................................................................................................4, 8, 13

    § 2187(a)(3) ...............................................................................................................4

    § 5001 ......................................................................................................................2

    § 5002 ......................................................................................................................3

    § 5003 ......................................................................................................................4

    § 5100(b)(1) ...............................................................................................................3

    § 5150 ......................................................................................................................2

    § 5151 ............................................................................................................... *passim*

**CONSTITUTIONAL PROVISIONS**

United States Constitution

    First Amendment .................................................................................................. *passim*

    Fourteenth Amendment .........................................................................................9, 11

**COURT RULES**

Federal Rules of Civil Procedure, Rule 65(b)(1) ................................................................9

**OTHER AUTHORITIES**

California Secretary of State, *Report of Registration*, October 1, 2019,
    https://elections.cdn.sos.ca.gov/ror/154day-presprim-2020/county.pdfo(as ............................3

The White House, *Proclamation on Declaring a National Emergency Concerning
    the Novel Coronavirus Disease (C*OVID-*19) Outbreak*,
    https://www.whitehouse.gov/presidential-actions/proclamation-declaring-
    national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/......................6

California Secretary of State, *Guide to Voter Registration Drives*,
    https://www.sos.ca.gov/elections/publications-and-resources/guide-vr-drives/ ........................4

California Secretary of State, *Initiatives and Referenda Pending Signature
    Verification*, https://www.sos.ca.gov/elections/ballot-measures/initiative-and-
    referendum-status/initiatives-and-referenda-pending-signature-verification/ (as
    of June 11, 2020)........................................................................................................20

**INTRODUCTION**

The Common Sense Party (CSP) is a political body that is attempting to qualify to participate in the November 2020 presidential general election.  If the CSP qualifies for that election, it will be able to place candidates for the offices of the United States President and Vice-President on the November ballot.  The CSP and its supporters (Plaintiffs) challenge California's requirement in Elections Code § 5151(c) for political bodies to demonstrate that at least 0.33 percent of voters (approximately 68,000 voters) register their support of the CSP by July 3, 2020, in order to qualify for the November general election ballot.  Plaintiffs alleged that prior to March 8, 2020, they solicited voter registrations in-person, mostly in front of grocery stores, but that the COVID-19 pandemic and the State's response to the pandemic restricted their ability to do so, and there are no meaningful, alternate ways to gather registrations.  Plaintiffs do not challenge the State's response, but claim that § 5151(c)'s nondiscriminatory, generally applicable party-qualification requirement violates their First Amendment rights in light of the pandemic and the State's response.  Plaintiffs' claim fails.

Contrary to Plaintiffs' allegations, Plaintiffs had and still have numerous methods that have not been affected by the pandemic to collect voter registration apart from in-person solicitation. Plaintiffs could have campaigned by traditional or social media.  Plaintiffs could have mailed campaign material, including voter registration cards, to eligible voters.  Plaintiffs could also have sent campaign material to voters by either targeted emails or unsolicited mass emails.  Thus, any alleged burden caused by § 5151(c), even in light of the pandemic and the State response, is less than severe, and is amply justified by the State's compelling interest in ensuring that political bodies are able to demonstrate sufficient voter support before they are permitted to place candidates on the general election ballot.

In seeking emergency equitable relief, plaintiffs always bear a heavy burden.  Plaintiffs' requested temporary restraining order ("TRO") would require the State to dramatically change its election-law system of qualifying political bodies to participate in elections.  In essence, Plaintiffs are asking this Court—by temporary relief—to permit the CSP to qualify for the November election and place candidates on the ballot even if it is unable to demonstrate a bare modicum of

1

1  voter support.  As such, Plaintiffs seek a disfavored mandatory injunction that is subject to a

2  heightened burden that they cannot satisfy.

3      While it is undisputed that the COVID-19 pandemic has caused disruptions to the daily

4  lives of Californians, Plaintiffs have failed to articulate—let alone substantiate—a cognizable

5  violation of their constitutional rights or any other basis for a TRO.  Nor have they shown that the

6  remaining equitable factors favor a TRO.  Accordingly, Plaintiffs' motion should be denied.

7  **BACKGROUND**

8  **I.    CALIFORNIA'S PARTY-QUALIFICATION SYSTEM**

9      **A.    Political Parties Must Qualify to Appear on the Ballot**

10     Under California's election system, political bodies may qualify for elections only if they

11 are able to demonstrate a minimal level of voter support.  The California Elections Code

12 expressly defines "party" to mean "a political party or organization that has qualified for

13 participation in any primary or presidential general election."  Cal. Elec. Code § 338.[1]  Thus, any

14 political body that has not qualified to participate in elections is not a "party" within the meaning

15 of the Elections Code.  Parties that qualify to participate in the presidential general election may

16 place on the ballot candidates for the offices of the United States President and Vice-President.

17 § 5150.

18     For a political body to qualify as a political party for either a primary election or a general

19 election, the Elections Code's requirements are clear and straightforward.  The organization must

20 hold a caucus or convention to elect temporary officers and designate a party name.  § 5001(a).

21 The political body must then file a formal notice with the Secretary of State of its intent to qualify

22 for the primary election or the general election.  § 5001(b).

23     As relevant here, there are two ways a political body that desires to qualify for the

24 presidential general election, but did not participate in the primary election, may do so:[2] (1) 123

25  _____

[1] Unless otherwise noted, all statutory references herein are to the California Elections Code.

26

27 [2] The Elections Code provides two other ways for a political body to qualify to participate in the presidential general election, but they do not apply to Plaintiffs.  *See* § 5151(a) (for parties that were qualified to participate in the presidential primary election preceding the presidential

28                                                                                    (continued…)

2

1   days before the presidential general election, 0.33 percent of registered voters declare a

2   preference for the party; or (2) 135 days before the presidential general election, a petition is filed

3   with the Secretary of State bearing signatures equal to at least 10 percent of the state's vote at the

4   preceding gubernatorial election, declaring they represent a proposed party.  § 5151(c), (d).

