1  JAMES R. SUTTON, State Bar No. 135930
   BRADLEY W. HERTZ, State Bar No. 138564
2  THE SUTTON LAW FIRM, PC
   150 Post Street, Suite 405
3  San Francisco, CA 94108
   Tel: 415/732-7700
4  Fax: 415/732-7701
   jsutton@campaignlawyers.com
5  bhertz@campaignlawyers.com

6  QUENTIN L. KOPP, State Bar No. 25070
   380 West Portal Ave.
7  San Francisco, CA 94127
   Tel: 415/681-5555
8  Fax: 415/242-8838
   quentinlkopp@gmail.com
9
   Attorneys for Plaintiffs
10 THE COMMON SENSE PARTY,
   TOM CAMPBELL, DEBBIE BENREY,
11 and MICHAEL TURNIPSEED

12

13          **THE UNITED STATES DISTRICT COURT**

14       **FOR THE EASTERN DISTRICT OF CALIFORNIA**

15

16 THE COMMON SENSE PARTY;          )  Case No. 2:20-CV-01091-MCE-CKD
   TOM CAMPBELL, in his             )
17 capacity as official representative of the )  **PLAINTIFFS' REPLY TO**
   Common Sense Party and as a registered )  **DEFENDANT'S OPPOSITION TO**
18 voter in the Common Sense Party; and )  **PLAINTIFFS' MOTION FOR**
   DEBBIE BENREY and MICHAEL        )  **TEMPORARY RESTRAINING ORDER**
19 TURNIPSEED, as registered voters  )  **AND/OR PRELIMINARY INJUNCTION;**
   in the Common Sense Party,        )  **DECLARATION OF ANGELO**
20                                    )  **PAPARELLA; SUPPLEMENTAL**
                   Plaintiffs,        )  **DECLARATION OF BOBBY G.**
21                                    )  **GLASER; SUPPLEMENTAL**
              v.                      )  **DECLARATION OF CHAD PEACE**
22                                    )
   ALEX PADILLA, in his official capacity )  Hearing Date:  June 25, 2020
23 as Secretary of State of California; and )  Hearing Time:  2pm
   DOES 1-20,                         )
24                                    )  Judge: Hon. Morrison C. England, Jr.
                   Defendants.        )
25 _____ )

26

27

28

PLAINTIFFS' REPLY

                         1

**INTRODUCTION**

At a time when state and local governments are urging Californians to stay at home and limit their interactions with others, and when headlines warn of new outbreaks of the COVID-19 virus, Defendant claims that Plaintiffs could have and should have re-started their in-person voter registration drive six weeks ago.  Defendant also claims that Plaintiffs could and should rely on email solicitations for voter registrations, ignoring the realities of the voter registration process and the testimony of experts that voters simply do not, and will not, register for a new party based on an email.  Given these realities, the requirements of EC section 5151 place an insurmountable and unconstitutional burden on Plaintiffs, warranting immediate relief from the Court. (See Libertarian Party of Ill. v. Pritzker (ND Ill. 4/23/20) No. 20-CV-2112, 2020 WL 1951687, p. 4.) ["[New parties and independent candidates] must choose between complying with the governor's emergency orders intended to prevent the spread of the coronavirus or engaging in the outreach needed to receive signatures to appear on the ballot."].)

Defendant insists that EC section 5151's voter registration requirements for new political party qualification are still enforceable despite the fact that the California's state and local shelter-in-place orders and the undeniable impact of these orders on social behavior have stripped Plaintiffs of the ability to collect the requisite number of registrations by July 3 – in effect blocking the Common Sense Party ("CSP") from the November 2020 ballot.  Defendant wants the Court to evaluate the constitutionality of EC section 5151 in a vacuum, without taking into account the unprecedented circumstances we now face as a society.  In contrast, numerous federal and state courts, state legislatures and state elections officials have recognized that the COVID-19 pandemic has placed insurmountable obstacles on access to the ballot for political parties and candidates, and have eliminated or greatly reduced ballot access requirements in order to protect precious First and Fourteenth Amendment rights.  The Court should follow the approach taken in these other jurisdictions and grant Plaintiffs' request for a temporary restraining order and/or preliminary injunction.

