UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE COMMON SENSE PARTY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ALEX PADILLA, in his official capacity as Secretary of State of California,<br><br>Defendant. | No. 2:20-cv-01091-MCE-EFB<br><br>**MEMORANDUM AND ORDER** |

Through the present lawsuit, filed on May 29, 2020, Plaintiffs the Common Sense Party, a political "party-in-formation" ("CSP"), Tom Campbell, in his capacity as official representative of and registered voter in the CSP, and Debbie Benrey and Michael Turnipseed, as registered voters in the CSP (collectively "Plaintiffs"), challenge the constitutionality of California Elections Code § 5151(c) ("§ 5151(c)") as it applies to them. According to Plaintiffs, circumstances caused by California's response to the COVID-19 pandemic render it impossible for them to comply with the statutory voter registration requirements included in § 5151(c) and absent injunctive relief, the CSP will not be able to participate as a recognized political party in the upcoming election. To that end, Plaintiffs now move for either a Temporary Restraining Order ("TRO") or Preliminary Injunction ("PI") (ECF No. 5) enjoining Defendant Secretary of State Alex Padilla

("Defendant" or "Secretary of State") from enforcing § 5151(c) against them and "requiring the Secretary of State to register the [CSP] as an official political party in California without the need for the [CSP] to obtain more voter registrations than those already submitted to County Registrars of Voters and the Secretary of State pursuant to EC section 5151(c)." Pls.' Mot. at 2. For the following reasons, that Motion is DENIED.[1]

## BACKGROUND[2]

As is relevant here, California's Election Code provides:

> A party is qualified to participate in a presidential general election under any of the following conditions:
>
> . . . .
>
> If on or before the 102nd day before a presidential general election, it appears to the Secretary of State, as a result of examining and totaling the statement of voters and their declared political preference transmitted to him or her by the county elections officials, that voters equal in number to at least 0.33 percent of the total number of voters registered on the 123rd day before the presidential general election have declared their preference for that party.

Cal. Elections Code § 5151(c)(1). Based on the current number of registered voters in California, § 5151(c) requires new political parties to secure 68,180 voter registrations in order to qualify for the November 2020 election ballot. The deadline to submit those registrations is July 3, 2020. Once officially recognized, a new political party has the right to designate candidates for the offices of President and Vice President, may raise campaign funds in larger increments, and may spend unlimited funds to support candidates for state offices.

As indicated, the CSP is a "party-in-formation" seeking to qualify as a political party for the November 2020 California election. Political bodies seeking to qualify as a

---

[1] Having determined that oral argument would not be of material assistance, the Court ordered this matter submitted on the briefs in accordance with E.D. Local Rule 230(g).

[2] The following recitation of facts is taken, almost entirely verbatim, from the parties' briefs.

2

political party by the voter-registration method have a variety of means to do so. They may use paper voter-registration cards or the California Online Voter Registration Application. Using paper voter-registration cards, political bodies may engage in in-person registration efforts by utilizing volunteers or paid professional gatherers to distribute in-person voter-registration cards to eligible voters, having the eligible voters fill out and sign the voter-registration cards preferring the political body, and then forwarding the registration cards (or affidavits of registration) to the county elections officials. Additionally, political bodies may mail voter-registration cards to potentially eligible voters either in targeted mailings to persons who request them or in blanket, unsolicited, mass mailings. If political bodies send voter-registration cards by the latter method, they must "enclose a cover letter or other notice with each card instructing the recipients to disregard the cards if they are currently registered voters." Cal. Elections Code § 2158(b)(4).

Political bodies also may solicit voter registration through the internet in various ways. Through efforts similar to sending voter-registration cards through the mail, political bodies may send links to the Secretary of State's voter-registration page in targeted emails to persons who request them, or in unsolicited mass emails. As with physical-mail campaigns, if political bodies send the link to the voter-registration page through unsolicited emails, the emails must instruct the recipients to disregard the link if they are currently registered voters. Political bodies need not provide such notice if the emails do not include a link to the Secretary of State's voter-registration page, but instead includes a link to another website that then links to Defendant's registration page. For example, a political body may send unsolicited mass emails that ask people to register to vote, or to re-register to indicate a preference for that political body with a link to the political body's own website, which may then have a link to the Secretary of State's voter-registration page. See Decl. of Carly Fields in Supp. of Opp'n to Pls.' Mot. ("Fields Decl."), Exs. 1 & 2.