5       After the Secretary of State receives the notice of intent to qualify, he would notify county

6   election officials of the political body's intent to qualify for the next primary or presidential

7   general election, and the county election officials would tabulate the political affiliation of

8   registered voters who are members of that political body.  § 5002.

9   **B.    Party Qualification by Voter Registration and Methods of Gathering Voter Registration**

10      For a political body to qualify for the March 2020 primary election through voter

11  registration, 67,085 voters must have registered a preference for the political body by October 1,

12  2019.[3]  *See* § 5100(b)(1).  The precise number of voter registrations required to qualify a political

13  body for the November 2020 election will not be known until July 3, 2020 (123 days before the

14  election), *see* § 5151(c), but based on the most recent official voter-registration report (as of Feb.

15  18), the qualification threshold would be approximately 68,180 voters.  Dkt. No. 1 at ¶ 24.

16      A voter may declare a preference for the political body in a new affidavit of registration, or

17  may re-register to indicate the voter's preference.  The completed affidavits of registration must

18  be submitted to the county elections officials by July 3, 2020.  § 5151(c).  After the county

19  elections officials receive the affidavits, they would provide the Secretary of State with the

20  number of voters who registered as preferring the political body.  § 2187(a)(3).  If a political body

21  does not obtain sufficient voter registration in time for a particular election, the existing

22  registrations may be counted for the political body's qualification attempts in the future.  § 5003.

23      Political bodies seeking to qualify as a political party by the voter-registration method have

24  a variety of means to do so.  Political bodies may use paper voter-registration cards or the

26  general election); § 5151(b) (for parties that participated in the last preceding gubernatorial
primary election).

27      [3] See California Secretary of State, *Report of Registration*, October 1, 2019,
28  https://elections.cdn.sos.ca.gov/ror/154day-presprim-2020/county.pdf (as of June 12, 2020).
There were 20,328,626 registered voters in California as of October 1, 2019.

3

California Online Voter Registration Application.[4]  Using paper voter-registration cards, political bodies may engage in in-person registration efforts by engaging volunteers or paid professional gatherers to distribute in-person voter-registration cards to eligible voters, having the eligible voters fill out and sign the voter-registration cards preferring the political body, and then forwarding the registration cards (or affidavits of registration) to the county elections officials. *See* §§ 2138, 2139.  Additionally, political bodies may mail voter-registration cards to potentially eligible voters either in targeted mailing to persons who request them or in blanket, unsolicited, mass mailings.  If political bodies send voters registration cards by the latter method, they must "enclose a cover letter or other notice with each card instructing the recipients to disregard the cards if they are currently registered voters."  § 2158(b)(4).

Political bodies also may solicit voter registration by various internet means.  Similar to sending voter-registration cards through the mail, political bodies may send links to the Secretary of State's voter-registration page[5] in targeted emails to persons who request them, or in unsolicited mass emails.  As with physical-mail campaigns, if political bodies send the link to the voter-registration page through unsolicited emails, the emails must instruct the recipients to disregard the link if they are currently registered voters.  *See* § 2158(b)(4).  Political bodies need not provide such notice if the emails do not include a link to the Secretary of State's voter-registration page, but instead includes a link to another website that then links to the Secretary of State's registration page.  For example, a political body may send unsolicited mass emails that ask people to register to vote, or to re-register to indicate a preference for that political body with a link to the political body's own website, which may then have a link to the Secretary of State's voter-registration page.  *See* Declaration of Carly Fields in Supp. of Opp'n to Pls.' Mot. (Fields Decl.), Exs. 1 & 2.

---

[4] California Secretary of State, *Guide to Voter Registration Drives*, https://www.sos.ca.gov/elections/publications-and-resources/guide-vr-drives/ (as of June 11, 2020).

[5] California Secretary of State, Voter Registration Application, https://covr.sos.ca.gov/ or https://RegisterToVote.ca.gov (as of June 11, 2020).

4

1    In addition to targeted and mass mailings and emails, political bodies may also use

2    traditional and social media to communicate with voters or potential voters and to solicit those

3    voters to register or re-register a preference for the political bodies.

4    **II.    THE COVID-19 PANDEMIC AND CALIFORNIA'S SWIFT RESPONSE**

5    COVID-19 is a contagious and dangerous infectious disease, which can be readily

6    transmitted when people gather outside the home.  California recognized early that COVID-19

7    had the potential to spread rapidly throughout the state.  In December 2020, California began

8    working closely with the national Centers for Disease Control and Prevention, the United States

9    Health and Human Services Agency, and local health departments to monitor and plan for the

10    potential spread of COVID-19 to the United States.  *See* Decl. of Peter H. Chang in Supp. of

11    Opp'n to Pls.' Mot. ("Chang Decl."), Ex. 1 at 1.  Since then, the California Department of Public

12    Health has been in regular communication with federal and local public health officials and other

13    components of the health care system, such as health providers and has been providing guidance

14    regarding COVID-19.  *Id.*

15    **A.    The State Orders and Their Effect on Election Activities**

16    On March 4, 2020, the Governor proclaimed a State of Emergency in California to prepare

17    for and respond to suspected or confirmed cases of COVID-19 in California and to implement

18    measures to mitigate the spread of COVID-19.  *See* Chang Decl., Ex. 1 at 2.  This proclamation

19    makes additional resources available, formalizes emergency state actions already underway, and

20    helps the State prepare for the broader spread of COVID-19.  *See*, *generally*, *id.*  On March 13,

21    2020, the President of the United States declared a national emergency due to the outbreak of

22    COVID-19 in the United States.[6]  On March 19, 2020, the Governor issued Executive Order N-

23    33-20.  Chang Decl., Ex. 2.

24    Executive Order N-33-20 directed all California residents to heed the directives of the

25    State's Public Health Officer relating to COVID-19.  These directives (which are updated on an

26    _____

27    [6] The White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (C*OVID-*19) Outbreak,* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (as of June 11, 2020).