**DISCUSSION**

PLAINTIFFS' REPLY

2

I.   **California's Shelter-In-Place Orders Have Disallowed In-Person Voter Registration Gathering.**

   A.   **The Governor's Orders Have Prohibited, and Still Prohibit, In- Person Voter Registration Drives.**

Defendant's conclusion that "it is beyond dispute" and "obvious" that voter registration drives have been allowed since May 1st is an incredible over-statement.  To the contrary, California's state and local shelter-in-place directives have not allowed for in-person voter registration gathering efforts – either on May 1, June 5, or at present.  The Governor's original order on March 19 mandated the closures of all but the most "essential" businesses and required people to stay at home.  (Defendant's Opp.; Chang Dec., Exh. 5.)  Nothing in the Governor's order stated or implied that in-person voter registration falls under the "essential" exception, which instead is limited to hospitals, pharmacies, grocery stores, fire departments, etc.

Defendant asserts that the state officially permitted in-person voter registration solicitation on May 1st, when it updated the "Stay at Home Q&A" information on the state's COVID-19 website to include "election-related activities."  This assertion is not true.  The "election-related activities" allowed by this update clearly related solely to the actual act of voting itself, and the state most likely added these activities at that time because two elections were scheduled to take place in the state soon thereafter, on May 12, 2020 (in Congressional District 25 and Senate District 28).  The May 1st update on "election-related activities" appeared under the heading "What About Voting?" and added "the collection and dropoff of ballots" as permissible activities.  (Defendant's Opp.; Quirarte Dec., ¶5 )  Thus, the only activities related to an election which became permissible on May 1st were dropping off a ballot at a voting center or working at a polling place, not voter registration or initiative petition drives.

Defendant also relies on the June 5th update to the state's COVID-19 website which, for the first time since the Governor's original order, allowed "the collection of signatures to qualify measures or candidates for the ballot."  (Defendant's Opp.; Quirarte Dec., ¶ 9.)  However, CSP is not asking people to "sign" a petition in order to "qualify a measure or candidate for the ballot" – it is asking people to complete a voter registration card so that CSP can qualify as an official

PLAINTIFFS' REPLY

1  political party.  This June 5th update thus still did not permit in-person solicitation of voter

2  registrations.  This June 5th update also undercuts Defendant's argument that voter registration

3  drives were allowed as early as May 1st; the state would not have needed to add a clarifying

4  example to the website if the original version so clearly allowed signature gathering.

### B. City and County Orders Are Stricter Than the Governor's Orders.

6       Even more notably, Defendant completely ignores that most if not all cities and counties

7  in California are subject to underlined additional orders issued by their mayor or county public health

8  officer.  Regardless of what the Governor's order did or did not say about election-related

9  activities, these city and county shelter-in-place orders make abundantly clear that soliciting voter

10  registrations at shopping centers, government buildings, public parks, and other public spaces is

11  dangerous to one's health, dangerous to the health of others, and prohibited.

12       The prohibition on interacting with other people in public places – which is of course

13  what circulators must do when attempting to convince citizens to change party affiliation – is

14  spelled out explicitly in the local orders.  (Iredell Dec.; Exhs. 1-5.)  These local orders also warn

15  citizens that they will be risking their health and safety, and the health and safety of others, if

16  they venture out of their houses for any unnecessary trips or spend any more time out than is

17  absolutely necessary.  (Iredell Dec., ¶¶ 2-6.)  Given such explicit instructions to not interact with

18  others, there is simply no way that CSP could be expected to have conducted a viable voter

19  registration drive since early March.

20       These local orders have also prevented circulators, whether paid professionals or

21  volunteers, from doing their jobs.  Because circulators have not been deemed "essential," they

22  have been prohibited from setting up a table in a shopping mall or carrying a clipboard in a park

23  or farmers market, and signature gathering firms have been unable to recruit or retain circulators

24  during this time period.  (Glaser Supp. Dec., ¶ 13; Paparella Dec., ¶ 7.)  Given the absence of

25  volunteer or paid circulators, there is simply no way that CSP could have been expected to

26  conduct a viable voter registration drive since early March.

### C. Even if In-Person Registration Was Allowed (Which It Is Not), It Would Be Futile.

28

PLAINTIFFS' REPLY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Even if, as Defendant contends, in-person registration drives were technically permissible as of May 1st (which they were not), these efforts would have been futile. During a time when the public is being continually instructed to "stop the spread" and "stay safe," it is unreasonable to think that people would be willing to take the risk of interacting with circulators about a new political party. People are hesitant to come in to close contact with their own friends and neighbors, let alone with strangers – and can also become fearful or even hostile if approached by a circulator. (Glaser Supp. Dec., ¶ 14; Paparella Dec., ¶ 8.) Furthermore, in-person registration gathering involves more than just a circulator coming in to close proximity to a potential registrant, it also involves the exchange of physical objects – pens, clipboards and registration forms – which is likely to exacerbate a potential registrant's apprehension. (Paparella Dec., ¶ 8.) Moreover, as mentioned above, the public spaces used for voter registration drives because of heavy foot traffic – shopping centers, libraries, government buildings, etc. – have basically been empty since early March, and are only now beginning to gradually re-open.