///

Finally, in addition to targeted and mass mailings and emails, political bodies may also use traditional and social media to communicate with voters or potential voters and to solicit those voters to register or re-register a preference for the political bodies.

Against that backdrop, on July 17, 2019, the CSP formally notified the Secretary of State's Office that it intended to qualify for the March 3, 2020 primary election. The CSP then reportedly began gathering voter registrations as early as September 2019. In fact, according to Plaintiffs, they implemented a plan in September 2019 to collect the required number of registrations and had been gathering registrations primarily by using in-person solicitors. There were many aspects of the registration-gathering plan, including running a pilot program to test various means of registering voters, soliciting bids from social media companies to drive traffic to the CSP's website, and engaging a professional petition circulation firm to assist in obtaining registrations. Through these efforts, the CSP claims it had every reason to believe that it would reach its goal within this period.

By the October 1, 2019, deadline to qualify for the March 2020 primary election, however, only 5,519 voters had registered as preferring the CSP, far short of the required approximately 68,000 registrations. Chang Decl., Ex. 11. Thereafter, on December 9, 2019, the CSP informed the Secretary of State's Office that it intended to instead qualify for the November 3, 2020, general election and requested all previous affidavits of registration that identified a preference for the CSP to be counted toward that goal. Chang Decl., Ex. 12. According to Defendant, as of January 3, 2020, 9,819 voters registered as preferring the CSP. Chang Decl., Ex. 13. As of February 18, 2020, 10,859 voters registered as preferring the CSP. Chang Decl., Ex. 14. Finally, as of June 9, 2020, 15,010 voters had purportedly registered as preferring the CSP. Decl. of Jason Rosales in Supp. of Opp'n to Pls.' Mot. (Rosales Decl.) at ¶ 6.

///
///
///

| Number of Registered Voters Preferring the CSP | As of |
|---|---|
| 5,519 | 10/1/2019 |
| 9,819 | 1/3/2020 |
| 10,859 | 2/18/2020 |
| 15,010 | 6/9/2020 |

Plaintiffs nonetheless contend they had been diligently adhering to their registration-gathering plan up until early March when the COVID-19 crisis hit. In response to the crisis, on March 4, 2020, California's Governor, Gavin Newsom, declared a State of Emergency for California. Out of a growing concern for public safety due to COVID-19, Plaintiffs thereafter suspended their in-person registration-gathering campaign on approximately March 8, 2020. As of that date, the CSP claims it had obtained a total of 19,038 registrants, or approximately 30 percent of the required number.[3] Subsequently, on March 19, 2020, Governor Newsom issued Executive Order N-33-20, directing all California residents to heed the directives of the State's Public Health Officer relating to COVID-19.

When Executive Order N-33-20 was issued, state public health directives required "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of [16 specified] federal critical infrastructure sectors, as outlined at https://www.cisa.gov/identifying-critical-infrastructureduring-covid-19." Chang Decl., Ex. 2.; see Chang Decl., Ex. 3 at 1 (State Public Health Order) (collectively with Executive Order N-33-20, the "State Orders"). The State Orders provided that "Californians working in these 16 critical infrastructure

---

[3] Exactly how many registrations Plaintiffs were able to procure is unclear. According to Defendant, "[i]t is questionable whether the CSP obtained 19,038 registrations by March 8, 2020, as Plaintiffs allege." Def.'s Opp'n at 19 n.11. "Based on information in the Secretary of State's voter-registration database (VoteCal), 15,010 active voters are registered with the CSP as of June 9, 2020." Id. "The current data in VoteCal, however, would not account for any voters who might have been registered with the CSP at an earlier date but who has since re-registered with another party." Id. Regardless, it appears that the total number of registered CSP voters as of June 9 was between approximately 15,000 and 19,000, well below the requisite 68,180.