28

5

1  ongoing basis as circumstances change) are available at https://covid19.ca.gov/stay-home-except-

2  for-essential-needs/.  When Executive Order N-33-20 was issued, state public health directives

3  required "all individuals living in the State of California to stay home or at their place of

4  residence except as needed to maintain continuity of operations of [16 specified] federal critical

5  infrastructure sectors, as outlined at https:/www.cisa.gov/identifying-critical-infrastructure-

6  during-covid-19."  Chang Decl., Ex. 2.; *see* Chang Decl., Ex. 3 at 1 (State Public Health Order)

7  (collectively with Executive Order N-33-20, the "State Orders").  The State Orders provided that

8  "Californians working in these 16 critical infrastructure sectors may continue their work because

9  of the importance of these sectors to Californian's health and well-being."  Chang Decl., Ex. 2. at

10  2.  The 16 critical infrastructure sectors referenced in the State Order are identified by the U.S.

11  Department of Homeland Security, Cybersecurity & Infrastructure Security Agency (CISA).  One

12  of the critical infrastructure sectors identified by CISA is "Other Community- or Government-

13  Based Operations and Essential Functions."  Chang Decl., Ex. 4 at 12.  At least as of March 28,

14  2020, that section included "[e]lections personnel" which "include both public and private sector

15  elections support."  *Id.*  The State Orders also addressed other circumstances in which individuals

16  who are not designated "Essential Critical Infrastructure Workers" may leave their houses, such

17  as "access[ing] such necessities as food, prescriptions, and health care."  Chang Decl., Ex. 2 at 2.

18      In addition, the State Public Health Officer designated a list of "Essential Critical

19  Infrastructure Workers" to "help state, local, tribal, and industry partners as they work to protect

20  communities, while ensuring continuity of functions critical to public health and safety, as well as

21  economic and national security."  Chang Decl., Ex. 5 at 1.  Included under the heading of

22  "Government Operations and other community-based essential functions," the State Public Health

23  Officer identified "Elections personnel" as "Essential Workforce."  *Id.* at 10.

24      Since the State Orders issued, the Governor has continued to emphasize that elections are

25  essential to our democracy and continued to clarify that election-related activities are permissible

26  under the State Orders.  On May 1, 2020, the "Stay home Q&A" page of California's COVID

27  information website was updated.  Under the section titled "Protected activities," and in response

28  to the question "What about Voting?", the website provided that "Elections are an essential

6

1  activity" and advised that whenever persons "engage in any permissible activity—including the

2  collection and dropoff of ballots, or other election-related  activities—be mindful of physical

3  distancing and other measures to protect yourself and those around you."[7]  Declaration of

4  Angelica Quirarte in Supp. of Opp'n to Pls.' Mot. (Quirarte Decl.) at ¶ 5.  That answer was later

5  updated on June 5, 2020, to specifically identify as examples of permissible election-related

6  activities "the collection of signatures to qualify candidates or measures for the ballot".  *Id.* at ¶ 9.

7  **B.    The Governor's Roadmap to Reopen California**

8  On April 28, 2020, the Governor announced the State's four-stage "Resilience Roadmap" to

9  guide the gradual and safe reopening of the State.  *See* Chang Decl., Ex. 6 at 1.  The Roadmap

10  involves the following four stages: safety and preparation (Stage 1); reopening of lower-risk

11  workplaces and other spaces (Stage 2); reopening of higher-risk workplaces and other spaces

12  (Stage 3); and, finally, an end to the Stay-at-Home Order (Stage 4).  *Id.*

13  On May 7, 2020, the State Public Health Officer issued an order moving the State into

14  Stage Two based on her review of the data and signaling an intent to "progressively designate

15  sectors, businesses, establishments, or activities that may reopen with certain modifications, based

16  on public health and safety needs" and "a pace designed to protect public health and safety." *See*

17  Chang Decl., Ex. 7 at 2.  In Stage 2, Californians are permitted to "leave their homes to work at,

18  patronize, or otherwise engage with those businesses, establishments, or activities" that have

19  reopened "and must, when they do so, continue at all times to practice physical distancing,

20  minimize their time outside of the home, and wash their hands frequently."  *Id.*  According to the

21  Resilience Roadmap, "[w]e are now in early Stage 2, where retail, related logistics and

22  manufacturing, office workplaces, limited personal services, outdoor museums, child care, and

23  essential businesses can open with modifications."  Chang Decl., Ex. 8.

24  **III.    THE CSP'S ATTEMPTS TO QUALIFY AS A POLITICAL PARTY AND THE PRESENT
         ACTION**

25  Plaintiffs are the CSP, a political body attempting to qualify as a political party in

26  California, and its officers and supporters.  In March 2019, Plaintiff Campbell emailed the

27

28  _____

[7] The State's COVID-19 information website is available at https://covid19.ca.gov/stay-home-except-for-essential-needs/.

7

1  Secretary of State's Office to inquire whether he may solicit voter registration from voters who

2  have already registered for another party by emailing a link to the Secretary of State's website,

3  whether he may link to the Secretary of State's voter-registration webpage from his website, and

4  how he may send links to the Secretary of State's voter registration page by email to voters who

5  have already registered to vote.  Fields Decl., Exs. 1 & 2.  In response, the Secretary of State's

6  Office informed Mr. Campbell that he may send unsolicited mass emails to registered voters if

7  the email asks them to re-register with a link to the political body's own website, which has a link

8  to the Secretary of State's voter registration page.  *Id.*, Ex. 2.  The Secretary of State's Office

9  further informed Mr. Campbell that if the unsolicited email contains "direct links, such as

10  https://registertovote.ca.gov or https://covr.ca.gov," the links "must be prefaced by the language

11  in Elections Code section 2158(b)(4)" [instructing the recipients to disregard the cards if they are

12  currently registered voters].  *Id.*

13       On July 17, 2019, the CSP formally notified the Secretary of State's Office that it intended

14  to qualify for the March 3, 2020 primary election.  Chang Decl., Ex. 9.  The CSP reportedly

15  began gathering voter registrations as least as of September 2019.  Chang Decl., Ex. 10.  By the

16  October 1, 2019, deadline to qualify for the March 2020 primary election, however, only 5,519

17  voters had registered as preferring the CSP, far short of the required approximately 68,000

18  registrations.  Chang Decl., Ex. 11.  Thereafter, on December 9, 2019, the CSP informed the

19  Secretary of State's Office that it intended to qualify for the November 3, 2020, general election,

20  and requested all previous affidavits of registration that identified a preference for the CSP to be

21  counted as well.  Chang Decl., Ex. 12.  As of January 3, 2020, 9,819 voters registered as

22  preferring the CSP.  Chang Decl., Ex. 13.  As of February 18, 2020, 10,859 voters registered as

23  preferring the CSP.  Chang Decl., Ex. 14.  And as of June 9, 2020, 15,010 voters registered as

24  preferring the CSP.  Declaration of Jason Rosales in Supp. of Opp'n to Pls.' Mot. (Rosales Decl.)