The federal district court which granted a political party's request for relief from Illinois' ballot access laws in light of the COVID-19 pandemic recognized that voter registration drives are likely to be ineffective for the foreseeable future (even though Defendant does not see this obvious point): "[T]he court notes that even after some restrictions are lifted, until a vaccine is available, voters are likely to continue practicing social distancing and avoiding any physical hand contact with other persons or objects." (Libertarian Party of Ill. v. Pritzker, supra, p. 10.)

## II.  Plaintiffs Do Not Have Other Effective Means By Which to Gather Voter Registrations.

Defendant argues that EC section 5151 is not a severe burden on CSP's constitutional rights because political parties have means other than in-person solicitations to obtain voter registrations; namely through U.S. mail and email. On the one hand, CSP has in fact maintained a website and conducted electronic outreach since 2019, continuing through the shelter-in-place

PLAINTIFFS' REPLY

1   orders. (Peace Supp. Dec., ¶¶ 3-4.)[1]  On the other hand, in practice, mail and email solicitation of

2   voter registrations is <u>not</u> effective and is <u>not</u> sufficient to obtain the number of registrations

3   mandated by EC section 5151.  As clearly demonstrated by the declarations of petition

4   circulation experts submitted by Plaintiffs, as well as CSP's experience soliciting voter

5   registrations since last fall, in-person solicitation is the only way to gather new registrants

6   because the circulator can actually engage with the potential registrant and discuss CSP's

7   message face-to-face.  (Paparella Dec., ¶¶ 8, 14; Glaser Supp. Dec., ¶¶ 15, 16.)  Defendant

8   completely ignores that letters and emails of course do not allow for this kind of personal

9   engagement, and does not even discuss these expert declarations.[2]

10   **A.  <u>Voter Registrations Via U.S. Mail Is Not a Viable Alternative</u>.**

11        Defendant is simply wrong to suggest that obtaining voter registrations via traditional

12   mail is a viable method unaffected by the COVID-19 pandemic.  First, the postal service has not

13   been untouched by the current public health crisis and the public is not opening and reading their

14   mail as they usually would.  A federal district court recognized that direct mail campaigns are not

15   viable at this time and do not justify denying relief from ballot access requirements:

16        Conducting an effective mail campaign in the current environment presents a
     significant hurdle.  Such a mail-only signature gathering campaign assumes both a
17        fully operational postal service and a public willing to walk to the mailbox, open
     physical envelopes, sign a petition, and deposit the envelope back into a mailbox
18        or make a trip to the Post Office. Today, sadly, ample reasons exist to question the
     plausibility of each of those assumptions.
19
     (<u>Esshaki v. Whitmer</u> (ED Mich. 4/20/20) No. 2:20-CV-10831-TGB, 2020 WL 1910154, at *19.)
20
          Independent from how the current public health crisis has impacted the mail, the state-
21
     mandated cover letter effectively acts as a complete bar to gathering voter registrations via mail
22

23   _____

24        [1]Defendant's claim that CSP has "abandoned" its voter registration efforts is therefore
     <u>completely false</u>.  (Defendant's Opp., p. 17.)
25
          [2]Even the established political parties have been unable to register new members during the
26   COVID-19 crisis, despite perhaps the most contentious Presidential election in current times.  (<u>USA
     Today</u> (6/11/20) "US Voter Registration Plummets During Coronavirus Pandemic.")
27

28
     PLAINTIFFS' REPLY

                                                6

or email.  Though Defendant references the state law requirement that voter registration cards sent through the mail or email must include a cover letter "instructing the recipients to <u>disregard the cards</u> if they are currently registered voters" (EC section 2158(b)(4); emphasis added), Defendant ignores the impact of this draconian requirement.  Rather paradoxically, in order to pursue a mail or email registration gathering effort, CSP would have to spend resources on creating and distributing the materials, and then include a notice telling potential registrants <u>to ignore those very same materials.</u>  There is no reason to think that recipients would not heed these instructions and toss the letter or delete the email.  This state-mandated cover letter makes the alternative methods suggested by Defendant insufficient to overcome the constitutional barrier of EC section 5151 during the current public health crisis.