5

sectors may continue their work because of the importance of these sectors to Californian's health and well-being." Id., Ex. 2. at 2.  The 16 critical infrastructure sectors referenced in the State Order are identified by the U.S. Department of Homeland Security, Cybersecurity & Infrastructure Security Agency ("CISA").  One of the critical infrastructure sectors identified by CISA is "Other Community- or Government-Based Operations and Essential Functions." Id., Ex. 4 at 12.  At least as of March 28, 2020, that section included "[e]lections personnel" which "include both public and private sector elections support." Id.  The State Orders also addressed other circumstances in which individuals who are not designated "Essential Critical Infrastructure Workers" may leave their houses, such as "access[ing] such necessities as food, prescriptions, and health care." Id., Ex. 2 at 2.

In addition, the State Public Health Officer designated a list of "Essential Critical Infrastructure Workers" to "help state, local, tribal, and industry partners as they work to protect communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security." Id., Ex. 5 at 1.  Included under the heading of "Government Operations and other community-based essential functions," the State Public Health Officer identified "Elections personnel" as "Essential Workforce." Id. at 10.

On May 1, 2020, the "Stay home Q&A" page of California's COVID information website was updated.  Under the section titled "Protected activities," and in response to the question "What about Voting?", the website provided that "Elections are an essential activity" and advised that whenever persons "engage in any permissible activity—including the collection and dropoff of ballots, or other election-related activities—be mindful of physical distancing and other measures to protect yourself and those around you."  Decl. of Angelica Quirarte in Supp. of Opp'n to Pls.' Mot. ("Quirarte Decl.") at ¶ 5.  That answer was later updated on June 5, 2020, to specifically identify as examples of permissible election-related activities "the collection of signatures to qualify candidates or measures for the ballot." Id. at ¶ 9.

On April 28, 2020, the Governor announced the State's four-stage "Resilience Roadmap" to guide the gradual and safe reopening of the State. See Chang Decl., Ex. 6 at 1. The Roadmap involves the following four stages: safety and preparation (Stage 1); reopening of lower-risk workplaces and other spaces (Stage 2); reopening of higher-risk workplaces and other spaces (Stage 3); and, finally, an end to the Stay-at-Home Order (Stage 4). Id.

On May 7, 2020, the State Public Health Officer issued an order moving the State into Stage Two based on her review of the data and signaling an intent to "progressively designate sectors, businesses, establishments, or activities that may reopen with certain modifications, based on public health and safety needs" and "a pace designed to protect public health and safety." See Chang Decl., Ex. 7 at 2. In Stage 2, Californians are permitted to "leave their homes to work at, patronize, or otherwise engage with those businesses, establishments, or activities" that have reopened "and must, when they do so, continue at all times to practice physical distancing, minimize their time outside of the home, and wash their hands frequently." Id. According to the Resilience Roadmap, "[w]e are now in early Stage 2, where retail, related logistics and manufacturing, office workplaces, limited personal services, outdoor museums, child care, and essential businesses can open with modifications." Chang Decl., Ex. 8.

## STANDARD

The purpose of a temporary restraining order is to preserve the status quo pending the complete briefing and thorough consideration contemplated by full proceedings pursuant to a preliminary injunction. See Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 438-39 (1974) (temporary restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer"); see also Reno Air Racing Ass'n., Inc. v. McCord, 452 F.3d 1126, 1131 (9th Cir. 2006).

Issuance of a temporary restraining order, as a form of preliminary injunctive relief, is an extraordinary remedy, and Plaintiffs have the burden of proving the propriety of such a remedy. See Mazurek v. Armstrong, 520 U.S. 968, 972 (1997). In general, the showing required for a temporary restraining order and a preliminary injunction are the same. Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001).