25  at ¶ 6.

26

27

28

| Number of Registered Voter Preferring the CSP | As of |
|---|---|
| 5,519 | 10/1/2019 |
| 9,819 | 1/3/2020 |
| 10,859 | 2/18/2020 |
| 15,010 | 6/9/2020 |

On May 29, 2020, Plaintiffs filed this action, alleging that § 5151(c) violates their speech, voting, and associational rights under the First Amendment and their Due Process Clause right under Fourteenth Amendment in light of the COVID-19 pandemic and the State Orders.  Dkt. No. 1.  Plaintiffs then moved for a temporary restraining order (TRO) and/or preliminary injunction.  Dkt. No. 5.  Plaintiffs allege that § 5151(c) is unconstitutional under the current circumstances because it is a "complete barrier" that "absolutely prevents new parties from participating in an election."  *Id.* at 6-7.  Specifically, Plaintiffs allege that due to the pandemic, they had to suspend their in-person solicitation of voter registration on or about March 8, 2020.  *Id.* at 4.  Plaintiffs further allege that after the State Orders were issued on March 19, 2020, the orders and their social-distancing rules made in-person solicitation of voter registrations impossible and unlawful.  *Id.* at 4-5.

## LEGAL STANDARD

TROs are emergency measures, intended to preserve the status quo pending a full hearing on the injunctive relief requested, and the irreparable harm must therefore be immediate.  Fed. R. Civ. Proc. 65(b)(1); *see Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006).  Such relief is an "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 690 (2008), hinging on "a significant threat of irreparable injury that must be imminent in nature."  *Givens v. Newsom*, No. 2:20-cv-00852-JAM-CKD, 2020 WL 2307224, at *3 (E.D. Cal. May 8, 2020) *appeal docketed*, No. 20-15949 (9th Cir. May 19, 2020) (internal citations omitted).

TROs are subject to standards similar to those governing preliminary injunctions.  Plaintiffs must show that they are likely to succeed on the merits, that they are likely to suffer irreparable

9

1  harm without preliminary relief, that the balance of equities tips in their favor, and that an

2  injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

3      Alternatively, injunctive relief "is appropriate when a plaintiff demonstrates that serious

4  questions going to the merits were raised and the balance of hardships tips sharply in the

5  plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir.

6  2011). Even under this alternative sliding scale test, plaintiffs must make a showing of all four

7  *Winter* factors. *Id.* at 1132, 1135. Injunctive relief "is 'an extraordinary and drastic remedy, one

8  that should not be granted unless the movant, by a clear showing, carries the burden of

9  persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

10      Significantly, preliminary injunctions that would alter the status quo are "particularly

11  disfavored." *Stanley v. Univ. of So. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (quotation omitted).

12  "It is so well settled as not to require citation of authority that the usual function of a preliminary

13  injunction is to preserve the status quo ante litem pending a determination of the action on the

14  merits." *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1963).

15                              **ARGUMENT**

16  **I.   PLAINTIFFS FAIL TO SATISFY THE EQUITABLE FACTORS FOR A TEMPORARY
       RESTRAINING ORDER OR PRELIMINARY INJUNCTION**

17      Plaintiffs' application for a TRO or preliminary injunctive relief should be denied because

18  they fail to satisfy the four equitable factors that the Court weighs in determining whether to grant

19  such extraordinary relief. Notably, Plaintiffs' application is subject to a heightened standard

20  because they seek a mandatory injunction by requesting an injunction against the status quo of the

21  statutory standard set by the Legislature for political-party qualification. In contrast to

22  prohibitory injunctions designed to preserve the status quo during litigation, "mandatory"

23  injunctions go "well beyond simply maintaining the status quo *pendent lite*."[8] *Stanley*, 13 F.3d at

24

---

25      [8] Plaintiffs may claim that, in seeking to "prohibit" the application of § 5151(c), they are
   requesting a "prohibitory" injunction, but the *effects* of such an order would prove otherwise. *See

26  Saddiq v. Trinity Servs. Grp.*, No. 13-01671-PHX-ROS (MHB), 2015 WL 13684701, at *2 (D.
   Ariz. Nov. 3, 2015) (noting that a request for a preliminary "injunction 'prohibiting [defendants']

27  revoking of [plaintiff's] Halal diet' . . . . appears to seek a prohibitory injunction, or one that seeks
   only to maintain the status quo," but the "wording is misleading" as it would be "a mandatory

28  injunction that would overrule an administrative decision already in effect").

                                    10

1320 (quotation omitted).  In addition to satisfying the requisite equitable factors, Plaintiffs must meet the "doubly demanding" burden of "establish[ing] that the law and facts *clearly favor* [their] position.'"  *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).  Plaintiffs cannot make this showing.

> ### A. Plaintiffs Have Failed to Demonstrate a Likelihood of Success on the Merits of Their Claims

"Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections."  *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  In examining challenges to state election laws based on First and Fourteenth Amendment rights, the Supreme Court has developed a flexible balancing and means-end fit standard: when state election laws impose only "'reasonable, non-discriminatory restrictions . . . the State's important regulatory interests are generally sufficient to justify' the restrictions," but when those rights are subject to "severe restrictions," strict scrutiny is appropriate.  *Id.* at 434 (quotations omitted); *see Public Integrity Alliance v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016) (en banc).