**B. <u>Voter Registrations Via Electronic Means Is Also Not a Viable Alternative</u>.**

The effectiveness of soliciting voter registrations via electronic means pales in comparison to in-person efforts.  (Glaser Supp. Dec., ¶16.)  First, as mentioned above, the requirement that emails asking a registered voter to re-register must include a statement to disregard the request renders such email solicitations moot.  Second, as also mentioned above, voters simply do not respond to requests to register with a new political party through an email the same way they do through a conversation with a live human being.  In addition, electronic voter registration drives do not reach lower-income communities which may not have adequate access to the internet or older adults who may not be familiar with using the internet or operating electronic devices.  The shelter-in-place orders have also hampered the public's access to computers and the internet at community centers and libraries.

**III.  <u>Plaintiffs Would Have Obtained the Requisite Number of Registrations Were it Not for the COVID-19 Pandemic.</u>**

Defendant asserts that, based on the number of new registrants in the CSP through March 8, 2020, it would not have reached 68,180 by July 3.  <u>This assertion is wrong</u>, because Plaintiffs had, since early 2020, planned on focusing their outreach efforts in late April or early May 2020.  (Glaser Supp. Dec., ¶ 11.)  Plaintiffs instituted a comprehensive voter registration plan last fall

based on the advice of experts and a pilot program, and had been diligently adhering to this plan up until March 8, when the COVID-19 crisis suspended its efforts. Specifically, CSP sought new registrants through its volunteer network, paid firms and website through early March 2020, but planned to – and had no reason to believe that it would not be able to – ramp up its efforts in late April or early May 2020 when statewide initiative petitions had to be turned in and circulators would therefore be much more available. (Glaser Supp. Dec., ¶ 10.) The sustained success of its voter registration drive up until March 8 – registering over 15,000 voters and thereby reaching over 20 percent of the required number months before when it planned on devoting significantly more resources to its efforts – demonstrated to CSP that its message was resonating with voters. It then planned to retain significantly more circulators starting in late April or early May, allowing at least two full months to close the gap and get to 68,180 new registrants by July 3. (Glaser Supp. Dec., ¶¶ 10-11, 17.) This plan was reasonable and headed for success.

The shut down of Plaintiffs' plan by the COVID-19 crisis is a concrete, specific harm which justifies immediate relief from the Court. Defendant looks only at what happened before the COVID-19 crisis when claiming that CSP should have been able to reach its goal before March 8. Even though "hindsight is 20-20," courts have explicitly rejected the premise that the ability of political parties and candidates to gather the requisite number of registrations or signatures before the COVID-19 pandemic protects ballot access laws from judicial intervention. For example, in Esshaki v. Whitmer, supra, at *16, a federal district court dismissed the state's argument that candidates should have "double-down[ed]" on signature gathering efforts before the stay-at-home orders were issued, concluding that this argument defied "good sense." The Court should similarly reject Defendant's argument here.

In sum, Plaintiffs reasonably constructed their registration gathering plan based on the statutory July 3, 2020 deadline. Had the pandemic not occurred and in-person registration efforts not been halted, Plaintiffs would have obtained at least 68,180 registrations by this date. (Glaser Supp. Dec., ¶ 17.) Plaintiffs should not be faulted for not front-loading their efforts and

PLAINTIFFS' REPLY

8

anticipating a global pandemic.  The First Amendment does not impose such impossible foresight on political organizations seeking access to the ballot.  Instead, courts have consistently invalidated ballot access laws when – as has happened in California since early March – they make it "virtually impossible" to qualify for the ballot.  (See, e.g., Williams v. Rhodes (1968) 393 U.S. 23, 25; Libertarian Party of Ill. v. Pritzker, supra, p. 7.)

## IV.    Numerous Other Jurisdictions Have Determined That Ballot Access Requirements Are Unconstitutional in Light of the COVID-19 Crisis.

Across the country, ballot access requirements have been eliminated or reduced in light of the overwhelming obstacles new political parties and candidates currently face during the public health crisis, as summarized in the chart attached to the Iredell Declaration.  (Iredell Dec., Exh. 6.)  Some of these ballot access requirement modifications have been made by court order. (Iredell Dec., Exh. 6.)  Some have been made by an act of the state legislature.  (Iredell Dec., Exh. 6.)  And some have been made by an executive order of the Governor.  (Iredell Dec., Exh. 6.)  All of these jurisdictions have concluded that the ballot access laws, which may be reasonable under regular circumstances, place an unconstitutional burden on First Amendment rights during these extraordinary times; that new political parties and candidates will suffer irreparable harm unless the registration or signature requirements are eliminated or significantly reduced; and that the equities weigh in favor of allowing access to the ballot.