The party requesting preliminary injunctive relief must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Resources Defense Council, 555 U.S. 7, 20 (2008); Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting same). The propriety of an injunction hinges on a significant threat of irreparable injury that must be imminent in nature. Caribbean Marine Serv. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988).

Alternatively, under the so-called sliding scale approach, as long as the Plaintiffs demonstrate the requisite likelihood of irreparable harm and show that an injunction is in the public interest, a preliminary injunction can still issue so long as serious questions going to the merits are raised and the balance of hardships tips sharply in Plaintiffs' favor. Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-36 (9th Cir. 2011) (concluding that the "serious questions" version of the sliding scale test for preliminary injunctions remains viable after Winter).

There are two types of injunctions. "A mandatory injunction orders a responsible party to take action, while a prohibitory injunction prohibits a party from taking action and preserves the status quo pending a final resolution on the merits." Arizona Dream Act Coal. v. Brewer, 757 F.3d 1053, 1060 (9th Cir. 2014) (internal citations and quotations omitted). A mandatory injunction goes well beyond simply maintaining the status quo and is particularly disfavored. Anderson v. United States, 612 F.2d 1112, 1114 (9th Cir. 1979). Mandatory preliminary relief should not be issued unless the facts and law clearly

favor the moving party. Id. "The court's finding of a strong likelihood that plaintiffs would succeed on the merits of their claims also evidences a conclusion that the law and facts clearly favor plaintiffs" and meets the heightened burden required for issuance of a mandatory preliminary injunction. Katie A., ex rel. Ludin v. Los Angeles Cnty., 481 F.3d 1150, 1157 (9th Cir. 2007).

## ANALYSIS

In this case, Plaintiffs ask the Court to issue a mandatory injunction requiring the State of California to recognize the CSP as an official political party despite the fact that Plaintiffs have not secured the requisite number of voter registrations under § 5151(c). Because the Court concludes Plaintiffs have failed to show they are likely to succeed on the merits of their claims, especially to the level necessary to justify granting mandatory injunctive relief, the Court need not address Plaintiffs' arguments going to irreparable harm, the balance of equities, or the public interest.

Plaintiffs do not dispute that absent the circumstances arising from the State's response to the COVID-19 pandemic, § 5151(c) is constitutional. According to Plaintiffs, however, they are nonetheless "entitled to relief because the State of California has failed to provide any meaningful alternative procedures for them to participate as an officially-recognized political party in the upcoming election." Pls.' Mot. at 6. Plaintiffs therefore contend that "California's statutory scheme regarding new party ballot qualification, including voter registration requirements and corresponding deadlines, cannot withstand constitutional scrutiny given COVID-19 and present circumstances." Id. at 7.

More specifically, Plaintiffs take the position that "COVID-19, and the statewide shelter-in-place orders issued in response, have made all in-person voter registration

///
///

collection efforts futile and unlawful." Pls.' Mot. at 5.[4]  "Therefore, the [CSP] has no effective way by which to gather the required number of voter registrations by the July 3, 2020 statutory deadline." Id. (emphasis omitted).  Accordingly, Plaintiffs reason, "[t]his absolute barrier to new political party qualification and ballot access entitles [them] to the relief requested." Id. at 6.  This is because, "in light of the current public health crisis, California's voter registration requirements for new parties seeking to qualify for the ballot cannot withstand the applicable level of constitutional scrutiny – strict scrutiny – which is the highest and most stringent standard of judicial review." Id.  The Court is not convinced.

### A.  Constitutional Framework

"Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections." Burdick v. Takushi, 504 U.S. 428, 433 (1992).  "Burdick recognized that governments necessarily 'must play an active role in structuring elections,' and '[e]lection laws will invariably impose some burden upon individual voters.'" Public Integrity Alliance, Inc. v. City of Tucson, 836 F.3d 1019, 1024 (9th Cir. 2016) (en banc) (quoting Burdick, 504 U.S. at 433).  "Consequently, not every voting regulation is subject to strict scrutiny." Id.  "Instead, . . . a more flexible standard applies." Burdick, 504 U.S. at 434.

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

Id. (quoting Anderson v. Celebrezze, 460 U.S. 780, 789 (1983)).