To apply this standard, courts must weigh "the character and magnitude" of the asserted injury against the "interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration the extent to which the State interests make the burden necessary.  *Burdick*, 504 U.S. at 434.  Accordingly, the Supreme Court has "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls."  *Burdick*, 504 U.S. at 438 (citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 199 (1986)).  But when those rights are subject to "severe restrictions," the law must be "narrowly drawn to advance a state interest of compelling importance."  *Burdick*, 504 U.S. at 434.  Applying these precepts, this Court has "repeatedly upheld as 'not severe' restrictions that are generally applicable, evenhanded, politically neutral, and protect the reliability and integrity of the election process," *Public Integrity Alliance*, 836 F.3d at 1024 (quotation omitted), and has "noted that 'voting regulations are rarely subject to strict scrutiny'" *Chamness v. Bowen*, 722 F.3d 1110, 1116 (9th Cir. 2013) (citing *Dudum v. Arntz*, 640 F.3d 1098, 1106 (9th Cir. 2011)).

11

Under this balancing standard, Plaintiffs have failed to show that they are likely to succeed on their merits of their claims, or that they raise a serious question going to the merits.

**1.    Section 5151(c) Does Not Impose a Severe Burden on Plaintiffs' First Amendment Rights**

The Supreme Court has established with "unmistakable clarity" that "States have an undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot." *Munro*, 479 F.3d at 194 (citation and internal quotation marks omitted). While the Court has held unconstitutional state laws that made it "virtually impossible for a new political party to be placed on the ballot, even if the party had hundreds of thousands of adherents," the right to be placed on the ballot is "not absolute" and is "necessarily subject to qualification if elections are to be run fairly and effectively." *Id.* at 193 (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974)). Plaintiffs do not dispute that § 5151(c) is a reasonable, nondiscriminatory measure on its face, or that § 5151(c) is applied evenhandedly, is politically neutral, and protects the integrity of California's election process. Yet, Plaintiffs allege that § 5151(c) is an "absolute barrier" to new-party qualification and imposes requirements "impossible to attain" in light of the COVID-19 pandemic and the State Orders, claiming that the State has provided no meaningful procedure for new parties to access the ballot other than by in-person solicitation of voter registration. *See* Pls.' Mot. at 6. Plaintiffs, however, fail to show that the party-qualification requirement of § 5151(c) imposes a severe burden on their ability to qualify for the November election even in light of the current circumstances.

**a.    Plaintiffs Have and Have Had Numerous Means to Campaign and Gather Voter Registration Unaffected by the Pandemic**

While the pandemic and the State Orders might have limited Plaintiffs' ability solicit voter registration for the CSP in person for a period of time, Plaintiffs have, and have had, numerous ways to gather voter registration that do not require in-person solicitation. *See*, *supra*, Background section I.B. In addition to in-person solicitation, Plaintiffs may mail voter-registration cards to potentially eligible voters either in targeted mailing to persons who request them or in blanket, unsolicited, mass mailings. *Id.* Similarly, Plaintiffs may send links to the Secretary of State's voter-registration page in targeted emails to persons who request them, or in

12

1  unsolicited mass emails.[9]  Additionally, Plaintiffs may also continue to use traditional and social

2  media to communicate with voters or potential voters and to encourage those voters to register or

3  re-register to indicate a preference for the CSP.  These other means of gathering voter registration

4  do not require in-person solicitation and are unaffected by the pandemic or the alleged change in

5  social behavior.  Thus, any burden that § 5151(c) imposes on the CSP is less than severe because

6  the pandemic affects only Plaintiffs' in-person solicitation efforts, and not any of the numerous

7  other means to gather voter registration.

8      Indeed, Plaintiffs acknowledge that they may campaign and gather voter registrations in

9  ways other than in-person solicitation, including by email and social media.  *See* Compl. at ¶¶ 37-

10  38; Campbell Decl. in Supp. of Pls.' Mot. at 1-2 (Dkt. No. 5, pages 21-22 of 142); Peace Decl. in

11  Supp. of Pls.' Mot. at 1 (Dkt. No. 5, page 31 of 142).  They have also specifically inquired with

12  the Secretary of State's Office about electronic means to gather voter registrations.  Fields Decl.,

13  Exs. 1 & 2.  Rather, Plaintiffs assert that in-person solicitation is the most *cost-effective* mean of

14  gathering voter registration.  *See* Peace Decl. at 1-2; *see also* Compl. at ¶¶ 37-38.  But being

15  unable to conduct its registration campaign using the lowest cost method possible is not a burden

16  rising to constitutional significance, and does not serve to exclude Plaintiffs from the ballot.

17      Additionally, even as to in-person solicitation efforts, which Plaintiffs allege they

18  voluntarily ceased on March 8, Plaintiffs could have continued those efforts no later than May 1,

19  2020, when the State clarified that "election-related activities" are "permissible activities" under

20  the State Orders.  Quirarte Decl. at ¶ 5.  Since at least May 1, it has been beyond dispute that

21  "election-related activities" are permissible under the State Orders—and, as should be obvious

22  (and as the State's June 5 update puts beyond all possible doubt) "election-related activities"

---

23

24      [9] In his declaration, Plaintiff Campbell asserts that the Secretary of State's Office
   informed him that the CSP cannot send unsolicited voter-registration forms by email to anyone
   already registered to vote.  (Campbell Decl. in Supp. of Pls.' Mot. at 3-4, ¶ 11 (Dkt. No. 5, pages
25  23-24 of 142).)  To the contrary, in response to Mr. Campbell's inquiry about sending unsolicited
   emails, the Secretary of State's Office informed him that he may send unsolicited mass emails to
26  voters asking them to re-register for the CSP party if he provides a link in the email to his website
   that has a link to the Secretary of State's voter registration page.  Fields Decl., Ex. 2.  The
27  Secretary of State's Office also informed Mr. Campbell that, alternatively, he may send direct
   links to the Secretary of State's voter registration page in unsolicited mass emails to registered
28  voters if the email contains language required by § 2158(b)(4).  *Id.*

13

1    include election-related in-person signature and voter registration gathering. *See id.* at ¶ 9.