The cases relied upon by Defendant are inapposite from the case at hand.  In Ohio, proponents of an initiative sought to enjoin signature requirements for initiative petitions. (Thompson v. Dewine (6th Cir. 2020) 959 F.3d 804.[3])  The Court denied the requested relief because, unlike the state and local shelter-in-place orders in California, Ohio's order had an explicit exception for "all activity protected under the First Amendment" and the state had explicitly confirmed that "its stay-at-home restrictions did not apply to 'initiative or referendum circulators.'"  (Id. at p. 6.)  Furthermore, the Ohio case involved signatures on initiative petitions

---

[3]We note that this Ohio case is currently on appeal to the United States Supreme Court. (Emergency Application to Vacate Stay filed 6/16/20, U.S. Supreme Court Case No. 19A-1054.)

PLAINTIFFS' REPLY

9

1   not voter registrations for new political parties, and the Ohio statute did not require signature

2   drives conducted via mail or email to include a directive to disregard them.

3          The New York case is even less on point.  (<u>Murray v. Cuomo</u> (SDNY 5/18/20) No. 1:20-

4   CV-03571-MKV, 2020 WL 2521449.)  In New York, the Governor had issued an executive

5   order in response to the COVID-19 crisis reducing a signature requirement but also reducing the

6   number of days allowed to gather signatures, and the Court simply rejected a lawsuit filed by a

7   candidate seeking to re-instate the original signature gathering window.  (<u>Id</u>.)  The New York

8   Court therefore implicitly agreed that ballot access laws need to be modified based on the public

9   health crisis.  Similarly, the Arizona Court agreed that "it is undeniable that the COVID-19

10  pandemic is currently wreaking havoc on initiative committees' ability to gather signatures," but

11  nevertheless denied relief (in an initiative, not a political party qualification case) because "some

12  Arizona initiative committees had gathered enough signatures to qualify before the pandemic

13  took hold." (<u>Arizonans for Fair Elections v. Hobbs</u> (D Ariz. 4/17/20) No. CV-20-00658-PHX-

14  DWL, 2020 WL 1905747.)  Not only have no new political parties qualified for the November

15  2020 ballot in California, but CSP was on track to do so when it had to cease its registration

16  drive.

**CONCLUSION**

17

18         The Court should grant Plaintiffs' request for immediate relief from EC section 5151

19  because, despite Defendant's focus on what CSP "could have done" or "should have done," EC

20  section 5151 effectively serves as an <u>absolute barrier</u> to the ballot for new political parties

21  because of the COVID-19 pandemic.  Because Plaintiffs now have no viable means to obtain the

22  requisite number of registrations, and because CSP was on track to meet the July 3 deadline, they

23  will suffer irreparable harm to their speech, voting and associational rights without immediate

24  intervention by the Court.

25

26  Dated: June 19, 2020                         Respectfully Submitted:

27

28

PLAINTIFFS' REPLY

1

By: _(signature)_

2    James R. Sutton
     Bradley W. Hertz
3    The Sutton Law Firm, PC
     Attorneys for Plaintiffs
     THE COMMON SENSE PARTY,
4    TOM CAMPBELL, DEBBIE BENREY,
     and MICHAEL TURNIPSEED
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY

## DECLARATION OF ANGELO PAPARELLA

I, ANGELO PAPARELLA, make this Declaration, pursuant to 28 U.S.C. 1746, in support of Plaintiffs' Reply to Defendant's Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction, filed by THE COMMON SENSE PARTY et. al. ("Plaintiffs"), based on my own personal knowledge, and, if called upon to testify hereto, I could and would competently do so:

1.      My name is Angelo Paparella and I am the owner of a firm which provides signature-gathering services to California state and local initiative campaigns.

2.      I have managed California petition drives since 1988, resulting in more than 44 million signatures, and qualified hundreds of state and local initiatives. I also assist clients with compliance with the California Elections Code, the formatting of ballot initiatives, and the printing of formatted ballot initiatives.  In addition to the petition management services, I act as a political consultant to ballot measure committees on field strategy and operations.

3.      I was a founding member and the Director of Operations for Voter Revolt from 1987 to 1992.  Voter Revolt was a grassroots citizen organization that successfully qualified and won approval of Proposition 103 in California 1988.

4.      Since 1992, I have personally worked on over 260 total ballot measure campaigns in California.  Among numerous other examples, I helped qualify the following statewide ballot measures in California: Proposition 31 pertaining to California's state budget in 2012; Proposition 47 pertaining to criminal sentencing in 2014; and Proposition 61 pertaining to drug pricing in 2016.

5.      Our firm has been working with numerous state and local initiative campaigns in 2020, both before and during the COVID-19 shelter-in-place orders issued by the state and various municipalities.  I therefore have first-hand information about the difficulties facing campaigns which are attempting to gather signatures on petitions at this time.