///

---

[4] The Court is cognizant that in their Reply, Plaintiffs argue that City and County orders responding to COVID-19 are even more strict than the State Orders.  Plaintiffs also point out, by way of Reply, that other jurisdictions have voluntarily modified their ballot access requirements.  The problem with these arguments is that they were not raised in Plaintiffs' moving papers or their complaint and thus are not properly before the Court.  Those arguments are thus DISREGARDED.

"Under Burdick's balancing and means-end fit framework, strict scrutiny is appropriate when First or Fourteenth Amendment rights are subjected to 'severe' restrictions." Public Integrity Alliance, 836 F.3d at 1024 (internal quotation marks and citations omitted). "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." Burdick, 504 U.S. at 434 (quoting Anderson, 460 U.S. at 788). The Ninth Circuit has "repeatedly upheld as 'not severe' restrictions that are generally applicable, evenhanded, politically neutral, and protect the reliability and integrity of the election process." Public Integrity Alliance, 836 F.3d at 1024 (quoting Dudum v. Arntz, 640 F.3d 1098, 1066 (9th Cir. 2011)).

    **B.**    **Even In Light Of The State's Response To The COVID-19 Pandemic, § 5151(C) Does Not Impose A Severe Burden On Plaintiffs, And Strict Scrutiny Thus Does Not Apply.**

As indicated, Plaintiffs take the position that strict scrutiny is warranted here because given the statewide COVID-19 related orders, § 5151(c) provides a complete barrier to ballot access. Indeed, they contend that "[c]urrently, there is no meaningful way by which the [CSP] can participate as an officially-recognized party in the November 2020 election." Pls.' Mot. at 6. Accordingly, Plaintiffs argue, "[g]iven current circumstances, [§] 5151(c) is unconstitutional because it imposes a severe burden on Plaintiffs' First Amendment rights of political speech and association and is not narrowly drawn to advance a state interest of compelling importance." Id. at 7.

The crux of Plaintiffs' argument is thus that § 5151(c) imposes a "severe" restriction triggering strict scrutiny because it "eliminates any and all opportunity for the [CSP] to be recognized as a political party in time to participate in the November 2020 California election." Id. at 8. This argument is belied by the record.

As Defendant points out and as is outlined in the Factual Background above, "[w]hile the pandemic and the State Orders might have limited Plaintiffs' ability to solicit voter registration for the CSP in person for a period of time, Plaintiffs have, and have

had, numerous ways to gather voter registration that do not require in-person solicitation." Def.s' Opp'n at 12. Indeed, even if in-person solicitations were curtailed, Plaintiffs could: (1) "mail voter registration cards to potentially eligible voters either in targeted mailing to persons who request them or in blanket, unsolicited, mass mailings"; (2) "send links to the Secretary of State's voter-registration page in targeted emails to persons who request them, or in unsolicited mass emails"; or (3) "continue to use traditional and social media to communicate with voters or potential voters and to encourage those voters to register or re-register to indicate a preference for the CSP." Id. at 12-13. None of these options were impacted by the State's response to the COVID-19 pandemic. Given these additional options, the burden imposed by § 5151(c) falls far short of severe.

Moreover, contrary to Plaintiffs' arguments, Defendant points to various clarifications of the stay-at-home orders intended to advise that election-related activities remained essential even during the shutdown. See Quirarte Decl., ECF No. XX, ¶¶ 5, 9.[5] Accordingly, it appears to the Court that Plaintiffs remained free to solicit new voter registrations through all available means for much more time than they contend. Indeed, they have had almost one year from the time they indicated their intent to qualify for the March 2020 ballot to secure the necessary registrations. In context, a short window where in-person solicitation may not have been permitted does not qualify as a "severe" burden.