2    Plaintiffs, however, do not allege they have at any point restarted their in-person solicitation

3    efforts or that they attempted to.

4            Even assuming Plaintiffs had seven fewer weeks to gather voter registration in-person than

5    previous election cycles (between March 19, 2020, when the State Orders issued, and May 1,

6    2020, when the State clarified that election-related activities are permissible), that does not

7    necessarily mean that § 5151(c) imposes a severe burden on their ability to qualify for the

8    November election. *See Munro*, 479 U.S. at 197 ("Comparing the actual experience before and

9    after [the challenged amendment] tells us nothing about how minor parties would have fared in

10   those early years had Washington conditioned ballot access to the maximum extent permitted by

11   the Constitution.").  In this case, Plaintiffs had begun their in-person voter-registration gathering

12   efforts at least since September 2019 before voluntarily ending those efforts on March 8, 2019.

13   Chang Decl., Ex. 10.  Plaintiffs thus had at least 188 days to gather signatures in-person, which

14   was eight more days than the 180-day signature-collection period upheld by the Supreme Court in

15   *Jenness*.  *See Jenness v. Fortson*, 403 U.S. 431, 433-34 (1971).  Plaintiffs also have had more

16   than a month to continue their in-person solicitation efforts beginning on May 1, when the State

17   clarified that "election-related activities" are permissible under the State Orders.  Quirarte Decl. at

18   ¶ 5.

19                      **b.    Courts in Other Jurisdictions Have Denied Preliminary Relief
                                to Enjoin Ballot Access Measures During the Pandemic**
20
21           The instant case is akin to a recent decision by the Sixth Circuit denying a preliminary-

22   injunction motion filed by initiative proponents against Ohio's in-person signature-gathering

23   requirement.  *Thompson v. Dewine*, 959 F.3d 804 (6th Cir. 2020).  There, the court determined

24   that Ohio had exempted conduct protected by the First Amendment from its stay-at-home order,

25   but the court found it significant that even if Ohio's stay-at-home orders had applied to the

26   plaintiffs, Ohio had begun to lift its stay-at-home restrictions.  *Id.* at 810.  Thus, even if the state

27   orders had applied to plaintiffs, the orders imposed only a five-week period from the lifting of the

28   state restrictions until the deadline to submit an initiative petition, which "undermine[d]

                                                14

Plaintiffs' argument that the State ha[d] excluded them from the ballot." *Id.* Similarly here, assuming the State Orders limited Plaintiffs' ability to solicit voter registration in person, that limitation lasted only seven weeks (from March 19 to May 1). Plaintiffs were also able to restart their in-person solicitation efforts at least as of May 1, had they opted to do so, giving them more than 2 additional months to continue their efforts. There is no basis for the suggestion that Plaintiffs have been excluded from the November ballot.

Other courts around the country have similarly denied preliminary relief based on challenges to ballot-access measures even in the midst of the continuing pandemic. *See, e.g.*, *Murray v. Cuomo*, No. 1:20-CV-03571-MKV, 2020 WL 2521449 (S.D.N.Y. May 18, 2020) (denying TRO application challenging New York's signature requirement for ballot access because challenged COVID-19-related restrictions are reasonable and non-discriminatory and furthers both the state's interest in protecting public health and interest in ensuring the orderly conduct of election); *Arizonans for Fair Elections v. Hobbs*, No. CV-20-00658-PHX-DWL, 2020 WL 1905747, *2 (D. Ariz. Apr. 17, 2020) (denying plaintiffs' TRO application because plaintiffs failed to show a severe burden even though the pandemic has created havoc on initiative committees' ability to gather signatures, some committees were able to gather enough signatures to qualify initiatives before the pandemic took hold).

Plaintiffs rely on three cases from other jurisdictions in which courts modified ballot-access requirements in light of the pandemic and the states' respective stay-at-home orders. But those cases are distinguishable because the respective laws in those jurisdictions required parties and candidates to collect physical signatures from voters, which necessarily must be done in person, and because those laws left virtually no time for the plaintiffs to gather signatures. In *Libertarian Party of Illinois v. Pritzker*, political parties and registered voters challenged Illinois' in-person signature requirements to qualify independent and third-party candidates for the November 2020 election. No. 20-CV-2112, 2020 WL 1951687, at *1 (N.D. Ill. Apr. 23, 2020). For prospective candidates for statewide offices, Illinois law required them to collect signatures from the lesser of 25,000 voters or one percent of the votes cast in the most recent statewide election. *Id.* Specifically, all signatures have to be "wet" (physical) signatures and notarized. *Id.*

15

1    Furthermore, the window for gathering signatures opened on March 24, 2020, *after* Illinois

2    imposed its stay-at-home order on March 20, 2020, and signatures were required to be submitted

3    by June 20, 2020.  *Id.* at *4.  In dictum, the district court stated that the "combined effect" of

4    Illinois' stay-at-home order and the in-person signature requirement resulted in a nearly

5    insurmountable hurdle.  *Id.*  The court, however, concluded that it need not address the claim on

6    the merits because the parties had jointly proposed modifying Illinois' signature requirement, a

7    modification which the court adopted.  *Id.*  Notably, the court also questioned in dictum whether

8    "[s]uspending entirely the signature requirement without requiring candidates to otherwise

9    demonstrate historical support" would be appropriate.  *Id.* (citing *Munro*, 479 U.S. at 197, 107

10   S.Ct. 533 (noting that states need not provide automatic ballot access)).

11       Here, the alleged burdens on Plaintiffs are materially lighter than those imposed on the

12   plaintiffs in *Libertarian Party of Illinois*.  § 5151(c) does not require in-person "wet" signatures,

13   nor does it require notarization.  As discussed above, Plaintiffs could obtain voter registration by

14   various means without in-person contact.  Furthermore, unlike in *Libertarian Party of Illinois*, in

15   which plaintiffs had less than three months to collect signatures during a window that opened

16   *after* the state imposed its stay-at-home order, Plaintiffs here have been gathering voter

17   registrations since at least September 2019, and had more than six months to do so until they

18   voluntarily ceased in-person solicitation efforts on March 8, 2020.  Plaintiffs were also able to

19   restart their in-person solicitation efforts at least as of May 1, 2020, had they opted to do so.