6.      Based on my experience and expertise, gathering signatures on petitions

DECLARATION OF ANGELO PAPARELLA                    1

1   during the COVID-19 shelter-in-place orders is at best significantly more difficult than

2   gathering signatures before the orders were put in place, and at worst virtually impossible.

3   In my 32 years of experience, I have never witnessed circumstances which make it so

4   difficult to interact with potential signers and believe that the effect of the COVID-19

5   pandemic and shelter-in-place orders on petition circulation is unprecedented.

6          7.      It has been extremely difficult for my firm to recruit and retain circulators

7   during the shelter-in-place orders for several reasons.  Most notably, individuals are

8   concerned about their own personal safety and the risk of exposure if they were to interact

9   with potential signers.  Second, several circulators can not work at this time because they

10   have to care for children whose school or childcare has been suspended, or for elderly

11   parents.  Finally, most of the places where circulators normally would gather signatures,

12   including shopping malls, courthouses, libraries, public parks and other gathering places,

13   have been shut down by the state or local orders, so circulators are reasonably concluding

14   that they can not earn enough money to make the job worth their time.

15          8.      Not only is it difficult to recruit circulators, but potential signers are

16   incredibly reluctant to interact with circulators at this time, even in places where these

17   interactions may be technically allowed.  Most notably, the state and county orders are

18   requiring citizens to cease all face-to-face interactions with individuals outside of their

19   families, which of course means that people believe that they are not allowed to, or at

20   least should not, talk to circulators.  In addition, based on my experience and expertise,

21   people are much less likely to be willing to interact with someone who is wearing a mask

22   and standing at least six feet away.  People also fear touching the clipboard, petition, and

23   pen, and it is not easy to sanitize these items after every use.

24          9.      Although certain public places and retail establishments in certain parts of

25   the state have begun to open up, I have seen very little change in the willingness of

26   circulators to take jobs with initiative campaigns or the willingness of voters to interact

27   with circulators, and I do not anticipate that interactions between circulators and citizens

28   will improve at any time in the foreseeable future.

DECLARATION OF ANGELO PAPARELLA                    2

1        10.    Clients have tried using emails to collect signatures.  In 2020, I know of two

2    campaigns that sent thousands of emails and received a minimal return.  I do not believe

3    that email campaigns can come close to the efficiency of face-to-face voter outreach.

4

5        I declare under penalty of perjury under the laws of the United States of America

6    that the foregoing is true and correct.

7    Executed on June _18_, 2020 at _____Calabasas_____, California.

8

9                                            ANGELO PAPARELLA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ANGELO PAPARELLA         3

# SUPPLEMENTAL DECLARATION OF BOBBY G. GLASER

I, BOBBY G. GLASER, make this Supplemental Declaration, pursuant to 28 U.S.C. 1746, in support of Plaintiffs' Reply to Defendant's Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction, filed by THE COMMON SENSE PARTY et al. ("Plaintiffs"), based on my own personal knowledge, and, if called upon to testify hereto, I could and would competently do so:

1.     This Declaration supplements the Declaration which I submitted in connection with the Memorandum of Points & Authorities filed by the Common Sense Party ("CSP"). That Declaration summarizes my professional experience and expertise.

2.     We started organizing for the CSP in August of last year (2019) by drafting party information, signs, and other collateral materials. The La Jolla Group Consulting, Inc. ("The La Jolla Group" or "TLJG") was to conduct test marketing in San Diego. IVC Media would conduct digital outreach.

3.     In September 2019, we conducted a small local outreach for new CSP members. We had good success. At that time, there were only two local petitions on the street and the voter registration drive was a good companion effort.

4.     In October 2019, the CSP decided to expand the test project more broadly across Southern California and into the Bay Area. We had initial success but, as a number of statewide petitions hit the street, we had dwindling numbers of new registrations.

5.     When we were working with the CSP on developing the plan to gather enough new registrations to qualify the party for the 2020 ballot, we knew that the deadline was July 3, 2020, and planned our activities knowing that we could collect registrations up until that date. We did not expect to gather the same number of registrations every month and expected to be able to gather more registrations closer to the July deadline.

6.     There is stiff competition for the attention of the independent contractors which we can retain as circulators for CSP's voter registration efforts. AB5 aside, they truly are

SUPPLEMENTAL DECLARATION OF BOBBY G. GLASER

1

1 independent contractors. They chase the highest dollar being paid by a campaign and look for

2 the easiest money. In the case of completing a new voter registration, it is very time consuming.

3 The card has many questions and the circulator must let the citizen fill out all of the information.

4 So, there is competition between being hired by an initiative or referendum campaign, which

5 would pay approximately $20 for collecting five signatures, and being hired for a voter

6 registration effort, which would pay between $5 and $7 for completing one new voter

7 registration.