That said, it also appears to the Court that Plaintiffs essentially abandoned most of their efforts once they ceased utilizing in-person solicitations at the beginning of March. Since then it appears Plaintiffs' primary goal was to drive traffic to their website. Peace Decl., ECF No. 15, ¶¶ 4, 5, 8. After that, and even now when much of California

---

[5] Plaintiffs nit-pick whether these rules clearly and actually allowed for in-person voter registration to continue. What is missing from their arguments, however, is any discussion of how they attempted to obtain clarification so they could continue with their purportedly mission critical efforts. Given how important Plaintiffs claim in-person solicitations are, it would seem they would have been incentivized to seek clarification from the Governor's office directly rather than assuming their activities were non-essential and forgoing them completely.

is re-opened, it is unclear what efforts Plaintiffs have undertaken to try to continue to collect registrations.  Indeed, they waited some two months to even initiate this action to challenge § 5151(c) itself.  If in-person solicitation was so instrumental to Plaintiffs' success, it seems they would have filed their challenge immediately rather than waiting so long during such a critical time in their campaign.[6]  Regardless, given all of the foregoing, Plaintiffs have failed to show they are likely to succeed in proving that the burden imposed by § 5151(c) under these pandemic-related circumstances is close to severe.  As such, a more flexible balancing approach is appropriate to evaluating the constitutionality of California's law.

### C. Plaintiffs Have Failed To Meet Their Heavy Burden To Show They Are Likely To Succeed On The Merits Under The <u>Burdick</u> Balancing Test.

The Court concludes that the State has compelling interests which outweigh the burden imposed on Plaintiffs by § 5151(c).  As Defendant argues, "[i]t is unquestionable that the State has compelling interests in ensuring that parties that participate in the presidential general election—who may place candidates on the ballot for the offices of the United States President and Vice-President—have a modicum of voter support— determined by the Legislature to be 0.33 percent of registered voters."  Def.'s Opp. at 18. In addition, "States have an undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot."  Munro v. Socialist Workers Party, 479 U.S. 189, 194 (1986) (citation and internal quotation marks omitted).  Other interests include "preservation of the integrity of the electoral process and regulating the number of candidates on the ballot to avoid undue voter confusion." Am. Party of Texas v. White, 415 U.S. 767, 782, n.14 (1974); Jenness v. Fortson, 403 U.S. 431, 442 (1971).  The Court also agrees with Defendant that "[g]ranting the

///

---

[6] The Court is also skeptical of Plaintiffs' conclusory argument that, absent COVID-19, they would have collected enough signatures to gain access to the November 2020 ballot.  They made minimal progress over the many months leading up to March and it is less than clear to the Court that they would have been any more successful in the last few months leading up to the July 3 deadline.  At any rate, the Court finds Plaintiffs have not met their heavy burden on this point either.

13

relief Plaintiffs seek would wholly subvert these compelling state interests." Def.'s Opp. at 18.

To this end, the recent Sixth Circuit decision in Thompson v. Dewine, 959 F.3d 804 (2020), is instructive. In that case, "[t]he Ohio Constitution and the Ohio Code establish[ed] the process for proposing an initiative to the State's electors and impose[d] many requirements for ballot access." Id. at 806. The appellate court observed that "a petition to put an initiative before Ohio's electors for referendum must include signatures from ten percent of the applicable jurisdiction's electors that voted in the last gubernatorial election, each signature must 'be written in ink,' and the initiative's circulator must witness each signature." Id. Finally, "the initiative's proponents must submit these signatures to the Secretary of State 125 days before the election for a constitutional amendment and 110 days before the election for a municipal ordinance." Id. at 806-07.

The plaintiffs in Thompson had sought an injunction in the district court, arguing that in light of the COVID-19 pandemic the foregoing requirements violated their First and Fourteenth Amendment rights. Id. at 807. That district court "granted their motion in part, enjoining enforcement of the ink signature requirement, the witness requirement, and the submission deadlines, and denied their motion in part, upholding the number of signatures requirement." Id. Defendants moved for an administrative stay and stay pending appeal. Id.