20       The other cases cited by Plaintiffs, *Esshaki v. Whitmer*, No. 2:20-cv-10831, 2020 WL

21   1910154, at *2 (E.D. Mich. Apr. 20, 2020), *reversed in part*, *Esshaki v. Whitmer*,

22   ---Fed. Appx.---, 2020 WL 2185553 (6th Cir. May 5, 2020), and *Goldstein v. Secretary of*

23   *Commonwealth*, 142 N.E.3d 560, 564 (2020), are similarly inapposite as they both addressed

24   ballot-access conditions that imposed in-person signature requirements.  Furthermore, in *Esshaki*,

25   Michigan's stay-at-home orders remained in place through the deadline for petition submission.

26   *Esshaki*, 2020 WL 2185553 at *1; *see Thompson*, 959 F.3d at 809.  In contrast here, even

27   assuming that the State Orders had prohibited Plaintiffs from in-person voter-registration

28   gathering beginning on March 19, the state clarified on May 1 that "election-related activities" are

16

1  permitted, thus any perceived restriction on in-person voter-registration gathering lasted less than

2  seven weeks (from March 19 to May 1). *See* Quirarte Decl. at ¶ 5. Therefore, Plaintiffs had more

3  than two months to resume their in-person solicitation efforts before voter registrations are

4  tabulated on July 3, 2020, yet they do not allege that they attempted to resume such efforts.

5                    **c.    Plaintiffs Have Failed to Show Diligence in Seeking
                            Qualification**

6

7          It is undeniable that Plaintiffs, like all other Californians, have been negatively impacted by

8  the pandemic. However, even if Plaintiffs had limited ability to solicit voter registration in person

9  during a narrow window of time, and it may be more difficult now to procure voter registration in

   person than before the pandemic, it cannot be said that Plaintiffs are excluded from the ballot by
10
   § 5151(c). *See Thompson*, 959 F.3d at 810 ("[J]ust because procuring signatures is now harder
11
   (largely because of a disease beyond the control of the State) doesn't mean that Plaintiffs are
12
   *excluded* from the ballot.") (emphasis in original). Plaintiffs could have continued to gather voter
13
   registration by every other mean available.
14
           Yet, Plaintiffs seemed to have abandoned their efforts on March 8, 2020. Even if Plaintiffs
15
   chose to cease in-person solicitation of voter registration because of the possible risk of exposure
16
   to COVID-19, they do not allege that they attempted to continue gathering voter registrations by
17
   every other means available that do not require in-person contact. Furthermore, the State Orders
18
   made clear at least as of May 1, 2020, that "election-related activities" are permissible. Quirarte
19
   Decl. at ¶ 5. But Plaintiffs do not allege any attempt to restart their in-person voter-registration
20
   campaign.
21
           While it may now be more difficult to gather voter registrations by in-person solicitation
22
   due to the alleged change in social behavior, that alleged result cannot be attributed to § 5151(c).
23
   *See Thompson*, 959 F.3d at 810. ("[W]e cannot hold private citizens' decisions to stay home for
24
   their own safety against the State."). There is no dispute that § 5151(c) is generally applicable,
25
   evenhanded, politically neutral, and protects the reliability and integrity of the election process.
26
   Therefore, § 5151(c) does not impose a severe burden on Plaintiffs' asserted rights even in light
27
   of the pandemic and the State Orders. *See Thompson*, 959 F.3d at 810 ("Because the state has not
28

                                                    17

1  excluded plaintiffs from the ballot, the burden imposed on them by the state's initiative

2  requirement cannot be severe.")

3           **2.    The State's Compelling Interest in Establishing Minimum**
                    **Qualifications for Political Parties to Appear on the Ballot Is**
4                   **Undiminished by the Pandemic**

5          It is unquestionable that the State has compelling interests in ensuring that parties that

6  participate in the presidential general election—who may place candidates on the ballot for the

7  offices of the United States President and Vice-President—have a modicum of voter support—

8  determined by the Legislature to be 0.33 percent of registered voters.  Indeed, Plaintiffs

9  acknowledge such interest. Pls.' Mot. at 7.  Thus, Plaintiffs' motion must be denied because any

10 burden imposed by § 5151(c) on the CSP's asserted rights as alleged in the Complaint is

11 outweighed by compelling state interests even in light of the pandemic and State Orders.[10]

12         It is well settled that a state has a compelling interest in regulating the method by which

13 candidates appear on the ballot and "protecting the integrity, fairness, and efficiency of their

14 ballots and election processes as a means of electing public officials." *Timmons v. Twin Cities*

15 *Area New Party*, 520 U.S. 351, 364 (1997).  The Supreme Court has established with

16 "unmistakable clarity" that "States have an undoubted right to require candidates to make a

17 preliminary showing of substantial support in order to qualify for a place on the ballot." *Munro*,

18 479 U.S. at 194 (citation and internal quotation marks omitted).  The "compelling" State interests

19 protected by such requirement include "preserving the integrity of the electoral process,"

20 "regulating the number of candidates on the ballot," and "avoiding confusion, deception, and

21 frustration of the democratic process at the general election." *Am. Party of Texas v. White*, 415

22 U.S. 767, 782, n. 14 (1974); *Jenness*, 403 U.S. at 442.  Granting the relief Plaintiffs seek would

23 wholly subvert these compelling state interests.

24         _____

25 [10] Plaintiffs do not appear to raise their Due Process Clause claim as a basis for their TRO
   application.  Nonetheless, to the extent that claim is based on Plaintiff's claim under the First
26 Amendment, it fails for the same reasons.  Plaintiffs' claim could not succeed without a showing
   that § 5151(c) is "arbitrary and lacking a rational basis." *Enquist v. Or. Dept. of Agric.*, 478
27 F.3d 985, 997 (9th Cir. 2007).  As addressed here, California's party-qualification requirements
   further the state's compelling interests in preserving the integrity of the electoral process,
28 regulating the number of candidates on the ballot, and avoiding confusion, deception, and
   frustration of the democratic process at the general election.

                                    18

1    To protect these compelling interests, the Supreme Court has upheld signature-gathering

2    requirements ranging from one to five percent of voters or votes cast—requirements far more

3    burdensome than the 0.33 percent under § 5151(c). *See Munro*, 479 U.S. at 189 (rejecting a First

4    Amendment challenge to the requirement that minor-party candidates obtain petition signatures

5    numbering at least 1% of total vote cast for the Governor at the preceding general election); *Am.*

6    *Party of Texas*, 415 U.S. at 767 (same); *Jenness*, 403 U.S. at 442 (upholding Georgia's

7    requirement for 5% of registered voters to sign a petition for a candidate to be placed on the

8    general election ballot).

9    Plaintiffs do not suggest that the State's interests in ensuring parties appearing on ballots

10    have a significant modicum of voter support is less important or compelling than before the

11    pandemic. Yet, they seek to obtain the ultimate relief sought in this action by an application for a

12    TRO without having demonstrated the bare minimum level of voter support that the Legislature

13    deemed sufficient before placing on the ballot. Here, § 5151(c) is reasonable and non-

14    discriminatory, and is justified by the State's compelling interests even in light of the pandemic.

15    **B.    Equitable Factors Weigh Heavily Against Issuance of a Temporary**
       **Restraining Order**
16

17    In addition to failing to demonstrate a likelihood of success on the merits, Plaintiffs fail to

18    show that they will suffer irreparable harm, that the balance of equities weighs in their favor, or

19    that it is in the public interest to permit the CSP to participate in the November general election

20    without having demonstrated substantial voter support. *Winter*, 555 U.S. at 20; *Drakes Bay*

21    *Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) ("When the government is a party,

22    these last two factors merge.").

23    Any alleged irreparable harm to Plaintiffs is speculative. Plaintiffs have not shown that

24    they would have qualified for the November election even without the pandemic or the resulting

25    State Orders. Plaintiffs allege that, through March 8, 2020, they gathered 19,038 registrations.[11]

26    _____
       [11] It is questionable whether the CSP obtained 19,038 registrations by March 8, 2020, as
27    Plaintiffs allege. Based on information in the Secretary of State's voter-registration database
       (VoteCal), 15,010 active voters are registered with the CSP as of June 9, 2020. Rosales Decl. at
       ¶ 6. The current data in VoteCal, however, would not account for any voters who might have
28    been registered with the CSP at an earlier date but who has since re-registered with another party.

19

1    Pls. Mot. at 4.  Even assuming that is correct, the CSP still gathered less than 30 percent of the

2    approximately 68,180 registrations necessary to qualify for the November election.  *See* Pls.'

3    Mot. at 4.  In fact, evidence shows that Plaintiffs' voter-registration gathering efforts had started

4    to slow at the beginning of 2020.  In the 12 weeks between October 1, 2019, and January 3, 2020,

5    Plaintiffs gathered 4,300 registrations.  *Compare* Chang Decl., Ex. 11 *with* Ex. 13.  In following

6    six-week period, however, Plaintiffs were only able to gather 1,040 registrations.[12]  *Compare*

7    Chang Decl., Ex. 13 *with* Ex. 14.  It also cannot be suggested that successful voter-registration or

8    signature-gathering campaigns are impossible under the current circumstances.  Even in light of

9    the ongoing pandemic and the State Orders, other electioneering efforts have carried on.  To date,

10    four ballot initiatives have submitted raw counts of signatures exceeding the 623,212-signature

11    threshold necessary to qualify for the November ballot and are awaiting signature verification.[13]

12        On the other hand, unless a statute is unconstitutional, enjoining a "State from conducting

13    [its] elections pursuant to a statute enacted by the Legislature . . . would seriously and irreparably

14    harm [the State]."  *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).  Even in the midst of the

15    COVID-19 pandemic, California would suffer irreparable harm if it was enjoined from

16    conducting its election in accordance with its lawfully enacted ballot-access regulations.  *See*

17    *Thompson*, 959 F.3d at 812.

18        Furthermore, the balance of the equities and public interest clearly favor the Secretary of

19    State and weigh against injunctive relief.  Giving effect to the will of the people by enforcing the

20    laws they and their representatives enact serves the public interest.  *See Thompson*, 959 F.3d at

21    812.  It would also be against the public interest if the CSP is permitted to qualify for November

22    election and put on the ballot candidates for the offices of the President and Vice-President

23    without having demonstrated that it has a substantial modicum of voter support.

24

25        [12] The slowing pace of the CSP's voter-registration efforts also sows doubt as to the
allegation that they gathered 19,038 registrations by March 8 as it would mean that the CSP
gathered 8,179 registrations in the three weeks after February 18, 2020, while having gather only

26    1,040 registrations in the six weeks before February 18, 2020.  Plaintiffs provide no explanation
as to how that could have occurred.

27        [13] *See* California Secretary of State, *Initiatives and Referenda Pending Signature
Verification*, https://www.sos.ca.gov/elections/ballot-measures/initiative-and-referendum-

28    status/initiatives-and-referenda-pending-signature-verification/ (as of June 11, 2020).

1

**CONCLUSION**

2    For the reasons provided above, Plaintiffs' motion for a temporary restraining order or

3    preliminary injunction should be denied.

4

Dated:  June 12, 2020                              Respectfully submitted,

5
                                                   XAVIER BECERRA
6                                                  Attorney General of California
                                                   MARK BECKINGTON
7                                                  Supervising Deputy Attorney General
                                                   MILAD DALJU
8                                                  Deputy Attorney General

9                                                  */ s / Peter H. Chang*
                                                   PETER H. CHANG
10                                                 Deputy Attorney General
                                                   *Attorneys for Defendant Secretary of State*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21