8          7.          We suspended registration collection during late November and December 2019.

9 Between the competition to retain circulators and bad weather, there was little opportunity to

10 attract more CSP members during this time period. We wrote a new plan for the new year 2020.

11         8.          The first part of the plan was to raise the amount paid to circulators and compete

12 directly with initiative petitions for circulator attention. This was started in January and

13 continued. We had some success, but we were really building our crew for the big push later in

14 the season.

15        9.          There are various calendars in politics. Initiative petitions need to be turned into

16 the various Registrar of Voters offices by April, or May at the latest, in order to guarantee the

17 initiative will be on the November ballot (if their signatures qualify). This means that the prices

18 charged by circulators increase in February, March, and April as campaigns are scrambling to

19 meet these deadlines, and then prices charged by circulators decrease significantly starting in

20 about April. This would be a normal cycle.

21       10.         We designed a plan for CSP to capitalize on the time gap between the normal end

22 of cycle for initiative petitions (April or May 2020) and the voter registration deadline for new

23 political parties (the first week of July 2020). As petitions were finishing up in April, we would

24 ramp up for a final push in late April, May and June. This would allow us to hit our goal by early

25 July. We also anticipated having small numbers of new CSP registrations in February and

26 March, but particularly important numbers to build the foundation and the size of our crews. As

27

28 SUPPLEMENTAL DECLARATION OF BOBBY G. GLASER

2

1  initiative petitions came off the street, we would be able to hire circulators to complete more

2  voter registration cards for the CSP in late April, May and June.

3        11.    The plan, which we developed for CSP in January 2020, had late April as the

4  jumping off point for the big push, doubling our numbers from March. We then expected that

5  May would double the numbers from April. We would maintain the highest volume through

6  June as we would not face competition from initiative campaigns by that point in time.

7        12.    I have used this strategy for numerous voter registration and signature gathering

8  plans – focusing efforts on the time period after initiative petitions attempting to qualify for the

9  ballot have been submitted, so that we can retain more circulators at a more reasonable price –

10  and have always had success. We had no reason to believe that CSP would not be able to reach

11  its registration goal by July 3, 2020 based on this tried-and-true strategy.

12        13.    Then we hit the quarantine in the first week of March. The health and safety of

13  the public and our crews came first. By government order, we could not be on the street, speak

14  with citizens to recruit new voter registrations, and approach people at their homes. Our efforts

15  were completely ended by the government orders.

16        14.    Some circulators are just now emerging to try and collect signatures, without

17  much success. The law requires that masks and gloves be worn by circulators for safety.  The

18  masks are off-putting. Gloves are off-putting. Citizens do not want to be approached for any

19  reason. In my experience over the last few weeks, citizens definitely will not stop and talk to a

20  circulator about a voter registration effort or initiative.

21        15.    In the past, I have attempted to generate new voter registrations by mail and by

22  digital advertising. It just will not work. The Registrar of Voters will allow campaigns to mail

23  voter registration cards, but the return rate is extremely low. In my experience, and based on my

24  expertise, if a campaign mails voter registration cards to a million citizens, it might only get back

25  1,000 completed cards. The Registrar offices do not mail out cards themselves for the same

26  reason.

27

28  SUPPLEMENTAL DECLARATION OF BOBBY G. GLASER

3

16.    Digital efforts to register voters are no better.  You cannot put a digital card online, so the campaign must either (1) direct potential registrants to the Secretary of State's website, which means the campaign will have no way of knowing whether they actually complete a registration; or (2) get the voter to send an email back to the campaign so that the campaign in turn can mail them a voter registration card and then attempt to get them to return the card to the campaign or the Registrar's office.  In my experience, and based on my expertise, the results of digital efforts for voter registration are almost zero percent.

17.    Given the plan developed by the CSP in January 2020, and based on my experience and expertise, I am confident that the CSP would have had at least 68,180 new registrants by July 3, 2020 but for the quarantine shut down.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June _18_, 2020 at _____, California.

BOBBY G. GLASER

SUPPLEMENTAL DECLARATION OF BOBBY G. GLASER

4

## SUPPLEMENTAL DECLARATION OF CHAD PEACE

I, CHAD PEACE, make this Supplemental Declaration, pursuant to 28 U.S.C. 1746, in support of Plaintiffs' Reply to Defendant's Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction, filed by THE COMMON SENSE PARTY et al. ("Plaintiffs"), based on my own personal knowledge, and, if called upon to testify hereto, I could and would competently do so:

1.    This Declaration supplements the Declaration which I submitted in connection with the Memorandum of Points & Authorities filed by the Common Sense Party ("CSP"). That Declaration summarizes my professional experience and expertise.

2.    The Common Sense Party maintains a website on which potential registrants can indicate their desire to join the party. The website contains a link to the California Secretary of State's online voter registration page.

3.    Although in-person registration gathering efforts were suspended as of March 8, 2020, the Common Sense Party maintained an online presence, via its website, throughout California's shelter-in-place orders.

4.    The Common Sense Party has made efforts to direct potential registrants to its website amidst the COVID-19 pandemic. During the time since March 8, when the Common Sense Party ceased in-person voter party re-registration efforts, the Common Sense Party contracted with IVC Media LLC to drive traffic to the Common Sense Party website. The primary goal of work the Common Sense Party contracted through IVC Media LLC during this time period was directed at that specific goal – with the intent of getting people to see and utilize the link to the Secretary of State's website.

5.    During the period from March 8 to present, among other efforts, IVC Media LLC maintained an active response to questions sent to the Common Sense Party through its website and issued public statements online commenting on issues of electoral reform. Furthermore, every message sent out during this time prominently included an invitation to visit

SUPPLEMENTAL DECLARATION OF CHAD PEACE

1

1    the Common Sense Party website, because only there could the Common Sense Party hope to

2    direct a potential re-registrant to the Secretary of State website.

3        6.    As a general matter, it is exceptionally difficult to induce internet users to sign a

4    petition that one places on one's own website. It is even more difficult to get them to go to

5    another site to sign a petition. And, it is even harder still to induce internet users to go to another

6    site and complete a voter re-registration form.

7        7.    Signing a petition is much easier than filling out the voter registration form

8    required by the Secretary of State, whereby one registers and indicates one's party preference.

9    The voter registration form requires information not required when simply signing

10   a petition, such as one's place of birth, driver's license number or social security number, and

11   language preference. In addition, a registrant must indicate whether he or she was previously

12   registered and whether one's mailing address is different from one's home address. Further, the

13   registration form requires checking a box designated "Other" in the category of political party

14   and then typing in "Common Sense Party." Officially registered parties are pre-listed in a drop-

15   down menu, providing a party's name that a voter can click. A new party has to ask registrants to

16   take this extra step of typing in the new party's name, with no pre-printed reference to the party

17   anywhere on the form.

18       8.    Given the inherent hardships in obtaining voter registrations through electronic

19   means, in mid-March, IVC Media LLC advised the Common Sense Party that it was wiser to

20   conserve the majority of its resources for the day when in-person solicitation of voter registration

21   would be permitted again, hoping that day would not be long after the day on which California

22   issued its first shelter-in-place order. Nevertheless, as detailed in Paragraph 5, the Common

23   Sense Party continued to make efforts to obtain voter registrations via electronic means

24   throughout the period from March 8 to present.

25

26

27       I declare under penalty of perjury under the laws of the United States of America that the

28   SUPPLEMENTAL DECLARATION OF CHAD PEACE

2

1    foregoing is true and correct.

2

3          Executed on June  19  , 2020 at  San Diego                          , California.

4

5                                          CHAD PEACE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    SUPPLEMENTAL DECLARATION OF CHAD PEACE
                                    3

# PROOF OF SERVICE

1.      I am over the age of eighteen years and not a party to the within action. My business address is 150 Post Street, Suite 405, San Francisco, CA 94108.  I make this declaration based on my personal knowledge, and if called upon to testify hereto, could and would competently do so.

2.      On June 19, 2020, I served the foregoing document described as **"PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION; DECLARATION OF ANGELO PAPARELLA; SUPPLEMENTAL DECLARATION OF BOBBY G. GLASER; SUPPLEMENTAL DECLARATION OF CHAD PEACE"** on the following parties to this action, as follows:

| | |
|---|---|
| Peter H. Chang, Esq.<br>Milad Dalju, Esq.<br>Deputy Attorney Generals<br>Department of Justice<br>Office of the Attorney General<br>455 Golden Gate Ave., Suite 11000<br>San Francisco, CA 94102-7004<br>Direct: 415-510-3776<br>Peter.Chang@doj.ca.gov<br>Milad.Dalju@doj.ca.gov | Counsel for Defendant ALEX PADILLA |

__XX__ (VIA ELECTRONIC MAIL) I transmitted the document(s) via electronic mail to the addressees listed above at their electronic mail addresses as listed above.

_____ (VIA PERSONAL DELIVERY) I personally delivered copies of the document(s) to the addressees listed above.

Executed on June 19, 2020, at San Francisco, California.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Bradley W. Hertz

1