The Sixth Circuit thereafter granted Defendants' requested stay pending appeal finding that they were likely to prevail on the merits and emphasizing both that the Ohio stay-at-home orders exempted conduct protected by the First Amendment and Ohio had already begun to lift those stay-at-home restrictions in any event. Id. at 809-10. That court went on to note:

///

///

///

> Plaintiffs' claim effectively boils down to frustration over failing to procure as many signatures for their petitions (because of social distancing and reduced public crowds) as they would without the pandemic. But that's not necessarily true. There's no reason that Plaintiffs can't advertise their initiatives within the bounds of our current situation, such as through social or traditional media inviting interested electors to contact them and bring the petitions to the electors' homes to sign. Or Plaintiffs could bring their petitions to the public by speaking with electors and witnessing the signatures from a safe distance, and sterilizing writing instruments between signatures.
>
> Moreover, just because procuring signatures is now harder (largely because of a disease beyond the control of the State) doesn't mean that Plaintiffs are <u>excluded</u> from the ballot. And we must remember, First Amendment violations require state action. U.S. Const. amend. I ("<u>Congress</u> shall make no law...." (emphasis added)); 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, <u>of any State</u> . . . . " (emphasis added)). So we cannot hold private citizens' decisions to stay home for their own safety against the State. Because the State has not excluded Plaintiffs from the ballot, the burden imposed on them by the State's initiative requirements cannot be severe. <u>See</u> <u>Schmitt</u>, 933 F.3d at 639.

<u>Id.</u> at 810; <u>see also</u> <u>Arizonans for Fair Elections v. Hobbs</u>, ___ F. Supp. 3d ___, 2020 WL 1905747 (D. Ariz. April 17, 2020) (finding plaintiffs unlikely to succeed on the merits when it was unclear how diligent they were in attempting to collect signatures and noting that "although it is impossible to predict how the pandemic will play out in the coming weeks and months, it is possible that conditions will abate to the point that in-person signature gathering again becomes viable before the July 2020 submission deadline for signatures").

The foregoing arguments are equally persuasive here. The stay-at-home orders only prohibited Plaintiffs from conducting in-person solicitation, if at all, for a very short period of time. Moreover, Plaintiffs have had many months and many options available to attempt to collect the requisite new voter registrations but have nonetheless still failed to do so or to expend any commendable effort toward that end. On balance then, the Court concludes that the burden on Plaintiffs was far outweighed by the State's

///

compelling interests and Plaintiffs have thus failed to show they are likely to succeed on the merits of their instant claims.

Nor does the Court find Plaintiffs' cited authorities persuasive. See, e.g., Libertarian Party of Illinois v. Pritzker, No. 20-cv-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020); Esshaki v. Whitmer, No. 2:20-cv-10831-TGB, 2020 WL 1910154 (E.D. Mich. Apr. 20, 2020). In Libertarian Party of Illinois, the challenged statutory regime required "wet" signatures, as opposed to electronic, signed by a voter in person and notarized. 2020 WL 1951687, at *1. Moreover, the short window for gathering signatures in that case only first opened at approximately the same time state COVID-19 restrictions were imposed. Id. at *4. Given that, the defendants there unsurprisingly agreed that the ballot access restrictions should be relaxed. Id. No such circumstances are present here.

The court in Esshaki also addressed a signature requirement that left no room for electronic submissions during a time when candidates were subject to a stay-at-home order making no exceptions for conduct protected by the First Amendment. Moreover, that order remained in place through the deadline of petition submission. 2020 WL 1910154. Essentially, the state "abruptly prohibited the plaintiffs from procuring signatures during the last month before the deadline, leaving them with only the signatures that they had gathered to that point." Thompson, 959 F.3d at 809. Again, the facts of the instant matter are fundamentally dissimilar.

Plaintiffs' authorities are thus inapposite. Given the foregoing, the Court concludes that Plaintiffs have failed to meet their heavy burden of showing they are likely to succeed on the merits, and it follows that granting any kind of mandatory relief would be inappropriate.

///

///

///

///

**CONCLUSION**

For the reasons just stated, Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction (ECF No. 5) is DENIED.

IT IS SO ORDERED.

Dated: June 26, 2020

MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE